**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHARLES MORROW and MICHAEL OVERTON, Individually and on behalf of similarly situated employees,** | ) ) ) | |
| | ) | **CIVIL ACTION NO: 3:07-CV-617-MHT** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **FLOWERS FOODS, INC., FLOWERS BAKING CO., OF OPELIKA, LLC,** | ) ) ) | |
| **Defendants.** | ) | |

**DEFENDANT FLOWERS FOODS, INC.'S AND DEFENDANT FLOWERS BAKING
CO. OF OPELIKA, LLC'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION
TO CONDITIONALLY CERTIFY AND FACILITATE CLASS NOTICE**

COME NOW Defendant Flowers Foods, Inc. ("Flowers Foods") and Defendant Flowers

Baking Co. of Opelika, LLC ("Flowers/Opelika"), by and through their undersigned counsel, and

submit the following Response in Opposition to Plaintiffs' Motion to Conditionally Certify and

Facilitate Class Notice ("Plaintiffs' Motion" or "Plaintiffs' Motion for Conditional

Certification").

Plaintiffs are four former and two current independent contractor distributors of

Flowers/Opelika only, who work or worked at a total of three warehouses utilized by

Flowers/Opelika, one in Montgomery, Alabama, one in Roanoke, Alabama, and one in

LaGrange, Georgia.[1] Today, the date this Response was due with this Court, contrary to

representations by Plaintiffs' counsel yesterday that there were no additional Flowers/Opelika

---

[1] Plaintiffs Charles Morrow, Michael Overton, James Marty Smith, and Michael Smith are former distributors of
Flowers/Opelika. Plaintiffs Dwyane Cleveland and Mark Murphy are current distributors of Flowers/Opelika. While
Defendants maintain, as outlined in their Response in Opposition to Plaintiffs' Motion for Leave to Amend
Complaint, that Plaintiffs James Marty Smith, Michael Smith, Dwayne Cleveland, and Mark Murphy have not
followed the proper statutory procedure to become plaintiffs, Defendants agree that these four individuals should be
considered Plaintiffs for purposes of Plaintiffs' Motion to Conditionally Certify and Facilitate Class Notice.

opt-ins, Plaintiffs filed five opt-in consent forms from two current and three former independent contractor distributors of Flowers/Opelika, who also work or worked in Montgomery, Alabama, and LaGrange, Georgia, and in Greenville, Alabama.[2] Despite their limited number and limited locations from which they and the opt-ins work or worked, Plaintiffs ask the Court to conditionally certify and facilitate class notice for a "nationwide" collective action under Section 216(b) of the Fair Labor Standards Act ("FLSA"), encompassing all current and former independent distributors and employee route salespersons, located in 20 different states and the District of Columbia, at 25 different subsidiaries of Flowers Foods, 24 of which are not even parties to this lawsuit, for the past three years. Based on the facts and law submitted, Plaintiffs' Motion should be denied.[3]

## I.    STATEMENT OF FACTS

### A.    Flowers Foods and Its Subsidiaries

Flowers Foods, headquartered in Thomasville, Georgia, is the parent holding company of 39 operating subsidiaries. These subsidiaries produce and/or distribute fresh breads, buns, rolls, snack cakes, pastries, and frozen buns and rolls. (Aff. of Karyl H. Lauder ("Lauder"), ¶¶ 3, 6,

---

[2] Two of the opt-ins, namely Doug Branch and Lew Baxter, are current independent distributors of Flowers/Opelika at the Montgomery warehouse. Opt-in Greg Patisaul is a former independent distributor of Flowers/Opelika in LaGrange, Georgia. Opt-ins Ricky Small and Melvin Snow are former independent distributors of Flowers/Opelika at the Greenville, Alabama, warehouse. (Aff. of Michael Lord ("Lord"), ¶ 3, attached hereto as Exhibit 3). Opt-ins Patisaul, Small, and Snow all ceased being independent distributors with Flowers/Opelika more than two years prior to the filing their consents. (Aff. of Don Adkins, ¶¶ 10-12, attached hereto as Exhibit 5). Accordingly, their claims should be time barred under the applicable statute of limitations.

In addition to the aforementioned Opelika opt-ins, Plaintiffs have represented that they now have a consent form from a distributor of Flowers Baking Co. of Thomasville, LLC. This consent form has not been filed with the Court, nor was it referenced in Plaintiffs' Motion. Assuming Plaintiffs have such a consent form, it would have no relevance to Plaintiffs' pending Motion, as **no determination has been made that any independent distributors are similarly situated, and because Flowers Baking Co. of Thomasville, LLC is not a party to this action**. As the purported Thomasville plaintiff only had a Distributor Agreement with Flowers/Thomasville, Flowers/Thomasville is a necessary party. Regardless, Plaintiffs have proffered no admissible affidavit evidence whatsoever concerning this purported plaintiff.

[3] 29 U.S.C. § 201-219, as amended by the Portal-to-Portal Act, *id.* §§ 215-62. While Defendants deny that Plaintiffs were or are "employees," Section 216(b) nonetheless is the vehicle for Plaintiffs to bring their claims given their contention that they are or were "employees" under the FLSA.

attached hereto as Exhibit 1).  Twenty-five of these operating subsidiaries utilize independent contractor distributors ("independent distributors") or employee route salespersons to deliver the products.  (Aff. of Chuck Rich ("Rich"), ¶ 13, attached hereto as Exhibit 2). The independent distributors or employee route salespersons are located in 20 different states and the District of Columbia. (Aff. of Rich, ¶¶ 13-14). They contract with, or are employed by, a particular subsidiary of Flowers Foods, not Flowers Foods or multiple subsidiaries. (Aff. of Rich, ¶¶ 13 - 14, 17).  They currently operate out of about 500 different warehouses. (Aff. of Rich, ¶ 15).

Each Flowers Foods' subsidiary, including Flowers/Opelika, is organized as a distinct legal entity and separate profit and loss center. (Aff. of Lauder, ¶ 3). Each subsidiary independently manages its own operations and makes its own decisions regarding individual independent distributors and employees.  The management of Flowers Foods has no day-to-day operational control over any of its subsidiaries and does not make any daily decisions regarding the operations of these subsidiaries. (Aff. of Lauder, ¶ 7; Aff. of Steve Bordeaux ("Bordeaux"), ¶¶ 1, 6-7, attached hereto as Exhibit 4).  Neither does subsidiary management contact other subsidiaries before or when addressing independent distributor or employee issues. Such decisions are made solely by the respective subsidiary management. (Aff. of Bordeaux, ¶ 7).

**B.     Distributorship Program and Conversion to Distributorships from Exempt Route Sales Employee Positions**

In the mid-1980s, senior executives of Flowers Industries began to consider the possibility of having certain of its baking subsidiaries distribute bakery products through independent distributors.   Under this business model, independent distributors are sold distribution rights to certain branded products, such as, Nature's Own, Cobblestone Mill, and Blue Bird. (Aff. of Rich, ¶ 2).  Prior to executives at Flowers Industries considering the independent distributor business model, it was being used by other bakers, including, among

3

others, Pepperidge Farm, Tasty Baking Company, and Holsum Baking Company. This business model is premised on the belief that independent distributors who own their own distribution rights will have more entrepreneurial incentive to develop business and to generate additional sales. (Aff. of Rich, ¶ 3). Other major bakers that currently use this business model include George Weston, Ltd., Sara Lee Corp., and Bimbo Bakeries USA. (Aff. of Rich, ¶ 10).

Under the distributor model, independent distributors order and purchase bakery products from the respective subsidiary with which they have a Distributor Agreement. The respective subsidiary sells products to its independent distributors at a specified discount percentage off of the suggested wholesale price. The independent distributors, in turn, sell the bakery products to retail accounts. An independent distributor's income is the difference between the price he/she purchases products from the respective subsidiary for and the price he/she sells the products to retail accounts for, less the independent distributor's business expenses. (Aff. of Rich, ¶ 20).

Before utilizing the independent distributorship model, Flowers' subsidiaries, including Flowers/Opelika, used employee route salespersons, who were paid on a base plus commission formula, to deliver products to customers. This position was treated as exempt from the overtime and minimum wage provisions of the FLSA under the Outside Sales Exemption, and, for employees who delivered product manufactured out of state, the Motor Carrier Exemption. [4] (Aff. of Rich, ¶ 5; Aff. of Bordeaux, ¶ 3). Because employee route salespersons at Flowers/Opelika and other subsidiaries were considered exempt positions under the FLSA, the conversion to the independent distributor model did not eliminate any overtime payments. (Aff. of Rich, ¶ 5; Aff. of Bordeaux, ¶ 3). As such, the payment of overtime was not a reason for converting to this new method of distribution. (Aff. of Rich, ¶ 5).

---

[4] See 29 U.S.C. § 213(a)(1) ("Outside Sales Exemption"); see also 49 U.S.C. § 31502 et seq. ("Motor Carrier Act").

At several subsidiaries, there were legal challenges to the implementation of the distributorship program. The distributorship program was repeatedly upheld as one of independent contractor. For example, the National Labor Relations Board (NLRB), in a decision that was subsequently affirmed on appeal by the District of Columbia Court of Appeals, upheld the business model as one of independent contractor. *See West Virginia Baking Co., Inc.,* 299 N.L.R.B. 306 (1990), *aff'd* 946 F.2d 1563 (D.C. Cir. 1991). In addition, two Regional Directors of the National Labor Relations Board have concluded that distributors of the particular subsidiary involved were independent contractors. (Aff. of Rich, ¶ 18). The Internal Revenue Service (IRS) has also historically treated the business model as one of independent contractor. Specifically, after the conversion to independent distributors, Flowers/Opelika began to treat distributors as "statutory employees" under Section 3121(d)(3)(A) of the Internal Revenue Code (IRC). (Aff. of Rich, ¶¶ 6, 8). Under this section, certain categories of common law independent contractors, including bakery distributors, are treated as employees for Federal Insurance Contribution Act (FICA) purposes only.[5] (Aff. of Rich, ¶ 6). The Internal Revenue Code also incorporates this "statutory employee" definition for Federal Unemployment Tax Act (FUTA) purposes. (Aff. of Rich, ¶ 7). The IRS has twice audited Flowers and its subsidiaries, for tax periods March 31, 1994-December 31, 1995, and for the year ending December 31, 1991, and specifically acknowledged the appropriateness of Flowers' subsidiaries treating distributors as "statutory employees" for FICA and FUTA purposes, but as independent contractors otherwise (*i.e.,* no income tax withholding). (Aff. of Rich, ¶¶ 8-9).

---

[5] Section 3121(d)(3)(A) provides, in pertinent part, that for FICA purposes, the term "employee" (commonly referred to as "statutory employee") includes any individual who performs services for remuneration for any person as an agent or commission driver engaged in distributing bakery products for his principal if the contract of service contemplates that substantially all of such services are to be performed personally by such individual and the services are part of a continuing relationship with the person for whom the services are performed. The statutory definition specifically excludes common law employees.

C.    **Flowers/Opelika's Organization and Autonomy from Flowers Foods and Other Subsidiaries**

Flowers/Opelika is comprised of eight different geographical branches, encompassing fourteen sales warehouses from which distributors, such as Plaintiffs and opt-ins, operate[d]. Ten of the warehouses are located in Alabama and four of the warehouses are located in Georgia.[6] Each branch has a different Sales Manager and Operations Manager. (Aff. of Michael Lord ("Lord"), ¶ 2).

Any day-to-day issues with independent distributors, along with general oversight of independent distributors' territories, are generally handled at the individual branch and warehouse levels by these Sales and Operations Managers.  (Aff. of Lord, ¶¶ 2, 4; Aff. of Bordeaux, ¶ 6).  The two Directors of Sales for Flowers/Opelika only get involved in the day-to-day independent distributor issues on a limited basis, such as, for example, on product ordering, stale product removal, independent distributor performance, and customer service issues. Michael Lord, the Vice President of Sales for Flowers/Opelika, and Steve Bordeaux, the President of Flowers/Opelika, typically become involved in such issues only when serious customer relations issues are involved and/or for the potential termination of an independent distributor's agreement with Flowers/Opelika.  (Aff. of Lord, ¶ 4; Aff. of Bordeaux, ¶¶ 1, 6).

Flowers/Opelika management may consult with Flowers Foods' in-house counsel or the Vice President of Distributor Operations for Flowers Foods Bakeries Group, Chuck Rich, only on occasion, when addressing serious independent distributor problems for which Flowers/Opelika management wishes to seek advice.  However, Flowers/Opelika management makes all decisions regarding its operations, even when such individuals are consulted.  (Aff. of Lord, ¶ 5; Aff. of Bordeaux, ¶ 7; Aff. of Rich, ¶ 11).  Flowers/Opelika does not consult with

---

[6] The warehouses are located in Montgomery, Troy, Selma, Greenville, Clanton, Alex City, Tallassee, Opelika, Phenix City, and Roanoke, Alabama, and LaGrange, Manchester, Georgetown, and Thomaston, Georgia.

management personnel at any other Flowers Foods' subsidiary before or when addressing independent distributor or employee issues.  (Aff. of Lord, ¶ 5; Aff. of Bordeaux, ¶ 7).

>    **D.    Distributors' Individualized Experiences with Flowers/Opelika**

>        **1.    <u>Plaintiffs' And Opt-Ins' Individualized Experiences As Independent Distributors</u>**

During the period for which Plaintiffs seek conditional certification (July 2, 2004 until the present), Plaintiffs and opt-ins were independent distributors with Flowers/Opelika at some point; however, as will be discussed below, they all had different, individualized experiences as independent distributors.

For example, Plaintiffs and opt-ins worked out of different warehouses, in different geographic locations, and during different time periods.  Plaintiff Morrow executed a Distributor Agreement with Flowers/Opelika in June 1994, and was a distributor at the Montgomery warehouse under Branch 64 until approximately the end of December 2005. (Aff. of Lord, ¶ 3; Aff. of Don Adkins ("Adkins"), ¶ 2).  Plaintiff Cleveland executed a Distributor Agreement with Flowers/Opelika in June 2004, and has been an independent distributor at the Montgomery warehouse under Branch 64 since this time. (Aff. of Lord, ¶ 3; Aff. of Adkins, ¶ 6).  Plaintiff Overton executed a Distributor Agreement with Flowers/Opelika in April 2006, and was an independent distributor at the Roanoke warehouse under Branch 65 until September of 2006. (Aff. of Lord, ¶ 3; Aff. of Adkins, ¶ 3).  Plaintiff James Marty Smith executed a Distributor Agreement with Flowers/Opelika in October 2006, and was an independent distributor at the Roanoke warehouse under Branch 65 until approximately January 2007. (Aff. of Lord, ¶ 3; Aff. of Adkins, ¶ 5).  Plaintiff Michael Smith executed a Distributor Agreement with Flowers/Opelika in November 2003, and was an independent distributor at the LaGrange, Georgia, warehouse under Branch 65 until December 2006. (Aff. of Lord, ¶ 3; Aff. of Adkins, ¶ 4).  Plaintiff Murphy

executed a Distributor Agreement with Flowers/Opelika in September 2002, and has remained an independent distributor at the LaGrange, Georgia, warehouse under Branch 65 since that time. (Aff. of Lord, ¶ 3 and Aff. of Adkins, ¶ 7).  Opt-in Branch executed a Distributor Agreement with Flowers/Opelika in June 2004, and remains an independent distributor at the Montgomery warehouse under Branch 64. (Aff. of Lord, ¶ 3; Aff. of Adkins, ¶ 9).  Opt-in Baxter executed a Distributor Agreement with Flowers/Opelika in November 2003, and remains an independent distributor at the Montgomery warehouse under Branch 64. (Aff. of Lord, ¶ 3; Aff. of Adkins, ¶ 9).  Opt-in Small executed a Distributor Agreement with Flowers/Opelika in March 2000 and was an independent distributor at the Greenville warehouse under Branch 66 until September 2005. (Aff. of Lord, ¶ 3, Aff. of Adkins, ¶ 10).  Opt-in Snow executed a Distributor Agreement with Flowers/Opelika in March 2004, and was an independent distributor at the Greenville warehouse under Branch 66 until September 2005. (Aff. of Lord, ¶ 3; Aff. of Adkins, ¶ 11). Opt-in Patisaul executed a Distributor Agreement with Flowers/Opelika in March 2005, and was an independent distributor at the LaGrange warehouse under Branch 65 until April 2005. (Aff. of Lord, ¶ 3; Aff. of Adkins, ¶ 12).  None of the Plaintiffs or opt-ins ever had any relationship with any other subsidiary of Flowers Foods, either during the proposed statutory period or beyond. (Aff. of Adkins, ¶ 13).

While independent distributors with Flowers/Opelika, some of the Plaintiffs and opt-ins work/worked with different management at the different warehouses and branches.  At Branch 64, Cleveland, Morrow, Branch, and Baxter work/worked with Sales Manager John Renfroe and Operations Manager Ricky Bell.  At Branch 65, Overton, Marty Smith, Murphy, Michael Smith, and Patisaul work/worked with Sales Manager David Earl and Operations Manager Terry

Prather.  At Branch 66, Patisaul worked with Sales Manager Billy Reed and Operations Manager Fred Jeffcoat. (Aff. of Lord, ¶¶ 2, 3).

Further, Plaintiffs and opt-ins serviced different national accounts (Aff. of Lord, ¶ 7), many of which contained different service requirements that affected their daily duties. (Aff. of Lord, ¶ 10).  Plaintiffs also serviced accounts with different payments methods and associated varying inventory collection obligations.  For example, certain retail accounts use "pay-by-scan" technology for accounting purposes.  This pay-by-scan technology allows these accounts to only pay for products that are actually scanned through the sales register. Because pay-by-scan accounts involve different accounting from traditional accounts, distributors who have pay-by-scan accounts must conduct physical inventories on a week-by-week basis. (Aff. of Lord, ¶ 6). As outlined in the chart below, only three out of the six Plaintiffs ever serviced Pay-By-Scan accounts during the proposed statutory period, and the Pay-By-Scan account of one of these independent distributors, namely Murphy, subsequently closed. (Aff. of Lord, ¶ 6).

Independent distributors can take various steps to increase product sales in most of their accounts, including providing superior service to customers, asking customers for extra space for special displays, and utilizing point of sale materials. Such efforts are generally independent distributor specific and depend upon what particular efforts an independent distributor decides to take. Some accounts require substantially more service than others.  For example, Wal-Mart and traditional supermarkets like Winn-Dixie require substantially more service (and time spent at the account) than small "Mom and Pop" accounts or foodservice accounts (such as Burger King and Arby's). (Aff. of Lord, ¶ 10).

If an account opens in an independent distributor's territory, the independent distributor is the beneficiary of such additional business and does not need to pay any additional monies to

the Company for such accounts. For example, a Costco recently opened in Plaintiff Dwayne Cleveland's territory. It is anticipated that this account will generate sales of approximately $2,000.00 per week. Conversely, if an account closes in an independent distributor's territory, the distributor loses the profits derived from sales in such an account. (Aff. of Lord, ¶ 15).

Finally, Plaintiffs made different monetary investments in their distributorships and have gained (or lost) different amounts of equity in their distributorships based on business development and entrepreneurial opportunities in their respective territories. For example, Morrow purchased his distributorship for $38,634 and subsequently sold it back to Flowers/Opelika for $69,210. (Aff. of Adkins, ¶ 2). Overton and James Marty Smith, however, purchased their distributorships for $45,100 and $47,420 (respectively), and sold them back to Flowers/Opelika for the same amount, gaining no equity. (Aff. of Adkins, ¶¶ 3, 5). Michael Smith purchased his distributorship for $48,840 but subsequently lost equity in the distributorship, selling it back to Flowers/Opelika for $46,560. (Aff. of Adkins, ¶ 4). Mark Murphy purchased his distributorship for $41,600, and the current value of his territory is $49,080. (Aff. of Adkins, ¶ 7).

The chart below further illustrates that Plaintiffs have/had significantly different experiences as distributors with Flowers/Opelika:

| Plaintiff Name | Position | Time Period | Warehouse | Mg'mnt | Nat'l Accounts | Pay-By-Scan | Equity |
|---|---|---|---|---|---|---|---|
| Morrow | Independent contractor distributor (Independent distributor) | June 1994-Dec. 2005 | Montgomery, AL | John Renfroe<br><br>Ricky Bell | -Winn-Dixie<br>-Arby's<br>-Chick-Fil-A<br>-Sonic<br>-Zaxby's | Yes-Winn Dixie | $38,634 (purchase price)<br><br>$69,210 (sales price) |

| Plaintiff Name | Position | Time Period | Warehouse | Mg'mnt | Nat'l Accounts | Pay-By-Scan | Equity |
|---|---|---|---|---|---|---|---|
| Overton | Prospective distributor with temporary agency<br><br>Independent distributor | Oct. 2005-Mar. 2006<br><br><br>Mar. 06-Sept. 06 | Roanoke, AL | David Earl<br><br>Terry Prather | -Dollar General<br>-Family Dollar<br>-Burger King | No | $45,000 (purchase price)<br><br>$45,000 (sales price) |
| James M. Smith | Prospective distributor with temp. agency<br><br>Independent distributor | Apr.-Oct. 2006<br><br><br>Oct. 06-Jan. 07 | Roanoke, AL | David Earl<br><br>Terry Prather | -Dollar General<br>-Family Dollar<br>-Burger King | No | $47,420 (purchase price)<br><br>$47,420 (sales price) |
| Cleveland | Independent distributor | June 2004-present | Montgomery, AL | John Renfroe<br><br>Ricky Bell | -Target<br>-Huddle House<br>-Brunos<br>-Dollar General<br>-Wal-Mart | Yes-Wal-Mart | $37,800 (purchase price)<br><br>$45,190 (current value) |
| Michael Smith | Independent distributor | Nov. 2003-Dec. 2006 | LaGrange, GA | David Earl<br><br>Terry Prather | -Dollar General<br>-Family Dollar<br>-Hardee's | No | $48,840 (purchase price)<br><br>$46,560 (sales price) |
| Mark Murphy | Independent distributor | Sept. 2002-present | LaGrange, GA | David Earl<br><br>Terry Prather | -Winn-Dixie<br>-Burger King<br>-CVS Drugs<br>-Dollar General | Yes at one time but it closed (Winn-Dixie) | $41,000 (purchase price)<br><br>$49,080 (current value) |

## 2. <u>Individualized Experiences of Independent Distributors Generally at Flowers/Opelika</u>

In addition to the differences outlined above regarding Plaintiffs' and opt-ins' individualized experiences as independent distributors, other independent distributors, including

independent distributors operating out of the same warehouses as Plaintiffs and some of the opt-ins at Flowers/Opelika, can and do operate their businesses very differently.

For example, independent distributors can hire helpers to assist them in running their respective territories. (Aff. of Lord, ¶ 8).  **Some independent distributors use helpers and some do not.**  Within the LaGrange warehouse alone, independent distributors Robert Thompson ("Thompson") and Ronald Corey McDonald ("McDonald"), for example, have not hired helpers (Decl. of Thompson, ¶ 10, attached hereto as Exhibit 6; Decl. of McDonald, ¶ 9, attached hereto as Exhibit 7), while prior independent distributor Terry Prather ("Prather") and distributors Dave Forster ("Forster") and Rufus Foster ("Foster"), for example, have chosen to hire (or did hire when distributors) helpers for a variety of reasons (Decl. of Prather, ¶ 8, attached hereto as Exhibit 8; Decl. of Forster, ¶ 10, attached hereto as Exhibit 9; and Decl. of Foster, ¶ 9, attached hereto as Exhibit 10). At the Troy warehouse, prior independent distributor John Alan Renfroe ("Renfroe") did not hire helpers to assist with his territory, primarily due to the expense involved.  (Decl. of Renfroe, ¶ 9, attached hereto as Exhibit 11).  However, in the Montgomery warehouse, independent distributors Robert McCrory ("McCrory"), Aaron Chapman ("Chapman"), and Bradley Shayne Allen ("Allen") have hired helpers, for various reasons, to help them service their territories. (Decl. of McCrory, ¶ 8, attached hereto as Exhibit 12; Decl. of Chapman, ¶9, attached hereto as Exhibit 13; Decl. of Allen, ¶ 9, attached hereto as Exhibit 14). Independent distributor Michael Lee Atkins ("Atkins") at the Roanoke warehouse, for example, often hires his wife as a helper to help with his territory and to help increase his sales because "she is . . . very good in selling products to customers." (Decl. of Atkins, ¶ 9, attached hereto as Exhibit 15).

Further, as a strategic sales tactic in the course of selling their products to certain customers, independent distributors may charge customers more or less than the suggested retail price for certain branded and non-branded products.  (Aff. of Lord, ¶ 11). **Some independent distributors have used/use this sales technique and others have/do not.** Within the Montgomery warehouse alone, independent distributor McCrory, for example, has not charged customers more or less than the suggested wholesale price (Decl. of McCrory, ¶ 3), while independent distributors Chapman and Allen, for example, have chosen to charge more or less than the suggested wholesale price. (Decl. of Chapman, ¶ 4; and Decl. of Allen, ¶ 4).

Further, independent distributors may sell their territories, in whole or in part. (Aff. of Lord, ¶ 14). **Some independent distributors have chosen to sell parts of their territories to other distributors for various business reasons, while others have not.** Within the Montgomery warehouse alone, Independent Distributor Allen, for example, has chosen to sell part of his territory to another independent distributor (Decl. of Allen, ¶ 17), while the other independent distributors, such as Chapman and McCrory, have not. (Decl. of Chapman, ¶ 17; Decl. of McCrory, ¶ 16).  In contrast, at the LaGrange warehouse, prior independent distributor Prather, and independent distributors Forster, Foster, and McDonald, for example, never sold any part of their territories to other distributors. (Decl. of Prather, ¶ 16; Decl. of Forster, ¶ 18; Decl. of Foster, ¶ 17; Decl. of McDonald, ¶ 17).  In Roanoke, independent distributor Atkins sold part of his territory to Flowers/Opelika and subsequently repurchased this area from Flowers/Opelika. (Decl. of Atkins, ¶ 17).

**The product orders for independent distributors also vary depending on the distributors' individualized customer needs, and independent distributors make product order decisions differently, adding or cutting to their recommended orders with variable**

**regularity, to meet these individualized needs.** (Aff. of Lord, ¶ 12).  For example, within the LaGrange warehouse alone, different independent distributors make adds or cuts to their orders with variable frequency and for different reasons, including market conditions in their respective territories, special customer requests, and the level of sales.  (*See, e.g.,* Decl. of Thompson, ¶ 6 (making adds or cuts to orders based on market conditions, "one to three times per week"); Decl. of Forster, ¶ 6 (making adds or cuts on "almost a daily basis" based on "what I see in my customers' stores or special requests from customers."); Decl. of Foster, ¶ 5 (making adds or cuts 1 to 2 times per week but stating that this changes from week to week)).   Within the Montgomery warehouse alone, this may likewise vary from independent distributor to independent distributor, with independent distributors making adds or cuts to orders "only a half-dozen times per year" (Decl. of McCrory, ¶ 4), to every other day (Decl. of Allen, ¶ 5).  *See also* Dep. of Henry Porterfield, dated 5/09/07, p. 117, line 15 to p. 118, line 7 (acknowledging he could make adds or cuts to his orders), attached hereto as Exhibit 16.

        **Independent distributors also set their own work hours and determine the order in which to service their different accounts.**  Former Montgomery independent distributor Henry Porterfield, for example, testified under oath in a different case that he determined the order of visiting his accounts during the course of a day.  (Dep. of Porterfield, p. 115, line 23 to p. 116, line 8).  Independent distributors may determine this order for servicing accounts based on, for example, individualized customers' needs and the location and hours of operation for stores in their territories. (*See, e.g.,* Decl. of Chapman, ¶ 8; Decl. of Allen, ¶ 8; Decl. of McCrory, ¶ 7; Decl. of Thompson ¶ 9; Decl. of Forster, ¶ 9; Decl. of Foster, ¶ 8; Decl. of McDonald, ¶ 8; Decl. of Atkins, ¶ 8).

Likewise, independent distributors within Flowers/Opelika, at the very warehouses from which Plaintiffs and some of the opt-ins operated, have different positions about their relationship with Flowers/Opelika and the control they have/had over their own businesses. For example, Plaintiffs have brought this action because they feel they are "employees" of Flowers Foods and Flowers/Opelika, thus entitling them to overtime compensation. (*See generally* Plaintiffs' Compl., ¶ 16). However, other independent distributors at the same warehouses from which Plaintiffs and some of the opt-ins operated believe that Flowers/Opelika has treated them as independent contractors or have represented themselves as independent contractors. For example, Henry Porterfield, a former independent distributor at the Montgomery warehouse, has a pending lawsuit in this Court against Flowers Foods and Flowers/Opelika alleging breach of contract and conversion claims. These causes of action are both predicated upon an *enforceable contract* and *cognizable, property interest in the business or equity subject to that contract*.[7] Further, Porterfield testified under oath that he filed tax returns for the years 1999 through 2003 representing that he was an independent businessman. (Dep. of Porterfield, p. 356, lines 1-15; p. 357, lines 8-14; p. 360, lines 4-23; p. 361, lines 4-20; p. 362, line 1 to p. 365, line 12). Other independent distributors or prior independent distributors at Flowers/Opelika, operating out of the LaGrange, Roanoke, and Montgomery warehouses, also consider themselves to be independent contractors (and not employees) with Flowers/Opelika. (Decl. of Prather, ¶ 15; Decl. of McDonald, ¶ 16; Decl. of McCrory, ¶ 15; Decl. of Chapman, ¶ 16; Decl. of Allen, ¶ 16).

Likewise, even though Plaintiffs generally allege, throughout their Complaint and in the Affidavits of Morrow and Overton, that Flowers/Opelika and Flowers Foods exercised significant control over the course of their duties and the duties of "all distributors," other

---

[7] Mr. Porterfield is represented by one of the law firms representing Plaintiffs in this case. Seemingly, the pursuit of such divergent claims, particularly alleged conversion, would appear to be a tacit admission that Plaintiffs, and the class they seek to represent, are not similarly situated.

independent distributors, including those at the same warehouses from which Plaintiffs and some of the opt-ins operate[d], did not believe that Flowers controlled their duties. *See, e.g.,* Decl. of Thompson, ¶ 4 ("I had almost complete control over my business. I did have to be sure that I followed some minimal rules, per the agreement, to protect *my* and Flowers' *businesses*."); Decl. of Forster, ¶ 4 ("I love this job because I am my own boss. I can do what I want so long as customers do not complain."); Decl. of Renfroe, ¶ 16 ("I believe Flowers treated me as independent businessman. I did not have a lot of dealings with management. I knew that I was an independent contractor and looked on it differently than when I was an employee.").

## II.     ARGUMENT AND CITATION OF AUTHORITIES

Plaintiffs seek conditional certification under Section 216(b) of the FLSA of a class of

> All current and former route distributors, *or other persons performing a service and/or delivery function on a non-hourly basis from July 2, 2004*[8] *to the present*, who worked overtime while employed at Flowers Foods subsidiaries, and were not compensated for such overtime work at an amount equaling one and one-half times the employee's regular rate of pay. Such persons shall not include persons who, as part of their duties, cross state lines to make deliveries.[9]

(Pl. Motion for Cond. Cert., Section I "Background," p.1).  Currently, there are six Plaintiffs from Flowers/Opelika (namely Morrow, Overton, James Marty Smith, Cleveland, Michael Smith, and Murphy) and five opt-ins from Flowers/Opelika.  Plaintiffs' proposed class includes

---

[8]  Plaintiffs seek a statutory period of three years for their collective action, which is only warranted for "willful violations" of the FLSA. 29 U.S.C. § 257. Defendants contend, and do not waive the position, that **Plaintiffs have not established any basis for finding that it has committed "willful violations" of the Act, therefore rendering only the two-year statutory period applicable**. *See id.* § 256. Certainly, Plaintiffs have not provided evidence that Flowers Foods and Flowers/Opelika affirmatively knew it was violating the FLSA or that it was acting <u>in</u> "reckless disregard" of the FLSA, which is required to establish such willfulness. *See McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 135  n. 13 (1988).

[9]  By excluding individuals who cross state lines to make their deliveries in their proposed class, Plaintiffs appear to be attempting to create a class of individuals who they deem would not fall within the Motor Carrier Exemption to the FLSA.  However, Plaintiffs are applying too limited a legal standard. Individuals are also exempt under the MCA exemption if the products they deliver originate from out-of-state and remain in a practical continuity of movement until the goods reach the customers for whom they were intended. *See, e.g., Shew v. Southland Corp.*, 370 F.2d 376 (5th Cir. 1966).

approximately 4,744 individuals (2,881 current independent distributors, 1,701 prior independent distributors who were distributors during the proposed statutory period but have subsequently ceased their business relationship with the Flowers Foods subsidiary with which they had distributor agreements, and at least 162 employee route salespersons). (Aff. of Rich, ¶¶ 13, 16-17). **Plaintiffs and the opt-ins comprise much less than one percent (specifically, .2%) of their proposed class**.

Plaintiffs claim that they are/were improperly classified as independent contractors (who are exempt from the FLSA's overtime requirements) and therefore are/were improperly denied overtime compensation for any hours worked over 40 in a workweek. Plaintiffs further claim that Flowers Foods and Flowers/Opelika created this independent contractor distributor position from an employee position in order to avoid the requirements of the FLSA and otherwise treated the independent distributors as employees through various policies and practices of Flowers Foods. (Pl.'s Motion for Cond. Cert., pps. 2, 6; Compl. ¶ 14, 15).

A.     **Eleventh Circuit Approach For Notice and Conditional Certification**

Section 216(b) of the FLSA allows employees to seek damages for alleged violations on behalf of themselves and others "similarly situated." 29 U.S.C. § 216(b). District courts possess discretionary power to authorize the sending of notice to potential class members in a collective action brought pursuant to Section 216(b).  The power to authorize notice must, however, be exercised with discretion and brought only in appropriate cases.  *Haynes v. Singer Co.,* 696 F.2d 884, 886 (11th Cir. 1983).  As Judge Albritton of this Court has noted in this very context, "Courts, as well as practicing attorneys, have a responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation."  *Horne, et al. v. United Services Automobile Ass'n,* 279 F. Supp. 2d 1231, 1237 (M.D. Ala. 2003) (quoting *Brooks v. BellSouth Telecommunications, Inc.,* 164 F.R.D.

561, 567 (N.D. Ala. 1995)); *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1318 (M.D. Ala. 2002). Further, when plaintiffs are requesting judicial notice and conditional certification, as they are in the instant case, the request must be viewed with "more scrutiny." *Haynes,* 696 F.2d at 886 n.2.

The Eleventh Circuit makes clear that a district court should make certain determinations before allowing an individual plaintiff to give notice to other potential members of a plaintiffs' class under the FLSA. Specifically, "the district court should satisfy itself that there are **other employees of defendant-employer who desire to 'opt-in' and are 'similarly situated'** with respect to their job requirements with regard to their pay provisions." *Dybach v. Florida Dep't of Corrections*, 942 F.2d 1562, 1567 (11th Cir. 1991); *Hipp v. Liberty Nat'l Ins. Co.,* 252 F.3d 1208, 1217-1218 (11th Cir. 2001); *Cameron-Grant v. Maxim Healthcare Servs.,* 347 F.3d 1240, 1243 (11th Cir. 2003) (emphasis added). The plaintiff bears the burden of demonstrating a reasonable basis for crediting the assertion that "aggrieved individuals exist in the class he proposes." *Haynes*, 696 F.2d at 887. Opt-in consents filed by individuals who work in the same locations as Plaintiffs are not sufficient. *See* Order Denying Conditional Class Certification and Judicial Notice and Motion to Require Disclosure of Names, Addresses, Etc. of Putative Class Members, *Johnson and Paisley v. WellPoint, Inc., et al.,* No. 1:06-cv-02430-ODE, slip. op. at 7 (N.D. Ga., Aug. 23, 2007) ("[t]he fact that three former coworkers of Plaintiffs (who worked in the same two offices as plaintiffs) desire to opt-in does not demonstrate that there are other [potential class members] who work in Defendant's many other offices, inside Georgia and elsewhere, who desire to opt-in."). (*See* WellPoint Order, attached hereto as Exhibit 17); *see also Harper v. Lovett's Buffett, Inc.,* 185 F.R.D. 358, 362 (M.D. Ala. 1999) (21 opt-in consents filed by employees who worked at the same location as seven named plaintiffs was not sufficient to

justify conditional certification and notice to all of defendant's restaurants located in six different states).

In the absence of a statutory definition of "similarly situated," courts in this Circuit, and especially here in Alabama, have "looked more closely for evidence of a factual or legal nexus between plaintiff's claims and the claims of the proposed class." *Barron v. Henry County School System*, 242 F. Supp. 2d 1096 (M.D. Ala. 2003); *Marsh v. Butler County School System*, 242 F. Supp. 2d 1086 (M.D. Ala. 2003). Because judicial economy is a primary concern of any class litigation, the presence of an unlawful uniform policy or plan affecting the individuals in the proposed aggrieved class is often required for notice. *Barron,* 242 F. Supp. 2d at 1102. *See also Brooks,* 164 F.R.D. at 569 (rejecting 216(b) notice where "it is clear that any claims of the proposed opt-in plaintiffs would present disparate factual and employment settings."). In sum, plaintiffs must offer <u>competent proof</u> on two elements for notice: (1) that others wish to join the suit, and (2) that there exists a factual or legal nexus between the plaintiffs and the members of the proposed class sufficient to indicate a common policy or plan that makes the proposed class an aggrieved class.

When there has been no discovery in the case at the time notice is requested, as is the case here, <u>the plaintiffs must establish the two elements with "detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary"</u>[10] <u>to gain notice</u>. *Hipp,* 252 F.3d at 1217; *see also Crawford v. Dothan City Board of Education,* 214 F.R.D. 694, 695 (M.D. Ala. 2003) (holding that the conditional certification and notice decision is typically

---

[10]    Post-*Hipp* decisions in the Eleventh Circuit have recognized that the "fairly lenient" standard is not minimal or automatic. *See Morrow v. UniCare Life &Health*, Civil Action No. 1:04-CV-01774 (May 26, 2006 Order p. 9) (N.D. Ga.) ("In *Haynes v. Singer Co., Inc.*, 696 F.2d 884 (11th Cir. 1983), the Eleventh Circuit, quoting Judge Posner, explained that courts should treat requests for court-approved notice with scrutiny."); *Brooks v. A Rainaldi Plumbing, Inc.*, 2006 U.S. Dist. LEXIS 89417 (M.D. Fla. 2006) ("While it is clear that, at this stage, Plaintiffs' burden is not heavy, it is not invisible."); *Reed v. Mobile County School Sys.*, 246 F. Supp. 2d 1227, 1236 (N.D. Ala. 2003) ("the burden on the plaintiffs is described as 'not heavy,' a relaxed burden but not a 'minimal' one.").

made "based on the pleadings and affidavits."). Many courts, including those here in the Middle District of Alabama, use the phrase "modest factual showing" to describe the quantum of evidence required for a named plaintiff to obtain conditional certification of a collective action. *See Harper,* 185 F.R.D. at 362 (adopting "modest factual showing" standard; plaintiffs "bear the burden to establish that they and the class they wish to represent are similarly situated;" holding that plaintiffs failed to sustain their burden as to all of defendant's operations in six states but did satisfy their burden as to one location).

Adopting the "modest factual showing" standard, one court reasoned that the requirement for plaintiff to make a preliminary *evidentiary* showing that others are similarly situated is premised on principles of "sound case management" as well as the need "to avoid the 'stirring up' of litigation through unwarranted solicitation." *D'Anna v. M/A-Com, Inc.*, 903 F. Supp. 889, 894 (D. Md. 1995). Moreover, an employer should not be unduly burdened by a "frivolous fishing expedition conducted by plaintiff." *Id., H&R Block, Ltd. v. Housden*, 186 F.R.D. 399, 401 (E.D. Tex. 1999)*; see also Mike v. Safeco Ins. Co. of America, Inc.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003) (adopting "modest factual showing" standard; "the court must be satisfied that there is a basis to conclude that questions common to a potential group of plaintiffs would predominate a determination of the merits in this case;" denying conditional certification because plaintiff failed to make the requisite factual showing); and *Madrid v. Minolta Business Solutions, Inc.*, No. 02-2294, 2002 WL 31190172 at *2 (S.D.N.Y. Oct. 2, 2002) (adopting "modest factual showing" standard; plaintiff's "bald assertions that technicians were not appropriately compensated for overtime performed, that time sheets were inaccurate, and that these same payroll practices were utilized nationwide merits little weight").

These standards serve an important purpose. "It would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only later to determine that the matter should not proceed as a collective action . . . ." *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003); *see also West v. Border Foods, Inc.*, 2006 WL 1892527, at *7 (D. Minn. July 10, 2006) ("[N]either the remedial purposes of the FLSA, nor the interests of judicial economy, would be advanced if we were to overlook facts which generally suggest that a collective action is improper").

In fact, district courts have seen firsthand the downside of certifying too early an overly broad class of FLSA plaintiffs, only to decertify them later.[11]  To cite a few fairly recent examples:

- The 2,470 opt-in class members recruited through court-supervised notice in *Brown v. Dolgencorp*, No. 7:02-CV-00673-UWC (N.D. Ala. 2006), resulted in 2,450 dismissals.

- The 2,157 opt-in plaintiff class members recruited through court- supervised notice in *Anderson v. Cagle's, Inc.*, No. 1:00-CV-00166-WLS, 2005 U.S. Dist. LEXIS 41747 (M.D. Ga. Dec. 8, 2005), *aff'd*, 2007 U.S. App. LEXIS 13654 (11th Cir. June 11, 2007), resulted in 2,145 dismissals.

- The 700 opt-in plaintiffs recruited through court-supervised notice in *Carlson v. C.H. Robinson Worldwide, Inc.*, No. 02-3780(JNE/JJG), 2006 U.S. Dist. LEXIS 71483 (D. Minn. Sept. 26, 2006), resulted in approximately 700 dismissals.

---

[11]  Contrary to Plaintiffs' assumption in their brief, conditional certification is not freely and easily granted by district courts within the Eleventh Circuit.  In fact, conditional certification is routinely and often denied.  *See Johnson and Paisley v. WellPoint, Inc. et al.*, No. 1:06-CV-2430-ODE, p.11 (N.D. Ga, Aug. 23, 2007); *Ledbetter v. Pruitt Corp.*, 2007 U.S. Dist. LEXIS 10243 (M.D. Ga. Feb. 12, 2007); *Becker v. Southern Soils Turf Management, Inc.*, No. 6:06-cv-22-orl-28JGG, 2006 U.S. Dist. LEXIS 85111 (M.D. Fla. Nov. 20, 2006); *Brooks v. A Rainaldi Plumbing, Inc.*, 2006 U.S. Dist. LEXIS 89417 (M.D. Fla. Dec. 8, 2006); *Robinson v. Dolgencorp*, No. 5:06-cv-122-Oc-10-GRJ, 2006 U.S. Dist. LEXIS 85471 (M.D. Fla. No. 13, 2006); *Saxton v. Title Max of Alabama*, 431 F. Supp. 2d 1185 (N.D. Ala. 2006); *Roper v. Cherokee County School District*, Civil Action No. 1:04-CV-0049 (N.D. Ga. Sept. 27, 2005); *Holt v Rite Aid Corp.*, 333 F. Supp. 2d 1265 (M.D. Ala. 2004); *Reed v. Mobile County School Sys.*, 246 F. Supp. 2d 1227 (S.D. Ala. 2003); *Horne v. United Services Automobile Assoc.*, 279 F. Supp. 2d 1231 (M.D. Ala. 2003); *Smith v. Tradesmen International, Inc.*, 289 F. Supp. 2d 1369 (S.D. Fla. 2003); *Marsh v. Butler County Sch. Sys.*, 242 F. Supp. 2d 1086 (M.D. Ala. 2003).

- The 261 opt-in plaintiffs from 13 states recruited through court-supervised notice in *Smith v. Heartland Auto. Services, Inc., d/b/a Jiffy Lube*, 404 F. Supp. 2d 1144, 1152-55 (D. Minn. 2005), resulted in 254 dismissals.

Collective action proceedings are appropriate from a judicial management standpoint if, <u>and only if</u>, the named plaintiffs are truly representative of the opt-in plaintiffs they seek to represent. In other words, collective action proceedings make sense only if the evidence about the claims of the named plaintiffs provides the basis for deciding claims of potentially hundreds (or even thousands) of opt-ins. If that inference is not appropriate in a given case (such as this case), then the Court and the parties are left with multiple issues of individualized discovery and proof, leading to confusion in the proceedings, and potentially wasted resources, resulting in mass dismissals.

As will be discussed more fully below, <u>because Plaintiffs have failed to provide any competent or probative, let alone admissible, evidence</u> in support of their Motion for Conditional Certification, Plaintiffs have failed in their evidentiary burden to make even a "modest factual showing" and <u>their Motion should be denied accordingly</u>. However, assuming this Court finds conditional certification and notice to be appropriate as to some class of individuals,[12] this Court should conditionally certify and send notice only to those independent distributors located in warehouses from which Plaintiffs and Opelika opt-ins operated.[13]

---

[12] Should this Court find judicial notice and conditional certification appropriate, Defendants request the opportunity to file objections to Plaintiffs' proposed notice at that time, to ensure that the notice comports with all applicable law and is fair and balanced to all parties. Defendants have multiple objections to Plaintiffs' proposed Notice, as currently drafted.

[13] Indeed, in <u>the very case upon which Plaintiffs principally rely</u> in their Motion for Conditional Certification, *Harper,* 185 F.R.D. at 363, <u>Judge Albritton of this Court refused to conditionally certify and send notice to plaintiffs' broad proposed class</u>, consisting of employees at all of defendant's locations in multiple states. Rather, because plaintiffs only presented evidence regarding the locations at which they worked, and only offered unsupported allegations regarding FLSA violations at the other locations, Judge Albritton **limited conditional certification and notice to the single location at which plaintiffs worked and from which the evidence was presented**. *See id.; see also* Section II(C)(3) of this Response.

**B.    Conditional Certification and Judicial Notice Are Not Warranted Because Plaintiffs Did Not Provide Any Admissible Evidence in Support of Their Motion**

Plaintiffs' Motion to Conditionally Certify and Facilitate Class Notice should be denied for the simple reason that Plaintiffs did not provide <u>any admissible evidence</u> to support the broad and conclusory allegations in their Complaint that Flowers Foods or Flowers/Opelika has violated the FLSA in the manner alleged.

Although Plaintiffs submitted two purported "affidavits" from Plaintiffs Morrow and Overton in support of their Motion, **Plaintiffs' Affidavits are fatally deficient and are inadmissible.** To be admissible and properly considered, any affidavits submitted in support of a Motion for Conditional Certification and Notice must either be (1) sworn to; or (2) state that "[affiant] declare[s] (or certif[ies], verify[ies], or state[s]) under penalty of perjury that the foregoing is true and correct." *Bosch, et al. v. Title Max, Inc.,* No. 03-AR-0463-S, 2004 U.S. Dist. LEXIS 30162, at *2-3 (N.D Ala. Aug. 25, 2004) (quoting 28 U.S.C. § 1746). Merely submitting a document called an "Affidavit" is not sufficient. *See id.*, n.3 (rejecting plaintiffs' arguments that because the documents were labeled as "Affidavits" they were sufficient, reasoning that "[i]t is simply not 'obvious' that because affidavits were given voluntarily the affiants were testifying under oath or affirmation."). In addition to affidavit testimony from "would be class members," plaintiffs can meet their evidentiary burden for satisfying one of the two requisite prongs- *i.e.* that others wish to opt-in- by providing consents to join the lawsuit from the aggrieved individuals themselves. *See Davis v. Charoen Popkhand (USA), Inc.,* 303 F. Supp. 2d 1272, 1277 (M.D. Ala. 2004).

Both of Plaintiffs' affidavits submitted in support of their Motion to Conditionally Certify, which was the <u>only evidence</u> Plaintiffs submitted with their Motion, are inadmissible

and should not be considered.  **Neither of Plaintiffs' affidavits are sworn to or notarized**, and thus they fail to meet the requisite legal standards for affidavits under the Federal Rules of Civil Procedure or for unsworn declarations under 28 U.S.C. § 1746.  Rather, Plaintiffs' affidavits merely provide that the affiants (Morrow and Overton, respectfully) "declare[s] as follows," without mentioning that they were declaring the same under the penalty of perjury. (*See* Aff. of Morrow; Aff. of Overton).  As such, because Plaintiffs did not provide <u>any admissible evidence</u> in support of their Motion to Conditionally Certify and Facilitate Notice, their Motion should be denied.  *See Bosch,* 2004 U.S. Dist. LEXIS 30162, at * 10 (reasoning that a court "has no choice but to deny the Plaintiffs' Motion for Conditional Certification" when no admissible evidence has been submitted in support thereof).[14]

> **C.    Conditional Certification and Judicial Notice Are Not Warranted  Because Plaintiffs Have Not Shown That Other Aggrieved Individuals In the Broad Class They Propose Desire to Opt-In**

Conditional Certification and judicial notice are also not warranted because Plaintiffs have <u>failed</u> to satisfy their evidentiary burden of showing that other aggrieved individuals in the broad class they propose wish to opt into the lawsuit.

> **1.    Even Assuming, *Arguendo,* That Plaintiffs' Evidence Was Admissible, Plaintiffs' Failed to Provide Sufficient Evidence that Other Aggrieved Individuals Exist in the Broad Class They Propose**

Plaintiffs have the burden of providing evidence to establish a "reasonable basis for crediting their assertions that aggrieved individuals exist *in the broad class they propose*." *Haynes,* 696 F.2d at 887 (emphasis added).  Plaintiffs' Motion for Conditional Certification and Notice should be denied because they have <u>failed to establish any basis,</u> let alone a reasonable

---

[14] Although Plaintiffs filed opt-in consent forms from two current and three former Flowers/Opelika independent distributors on October 17, 2007, the date this Response was due with this Court,  the opt-in consent forms were not sworn to or notarized. Regardless, the opt-in consents fail to establish that the opt-ins are similarly situated to Plaintiffs.  The opt-in consents merely state that opt-ins performed work on numerous occasions without receiving overtime. *See* Consents to Join, ¶ 2.

basis, <u>for asserting that other aggrieved individuals exist in their vast proposed class</u>, encompassing well over four thousand independent distributors at approximately 500 warehouses in twenty states and the District of Columbia.  As such, Plaintiffs' Motion for Conditional Certification and Notice should be denied.

        a.      ***Plaintiffs' Evidence is Legally Insufficient for Notice or Conditional Certification***

Even assuming, *arguendo*, that Plaintiffs' two affidavits were admissible, and that other subsidiaries who use independent distributors were parties to this action, Plaintiffs' virtually identical and conclusory allegations within their own affidavits, without providing any affidavits from the other alleged aggrieved individuals or any specific facts to show they have personal knowledge of practices or policies at any other warehouse or any other subsidiary (other than the warehouses from which they operated within Flowers/Opelika), are simply insufficient to meet their evidentiary burden for notice and conditional certification.

For example, in an attempt to show that other aggrieved individuals exist, Plaintiffs Morrow and Overton claim (in pertinent part) that they felt they were "being cheated" out of money for hours worked and that there "were several other route distributors who are similarly situated to me, who agree with my preceding statement, who want to get paid for the time they work." (Aff. of Morrow, ¶ 11; Aff. of Overton, ¶ 11).  Further, Paragraph 12 of both Morrow and Overton's affidavits provides:

> I believe several other route distributors, both past and present, . . . may be afraid to join the suit because they fear retaliation by Flowers. These people are in the same/similar position as me, and I believe most are or would be interested in joining this suit.

(Aff. of Morrow, ¶ 12, Aff. of Overton, ¶ 12).

These statements are legally insufficient to warrant conditional certification and notice because they are merely conclusory allegations and constitute inadmissible hearsay evidence. Plaintiffs do not testify that they have worked in <u>any other warehouse</u> or had independent distributor agreements with <u>any other subsidiary</u>, nor do they even provide <u>any specific facts</u> regarding the independent distributors who "agree[d] with the preceding statement," other than mention one independent distributor's name in each Affidavit (namely Dwayne Cleveland and Marty Smith, both of whom are Plaintiffs who operated out of the same warehouses as Morrow and Overton). Further, in an attempt to show that these alleged "aggrieved individuals" are similarly situated, Plaintiffs likewise provide only conclusory allegations in their Complaint, without providing any affidavits to substantiate these allegations from the other "aggrieved individuals." For example, Plaintiffs generally allege that the policies that resulted in FLSA violations were and are applied to all putative opt-ins in the same manner as they were to Plaintiffs (Compl., ¶¶ 37, 44); the "job requirements and duties" of Plaintiffs and putative opt-ins "all involve performing a service and/or delivery function" (Compl., ¶¶ 31-45 and Motion for Conditional Certification, p. 6); and Plaintiffs and putative opt-ins are "paid under the same system that has resulted in unpaid overtime wages for time spent working." (Compl., ¶ 45). However, these allegations are not supported by detailed affidavits, even in part, from <u>any other potential class members</u> either at Flowers/Opelika or at any other Flowers Foods subsidiary. District courts in the Eleventh Circuit have reasoned that blanket assertions that all individuals in the proposed class performed the same duties, without more, are "merely conclusory" and cannot be used to show such individuals are similarly situated. *See* Order, *Johnson and Paisley v. WellPoint, Inc. et al.,* No. 1:06-CV-2430-ODE, p.11 (N.D. Ga, Aug. 23, 2007) (plaintiffs' statements, coupled with the job description itself, that the job description and duties of all

individuals in the proposed nationwide class were similar, no matter which subsidiary the individual worked for, were "merely conclusory" and were not sufficient to show other individuals were similarly situated).

These conclusory allegations are not even adequately supported by the two affidavits submitted by Morrow and Overton. Morrow and Overton's affidavits use similar conclusory language such as "all distributors" (*see* Aff. of Morrow, ¶¶ 4, 6; Aff. of Overton, ¶¶ 4, 6), and "[t]hese people are in the same/similar position as me," (Aff. of Morrow, ¶ 12; Aff. of Overton, ¶ 12), without providing any specific facts or any other basis for the Court to conclude that Plaintiffs have any "first hand" knowledge to support their assertions. *See McClendon v. Ga. Kaolin Co.,* 782 F. Supp. 1548, 1557 (N.D. Ga. 1992) (affidavits or declarations must specifically affirmatively show affiant is competent to testify and has personal knowledge of facts). Morrow and Overton do not testify or provide any facts to establish that they have worked at any other warehouse (other than Montgomery or Roanoke) or subsidiary of Flowers Foods (other than Flowers/Opelika), for any other supervisors, at any other warehouses or subsidiaries, nor do they testify they have otherwise personally observed work done by independent distributors in any other warehouses or subsidiaries. Such conclusory allegations, without more, are <u>simply insufficient to justify notice or conditional certification to Plaintiffs'</u> <u>broad proposed class</u>.

Although both Morrow and Overton's affidavits provide identical language that the affiants "have personal knowledge of all the facts contained herein," and are "competent to testify to the same," absent any specific supporting facts to substantiate these conclusory allegations of personal knowledge, these statements lack any probative value whatsoever. *See Evers v. Gen. Motors Corp.*, 771 F.2d 984, 986 (11th Cir. 1985) (holding that "conclusory

allegations without specific supporting facts have no probative value."). Because Morrow and Overton offered <u>no specific facts</u> to show that they are competent to testify as to other warehouses within Flowers/Opelika, let alone facts to show they are competent to testify as to the practices affecting the thousands of other independent distributors at about 500 other warehouses at 25 different subsidiaries over the requested three year statutory period, their Motion must be denied.

In *Bernard v. Household International, Inc.*, 231 F. Supp. 2d 433 (E.D. Va. 2002), the court faced similar declarations in another FLSA collective action. *See* 231 F. Supp. 2d 433 (E.D. Va. 2002). There, the plaintiffs, who only worked at two facilities, tried to conditionally certify an action covering several additional facilities by making declarations encompassing those facilities. The court noted that the allegations pertaining to other facilities were qualified with phrases like "It is my understanding" or "I believe that." *See id.* at 436. Because plaintiffs offered no declarations from employees who worked at other facilities, the court limited certification to the facilities where plaintiffs did work. Also, the court disregarded the plaintiffs' allegations about other facilities, stating that there was no indication in the declarations that their allegations were based on "first hand knowledge." *See id.*

Following the reasoning set forth in *Bernard,* because Plaintiffs' have not provided <u>any competent evidence</u> to establish personal knowledge regarding the policies and practices of management at any other warehouse or subsidiary, or duties of independent distributors at any other warehouses, Plaintiffs' affidavits are legally insufficient to provide a basis for the Court to issue notice and conditional certification of Plaintiffs' broad proposed class and Plaintiffs' Motion must be denied.

      **b.**     ***Plaintiffs' Evidence Cannot Successfully Engage Defendants' Evidence to the Contrary that Plaintiffs and Putative Opt-Ins Are Not Similarly Situated***

To gain conditional certification and notice, Plaintiffs must provide evidence that "successfully engage[s] defendant's affidavits to the contrary." *See Grayson v. K-Mart Corp.,* 79 F.3d 1086, 1097 (11th Cir. 1996). Unlike Plaintiffs, <u>who provided no admissible evidence - let alone any competent or probative evidence</u> - to support their substantive allegations, Defendants have presented <u>ample evidence</u> to show that other independent distributors, even within the warehouses at Flowers/Opelika from which Plaintiffs and some of the opt-ins operated, are not "similarly situated."

To determine whether others are similarly situated, or have some "rudimentary showing of commonality," courts look at various, *ad hoc* factors, including (but not limited to) duties, geographic locations, employers, supervisors, when the alleged violations occurred, and any other relevant factors. *See, e.g., Dybach,* 942 F.3d at 1567-68; *Hipp,* 252 F.3d at 1219.

As will be discussed below, Plaintiffs have clearly not met their initial burden to show that they are similarly situated to putative opt-in class members even within the Flowers/Opelika subsidiary, let alone with independent distributors at all other subsidiaries, and thus conditional certification and notice is clearly inappropriate.

      **i.**     **Plaintiffs and Putative Opt-Ins Are Not Similarly Situated Because Plaintiffs Have Failed to Prove that Putative Opt-Ins Were Subject to the Same Practices and Policies as Plaintiffs**

First, Plaintiffs have failed to show that they are similarly situated to other independent distributors *even within their own warehouses at Flowers/Opelika* with regard to the practices and policies they were subject to, let alone to independent distributors at all other subsidiaries of Flowers Foods. For example, Morrow and Overton, in their Affidavits, both claim that they

"[could not] change or negotiate the price of product on [their] route[s]." (Aff. of Morrow, ¶ 8, Aff. of Overton, ¶ 8). Further, in Plaintiffs Complaint, they aver that "Flowers controls the price of the bread. Route distributors cannot change the price or offer discounts to customers as incentive to buy more product." (Compl., ¶ 32). However, as discussed above, Defendants provided an Affidavit from Michael Lord indicating that independent distributors can change suggested wholesale prices in certain situations (Aff. of Lord, ¶ 11), and also provided evidence from independent distributors at warehouses from which Plaintiffs operated, such as Chapman and Allen, to show that independent distributors do, in fact, change the suggested wholesale price when selling product to customers. (*See, e.g.,* Decl. of Chapman, ¶ 4; and Decl. of Allen, ¶ 4).

In Paragraph 25 of their Complaint, Plaintiffs allege that "Flowers provided Plaintiffs and other route distributors with a handheld computer that provides the route distributors with the amount of bread to order based on the customers past weekly sales." In Morrow and Overton's affidavits, they likewise state that "[a]ll route distributors are provided with a handheld computer by Flowers which is used to register each delivery, the order of deliveries, the amount of product to be provided to each customer . . .". (Aff. of Morrow, ¶ 4; Aff. of Overton, ¶ 4). However, the evidence presented from Flowers/Opelika management and independent distributors alike shows that Flowers does not dictate the amount of product that independent distributors must order (see Aff. of Lord, ¶ 12), and independent distributors can, and do, make adds or cuts to their product orders on a regular basis. (*See, e.g.,* Decl. of Thompson, ¶ 6, making adds or cuts to orders "one to three times per week"; Decl. of Forster, ¶ 6, making adds or cuts on "almost a daily basis"; Decl. of Foster, ¶ 5, making adds or cuts 1 to two times per week; Decl. of McCrory, ¶ 4, making

adds or cuts on a daily basis; Dep. of Porterfield, p. 117, line 15 to p. 118, line 7, acknowledging that he could make adds or cuts to orders).

In Paragraph 26 of their Complaint, Plaintiffs also allege that Flowers provides independent distributors with a handheld computer which "lists each stop in the order in which it has to be made, . . .". In Paragraph 4 of Morrow and Overton's affidavits, they again allege that "[a]ll route distributors are provided with a handheld computer . . . which [sets] the order of deliveries." However, Defendants' evidence, submitted from other independent distributors who operate out of the same warehouses as Plaintiffs, establishes that independent distributors can, and do, determine the order in which they service their deliveries. (*See, e.g.,* Decl. of Chapman, ¶ 8; Decl. of Allen, ¶ 8; Decl. of McCrory, ¶ 8; Decl. of Thompson ¶ 9; Decl. of Forster, ¶ 9; Decl. of Foster, ¶ 8; Decl. of McDonald, ¶ 8; Decl. of Atkins, ¶ 8; Dep. of Porterfield, p. 115, line 23 to p. 116, line 8).

Plaintiffs seemingly contend that all other independent distributors at all subsidiaries are similarly situated, thus justifying collective treatment for their broad proposed class, because they are or were subject to the same "unlawful company-wide policy" or "unlawful practice" of misclassification as independent contractors, which resulted in the denial of overtime (*see, e.g.,* Pl.'s Complaint, ¶ 83). Plaintiffs' argument fails for many reasons.

First, the **independent distributorship model used by Flowers Foods' subsidiaries has been upheld as one of independent contractor in multiple legal challenges.** (Aff. of Rich, ¶¶ 6, 8-9, 18). Thus, this is not a situation where the "policy" or "*de facto policy*" is unlawful on its face, as it may be where, for example, a company's policy treats janitors, who are clearly performing non-exempt work, as exempt. Rather, this is a situation where Plaintiffs are arguing that as a matter of *fact*, they are performing non-exempt duties and/or are being treated like

employees, and not as independent contractors, through various means of "control" by management of Flowers Foods and Flowers/Opelika. As such, Plaintiffs' classification as independent contractors (along with Plaintiffs' classification as exempt under the outside sales and Motor Carrier exemptions), <u>can only be called into question</u> when <u>detailed factual evidence</u> is presented to show that the actual day-to-day <u>practices</u> of management <u>towards each Plaintiff</u>, and the actual day-to-day duties <u>each Plaintiff</u> performed as a result, are indicative of an employer-employee- *and not independent contractor*- relationship (or that their day-to-day activities did not meet the applicable statutory exemption criteria). *See Holt,* 333 F. Supp. 2d at 1270-1272 (company's policy or practice of classifying managers as exempt was insufficient to show that all managers were similarly situated; rather, the application of the exemption was only called into question when plaintiffs provided evidence "as to the degree to which other [non-managerial] tasks [we]re performed," which necessarily required an analysis into each employee's job duties). In short, the distributor business model per se is not one of employer-employee; rather to the extent Plaintiffs were not treated as independent contractors requires an analysis and balancing of various actual practices, which will necessarily be fact-specific to each Plaintiff and potential class member.

Further, Plaintiffs seemingly contend that their proposed class members are similarly situated because independent distributors at all subsidiaries were subjected to an "unlawful plan" by Flowers Foods to create the independent contractor position from an employee route sales position for use by all of its subsidiaries in order to avoid the requirements of the FLSA. (Pl.'s Motion for Cond. Cert., p. 6 (citing Pl.'s Compl., ¶¶ 14, 15). However, as presented in the sworn and uncontroverted statements from the Vice President of Distributor Operations for Flowers Bakeries and the President of Flowers/Opelika, employee route salespersons employed at

Flowers Foods' subsidiaries, including Flowers/Opelika, were never paid overtime because they were traditionally treated as exempt under either both the well-established the Outside Sales or Motor Carrier exemptions. (Aff. of Rich, ¶ 5; Aff. of Bordeaux, ¶ 3). Thus, any decision to create an independent contractor position could clearly not have been made in order to avoid the requirements of FLSA because it did not result in the abolishment of any overtime pay.

> ii.  **Plaintiffs and Putative Opt-Ins Are Not Similarly Situated Because They Worked in Different Geographic Locations With Different Management**

As Defendants' evidence establishes, Plaintiffs and opt-ins are not similarly situated because they worked at different warehouses in different branches, located in different geographic locations, and for different management who handled the majority of the day-to-day issues with regard to independent distributors independently at the warehouse level, on a de-centralized basis. (*See* Aff. of Lord, ¶¶ 2-4; Aff. of Adkins ¶¶ 2-7; Aff. of Bordeaux, ¶ 6). Courts, including the Middle District of Alabama, have held where actual practice can differ from one management official to another, such facts render broad collective action treatment inappropriate. *See Saxton,* 431 F. Supp. 2d at 1189; *Horne,* 279 F. Supp. 2d at 1235-36.

Despite the fact that Plaintiffs and opt-ins themselves, who only operated out of 4 different warehouses, may have been exposed to different management practices, which in and of itself could render collective treatment inappropriate, the class that Plaintiffs propose is much broader, encompassing, as noted above, almost 500 warehouses, 25 different subsidiaries, and distributors or employee route salespersons located in 20 different states, and the District of Columbia. Numerous different managers over these warehouses each generally handled the day-to-day independent distributor issues independently, on a decentralized basis (Aff. of Rich, ¶ 11; Aff. of Lauder, ¶ 7). Absent any centralized decision making regarding day-to-day issues with

regard to independent distributors, management practice could vary substantially from warehouse to warehouse and subsidiary to subsidiary. The involvement of various subsidiaries "whose day-to-day activities and management . . . are decentralized" has been a factor that militates against a finding that collective action treatment is appropriate for all individuals working for all of the parent corporation's different subsidiaries. *Gutescu v. Carey Int'l, Inc.,* No. 01-4026-CIV-MARTINEZ/SIMONTON, 2003 U.S. Dist. LEXIS 25707, at *47 (S.D. Fla. June 16, 2003) (holding that the differing operations of various subsidiaries of the parent corporation, who operated on a decentralized basis with regard to the day-to-day activities and management practices, "le[d] [the court] to conclude that Plaintiff has failed to establish that all chauffeurs working under the [parent corporation] are sufficiently similarly situated to warrant inclusion in this lawsuit.").

Further, despite Defendants' evidence to the contrary, Plaintiffs have failed to provide any legally sufficient or admissible evidence to establish that, despite the potentially different management practices, other independent distributors in their broad proposed class were subjected to the same policies and practices as Plaintiffs. *See Reed,* 246 F. Supp. 2d at 1234 (focusing (in part) on fact that various campuses in proposed class enjoyed "considerable autonomy," coupled with lack of evidence to the contrary, to hold plaintiffs in broad class were not similarly situated).

### iii.    Plaintiffs and Putative Opt-Ins Are Not Similarly Situated Because They Did Not Work for the Same Employer

Plaintiffs have also failed to show that they and putative plaintiffs are similarly situated because Plaintiffs have not shown that all subsidiaries of Flowers Foods who used independent distributors constituted an "integrated enterprise" or were joint employers with Flowers Foods and/or Flowers/Opelika under the FLSA.

Currently, only one subsidiary (Flowers/Opelika) and the parent company (Flowers/Foods) are named Defendants in Plaintiffs' lawsuit. However, Plaintiffs seek a class encompassing thousands of independent distributors at 25 subsidiaries of Flowers Foods when the overwhelming majority of subsidiaries with whom potential class members had independent distributor agreements (Aff. of Rich, ¶ 13) are not even parties to this lawsuit. Plaintiffs contend, nonetheless, that independent distributors from all subsidiaries are similarly situated and should be sent judicial notice and conditionally certified in the same collective action without providing anything more than generalized conclusory allegations that all independent distributors were subject to the same "policies" and "practices" of Flowers Foods, which are insufficient as a matter of law. *See Evers,* 771 F.2d at 986; *see also Ledbetter* 2007 U.S. Dist. LEXIS 10243, at 15 (contending that individuals are similarly situated merely because they are subject to violations of the FLSA by the same employer, without providing detailed evidence in support, "is counter to the requirement that plaintiffs make 'substantial and detailed allegations of FLSA violations and provide evidence to support that plaintiffs and the potential class members are 'similarly situated'"). Plaintiffs failed to provide any legally sufficient or admissible evidence to show that Flowers Foods is a joint employer with any of its 25 subsidiaries, and that all subsidiaries are joint employers vis-à-vis each other, which is necessary to support their argument that independent distributors at all subsidiaries should be included in the same lawsuit. *See* 29 U.S.C. 206-207 (FLSA does not apply in the absence of an employer-employee relationship). Allowing conditional certification and notice to issue against multiple subsidiaries which are not even named parties to the action, and for which no joint employer relationship has been sufficiently pled[15] or established, not only violates the fundamental due process rights of

---

[15]  *See Bell Atlantic v. Twombly,* 127 S. Ct. 1955 (2007) (opining that Federal Rule of Civil Procedure 8 now requires parties to plead factual allegations sufficiently enough to raise a right to potential relief "above mere

such subsidiaries but also disregards the basic pre-requisite to liability under the FLSA- that an employer-employee relationship exists.

In contrast to Plaintiffs' complete lack of evidence to the contrary, Flowers Foods and Flowers/Opelika have presented ample evidence to establish that no such joint employment relationship exists because (in pertinent part): (1) independent distributors do not have a contractual relationship with Flowers Foods but rather have a contractual relationship only with the applicable subsidiary (Aff. of Rich, ¶ 13); (2) Flowers/Opelika operates independently of any other subsidiaries (Aff. of Rich, ¶ 11; Aff. of Lord, ¶ 5; Aff. of Bordeaux, ¶ 7); (3) subsidiaries, including Flowers/Opelika, handle the day-to-day operations independently, with minimal interaction from Flowers Foods (Aff. of Rich, ¶ 11; Aff. of Lord, ¶¶2, 4; Aff. of Bordeaux, ¶ 6).

Notwithstanding, it is clear that any determination of liability for Flowers Foods for all 25 subsidiaries, which would require an individualized inquiry into the exact relationship Flowers Foods has with each subsidiary, and the exact relationship each subsidiary has vis-à-vis each other, would be highly fact-intensive, rendering collective action treatment inappropriate. *See Gutescu,* 2003 U.S. Dist. LEXIS 25707, at *47, n.15 ("Since the liability of parent corporations as joint employers would need to be resolved on a subsidiary by subsidiary basis, this is another factor which militates against the[sic] inclusion of drivers who performed work for various subsidiaries within the same lawsuit").[16]

---

speculation.").

[16] Even assuming, *arguendo*, that Flowers Foods and all of its subsidiaries were considered to be an integrated enterprise, or joint employers, Plaintiffs Motion should still be denied because, as discussed above, Plaintiffs have failed to provide any evidence that they and potential class members are similarly situated or that individuals in the broad class they propose wish to opt-in. At a minimum, as will be discussed in Section II(C)(3), the scope of Plaintiffs' proposed class for conditional certification and notice should, as a matter of law, be limited to the locations from which Plaintiffs and Opelika opt-ins worked.

       **iv.**    **Plaintiffs and Putative Opt-Ins Are Not Similarly Situated Because Their Proposed Class Encompasses Two Different Positions with Different Compensation Structures**

Plaintiffs and putative opt-ins likewise are not similarly situated because the broad opt-in class they propose ("[a]ll current and former route distributors, or other persons performing a service and/or delivery function on a non-hourly basis from July 2, 2004 to the present, [who did not receive overtime]") consists of two different positions, namely an employee route salesperson position and an independent distributor position. (Aff. of Rich, ¶¶ 17-18). These positions are not only compensated differently (Aff. of Rich, ¶¶ 5, 12, 20) but also contain other differences, such as (for example) the ownership of distribution rights and associated equity interests for independent distributors but not for employee route salespersons. (Aff. of Rich, ¶¶ 3, 12, 20). Because Defendants contend both of these positions were exempt from overtime, if Plaintiffs' broad class were conditionally certified, each of these positions would need to be analyzed separately for each individual holding the position, as will be discussed more fully below, to determine the exempt or non-exempt status. Specifically, the duties of individuals holding employee route salesperson positions would need to be analyzed under the Motor Carrier and Outside Sales exemptions, but not under an independent contractor analysis, while the duties of individuals holding independent distributor positions may need to be analyzed under the Motor Carrier Act and Outside Sales exemptions, and/or independent contractor analysis. Clearly, such complex and individualized inquiries renders collective treatment and/or notice to Plaintiffs' broad proposed class inappropriate.

v.     **Plaintiffs and Putative Opt-Ins Are Not Similarly Situated Because Defenses Individual to the Plaintiffs and Putative Opt-Ins Exist**

Plaintiffs and putative opt-ins are also not similarly situated because defenses individual to each opt-in exist, which renders collective action treatment inappropriate.

Both Flowers Foods and Flowers/Opelika contend that all independent distributors and others subject to Plaintiffs' broad proposed class are/were, at all times within the statutory period, not "employees" covered under the FLSA and/or are/were performing exempt work as defined by the FLSA and its regulations. Flowers Foods and Flowers/Opelika both contend that the putative class members were not entitled to overtime under three separate bases, namely (1) as independent contractors,[17] (2) under the outside sales exemption to the FLSA, and (3) under the Motor Carrier Act exemption (49 U.S.C. § 304, et. seq.) to the FLSA. It is well settled that to determine which individuals "are entitled to overtime compensation under the FLSA depends on an *individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria.*" *Holt,* 333 F. Supp. 2d at 1271, 72 (emphasis added) (holding that "Plaintiffs employed as Store Managers or Assistant Store Managers . . . even within the region [of Alabama] are not similarly situated."); *Diaz v. Electronics Boutique of America, Inc.,* 2005 WL 2654270, at *4 (W.D. N.Y. 2005) (holding that although members of potential collective action shared the same job description, their job responsibilities may differ, requiring a "highly fact-specific and detailed analysis into each [individual]'s duties."). Put differently, the FLSA requires an "intensely fact bound and case specific inquiry" into whether each particular employee performed exempt work. *See* 29 C.F.R. Section 541.2; *Bohn v. Park City Gp., Inc.,* 94 F.3d 1457, 1461 (10th Cir. 1996). In the instant case, this fact-specific inquiry may not be satisfied by generally alleging that all independent distributors were subject to the same policies

---

[17] 29 U.S.C. 206-207 (FLSA does not apply in the absence of an employer-employee relationship).

or practices, as Plaintiffs are attempting to do, but necessarily requires an examination into the actual day-to-day practice of management, particularly with regard to whether too much control was/is being exercised by management, and the day-to-day duties of independent distributors. Where, as in the instant case, Defendants are relying on three separate exemptions from overtime, this inquiry necessarily becomes <u>even more individualized and complex</u>, as each putative opt-in's individual duties may have to be analyzed under each of the separate statutory exemptions to determine whether they were properly treated as exempt from overtime.

For example, the determination of whether an individual is an employee or independent contractor under the FLSA is fact-specific and focuses on the "economic realities" involved in the nature of the relationship between the individual and the company. The courts typically analyze the following five different factors when making this determination: (1) degree of control; (2) opportunities for profit or loss; (3) capital investment; (4) permanency of the relationship; and (5) skill required to perform the duties at hand. *See Schultz v. Capital International Security, Inc.,* 466 F.3d 298, 304-305 (4th Cir. 2006) (citing *W.J. Usery v. Pilgrim Equipment Co.,* 527 F.2d 1308, 1311 (1976)). Courts typically focus on the "totality of the circumstances" when making this determination; no one factor is dispositive. *See id.* The highly individualized and fact-specific inquiry involved in making this determination militates against collective action treatment. *See, e.g., Phaaler v. Consultants Architects, Inc.,* 2000 U.S. Dist. LEXIS 1772, at *4-5 (N.D. Ill. 2000) (denying collective action treatment for case involving misclassification of independent contractors because of the fact-intensive inquiry the court would be required to conduct regarding each putative opt-in's relationship with the company to determine whether they were independent contractors or employees under the FLSA.). The declaration evidence discussed above establishes that this inquiry may yield substantially

different results even when limiting the inquiry to independent distributors at the warehouses from which Plaintiffs operated.

Other fact-specific criteria relevant to the determination of whether individuals are independent contractors or independent distributors, may include, for example, whether an independent distributor hires a helper and to what extent, or whether an independent distributor has bought or sold portions of a territory, and the amount of capital investment in the business and potential for loss. The declaration evidence presented from other independent distributors within Plaintiffs' own warehouses and subsidiary, in addition to the evidence regarding the equity values of Plaintiffs' own territories, likewise illustrates the differences in independent distributors' businesses, even within the same warehouses, that are presented after such individualized inquiries are conducted.

Assuming, *arguendo*, certain independent distributors are "employees" under the FLSA, a similar fact-intensive analysis would need to be conducted into the duties of each putative opt-in to determine whether either or both the outside sales and Motor Carrier Act exemptions are applicable. *See, e.g., Clausman v. Nortel Networks, Inc.*, 2003 U.S. Dist. LEXIS 11501 (S.D. Ind. May 1, 2003); *Reich v. Homier Distributing Co., Inc.*, 362 F. Supp. 2d (N.D. Ind. 2005). Such fact-specific criteria that would need to be analyzed for each potential opt-in include, but are not limited to: (1) whether the individual was primarily "outside of the employer's workplace" and at customers' locations; (2) what activities each independent distributor did at each customer's location; (3) what work is performed "incidental to" the work of outside sales; (4) whether or not the independent distributor sells products that have been manufactured out of state and the percentage of such products; and (5) the weight of the independent distributors' vehicle with product. The need to conduct such fact-specific inquiries and analyses into the daily

tasks of each putative opt-in generally militates against collective action treatment. *See, e.g., Wombles v. Title Max of Ala., Inc.,* 2005 U.S. Dist. LEXIS 34733, at *16-17 (M.D. Ala. Dec. 7, 2005); *Holt,* 333 F. Supp. 2d at 1271-72; 75; *Ledbetter,* 2007 U.S. Dist. LEXIS 10243, at *16 (quoting *Horne,* 279 F. Supp. 2d at 1237) (the need for an individualized analysis, which is inherent in the FLSA violations analysis, "runs directly counter to the 'economy of scale' envisioned by the collective treatment of similarly situated employees under Section 216(b) of the Act."). The fact-intensive nature of these inquiries is further highlighted given the "nationwide" class Plaintiffs seek, encompassing 4,744 past and current independent distributors and route sales employees over a three year period at 25 different subsidiaries at approximately 500 different warehouses.

Finally, Flowers Foods and Flowers/Opelika will have a defense of release and waiver as to some opt-ins who, following court approval of the settlement, signed release and waivers of any FLSA claims. *See* Order dated December 5, 2006, *Quarles, et. al. v. Flowers Foods, Inc.* Case No. 05-21738-CIV-SEITZ/MCALILEY (S.D. Fla.). In *Quarles,* Plaintiffs, distributors of Flowers Baking Co. of Miami, LLC, agreed that they did not have any cognizable claims under the FLSA, specifically, even assuming they were employees under the Act, because of the outside sales and Motor Carrier exemptions. A copy of the Court's Order approving such settlement is attached hereto as Exhibit 18. Should the Court grant conditional certification and notice to Plaintiffs' broad proposed class, Flowers Foods and Flowers/Opelika will have to assert the defense of waiver and release on an opt-in by opt-in basis, thus again rendering collective action treatment inappropriate.

2.    **Plaintiffs Have Failed to Provide Any Probative or Admissible Evidence That Others In Their Broad Proposed Class Wish to Opt-In**

Even assuming, *arguendo*, that Plaintiffs' affidavits were admissible, Plaintiffs failed to provide <u>any evidence whatsoever</u> to show that any other individuals in this broad proposed class wish to opt-into this lawsuit.

Plaintiffs' only evidence to show that others within their broad proposed class wish to opt-into this lawsuit consists entirely of their own conclusory and unsupported allegations in their Motion for Conditional Certification, some consents-to-join signed by five Flowers/Opelika current and former independent distributors, most of whom work/worked out of the same warehouses as Plaintiffs and three of whom have claims that should be time-barred, an alleged opt-in consent from one former independent distributor in Thomasville, Georgia, who has an independent distributor agreement with a subsidiary which is <u>not even a party to this lawsuit</u>, and virtually identical inadmissible affidavits from Morrow and Overton stating they "believe" additional distributors will seek to join or opt into the lawsuit and that "[i]t is [their] belief that if the Court informs route distributors . . . that it has authorized and approved this suit . . . most employees will signup." (*See* Pl.s' Motion for Cond. Cert, p. 8; Aff. of Morrow, ¶¶ 12-13; Aff. of Overton, ¶¶ 12-13).

Courts within the Eleventh Circuit routinely find such "evidence" to be legally insufficient to meet plaintiffs' burden of showing that other individuals within plaintiffs' proposed class desire to opt-in and/or insufficient for notice and conditional certification. *See Wombles,* 2005 U.S. Dist. LEXIS 34733, at *3 (holding that two consents to join and five affidavits by plaintiffs indicating that they "believed" others wanted to join the lawsuit was insufficient to show others desired to opt-in for purposes of conditional certification); *Barten, et al. v. KTK & Associates, Inc.,* No. 8:06-CV-1574-T-27EAJ, 2007 U.S. Dist. LEXIS 54068, *7

(M.D. Fla. July 26, 2007) (quoting *Mackenzie v. Kindred Hosp. E., L.L.C.,* 276 F. Supp. 2d 1211, 1220 (M.D. Fla. 2003) ("[a] plaintiff's belief in the existence of other employees who desire to opt in and 'unsupported expectations that additional plaintiffs will subsequently come forward are insufficient to justify' certification of a collective action and notice to a potential class."); *Horne,* 279 F. Supp. 2d at 1236-37 (denying plaintiff's motion for notice, holding (in pertinent part) that plaintiff's affidavit stating, based on his "observation, experience, and dealings," that he "believe[d] there were similarly situated employees who desired to opt-in," was insufficient and "fail[ed] to meet even the light burden imposed under the FLSA."). Further, such evidence is clearly not sufficient to show that individuals outside of the locations at which Plaintiffs and opt-ins work/worked desire to opt-in. *See, e.g.,* Order, *WellPoint,* No. 1:06-CV-2430-ODE, slip op., p. 7 (holding (in pertinent part) that three consents from former co-workers of plaintiffs who worked in the same two locations as plaintiffs were not sufficient to show that individuals who worked at defendants' many other offices within the state, and across the country, desired to opt-in).

It is well-established that "certification of a collective action and notice to potential class members is not appropriate to determine *whether* there are others who desire to join the lawsuit." *Barten,* 2007 U.S. Dist. LEXIS 54068, at *6 (citing *Dybach,* 942 F. 2d at 1567-1568); *see also Parker v. Rowland Express, Inc.,* 492 F. Supp. 2d 1159 (D. Minn. 2007) ("First, an FLSA plaintiff is not entitled to conditional certification simply to seek out others who might wish to join in the lawsuit."). Rather, such as showing is required *before* conditional certification and notice may be authorized. *See Barten,* 2007 U.S. Dist. LEXIS 54068, at *6. As such, because Plaintiffs have <u>failed to provide any competent evidence</u> that other distributors within their "nationwide" *broad proposed class* wish to opt into this lawsuit, and because <u>Plaintiffs and opt-</u>

ins, even if the alleged opt-in from Thomasville were considered, <u>constitute much less than 1%</u> <u>of their proposed broad class</u>, the Court should deny their Motion for Conditional Certification and Notice.

3. **The Requested Scope Of Plaintiffs' Class Is Out Of Proportion To The Scope Of Plaintiffs' Work Locations, And If This Court Grants Any Notice It Should Be Confined To The Opelika Warehouses Out Of Which Plaintiffs Operated**

Even assuming, *arguendo,* that the Court determines that conditional certification and notice are appropriate as to some identifiable class in this case, such notice and certification should, *as a matter of law*, be confined to the discrete locations from which the Plaintiffs' purported "evidence" is presented: the four (4) Opelika warehouses out of which Plaintiffs and the Opelika opt-ins operated – Montgomery, Greenville, and Roanoke, Alabama, and LaGrange, Georgia – because, as discussed above, they have provided <u>no competent- let alone admissible-</u> <u>evidence</u> to show they are "similarly situated" to distributors at any other Flowers/Opelika warehouses or at any other subsidiary of Flowers Foods, which are not even parties to this lawsuit.

In a starkly similar case heard by Judge Albritton from the Middle District of Alabama, *Harper,* 185 F.R.D. at 358,[18] seven named plaintiffs were several hourly employees who claimed they had not been paid overtime and sought conditional certification and to send notice to all the hourly employees at all of the defendant's restaurants in six states. In their Complaint, plaintiffs alleged the defendant engaged in a widespread practice of failing to pay its employees proper wages (including overtime) as required by the FLSA. Plaintiffs contended that the defendant's

---

[18] Ironically, Plaintiffs principally rely on the *Harper* case in support of their motion for nation-wide notice to issue here. *See* Plaintiffs' Memorandum of Law in Support of Motion to Conditionally Certify and Facilitate Class Notice, at 5. Plaintiffs, however, fail to mention that the ***Harper court actually denied nation-wide notice*** and instead ***limited notice to one location*** – a single restaurant in Dothan, Alabama, where the plaintiffs worked. *Harper v. Lovett's Buffet, Inc.,* 185 F.R.D. 358, 363 (M.D. Ala. 1999).

pay plan for its managerial employees, which created incentives for keeping labor costs low (and limiting overtime payments), encouraged the overtime violations, and that this pay plan for management applied to employees at all of the defendants' restaurants. Plaintiffs also specifically described the alleged FLSA violations at the restaurant at which they worked and generally alleged that these same employment practices were common at all of the defendant's restaurants. *See id.* at 360. Defendants moved to strike the class allegations, arguing that plaintiffs did not establish that the other individuals in the proposed class were similarly situated, noting that proposed class members worked in different restaurants, under different management, and in different working environments in 6 different states. Plaintiffs, in turn, submitted fifteen affidavits from employees at the restaurant location where they worked, providing facts to show that they were also subject to these alleged overtime violations. Plaintiffs again argued (in pertinent part) that because the corporate policies, practices, and procedures affected all employees in these jobs, the "difficult factual and legal questions" often presented in FLSA cases were not present. *See id.* at 362.

When determining whether conditional certification and notice to plaintiffs' proposed class was proper, the Middle District of Alabama noted that plaintiffs had not provided any evidence to support their allegations that its pay plan for management resulted in the denial of overtime or that any such unlawful plan existed. The court further noted that although plaintiffs had provided evidence to show that FLSA violations may exist at the restaurant at which plaintiffs worked, "there is a total dearth of factual support for Plaintiffs' allegations of widespread wrongdoing at Defendant's other restaurants." *Id.* at 363 (citing *Haynes*, 696 F.2d at 884). In light of the individual nature of the overtime allegations, and because plaintiffs did not provide any evidence to show that individuals at locations other than those at which plaintiffs

worked were subject to the same FLSA violations, the court confined the notice to the Dothan, Alabama, restaurant where the plaintiffs worked. The Court, focusing on the breadth of plaintiffs' proposed class and lack of factual, evidentiary support regarding this broad class, reasoned:

> On the basis of evidence supporting possible FLSA violations at one restaurant and *unsupported allegations of widespread wrongdoing at Defendant's other restaurants*, Plaintiffs request that this Court authorize them to notify all hourly employees who have worked at any of Defendant's restaurants in some six (6) states within three (3) years of the filing of this lawsuit . . . and to provide the opportunity for these individuals to opt-in . . . *The court cannot, on the basis of the evidence presented, find these individuals to be similarly situated to the named, individual Plaintiffs or to allow even the conditional certification or provision of notice to such a huge, diverse class.*

*Id.* (emphasis added). The court thus reasoned that "[s]ince [it] cannot satisfy itself that there are other employees (at other restaurants) who desire to opt-in and who are similarly situated, as required by the Eleventh Circuit in *Dybach*, 942 F.2d at 1567-68, the court will not allow notice to be sent to employees of other restaurants." *Id.*[19]

Many other district courts in the Eleventh Circuit have likewise refused to conditionally certify, and/or authorize judicial notice, to the broad class plaintiffs propose, and have limited conditional certification and/or notice to the location(s) from which plaintiffs worked, when plaintiffs fail to provide any evidence that individuals at any other locations are similarly situated or wish to opt-in. *See, e.g., Spencer v. Regional Acceptance Corp.,* No. 05-60292, 2005 U.S. Dist. LEXIS 45221, *4-*6 (Aug. 19, 2005 S.D. Fla.) (limiting court-supervised notice to the branch where plaintiff worked, reasoning that the plaintiff merely alleged that defendants had

---

[19] The court, when allowing notice to be sent to the restaurant at which plaintiffs worked, noted that plaintiffs had provided detailed allegations and *evidentiary support* to show that they, and other employees at their restaurant, were subject to FLSA violations and had provided 21 consents to show other individuals desired to opt-into the lawsuit. *See id.* at 365. As discussed above, Plaintiffs in the instant case have failed to provide evidentiary support that comes anywhere close to that which was presented in *Harper.*

"nationwide policies and practices of violating the FLSA," without pleading any particularized facts supporting the existence of such a policy or practice on a national level, and did not submit any specific evidence that individuals outside their facility wished to opt-in); *Robbins-Pagel v. WM. F. Puckett, Inc.*, 2006 U.S. Dist. LEXIS 85253 (M.D. Fla. Nov. 22, 2006) (limiting notice to one facility where plaintiffs worked because plaintiffs presented no evidence that employees outside of the facility at which they worked were similarly situated or wished to opt-in); *Rivera v. Cemex,* 2006 U.S. Dist. LEXIS 84577 (M.D. Fla. Nov. 21, 2006) (limiting notice to one facility, despite plaintiffs' proposed class of individuals at all of the company's facilities, when plaintiffs only submitted affidavits from their facility and presented no evidence that individuals at any other facilities who were similarly situated wished to opt-in); *Horne,* 279 F. Supp. 2d at 1235 ("[a] plaintiff must demonstrate that employees outside of the work location for which plaintiff has provided evidence were similarly affected by the alleged work policies in order for the court to certify a collective action which extends beyond the plaintiff's own work locations.").

Like *Harper* and the cases cited above, in the instant case, Plaintiffs <u>only</u> provided "evidence" (assuming, *arguendo¸* that it is competent or even admissible) regarding violations at the <u>locations from which plaintiffs operated</u> and <u>failed to provide any evidence whatsoever</u> (other than their own unsupported allegations, which are insufficient as a matter of law) to show that others in their broad proposed class were similarly situated or wished to opt-in. Assuming the Court finds that conditional certification and notice to some class is appropriate, following the reasoning in the above-referenced cases, such conditional certification and notice should <u>clearly</u> be limited to the locations from which Plaintiffs and Opelika opt-ins operated.

## III.    CONCLUSION

Given the dearth of admissible evidence, bolstered by the fact that Plaintiffs constitute <u>less than one percent of their broad proposed class</u>, Plaintiffs' motion should be denied outright, and this case should simply move forward as a multi-plaintiff, non-collective action case under the FLSA.  *See WellPoint,* 1:06-cv-02430-ODE, p. 13 (holding that because plaintiffs failed to show that other individuals at all subsidiaries of defendants across the country were similarly situated and wished to opt-in, the case should proceed as an individual plaintiff action only). However, to the extent the Court determines that conditional certification and notice are appropriate, any such notice and certification should, as a matter of law, be limited to the four (4) warehouses out of which the Plaintiffs and the Opelika opt-ins operated – Montgomery, Greenville, and Roanoke, Alabama, and LaGrange, Georgia.

Respectfully submitted this 17th day of October, 2007.

/s/ Kevin P. Hishta
Kevin P. Hishta
Georgia Bar No. 357410
Admitted *Pro Hac Vice*
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Bank of America Plaza
600 Peachtree Street, NE
Suite 2100
Atlanta, GA  30308
E-mail: Kevin.Hishta@ogletreedeakins.com
(404) 881-1300
(404) 870-1732 Fax


Sandra B. Reiss (ASB-3650-S80S)
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203-2118
E-mail: Sandra.Reiss@odnss.com

Ph. (205) 328-1900
Fax (205) 328-6000

*Counsel for Defendants, Flowers Foods, Inc. and Flowers*
*Baking Co. of Opelika, LLC*

## EXHIBITS

Affidavit of Karyl Lauder– Exhibit 1

Affidavit of Chuck Rich – Exhibit 2

Affidavit of Michael Lord– Exhibit 3

Affidavit of Steve Bordeaux – Exhibit 4

Affidavit of Don Adkins– Exhibit 5

Declaration of Robert Thompson– Exhibit 6

Declaration of Ronald Corey McDonald– Exhibit 7

Declaration of Terry Prather – Exhibit 8

Declaration of Dave Forster– Exhibit 9

Declaration of Rufus Foster, Jr. – Exhibit 10

Declaration of John Alan Renfroe– Exhibit 11

Declaration of Robert McCrory– Exhibit 12

Declaration of Aaron Chapman– Exhibit 13

Declaration of Bradley Allen – Exhibit 14

Declaration of Michael Lee Atkins– Exhibit 15

Deposition excerpts of Henry Porterfield – Exhibit 16

*Wellpoint* Order – Exhibit 17

*Quarles* Order – Exhibit 18

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 17<u>th</u> day of October, 2007, I electronically filed the foregoing Defendant Flowers Foods, Inc.'s and Defendant Flowers Baking Co. of Opelika, LLC's Response In Opposition to Plaintiffs' Motion to Conditionally Certify And Facilitate Class Notice with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

Greg L. Davis, Esq.
The Law Offices of Greg L. Davis
6987 Halcyon Park Drive
Montgomery, AL  36117

Joe R. Whatley, Jr., Esq.
Whatley Drake & Kallas, LLC
2001 Park Place North
Suite 1000
Birmingham, Alabama  35203

Amy Lynne Weaver
Whatley Drake & Kallas, LLC
2001 Park Place North
Suite 1000
Birmingham, Alabama  35203

Joseph P. Guglielmo, Esq.
Whatley Drake & Kallas, LLC
1540 Broadway, 37th Floor
New York, New York  10036

I hereby certify that a true and correct copy will be sent by First Class, U.S. Mail on this 17th day of October, 2007 to:

E. Kirk Wood, Esq.
Law Offices of Archie Lamb
2017 2nd Avenue North
Birmingham, Alabama 35201

/s/ Kevin P. Hishta_____
Kevin P. Hishta

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| **CHARLES MORROW and MICHAEL OVERTON, Individually and on behalf of similarly situated employees,** | ) ) ) | |
| | ) | **CIVIL ACTION NO: 3:07-CV-617-MHT** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **FLOWERS FOODS, INC., FLOWERS BAKING CO., OF OPELIKA, LLC,** | ) ) ) | |
| **Defendants.** | ) | |

## AFFIDAVIT OF KARYL H. LAUDER

I, Karyl H. Lauder, having been duly sworn, hereby depose and state as follows:

1.      I am currently employed as the Vice President and Chief Accounting Officer for Flowers Foods, Inc. ("Flowers Foods"). I have held this position since September 24, 2007. Prior to this promotion, I was Vice President and Operations Controller for Flowers Foods, a position I held since January 2003.

2.      My responsibilities include consolidating the financial reports of Flowers Foods' subsidiaries, including Flowers Baking Co. of Opelika, LLC ("Flowers/Opelika"), and verifying that those financial reports are accurate. In my position, I am also aware of the organizational structure of Flowers Foods and its subsidiaries.

3.      Flowers Foods is the parent holding company of 39 operating subsidiaries. Each subsidiary is its own profit and loss center and is a separate legal entity.

4.      Flowers Foods and its subsidiaries' brands include Nature's Own, Cobblestone Mill, ButterKrust, Evangeline Maid, Mary Jane, Dandee, Flowers, Betsy Ross, European Bakers,

BlueBird, Mrs. Freshley's, Mi Casa, Tesoritos, as well as regional franchised brands, such as Sunbeam and Bunny.

5.      Certain Flowers Foods' subsidiaries distribute fresh breads, buns, rolls, and snack cakes through a direct-store-delivery (DSD) system. This DSD system is comprised principally of a network of independent distributors.

6.      Other subsidiaries of Flowers Foods are responsible for the national distribution of fresh snack cakes and frozen breads and rolls that are sold directly to customers' warehouses by contract carriers, an alternate distribution channel.

7.      I have no supervisory responsibility with respect to subsidiary management or operations, nor do I make any decisions with respect to their daily operations. The management of Flowers Foods has no day-to-day operational control over any subsidiaries, nor do they make any of the daily decisions concerning the operations of these subsidiaries.

I hereby declare under penalty of perjury of that foregoing is true and correct according to my personal knowledge, and if called as a witness, I could and would testify truthfully thereto.

Executed on ___October 15___, 2007.

_____
KARYL H. LAUDER

Sworn to and subscribed before me this 15th day of October, 2007.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES: Notary Public, Mitchell County, Georgia
My Commission Expires Oct. 6, 2010 .

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CHARLES MORROW and MICHAEL ）
OVERTON, Individually and on behalf ）
of similarly situated employees, ）
）
       Plaintiffs, ）
）
v. ）
）
FLOWERS FOODS, INC., FLOWERS ）
BAKING CO., OF OPELIKA, LLC, ）
）
       Defendants. ）

CIVIL ACTION NO: 3:07-CV-617-MHT

## AFFIDAVIT OF CHUCK RICH

I, Chuck Rich, having been duly sworn, hereby depose and state as follows:

1.     I am currently the Vice President of Distributor Operations for Flowers Foods Bakeries Group. I assumed this position in July 2005. Prior to assuming my current position, I held the position of Director of Distributor Relations for Flowers Foods Bakeries Group. Prior to assuming the position of Director of Distributor Relations, I held the positions of Tax Associate and Distributor Coordinator for Flowers Industries, Inc. I am familiar with the distributorship program implemented by various subsidiaries of Flowers Foods, Inc. (and its predecessor Flowers Industries, Inc.).

2.     Executives at Flowers Industries began to consider the possibility of its subsidiaries converting their employee route sales distribution systems to independent distributors in the mid-1980's. Under the distributor business model, distributors are sold distribution rights to certain branded products of Flowers Foods and its subsidiaries, such as Nature's Own, Cobblestone Mill, Breads International, and Blue Bird. Distribution rights to

private label products, which are products sold by major retailers using their own respective label names, are not sold. Neither are rights to non-branded products sold, such as products sold in clear bags to various fast food restaurants.

3.     Prior to executives at Flowers Industries considering the distributor business model, it was being used by other bakers, including Pepperidge Farm, Tasty Baking Company and Holsum Baking Company. This business model is premised on the belief that a distributor who owns his/her distribution rights will have more entrepreneurial incentive to develop the business and generate additional sales. This entrepreneurial incentive was the principal reason the distributor business model was developed by Flowers Industries for use by its baking subsidiaries.

4.     I was involved in the conversion of employee route salespersons at Flowers Baking Co. of Opelika, LLC ("Flowers/Opelika") in 1994. One of the keys to successful conversions was ensuring that the new distributors were placed in at least the equivalent economic position that they were in as employees. This point was stressed to Flowers/Opelika management when the conversion took place there. In order to provide additional income to distributors to allow them the opportunity to purchase health and other insurance and to otherwise bear the cost of operating independent business, the standard route commission of approximately 8% was generally raised to a product margin (discount) of 20-23% off of the suggested wholesale price. Distributorships also allowed those distributors participating in the program to build an equity interest in their territory/distribution rights.

5.     Before the employee route salespersons in Opelika were converted to independent distributors, they were paid on a base plus commission formula and treated as exempt from both the minimum and overtime obligations under the Fair Labor Standards Act (FLSA) outside sales

2

exemption. Employee route salespersons who delivered product that had been manufactured out of state were also considered to be exempt from overtime under the Motor Carrier exemption as well. This was true at other subsidiaries of Flowers Industries and Flowers Foods as well. The conversion to independent distributors did not eliminate any overtime payments. Because the conversion to distributors did not eliminate any overtime payments, overtime was not a reason for converting to this new method of distribution, including at Flowers/Opelika.

6.      Following conversion to independent distributors, Flowers/Opelika began to treat its distributors as "statutory employees" under Section 3121(d)(3)(A) of the Internal Revenue Code. Under this Section, certain categories of common law independent contractors, including bakery distributors, are treated as employees for Federal Insurance Contribution Act (FICA) purposes only.

7.      I understand that another provision of the Internal Revenue Code incorporates the "statutory employee" definition for Federal Unemployment Tax Act (FUTA) purposes.

8.      Flowers Foods' subsidiaries, including Flowers/Opelika, treat their distributors as "statutory employees" for FICA and FUTA purposes, but as independent contractors otherwise, *i.e.*, Flowers' subsidiaries, including Flowers/Opelika do not withhold any income tax on behalf of distributors.

9.      Flowers Industries and its subsidiaries were audited by the Internal Revenue Service (IRS) for the tax periods March 21, 1994 – December 31, 1995, and for the year ending December 31, 1999. On both of these occasions the IRS specifically concluded that the distributors of Flowers' subsidiaries were "statutory employees.

10.      One of the major industry publications for the baking industry is Milling & Baking News, published by Sosland Publishing Company. Numerous executives of Flowers

Foods and its subsidiaries subscribe to and/or read this publication, and have done so for years, including myself. This magazine, which is published weekly, regularly contains articles on industry trends. Attached hereto as Exhibit 1 is a true and accurate copy of an article from the Milling & Baking News, dated January 19, 1993, discussing conversions to independent distributors in the baking industry.

Other major bakers that currently use the distributor business model include George Weston, Ltd., Sara Lee Corporation, and Bimbo Bakeries USA.

11.    In my positions as Director of Distributor Relations and subsequently Vice President of Distributor Operations, I have general oversight of the distributorship program implemented by various subsidiaries of Flowers Foods, Inc. I do not make any decisions concerning individual distributors; my role is only one of providing it advice from time to time. Decisions concerning individual distributors are handled at the subsidiary level by management officials of that particular subsidiary.

12.    Conversions at subsidiaries of Flowers Foods/Flowers Industries have been done on a subsidiary by subsidiary basis. Sometimes, only certain sales area of a subsidiary have been converted, with the remaining sales areas' distribution continuing to be handled by employee route salespersons. Such route salespersons continue to be paid on a base plus commission formula and are treated as exempt from both the minimal wage and overtime obligations under the FLSA's outside sales exemption. Employee route salespersons who continue to deliver product that has been manufactured out of state continue to be considered exempt from overtime under the Motor Carrier exemption as well.

13.    Currently, 25 operating subsidiaries of Flowers Foods utilize independent distributors. The independent distributors execute a contract ("Distributor Agreement") with a

4

particular subsidiary only, *i.e.,* a distributor does not execute any Distributor Agreement with Flowers Foods or multiple subsidiaries of Flowers Foods. Such subsidiaries, in the aggregate, currently have Distributor Agreements with approximately 2,800 distributors. These subsidiaries, and their respective headquarters, follow:

| Subsidiary | Headquarters |
| --- | --- |
| Flowers Baking Co. of Thomasville, LLC | Thomasville, GA |
| Flowers Baking Co. of Miami, LLC | Miami, FL |
| Flowers Baking Co. of Bradenton, LLC | Bradenton, FL |
| Flowers Baking Co. of Jacksonville, LLC | Jacksonville, FL |
| Flowers Baking Co. of New Orleans, LLC | New Orleans, LA |
| Flowers Baking Co. of Baton Rouge, LLC | Baton Rouge, LA |
| Flowers Baking Co. of Lafayette, LLC | Lafayette, LA |
| Derst Baking Company, LLC | Savannah, GA |
| Flowers Baking Co. of Houston, LLC | Houston, TX |
| Flowers Baking Co. of Tyler, LLC | Tyler, TX |
| Flowers Baking Co. of San Antonio, LLC | San Antonio, TX |
| Flowers Baking Co. of El Paso, LLC | El Paso, TX |
| Flowers Baking Co. of Denton, LLC | Denton, TX |
| Flowers Baking Co. of Jamestown, LLC | Jamestown, NC |
| Franklin Baking Company, LLC | Goldsboro, NC |
| Flowers Baking Co. of Norfolk, LLC | Norfolk, VA |
| Flowers Baking Co. of Lynchburg, LLC | Lynchburg, VA |

- Flowers Baking Co. of Opelika, LLC            Opelika, AL

- Flowers Baking Co. of Tuscaloosa, LLC         Tuscaloosa, AL

- Flowers Baking Co. of Birmingham, LLC         Birmingham, AL

- Flowers Baking Co. of Villa Rica, LLC         Villa Rica, GA

- Flowers Baking Co. of Morristown, LLC         Morristown, TN

- Flowers Baking Co. of West Virginia, LLC      Bluefield, WV

- Flowers Baking Co. of Nashville, LLC          Nashville, TN

- Flowers Baking Co. of Batesville, LLC         Batesville, AR

14.     Distributors and/or employee route salespersons are located in all the states listed in Paragraph 13.    Independent distributors and/or outside salespersons are also located in Mississippi, New Mexico, Oklahoma, Missouri, Kentucky, Ohio, Illinois, Maryland, Indiana, Kansas and the District of Columbia.

15.     At these 25 subsidiaries, there are currently almost 500 warehouses from which distributors or company route salespersons operate.

16.     My office is responsible for tracking distributor turnover and similar statistical information.  The following chart summarizes distributors who have ceased being distributors for the periods noted:

| | |
|---|---|
| 2004 (July – December) | 338 |
| 2005 | 647 |
| 2006 | 395 |
| 2007 (through Period 9 or August 31st) | 321 |

17.     Certain subsidiaries continue to run sales routes utilizing employee route salespersons.  The current number of such routes in the aggregate is 162.

18.     Since July 2, 2004, several subsidiaries have converted route salespersons to independent distributors. Starting in early 2007, Derst Baking Co., LLC converted 138 routes to independent distributorships. This conversion involved 36 warehouses. Starting in August 2007, Flowers Baking Co. of Lynchburg, LLC converted 50 routes in Northern Virginia and Maryland to independent distributorships. This conversion involved four warehouses. In February 2007, Flowers Baking Co. of Morristown, LLC converted 20 routes to independent distributorships. This conversion involved two warehouses. In July 2004, Flowers Baking Co. of Batesville, LLC converted 62 routes to independent distributorships. This conversion involved six warehouses.

19.     I am aware that there have been several legal challenges involving distributors at various subsidiaries of Flowers Industries/Flowers Foods. In 1988, the Teamsters filed an unfair labor practice charge regarding a conversion at West Virginia Baking Company. This legal challenge resulted in a decision favorable to West Virginia Baking Company by the National Labor Relations Board in Washington, D.C. A copy of the Board's decision is attached as Exhibit 2. The Board's decision was upheld on appeal by the D.C. Circuit Court of Appeals in a decision reported at 946 Fed.2d 1563 (D.C. Cir. 1991). I am also aware that several Regional Directors of the National Labor Relations Board have concluded that distributors of the particular subsidiary involved were independent contractors.

20.     Distributors order and purchase bakery products from the respective subsidiary that they have a Distributor Agreement with. The respective subsidiary sells products to its distributors at a specified discount percentage off of the suggested wholesale price. The

distributors, in turn, sell the bakery products to retail accounts. A distributor's income is the difference between the price he/she purchases products from the respective subsidiary for and the price he/she sells the products to retail accounts for, less the distributor's business expenses.

I hereby declare under penalty of perjury that the foregoing is true and correct according to my personal knowledge, and if called as a witness, I could and would testify truthfully thereto.

Executed on _____October 17_____, 2007.

_____
CHUCK RICH

Sworn to and subscribed before me this __17th__ day of October, 2007.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:  10-30-10



8

# EXHIBIT 1 TO CHUCK RICH AFFIDAVIT

# Milling & Baking News.

## Conversion to owner-operator designed to help drivers, company



*While increased volume is cited as a principal goal by bakers converting to owner-operator route sales, some are reluctant to change, fearing they will lose control of the baker-customer relationship.*

Tony Brush, a 32-year-old route salesman with Klosterman Baking Co. in Cincinnati, assumed that the meeting called last summer by Klosterman management would address the drivers' union agreement, which was expiring soon.

Instead, after congratulating the assembled salesmen for their part in Klosterman's best year ever, company president Kenneth F. (Chip) Klosterman Jr. dropped a bombshell.

"He said he had a business proposition," Mr. Brush recalled.

The proposal was simple. Drivers were being given the chance to go into business for themselves by purchasing their distribution routes, trucks and hand-held computers from the company.

And if a driver wasn't interested in buying a route, the company would find someone who was. "We were stunned," Mr. Brush said. "But the more we talked about it with each other and with the company, the more people began to think it was a pretty good idea."

Klosterman's conversion last fall to an owner-operator sales and distribution system — after operating for 100 years with company-owned distribution routes — marked the latest example of a growing trend in the baking industry.

Although a modest cost reduction is one of the benefits baking companies realize by making the shift to independent distribution, executives said the primary goal is to spark entrepreneurial enthusiasm among drivers, and in so doing, boost sales for the company.

"The motivation caused by ownership is the main reason we did this," said Mr. Klosterman. "It's a situation where the driver wins and the company wins."

### After five-year study

Mr. Klosterman said the company pondered the idea of a conversion for five years and tested it in several markets before decid-

Continued on page 22

---

### Saxophone cookies in Washington

**LATE NEWS**

WASHINGTON — In a tribute to President-elect Bill Clinton's prowess with the saxophone, 30,000 cookies shaped like the musical instrument will be served for dessert this week at three inaugural balls. D.C. Central Kitchen, a non-profit organization in Washington, will bake the special cookies for the inaugural, using 20 saxophone cookie cutters donated by a Pittsburgh radio station. The station developed the cookie cutters last fall as part of a fund-raising effort.

### Battle looms for Spanish biscuit unit

MADRID — A battle appeared to be developing last week for control of Royal Brands, the food and agribusiness division of Tabacalera, the Spanish government-owned tobacco company. Tabacalera said RJR Nabisco, Inc. made a firm offer equal to some $147 million to buy 50% of Royal Brands. At the same time, United Biscuits of the U.K. has expressed interest, and BSN, France's leading food and beverage group, also was believed to be

Continued on page 9

---

## Winter wheat area up little from '92

WASHINGTON — Winter wheat plantings last fall for harvest in 1993 were estimated by the U.S. Department of Agriculture last week at 51,506,000 acres, up 1% from the previous year.

The plantings estimate by the National Agricultural Statistics Service of U.S.D.A. was well below trade projections averaging more than 53 million acres. It was the third straight year that seedings fell shy of expectations. Increased plantings had been expected because acreage reduction requirements for participation in government programs were lowered to 0% of base acreage from 5% for the 1992 crop.

Apparently offsetting the diminished ARP requirements was fall weather that delayed harvest of row crops. Additionally, a steady slide in flat prices last summer through mid-August may have had a deterring effect on farmers contemplating an acreage increase.

At 51,506,000 acres, 1993 winter wheat crop plantings were within

Continued on page 27

**COVER STORY**

# Conversion to owner-operators designed to help drivers, company

**Continued from page 1**

ing to go forward system-wide last summer. The task was completed in November.

Bob Fanelli, president of West Palm Beach, Fla.-based Distribution



*Proponents of owner-operator route systems see entrepreneurial spirit as a major benefit.*

Consultants, Inc. has long been the industry authority on fleet conversions. Mr. Fanelli's father, Robert J. Fanelli, pioneered the concept by helping Arnold Bakers and Pepperidge Farm, Inc. take their distribution out-of-house in the late 1940s and early 1950s.

**More than 5,000 routes converted**

Over the past 15 years, the younger Mr. Fanelli has been involved in converting more than 5,000 distribution routes at a dozen companies from company-owned to independent. He most recently advised Klosterman on structuring its conversion.

"A conversion is not designed to reduce your distribution costs at the expense of the route man," Mr. Fanelli said. "There are some savings, but they

generally run only in the 1% to 2% range of total sales."

Instead, Mr. Fanelli said, the real benefits for companies are increased sales. Typically, conversion to an owner-operator system can mean a 15% to 20% jump in sales over a company's baseline growth, he said.

"You throw on 15% to 20% and it stays there," he said.

"The central concept is that we are all more motivated if we own something. If bakeries can capture that entrepreneurial spirit and get the driver to be a salesman as well as a delivery person, everyone is going to benefit enormously from that."

Klosterman, which produces bread and rolls primarily for restaurants and institutional clients across parts of Ohio, Kentucky, Tennessee, Indiana, Illinois and Michigan, maintains about 150 sales routes.

According to Mr. Klosterman, between 75% and 80% of the company's drivers eventually elected to purchase their routes, with the remaining routes sold to bakery workers or others on the outside. A number of older drivers decided to retire rather than begin again as independent contractors, according to Mr. Brush.

Prices charged for trucks, routes and computer systems ranged from $25,000 to $70,000 and were calculated based on a route's average weekly sales, Mr. Brush said.

The company assisted drivers in obtaining financing for the acquisitions.

## 'You want to keep your customers happy. You find yourself digging harder.'

Drivers were not required to come up with a down payment for the purchase, Mr. Brush said, a fact which made the decision to buy much easier for many.

A six-month buy-back agreement with the company gave the drivers the option of bailing out early if they found the change not to their liking.

Mr. Klosterman declined to disclose details about the new pay structure for the owner-operators, except to say that

"on a $100-a-week account, th stands to put a lot more mon pocket than he would have be

**More income for drivers**

Although pay scales diff market to market, Mr. Fane independent drivers genera from a base pay of $230 or so plus an 8% commission to a commission with no base pay

"Since all of those things t to be provided by the comp must be provided by the men ing health and liability insur truck payments, you try to de system to pay all of the driver ing costs, plus his wages," he

Mr. Fanelli said drivers can their pay significantly if they crease their sales. At the same said, drivers continue to buil in their principal asset, the which can be cashed in upo ment in lieu of a company plan.

Mr. Brush, the Klosterma agreed that the responsibility ership and the incentive of g nancial reward were powerful that pushed drivers to work h

"On my way to church, or time, I've stopped in stores sure there is product on the sh he said. "You want to keep y tomers happy. You find your ging harder. I know that's the a lot of the guys."

**Fear of losing control**

Mr. Fanelli acknowledg some companies are reluctant the change to an owner-operat ture because they believe it w losing control of a critically ir element in their business — tionship with the customer.

But Mr. Fanelli doesn't se way. "Companies find that on owns his own business, he need as muc and dime s sion," he sa need for co minishes."

Added Klosterman: give my cont somebody w their own b what better could I have?," he said. "I don perceive it as a loss of control

One group that is worried loss of control is the Teamster Not surprisingly, the union is t with Klosterman's decision to owner-operators, and has cha the action through a complain National Labor Relations Boa

"We're seeking to revert b base-plus-commission pay str

**KLOSTERMAN**

**COVER STORY**

Tom Weber, secretary-treasurer Teamsters Local 114 in Cincinnati. "We heard nothing good from the (about how the new system is working)," Mr. Weber said. "They're still doing the same job but we got a lot more responsibility, a lot more paper work. I believe the whole thing is just an attempt by a company to place the cost of operations onto the employees, and unless so, because they're the ones that built the company."

Mr. Fanelli said the Teamsters typically make such arguments in challenging owner-operator conversions. "It's true that the company is transferring significant expenses to the driver, but what is not said is that the company is also transferring significant revenues to the driver," he said. He added Mr. Klosterman: "This has to be win-win for the driver. If it doesn't work for them, it's not going to work for us."

Mr. Fanelli said the Teamsters have had five complaints over the past 15 years regarding fleet conversions that have involved his company. In each case, the union has lost, he said.

Still, Mr. Fanelli acknowledged that the union's power is formidable. "I think the existence of the Teamsters is a block for the largest baking companies to do this," he said. "We've talked to the majors and they would give anything to adopt this kind of system, but most of them feel that the Teamsters would have so much at stake that the battle would cost more than it was worth."

**I.R.S. as another worry**

Beyond the union, at least one other powerful group threatens to potentially undermine the concept of fleet conversion — the Internal Revenue Service.

In an apparent quest for additional revenues, the agency has recently raised questions about what constitutes an independent owner-operator. Some fear the I.R.S. may reverse owner-operator designations and retroactively hold companies liable for "employee" withholding taxes — even without refunding the taxes that the driver himself may have already paid.

A coalition led by the National Federation of Independent Business is considering seeking legislation that would establish a clear definition of who and what constitutes an owner-operator.

D.J. Gribbon, a legislative representative with the National Federation of Independent Business, said that currently, "the definition is so vague that neither the I.R.S. nor companies can tell who is considered to be an independent owner-operator and who isn't."

"Any time you're taking a job position that used to be an employee and moving it to an independent contractor, you should be very careful," Mr. Gribbon added.

Mr. Fanelli said he doubted that the government will change rules that have been in place for decades and hold companies liable retroactively. But he conceded, "Anytime you see the government scrambling around for money like they are, you've got to be concerned."

Beyond the potentially perilous tax issue, Mr. Fanelli acknowledged that conversion of a route distribution fleet can be a lengthy, complex and difficult task.

"It's not a slam dunk to take this kind of action, particularly in a unionized environment," he said. "The first time we fail will be the last time we do this."

**Tasty conversion in '86**

Still, for at least one large company that completed the process some time ago, conversion to independent distribution was well worth the effort. Tasty Baking Co. in Philadelphia switched to owner-operators on its 460 routes in 1986.

"We could not be more delighted with the program," said Dan Nagle, vice-president of sales and marketing at Tasty Baking. "We originally went into it with one view in mind: To increase our sales and the sales of our people; to give them some equity.

"What we saw happen was that people really did grasp the entrepreneurial notion and work harder, better, faster, and sales have increased."

Franny Schweiss, a Tasty driver for 30 years, said most drivers were making as much if not more money than they did before the conversion.

"It's worked out real well for everyone," he said. "The company has treated the drivers very well."

Mr. Schweiss added that in some cases, routes that were sold for as much as $50,000 seven years ago have tripled in value.

"A lot of the drivers can sell their routes and go into retirement with a lot more than they would have had working for the company," he said.

As for Mr. Brush, the Klosterman driver, he is skeptical that the routes will appreciate to that extent in the Cincinnati area, given the slow-growing economy.

Still, he is optimistic about the opportunity ahead.

"Most of the drivers right now are really liking how things are going and the way it's set up, you can make some money," he said. "Then again, check with me three or four months down the road." □

*Internal Revenue Service position on definition of independent owner-operator is in question.*



**EXHIBIT 2 TO CHUCK RICH AFFIDAVIT**

306                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

**West Virginia Baking Company, Inc.** *and* **Chauffeurs, Teamsters, Warehousemen and Helpers, Local Union No. 175, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO. Case 9–CA–25261**

July 31, 1990

### DECISION AND ORDER

BY CHAIRMAN STEPHENS AND MEMBERS
CRACRAFT AND OVIATT

On March 13, 1989, Administrative Law Judge Wallace H. Nations issued the attached decision. The Charging Party filed exceptions and a supporting brief, and the Respondent filed an answering brief. The Charging Party also filed a request for oral argument.[1]

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[2] and conclusions[3] and to adopt the recommended Order.

### ORDER

The recommended Order of the administrative law judge is adopted and the complaint is dismissed.

---

[1] The Charging Party has requested oral argument. The request is denied as the record, exceptions, and briefs adequately present the issues and the positions of the parties.

[2] We adopt the judge's conclusion for the reasons set forth in his decision, that the Respondent's statements to employees that they would be terminated if they did not buy a distributorship did not violate Sec. 8(a)(1). The judge found that there was no nexus shown between the statements and any union or protected activity.

We find it unnecessary to pass on the merits of the 8(a)(1) violation, which our dissenting colleague would find. In our view, this theory was neither alleged in the complaint nor pursued by the General Counsel at any time. That theory is argued by the Charging Party in its exceptions, but a charging party is not free to expand the scope of the complaint without the consent of the General Counsel. See *Winn-Dixie Stores*, 224 NLRB 1418, 1420 (1976), affd. in pertinent part 567 F.2d 1343, 1350 (5th Cir. 1978). In particular, we note that the complaint allegation is framed as a "threat of discharge" for not becoming "non union independent contractors," and we do not read the General Counsel's brief to the administrative law judge as clearly presenting, in support of the independent threat allegation, the theory that Member Cracraft would rely on for finding such a violation.

[3] We agree with the judge's conclusion that the Respondent did not refuse to bargain in good faith over the decision to convert its driver-salesmen to independent distributors and the effects of that decision and, in fact, did bargain in good faith over the decision and its effects until impasse and lawful implementation of the distributorship program. Accordingly, we find it unnecessary to pass on whether the Respondent's decision to convert its driver-salesmen to independent distributors is a mandatory or permissive subject of bargaining.

**299 NLRB No. 37**

---

MEMBER CRACRAFT, dissenting in part.

I join my colleagues in all aspects of this decision except in their conclusion that the Respondent's statements to its driver-salesmen employees that they would be terminated if they did not participate in the independent distributorship program did not violate the Act. Regardless of the obligation to bargain over the decision itself, the Respondent had a statutory duty to bargain over the effects of its decision to convert to an independent distributorship mode of delivering its product.[1]

The Respondent's duty to bargain over the effects of its decision to convert "provides the Union with an opportunity to bargain in the employees' interest for such benefits as severance pay, payments into pension fund, preferential hiring . . . at other [employer operations], and reference letters with respect to other jobs."[2] We have found that the parties in the instant case bargained in good faith over the effects of the Respondent's decision to convert, and reached agreement on such matters as bumping rights and priority hiring rights.

Prior to this bargaining, William Rouse, the Respondent's Bluefield branch sales manager, told one employee that on the expiration of the contract the drivers would be required to buy their routes or "hit the streets." Referring to the distributorship program, Rouse told another employee that "[i]t'll either be Flowers' [the Respondent's] way or the highway." These statements, which conveyed the message that those driver-salesmen who chose not to participate in the independent distributorship program would be terminated, were not conditioned on the outcome of effects bargaining with the Union, and in fact were made to employees prior to the time the Union was informed of the Respondent's decision to convert to an independent distributorship program. Although the Respondent subsequently fulfilled its obligation to bargain over the effects of the decision to convert, Rouse's statements announced a fait accompli anticipating a breach of the duty to bargain over the effects of its decision. Such a statement cannot be afforded the protections of Section 8(c) simply because the Respondent later engaged in good-faith effects bargaining.[3] Accordingly, I conclude that the state-

---

[1] See *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 681–682 (1981).

[2] See *Nathan Yorke v. NLRB*, 709 F.2d 1138, 1143 (7th Cir. 1983), enfg. 259 NLRB 819 (1981) (trustee in bankruptcy's failure to give notice to the union and an opportunity to bargain over the effects of the decision to terminate the employer's operations violated Sec. 8(a)(5) and (1) of the Act).

[3] See generally *Safeway Stores*, 266 NLRB 1124 (1983) (threat to suspend employee for contacting the union before discussing problem with management held unlawful, notwithstanding fact that employee was not suspended and was later told she had every right to contact the union;
*Continued*

ments threatening termination violated Section 8(a)(1) of the Act.

respondent failed to meet the standards for effective repudiation of unlawful conduct set forth in *Passavant Memorial Area Hospital*, 237 NLRB 138 (1978).

Contrary to my colleagues, in my view no procedural obstacle exists with respect to my decision to find merit in the 8(a)(1) allegation of the complaint. The complaint alleges that the Respondent failed to fulfill its 8(a)(5) obligation to bargain about the decision to convert to an independent distributorship program and the effects of this decision. In the General Counsel's brief to the judge, the General Counsel treats the 8(a)(1) and 8(a)(3) complaint allegations as part of his theory that the Respondent acted in derogation of its obligation to bargain about the decision and its effects. My finding that the Respondent's statements violated Sec. 8(a)(1) focuses on the duty to bargain over the effects of the decision to convert. Although we have found that the Respondent did in fact meet its obligation to bargain regarding the effects of its decision to convert, the merits of the 8(a)(1) complaint allegation must be addressed. The record establishes, and the judge found, that the Respondent made statements to its employees threatening termination if they chose not to participate in the independent distributorship program. In these circumstances, the theory that the Respondent unlawfully threatened termination in derogation of its obligation to bargain over effects is reasonably encompassed in the complaint.

*Vyrone Alex Cravanas, Esq.*, for the General Counsel.
*John K. Anderson* and *David H. Grigereit, Esqs.*, of Atlanta, Georgia, for the Respondent.
*Patrick J. Szymanski, Esq.*, of Washington, D.C., for the Charging Party.

## DECISION

### STATEMENT OF THE CASE

WALLACE H. NATIONS, Administrative Law Judge. Based on charges filed March 25, 1988,[1] and amended April 15, by Chauffeurs, Teamsters, Warehousemen and Helpers Local Union No. 175, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO (Union), the Regional Director issued a complaint and notice of hearing on October 24, alleging that West Virginia Baking Company, Inc. (Respondent or Company), has been engaging in unfair labor practices in violation of Section 8(a)(1), (3), and (5) of the National Labor Relations Act (Act). Hearing was held in this matter on January 18–20, 1989, in Bluefield, West Virginia. Briefs were received from all parties on or about February 22, 1989.

Based on the entire record, and on my observation of the demeanor of the witnesses and in consideration of the briefs submitted, I make the following

### FINDINGS OF FACT

### I. JURISDICTION

Respondent, West Virginia Baking Company, Inc., is a corporation engaged in the production and distribution of baked goods at a plant located at Bluefield, West Virginia. Respondent has admitted the jurisdictional allegations of the complaint and I find that it is now, and has been at all times material to this proceeding, an employer

[1] All dates are in 1988 unless otherwise noted.

engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

### II. LABOR ORGANIZATION INVOLVED

It is admitted and I find that the Union is now, and has been at all times material to this proceeding a labor organization within the meaning of Section 2(5) of the Act.

### III. ALLEGED UNFAIR LABOR PRACTICES

#### A. Introduction and Issues Presented

The complaint in this proceeding alleges that Respondent West Virginia Baking Company, Inc. violated Section 8(a)(1) of the Act by threatening that it would discharge its driver-salesmen if they did not agree to become "non union independent contractors" upon expiration of the then current collective-bargaining agreement, violated Section 8(a)(1) and (3) of the Act by discharging its driver-salesmen because of their union and concerted activities, and violated Section 8(a)(1) and (5) of the Act by failing and refusing to negotiate in good faith over its decision to convert its driver-salesmen to so-called independent distributors.

The primary issues presented for determination are as follows:

1. Was the Respondent's decision to convert its driver-salesmen employees to independent distributors a mandatory subject of bargaining?

2. Did the independent distributors remain statutory employees after the conversion and did Respondent unlawfully withdraw recognition from the Union as their collective-bargaining representative?

3. If the decision to convert is a mandatory subject of bargaining, did the Respondent satisfy its burden of bargaining in good faith with the Union over that decision?

4. Did Respondent threaten its driver-salesmen employees with discharge and then subsequently discharge them because of their union or protected concerted activities?

#### B. Facts and Discussion Relating to the Issue of Whether the Decision to Convert was a Mandatory Subject of Bargaining

1. Facts describing Independent Distributorship Program and the decision to implement it

a. *Respondent's reasons for creating the program*

Flowers Industries, of Thomasville, Georgia, is the parent company of Respondent. It has a number of subsidiaries, primarily in the Southeast, but has one as far west as California. Each subsidiary is operated as a separate corporation and has a separate board of directors and officers. Respondent operates a wholesale bakery with its headquarters in Bluefield, West Virginia. Until the last 2 or 3 years, its product had been delivered to its customers by driver-salesmen who were employees of Respondent and represented by the Union in an appropriate unit. Such recognition had been embodied in successive collective-bargaining agreements, the most recent

308

of which was effective by its terms for the period March 31, 1985, until March 26, 1988.[2]

At the heart of this dispute is the decision by the Respondent to cease utilizing its driver-salesmen method of distribution and instead implement an "independent distributorship" mode of delivery. The distributorship program utilized by Respondent originated with the parent company and is apparently used by some of its other subsidiaries. The decision to implement the program rested with the Respondent. Prior to the implementation of the distributorship program in Respondent's Bluefield operation, it had been implemented at all other bakery locations operated by Respondent. This would amount to 12 or 13 other warehouse locations. These other implementations began in 1986 and have been completed by January 1987. At that time, Respondent considered implementing a similar program in the territory involved herein. It did not do so because the other conversions were taking longer than anticipated and because Respondent had received legal advice that such a move might violate the subcontracting clause in the collective-bargaining agreement.

Respondent has manufacturing facilities, referred to as bakeries and sales distribution centers. These distribution centers are where small trucks and salesmen are located. They will range in location from 1 mile from the bakery to as far as 100 miles. Product manufactured at the bakery is loaded on large tractor trailers and taken to the small distribution centers. There the product is offloaded into small distribution trucks and delivered to the customer by driver-salesmen. These salesmen have traditionally been employees of the Company, using trucks and other equipment owned and maintained by the Company. Respondent owns the distribution rights to its product brands in the areas served by the salesmen.

The distribution method used by Respondent is called full rack service. An alternative system is the tractor-trailer drop. Under this system, customers themselves place their own orders with the bakery, which fills the orders, loads them on tractor-trailers and delivers them to the customers at night, dropping the orders in front of the store. The customer is responsible for its own stales[3] and puts its own bread on its shelves. With this system the bakery experiences difficulty in having the customer order sufficient product. The customers also put up ragged displays. Additionally, the bakery might have 15 or 20 individual stores loaded on a single tractor-trailer.

If the truck would break down, the bakery would have to go out in the middle of the night and bring the truck back or bring a new truck. This meant that the product did not get into the involved supermarkets until late that day.

Respondent's president, Richard Nolan, testified that one of the most successful bakery operations with which he is familiar is the one at the Holsum Bakery in Phoenix, Arizona. It utilizes an independent distributorship program which Nolan read about in trade journals. Respondent's parent corporation sent representatives to Phoenix to observe the program in action. In turn, the parent invited Nolan to go to Port Arthur, Texas, to see one of the parent's subsidiary operations that was involved in converting to independent distributorships. Nolan visited this operation and was impressed with it, including the reaction of the salesmen to the program. Upon Nolan's return, he sent the Company's vice president of sales to Port Arthur to observe the operation. Thereafter, the two met and discussed the pros and cons of the operation. These actions were taken in 1985. Nolan had also had experience with competitors utilizing such a program. Pepperidge Farm has a distributorship program and several of Nolan's salesmen had taken these distributorships and seemed pleased with the arrangement.

Nolan testified that Respondent converted to such a program for several reasons. Its truck costs were exorbitant; it had trouble motivating its salesmen; and it wanted to come up with a way to recover some of its capital investment. He felt the distributorship program answered these needs.

Respondent's truck costs ran in excess of $40,000 a week, a figure which includes parts, tires, fuel, and maintenance. How much of this figure is attributable to the truck fleet used by driver-salesmen is not determinable from the record. However, the record does show that the Company once owned about 200 of the step vans used by the salesmen. The distributorship program took the Company out of the trucking business, insofar as it involved store deliveries. It eliminated the Company's parts inventory, fuel storage, and garage facilities. The Company's delivery trucks were sold to the distributors.

Respondent believes the program provides greater selling motivation because a distributor can make more money than an employee because his discount structure is greater. He could also build an equity in his territory which could be sold or passed on to heirs.

Lastly, the Company could sell the territory in which it operated. The average price of a territory or route in the involved area would be $30,000–35,000. This price would be financed by Respondent at 12 percent. It would also sell its trucks, recovering a great deal of invested capital. The Respondent's controller testified that the Company had sold trucks to distributors in the area represented by the Union for a total of $134,043 and routes in this territory for a total of $995,180. In its entire operation, the Company collected a total of $970,781 for trucks sold to distributors and $4,618,882 for routes sold to distributors.

---

[2] The following employees of Respondent constitute a unit appropriate for the purposes of collective bargaining within the meaning of Sec. 9(b) of the Act:

All hourly paid production and maintenance employees and transport drivers and all salaried or commissioned driver salesmen employed by the [Respondent] at its Bluefield, West Virginia plant and at its relay stations located at Bluefield and Beckley, West Virginia and Keene Mountain and Radford, Virginia but excluding all stale shop employees, all gatemen, firemen, watchmen, nurses and all office clerical employees, guards, professional employees and supervisors as defined in the Act and all other employees, as certified by the National Labor Relations Board in Case 9-RC-8416.

[3] Respondent's bakery products are coded to ensure freshness. Such codes allow the driver to determine the age of the product and in effect tell the driver when to pull the product from the shelves. Most codes allow 2 or 3 days of shelf time. Product pulled from shelves as being beyond code is returned to the Company as "stales."

The first distributorship program instituted by Respondent was in Charleston and Logan, West Virginia, in 1986. By January 1987, all of the Respondents delivery routes had been converted to distributorships except those whose driver-salesmen were represented by the Union. These routes are located in Bluefield, West Virginia, and Radford, Keene Mountain, and Marion, Virginia. Since the Company started the conversion to distributorships in 1986, it has made capital improvements to the bakery at Bluefield. The cost of these improvements has been between $4 and $6 million. In the involved operation, the Company has already sold 14 routes in Bluefield, nine in Keene Mountain, 5 in Radford and 4 in Marion. Throughout the rest of the Company's operation, it has sold approximately 127 routes.

During contract negotiations for the latest collective-bargaining agreement, which will be discussed in detail later, the Union proposed an owner-operator method of distribution as an alternative to the independent distributorship proposal of Respondent. Nolan testified that the Union's owner-operator proposal was discussed on several occasions by management. It addressed one of the Company's needs, reducing truck costs, but in Respondent's view would not aid in motivation nor would it provide a way to recover invested capital (by this, Respondent generally means the purchase price it is able to secure for one of its territories or routes). Respondent did not feel that the Union's proposal was as good a motivator as the distributorship plan because it did not provide for equity to be built in the territory. Respondent's program was devised to enable a distributor to make more money than a driver-salesman. In its presentation to the Union, the Company stressed only the needs to increase motivation and sales and cut truck expense as reasons for the program, choosing not to stress capital recoupment as that feature of the program was of interest only to it.

### b. Evidence describing the operation of the program

Several witnesses testified with respect to the details and operation of the independent distributorship program and this testimony is set out below under appropriate subheadings. Additionally, the relationship between Respondent and the independent distributor is governed by a contract termed the Distributors' Agreement. As this appears to be a valid, judicially enforceable contract, great weight is given to its description of the rights and obligations of the parties under it.

Clyde Joe Lester, who for 4 years was a driver-salesman for Respondent at its Keene Mountain facility, testified that he purchased a distributorship in June. Lester's testimony gives in some detail how the distributorship program works as well as similarities with and differences from the driver-salesman operation previously utilized by Respondent. At the time of his testimony, Lester was unhappy with the Company because of an ongoing dispute over problems with the Company increasing his product orders, resulting in his route running high "stales"[4] that cost him money.

Respondent's labor counsel and chief negotiator, John Anderson, also gave a description of some of the aspects of the distribution program from the Company's standpoint in the negotiation session of March 24. As that testimony has little relevance on the bargaining issue, it is included here to give a more complete picture of the program. Respondent's president, Nolan, also described the program in some detail.

### (1) Territories and financing

Respondent took a defined geographical area and mapped out defined sales territories or routes within that area which were sold to distributors who thereby acquired the exclusive distribution rights to Respondent's brands within that area. The territories or routes sold do not necessarily correspond to previous routes serviced by driver-salesmen. The routes to be sold were mapped out with the purpose of making them serviceable and reasonably profitable.

Lester purchased a route which was comprised of his old route and part of another one. The financing plan called for him to make a $2000 downpayment, a $1000 security deposit, and to purchase a truck, presumably of his choice, from those available from Respondent. Although the security deposit was initially to be paid by the distributor, the Respondent allowed Lester to finance it by paying Respondent $20 per week for 1 year. The remainder of the route purchase price was financed by Respondent at what Lester believed was a 12 percent interest rate. The downpayment was financed with the truck loan at Wachovia Bank of Salisbury, North Carolina, pursuant to an arrangement made with the bank by Respondent for all prospective distributors. Licenses and tags for the truck purchased by Lester were furnished by Respondent. For a few weeks, maintenance on the truck was performed by Respondent without charge, including providing three new tires and lights. Since that time, vehicle maintenance has been Lester's responsibility.

The purchase price of a route or territory is 10 times weekly brand sales based on the average weekly sales for a 12- to 13-week period. Those distributors who had previous experience with the Company as route sales employees received a 20-percent discount on this purchase price. Company financing of the territory purchase price and the security deposit as well as the Wachovia Bank financing for the downpayment and truck loan were utilized by virtually all persons purchasing distributorships; though Respondent contends that the distributors were free to secure financing from any source they chose. Similarly, company witnesses testified that a distributor could purchase a route truck from any source, but that if purchased from Respondent, the purchase price would include putting the truck in reasonable condition.

### (2) Supervision

Lester testified that when he was a driver-salesman, he was accompanied on his route by a company supervisor

---

[4] As an employee, Lester and other driver-salesmen returned their stales for full credit and no charge against their income was made by Respondent. Under the independent distributorship program, the distributor may return stales to the Company; however, he must bear a portion of the cost of the product so returned to the Company.

310                           DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

about once every month or two. The supervisor would check and see if the driver was picking up product on code, making proper distribution, making a proper rack set, etc. Since becoming a distributor, Lester is still accompanied on his route by Respondent's supervisors, on a more frequent basis than before and for the same reasons. Lester testified that though he is not sure, he may have the right to refuse to let a supervisor ride his route with him. On the other hand, Lester considered the help of the supervisors to be useful. I believe the best evidence establishes that the distributors do not have to accept company supervision unless they choose to do so.

Anderson testified that the distributor could tell the Company to stay off of his truck as it was his truck. He also stated that the distributor could not tell the Company to stay out of his territory. The Company still had a relationship with the customers and had to do certain marketing to create a market for its product. It was required to do that under the distributors agreement. Also, the Company reserved to itself the right to at least be able to examine the market and make sure that the distributor was not leaving product out of code and stale.

Anderson also testified that if the distributor was losing business in his territory, the Company had the right to terminate his contract. Nolan testified that there was no set standard where the Company would take this action, but that it just would have to be determined by the individual case.

### (3) Uniforms, personal appearance, and vehicle appearance

The Distributors' Agreement requires the distributor to maintain a clean and neat personal appearance consistent with the professional image customers and the public associate with the Company. It also charges the distributor with responsibility for truck sanitation and consistent with industry practice, requires the truck be kept clean at all times and maintained in such condition as to provide safe, prompt, and regular service to all customers.

Lester testified that as a distributor, he is required to wear a uniform; however, on cross-examination he could not remember being told that this was a fact and the Distributors' Agreement does not require the wearing of a uniform. He continues to wear his old driver-salesman uniform although other new distributors who did not work for Respondent before have purchased uniforms from Respondent. Respondent Territory Manager Steven Harris testified credibly that distributors are not required to wear a uniform and gave examples.

Lester testified that the Company can require a distributor to clean his truck, which carries the Respondent's name, and gave an example of the Company requiring an extremely dirty truck to be washed. He also testified that Sales Manager William Rouse told him to shave a beard he was growing, and he did so, though not as fast as Rouse told him to.

Nolan testified that distributors are not required to wear a uniform and are only required to be "clean." He further testified that beards were not allowed for salesmen, but are permitted for distributors and many sport them. Although I have no reason to doubt Nolan's testimony on this point, the word clearly has not gotten to

Rouse as his testimony reflects that he discourages the wearing of beards by distributors.

Anderson testified that the Company had no dress code for its distributors, but that they would be expected to abide by "industry standards." Anderson testified that in his opinion, the matter of what is proper attire is a matter between the Company and the individual distributor in the event a dispute arises. Nolan testified on this point that if the Company felt that a distributor did not maintain a neat and clean appearance, it would first just mention it to the man. If the distributor ignored the request, the Company would consider this a curable breach of the Distributors' Agreement and the person would have 10 days to cure his breach. At that point, if nothing had been done, the Company would give the man a warning and if he had enough warnings, it would take back his territory. This decision would be subject to judicial review.

### (4) Accounting

Accounting for Lester's operation is done by a CPA firm from Charleston. He pays part of their fee and Respondent pays a part. The firm used by Lester was recommended by Respondent and is used by many distributors. Lester also testified that some distributors use other accounting firms.

Under the distributorship agreement between the Company and distributor, the company pays $500 of the distributor's accounting costs for the first 3 years of the agreement. Bookkeeping is the distributor's responsibility.

### (5) Product purchasing and returns

At the time of the conversion to the distributorship program, driver-salesmen were compensated by base pay of $200 per week and an 8-percent commission on brand name products and a 4-percent commission on private label products. The distributor's net income is his gross income less his operating and capital expenses. The distributor purchases products for his territory from the Company and title to the product passes to the distributor at the time he receives it. Title did not pass to the driver-salesmen. The Company discounts the price it charges the distributor for the product by a variety of percentages. The distributor's gross income is based on the difference between the price he charges his customers and the discounted price charged by the company. Although the company has suggested prices to be charged to the distributor's customers, the distributor may change these prices up or down, except in the case of large chain accounts.

The Distributors' Agreement states that products will be sold to the distributor at terms and prices established by Respondent, and that Respondent will furnish suggested retail prices. Bid prices will be jointly established. I cannot find that the agreement speaks to the matter of product ordering.

The distributor must pay his weekly expenses such as fuel, casualty insurance, truck repair and tires, warehouse rent, and other operating expenses.

## WEST VIRGINIA BAKING CO.

Nolan testified that the distributor orders his own product. Driver-salesmen were responsible for ordering product, but if he did not order enough as a salesman then it was the responsibility of his district manager to see that he got the product. A distributor does not have that situation, he is responsible for ordering his own. The Company contends that it corrects clerical errors such as ordering product on a day of the week on which it is not available or ordering a quantity of product which is inconsistent with the amount available on trays. Respondent contends that it does not have the authority to increase a distributor's order. The Company may recommend an increase to a distributor. If the distributor is not immediately available, the change will be noted on the order. Respondent contends that in this situation, it contacts the distributor and discusses the order. The distributor may then refuse the additional order. Such recommended changes occur where sale items for large chains are involved or the Company has information of which the distributor is unaware. With respect to sale items, the Company suspends the stale allowance on such items and recommends additional orders so a large chain account will not run out of sale product. Distributors may still refuse extra product.

Lester testified that as a distributor, he must order from Respondent what the accounts on his route were accustomed to receiving and additionally, more of certain products on occasion to satisfy store specials. Respondent has required him to take more of certain items and take different items than those that Lester ordered on his own. He testified that if he refused to accept this nonordered product, he would "stale" it the next week. "Stales" are returned to Respondent for credit or partial credit on the distributor's account. For a period of time, the Company took back stales from its new distributors and gave full credit. However, pursuant to a preexisting agreement, that has changed to a situation where only partial credit is given. Lester testified that with respect to the forced orders he takes, he gets only the partial credit if the product has to be "staled." Based on a dispute between Lester and the Respondent regarding the stale allowance on order increased by Respondent, I credit Lester's testimony that a distributor can be forced to take extra product and face at least a partial liability if it is staled.[5] Though the Distributors' Agreement does not speak directly to this point, it does require the distributor to adhere to all promotions and feature pricing with respect to the major and chain accounts in his territory. Thus, it appears to me that the distributor can be forced to take extra product, but only in connection with a promotion involving a major or chain account.

Harris testified that distributor's orders are changed primarily to correct errors. He noted one instance of a promotion at a chain store wherein the quantity of product to meet the demands of the promotion was in question. In this case, he had the distributor take a larger order than he wanted, with the proviso that the Compa-

ny would accept responsibility for the stales resulting from the order.

Respondent has what it calls authorized accounts which are generally the bigger accounts. With respect to these accounts, the company extends credit and does billing and collecting. Lester believes that if an authorized account reneges on payment it will be charged back to him, and is unsure whether he can cancel an authorized account. The Distributors' Agreement would indicate that the Respondent is responsible for the accounts it creates or approves, not the distributor. Lester cannot extend credit for Respondent although he can extend credit to customers personally, if he chooses.

### (6) Social Security

Lester testified that he pays half of his social security obligation and Respondent pays half. He is allowed to incorporate so long as he maintains majority ownership in himself.

### (7) Employee assistance

When Lester was a driver-salesman, if he were sick or on vacation, a company supervisor would run his route. As a distributor, it is his responsibility to get someone to run the route if he is unable to do so. He believes the supervisors might do so, but are not obligated to. He testified that District Manager Troy Byers delivered some product at one time for distributors.

Anderson testified it was the distributor's responsibility to get someone to cover his route if he is off. He can hire one of the territory managers to service the route that day and would be required to pay the Company for the manager's time. Some distributors had obtained retired distributors or salesmen to cover the route for a day. Some distributors have hired helpers. Nolan testified that a salesman could not use helpers and were subject to discipline if he had an unauthorized person on his truck, in comparison with the distributorship situation.

### (8) Physical operations

Lester works out of the same location as a distributor that he did as an employee and has the same supervisor. As an employee, he reported to work at the warehouse at 3 a.m. to pick up product ordered approximately a week before. Lester testified that the Company set his work schedule as an employee and still does as a distributor and to change his schedule, he must get company approval. As an employee, Lester ran his route in an order that was dictated by common sense, taking into account geography and his load factor. He does the same as a distributor. It would also appear from his cross-examination and the testimony of Harris that Lester has refused scheduling suggestions and that he is free to set up his own schedule and route and change it without company approval.

At an account, Lester would check the bread rack for stales and new product needed as a personal responsibility and take appropriate action. As an employee he was required to keep a route book, and write receipts or tickets for product taken from a store or brought in. His paperwork as a distributor is the same in this regard, al-

[5] This dispute does tend to support Respondent's contention that it cannot unilaterally impose its views on the distributors and control their conduct. Lester has refused to pay the charge for stales made against him and if not settled by mutual agreement, presumably the matter will be judicially settled.

312

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

though Lester is not sure that he is required to maintain a route book. The route book spelled out many of the procedures the salesman had to follow or be subject to disciplinary procedures.

Nolan testified that a distributor checks in once a week. He turns in his authorized charges daily. He does not turn in his cash into the Company as he did in the past, it is now his responsibility. Settlement takes place once a week. As a salesman, it was three times a week. The Company sends the distributor a statement for what he bought last week and he receives that settlement on Tuesday and then sends the Company a check that it is to receive by the following Friday. Nolan also testified that a distributor can sell other company's products so long as they are not competitive with Respondent's products.

Harris testified that distributors are not required to use route books, though most do, and cited an example of one distributor who had chosen not to use such a book.

As an employee, when a customer had a problem, the customer usually called Respondent's Bluefield facility. Lester testified that the same is true in his operation as a distributor; although, his testimony on cross-examination indicates to me that he is unsure on this point. The Company's position is that the distributor handles customer problems, though this position is also at odds with its right to call on the distributors and its customers to ensure the distributor is performing satisfactorily.

### 2. Was the Respondent's decision to convert to independent distributors a mandatory subject of bargaining?

During negotiations, Respondent stated to the Union that its decision to convert to an independent distributorship method of delivery was not a mandatory subject of bargaining; citing, inter alia, the decision of the Regional Director for Region 9 in Case 9–CA–23141. The Regional Director determined after investigation not to issue a complaint based on a charge that Respondent had violated the Act by refusing to bargain over its decision to implement its distributorship program at another of its facilities where the driver-salesmen were represented by the United Steelworkers. In his letter decision, the Regional Director stated:

Pursuant to the distributorship system, the distributor purchases the exclusive right to distribute the Employer's product in a specific area and provides the truck, fuel, licenses, insurance and labor necessary for delivery. The distributor is paid a commission on baked goods sold. The Employer's decision to discontinue its own distribution system and rely on independent distributors involved a fundamental change in the nature and direction of the Employer's operations. In this connection, the evidence showed that the Employer was motivated by a desire to increase its sales and share of the baked goods market rather than factors, such as labor costs, over which the Union has control. The decision to convert to a distributorship system, therefore, involved a nonmandatory subject of bargain-

ing over which the Employer was not required to bargain. *Otis Elevator Co.*, 269 NLRB 891 (1984).

Based on its analysis of the Supreme Court's opinion in *First National Maintenance Corp. v. NLRB*, 452 U.S. 666 (1981), the Board established the principles for determining an employer's collective-bargaining obligation over decisions such as the one at issue in this case in *Otis*, supra. Although all four Board members agreed that the employer's decision in *Otis* was nonmandatory, they applied different legal analyses. The *Otis* plurality opinion applied a two-factor test: whether the decision turned on a change in the nature or direction of the business or whether it turned on labor costs. Member Dennis applied a two-step test: (1) whether the decision was amenable to resolution through the collective-bargaining process, and if so, (2) whether the benefits for labor-management relations and the collective-bargaining process outweighed the burdens placed on management.

The evidence in this case establishes that the Respondent converted its employees to distributors for three reasons unrelated to labor costs. The Board's decision in *Collateral Control Corp.*, 288 NLRB 41 (1988), puts into question whether the plurality's labor cost test is still of importance and seems to stress the approach of Member Dennis. To the extent this question is still viable, the evidence in this case establishes that Respondent's decision was not motivated by labor cost savings, for its projections at the time of implementation were that the independent distributorship conversion would increase its labor costs.[6] Additionally, a goal of the program was for the distributors to make more money than route sales employees.

It is Respondent's contention that its decision to convert was for reasons unrelated to labor costs and turned on a change in the nature and direction of its business. For the reasons set forth below, I agree with this contention. The first reason for the Respondent's decision was to increase sales. The independent distributorship produced increased sales incentives in two ways. The distributor's discount rate is higher than the route sales driver's commission rate. In addition, the distributorship is valued based on 10 times weekly brand sales. Therefore, a $100-per-week increase in sales would increase the distributor's equity in his distributorship by $1000. This equity incentive was also intended to increase sales. Though not argued by the Company, it is also obvious that a slackening in sales would have an adverse impact on equity and present more of a threat to the distributor's independent business than it would have had on him as an employee, as he no longer enjoys any base pay and benefits.

The second reason for the Respondent's conversion to distributorships was to get out of the truck business. As the delivery trucks were sold, the Company began to

---

[6] A self-explanatory analysis of the projected labor cost impact of the conversion at the time of implementation is appended to this decision as Appendix A. This analysis is supported by the record evidence and supports the conclusion that labor cost savings were not a motivating factor in Respondent's decision to implement the conversion to independent distributorships.

enjoy significant savings by eliminating parts inventories, garage facilities, maintenance equipment, gasoline storage tanks, and other costs associated with vehicle maintenance and repair.

Finally, the distributorship decision was motivated by a desire to create or recoup capital resources and reallocate them from distribution to production. The distributorship conversion produced approximately $5.5 million in capital through the sale of trucks and territories. Since beginning its withdrawal from the distribution part of its business, the Company has invested approximately $4 to $6 million in the production aspect of its business. It is this reason for converting that most convinces me that the decision was entrepreneurial in character and represented the Company's desire to improve its competitive position by modernizing its production facility while likely improving its sales position as well.

It is also this reason that convinces me that the decision to convert was not really amenable to resolution through collective bargaining. As will be discussed in the section of this decision dealing with the collective bargaining between the Union and Respondent, the Union proposed a distribution system based on the driver-salesmen becoming owner-operators of their equipment, leasing the equipment to the Respondent and working on a 100-percent commission basis. This proposal, which was considered by Respondent, would take Respondent out of the delivery truck business and would have provided incentive for increased sales effort on the part of the driver-salesmen. It offers nothing, however, to address Respondent's desire to generate capital from existing resources (the value of brand names and sales territories) and allocate this capital to improving its production efficiency.

I agree with Respondent that it has made a fundamental change in the nature and direction of its business. Although I do not agree that it removed itself totally from the business of distribution of its products, it did remove itself from this function to a very significant degree. I believe that the degree of divestment of its distribution function is sufficient to bring Respondent's conversion into the ambit of the *Otis* plurality's view of the Board's earlier decision in *Adams Dairy*, 137 NLRB 815 (1962), enf. denied in relevant part 350 F.2d 108 (8th Cir. 1965), cert. denied 382 U.S. 1011 (1965), and distinguish it from the Board's recent holding in *Collateral Control Corp.*, supra. In recognizing that a distributorship conversion may constitute a fundamental change in the nature and direction of a company's business, the *Otis* plurality explained:

> In contrast, if *Adams Dairy* [citation omitted] were before us today, we would hold that decision to "subcontract" is not subject to Section 8(d), because the employer's decision there to discontinue its distribution operation and to contract out that function turned upon a fundamental change in the scope and direction of the enterprise. The employer retained no control over the equipment or the employees in the subcontractors' distribution system. Further, no alter ego or other sham devices were employed to disguise a unilateral reduction in labor

costs in an operation over which the employer maintained surreptitious control. As the Court of Appeals said: "[T]here is a change in basic operating procedure in that the dairy liquidated that part of its business handling distribution of milk product. . . ."

269 NLRB at 893.

In *Collateral Control Corp.* and cases cited with approval therein, the Board has continued to adhere to the view that distributorship conversions such as that in *Adams Dairy* are nonmandatory subjects of bargaining because they involve a fundamental change in the nature and direction of the business.

If this case is analyzed under the two-step test of Member Dennis in *Otis*, the same conclusion is reached. Member Dennis described the critical inquiry in the first step of her analysis as follows:

> Is a factor over which the union has control (e.g., labor costs) a significant consideration in the employer's decision? A factor over which the Union has control is a "significant consideration" if the union is in a position to lend assistance or offer concessions that reasonably could affect—i.e., make a difference in—the employer's decision. If the decision is not based on a factor over which the union has control, or if such a factor is at best an insignificant consideration in the employer's decision, the analysis ends, and bargaining is not required.

269 NLRB at 897.

I have already found that labor costs were not involved in Respondent's decision to convert. Other factors over which the Union has significant control were just part of the reason for Respondent's decision to convert to independent distributorships. The overriding reason for this decision in my opinion was the desire to recoup or create significant capital through the sale of its existing saleable assets, territories, and the reallocation of that capital to the production function. Over this important factor in this Respondent's decision, the Union had no control nor was it really in a position to lend assistance or offer concessions that could have made a difference in Respondent's decision.

Although under Member Dennis' approach, the second step would not be addressed given a negative finding on the first, I feel constrained to do so in light of the Board's reasoning in *Collateral Control Corp.*, where the Board has analyzed the facts of that case giving consideration to many of the factors considered important by Member Dennis in her second-step analysis. Member Dennis described the second step as follows:

> The second step in the analysis, therefore, involves weighing the fact that the decision is amenable to resolution through the bargaining process ("the benefit") against the constraints that process places on management ("the burden"). As outlined in *First National Maintenance*, the burden elements to be examined include, without limitation, the following:

314                         DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

(a) extent of capital commitment;
(b) extent of changes in operation;
(c) need for speed;
(d) need for flexibility;
(e) need for confidentiality.

Of these elements, the first two appear to be the most important in later Board decisions. To some degree the element of need of confidentiality is also present in the instant proceeding. The evidence reflects that during negotiations the Company's competitors attempted to take advantage to the situation, contacting the Company's route sales drivers in an attempt to hire them away as a means to enter the involved market. Respondent's argument that speed was an element is somewhat weaker as the evidence would indicate that its competitors could have anticipated that it was seriously considering converting to a distributorship program for the Bluefield driver-salesmen since it converted all of its other facilities 2 years before. The elements of capital commitment and extent of changes in operations will be discussed below.

Member Dennis in *Otis* found that the burden imposed on management by requiring collective bargaining over distributorships outweighed the benefit to labor-management relations and collective bargaining:

*Adams Dairy* illustrates the burden elements of extent of changes in operations and extent of capital commitment. A dairy decided to change its existing distribution system by replacing its driver-salesmen with independent contractors. The independent distributors took title to the products at dockside and were solely responsible for selling them. Trucks used previously by driver-salesmen were sold to the independent distributors.

The *Adams* Court said that the case did not involve "just the substitution of set of employees for another. . . . [T]here is a change in basic operating procedure in that the dairy liquidated that part of its business handling distribution of milk products. . . . [T]here was a change in the capital structure of *Adams Dairy* which resulted in a partial liquidation and recoup of capital investment." 350 F.2d. at 111.

Where the burden elements in a particular case are weighty, as illustrated above, it is likely that the decision at issue will not be a mandatory subject of bargaining.

269 NLRB at 898–899.

The Board and the courts have consistently recognized that where a significant reallocation of capital is involved in such a decision, management's need for predictability outweighs any possible benefit of collective bargaining. *General Motors Corp.*, 191 NLRB 951 (1971); petition for review denied *UAW v. NLRB*, 470 F.2d 422 (D.C. Cir. 1972). In the instant case the Respondent shifted almost $6 million in capital assets from its distribution business to the production aspect of its business. In *Collateral Control Corp.*, there was no capital investment or shift of significant capital from the function subcontracted to another function of the company involved.

Both Member Dennis in *Otis* and the Board in *Collateral Control Corp.* considered the extent of changes in operations. In *Collateral Control Corp.*, the Board stated:

In *Fibreboard*, as summarized in the Supreme Court's 1981 decision in *First National Corp. v. NLRB*, supra, an employer's decision to subcontract unit work was held to be a mandatory subject of bargaining for three reasons: First, no alteration occurred in the company's "basic operation."

The maintenance work still had to be performed in the plant. No capital investment was contemplated; the Company merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment. Therefore, to require the employer to bargain about the matter would not significantly abridge his freedom to manage the business. [379 U.S. at 213.]

. . . .

The guard services that were contracted out are an integral part of the Respondent's business and were performed under the subcontract as before. [Footnote comparing *Century Air Freight*, 284 NLRB 730 (1987), with *Adams Dairy* omitted.] Moreover, the record indicated that the Respondent retained some control over the subcontractor's employees in issuing written instructions to Wackenhut (subcontractor) about the performance of guard duties under the subcontract.

In finding no alteration in the Company's basic operation, the Board in *Collateral Control Corp.* relied upon four factors: (1) the employer's management performed the same functions after it enlisted the aid of a subcontractor as it has when it employed people to perform the subcontracted work itself; (2) the work contracted out continued to be an integral part of the employer's business and was performed under the subcontract as it had been performed previously; (3) the employer retained control over the subcontractor's employees by issuing written instructions about the performance of guard duties under the subcontract; and (4) there was no significant investment or withdrawal of capital.

Contrary to *Collateral Control Corp.*, there are changes in management functions under Respondent's independent distributorship program. Previously all of the factors governing profit and loss in the distribution of the Company's products were controlled by management. Most, though not all, of those factors have not been transferred to the distributors. The distributor sets the price at which he will sell his product to most customers, though not the large chain customers. He makes the final decision on ordering product, though management still has input, and some control, especially with promotions arranged with large chain customers. The distributor sets his own work schedule and route, may extend credit (though not withdraw credit from a customer to which Respondent has already extended it), sell noncompetitive product and resolves customer complaints.

The distributor must control stales and bears half the risk of loss for stales above 10 percent of his gross sales. That Respondent retains any financial responsibility for

stales and can require a distributor to accept promotional orders are indicators that its distributors are not quite as independent as those in *Adams Dairy*. I do not find that these two elements make the instant case sufficiently less like *Adams Dairy* to find that it calls for the Board's holding in *Collateral Control Corp.* or *Century Air Freight*. There are more significant differences between the instant proceeding and *Collateral Control Corp.* than there are similarities, and conversely more significant similarities between it and *Adams Dairy* than significant differences.

For example, other changes in management functions under the independent distributorship plan include the requirement that the distributor also bear the complete responsibility for his truck and bear the risk of loss even if damage occurs on company property. All of the above factors were totally the responsibility of management previously.

In addition, the distributor exercises substantial control over his operating expenses which previously were controlled by management. The distributor is free to hire employees to assist in his business, is responsible for his territory in the event he cannot personally service it, and is free to negotiate the various other costs of operating his business such as liability insurance, accounting services, etc. Previously all of these factors were under the control of management.

Management previously exercised strict control over how a route sales employee performed his job. In areas such as personal appearance, truck cleanliness, route order, ordering of product, and day-to-day on the job performance, management dictated how the job was to be performed. Now, with a few exceptions, management can only make recommendations to distributors on running their business. The distributor is free to accept or reject these recommendations. Serious disagreements are subject to judicial resolution, not Respondent's unilateral determination.

To the extent financial statements are required of the distributor, they are limited to two purposes which fail to indicate an exercise of company control. First, they are used for company-distributorship settlement on a weekly basis. The more detailed financial data involving operating expenses is required so the Company can make FICA calculations as it is required to do under Federal regulations governing independent contractors.

The factor of whether the function being subcontracted or converted (distribution function) is no longer an integral part of the company's business was discussed in *Collateral Control Corp.*, with the Board noting this comparison contained in *Century Air Freight*, supra at fn. 9:

In *Adams Dairy*, the employer employed drivers to deliver its product and also sold its product to independent distributors who took title to the product at the loading dock. The employer decided to get out of the distribution business altogether, unilaterally discontinued its delivery operations, and arranged to sell all its products to independent distributors. Thus, its responsibility for and control over its product ended at the loading dock. The *Otis* plurality stated that it would find that decision to sub-

contract not subject to mandatory bargaining because the decision involved a fundamental change in the scope and direction of the enterprise. In that case, however, the employer retained no control over the equipment, the employees, or the product, or over the distribution of its product. In contrast, in the present case, the trucking services are an integral part of the business. Moreover, the record indicates that the Respondent retained some control over the subcontractor's employees and operations and had ultimate control over responsibility for the shipping process.

The Court in *Adams Dairy* described the fundamental change in the basic operating procedure as follows:

After the decision was made by the dairy to sell its products dockside to the independent distributors, all of the trucks used previously by driver-salesmen were sold to independent distributors. Adams Dairy did not finance the sales nor in any way arrange for such financing. The routes driven by the independent distributors, though covering a similar territory, did not correspond to the previous routes of the driver-salesmen. The independent distributors took title to the products at dockside and Adams, thereafter legally had no concern with what was done with the products. The distributors were solely responsible for selling the products. The work done by the independent contractors, contrary to the situation in *Fibreboard*, was not primarily performed in the Adams plant for the benefit of the dairy. Adams was not directly concerned with whether or not any given distributor sustained a profit or loss, as would have been the situation with the driver-salesmen. The only major restrictions that Adams placed upon the independent distributors by contract related to sanitation matters and to the maintenance of high product standards and the maintenance of good will.

Contrary to the situation in *Fibreboard*, then, there is more involved in *Adams Dairy* than just the substitution of one set of employees for another. In *Adams Dairy*, there is a change in basic operating procedure in that the dairy liquidated that part of its business handling distribution of milk products. Unlike the situation in *Fibreboard*, there was a change in the capital structure of Adams Dairy which resulted in a partial liquidation and recoup of capital investment. To require Adams to bargain about its decision to close out the distribution end of its business would significantly abridge its freedom to manage its own affairs.

I agree with the Respondent that its conversion to distributors is practically identical to that in *Adams Dairy* in all controlling respects. First, as in *Adams Dairy*, title to the product passes to the distributor at dockside. The company legally has no concern or control over what the distributor does with the product. Should the distributor choose to do so, he may return a certain percentage of the product to the Respondent and receive a stale

credit. In addition, however, the distributor may dispose of that product in other ways. Further, as in *Adams Dairy*, the trucks previously used by driver-salesmen were sold to the independent distributors. The responsibility and control over every aspect of the truck is the distributors'.

The instant case is stronger than *Adams Dairy* in that the Company had sold to the distributors the right to distribute its brands within a defined geographic area. Although the Company did not finance the sale of the trucks, it did provide an option through Wachovia Bank by which the distributors could finance the sale. The Company also offered to finance the territories itself. Both of these appear to be arm's-length transactions with significant interest involved. Moreover, the distributors were free to find different financing if they chose to do so. I do not believe that the financing options made available, or the Respondent's stale policy or its promotion ordering policy are an insufficient indicia of control or continuity in the basic operating procedure to take this case out of the *Adams Dairy* precedent. As was the case in *Adams Dairy*, the Respondent here changed its basic operating procedure in that the distribution business has been liquidated and a fundamental change in the Company's capital structure has taken place since capital has been reallocated from the distribution function to the production process.

For all of the reasons set forth above, I find that the instant case is governed by the Board's decision in *Otis Elevator* and its holding in *Collateral Control Corp.* is not applicable. Accordingly, under the guidelines set forth in *Otis Elevator*, I find that Respondent's decision to convert its driver-salesmen employees to independent distributorships was not a mandatory subject of bargaining and Respondent was not obligated to bargain over the decision.

### C. Did the Independent Distributors Remain Statutory Employees After the Conversion and Did Respondent Unlawfully Withdraw Recognition from the Union as their Collective-Bargaining Representative?

General Counsel argues that Respondent retained sufficient control over the method of distribution of its product and sufficient control over the distributors to negate their status as independent contractors. Thus, Respondent's alleged refusal to bargain over its employees' method of distribution constitutes an unlawful unilateral change in terms and conditions of employment.

In support of this position, General Counsel asserts that the record shows that Respondent waived the cash downpayment for the routes, providing virtually all of the financing and accounting for the distributors; pays $500 of the cost of such accounting services during the first 3 years of the distributorship; purchased the requisite licenses and tags; provided free maintenance and repairs on the vehicles purchased by the distributors; requires the distributors to wear uniforms and to maintain an appearance acceptable to Respondent; regularly instructs distributors regarding vehicle maintenance and upkeep; regularly assigns supervisors to ride with distributors, checking stock rotation and displays; reimburses distributors for stale stock; prohibits distributors from selling stale items; requires distributors to purchase certain products; and exercises final approval of sales of routes by distributors. Citing *Roadway Package System*, 288 NLRB 196 (1988), and *Mission Foods Corp.*, 280 NLRB 251 (1986).

I disagree with this position both on factual as well as legal grounds. In the two cases cited, the Board clearly states that neither the jobber arrangement in *Mission Foods* nor the P&D driver arrangement in *Roadway* exhibited entrepreneurial or proprietary characteristics found in true independent contractor relationships. In the instant case, the independent distributors have purchased territories wherein they have the exclusive distribution rights to Respondent's brands, pay upwards of $35,000 for these rights. The rights may appreciate if the distributors' business increases from the date of purchase and such rights may be sold. The Distributors' Agreement states that the distribution rights are owned by the distributor and may be assigned, transferred or sold, in whole or in part, by the distributor, subject to the written approval of the assignees', transferees' or purchasers' qualifications by the Company. The Company also retained the right of first refusal under the same terms offered by a potential purchaser. I do not believe that these conditions inhibit the salability of the routes nor detracts from the proprietary interest of the distributor.

With respect to vehicle maintenance, it is clear that the distributor is responsible for this aspect of his business, and the Company merely put the vehicles sold to distributors into proper operating condition before transferring them to the distributors. Again, the distributors purchased these vehicles from the Company and have an unfettered right to sell them whenever and to whomever they please. Loans which they secured from the Wachovia Bank are their loans and not the Company's loans.

The payment of the first $500 of accounting costs for the first 3 years of the agreement appears to me to be nothing more than a means to get around the reluctance of a prospective purchaser of a distributorship who may not know the cost of accounting services. This inducement does have a 3-year limitation, and the choice of accountants is up to the distributor. I find this similar to the startup stale policy, which was much more generous than the ongoing stale policy.

I cannot find from the record that Respondent can require distributors to wear uniforms although it may encourage this practice. Likewise, I cannot find that the Company regularly instructs distributors on vehicle maintenance and upkeep. I cannot find that the Company regularly assigns supervisors to ride with distributors, though it may request that they do so and a distributor may agree. I find that the distributors can refuse to allow a supervisor to ride with him.

The Distributor's Agreement prohibits the sale of stale stock to the general public, but otherwise authorizes the sale of such merchandise to purchasers who are not competitors of the Company.

Compare the facts of this case as set forth immediately above and in the preceding section of this decision with the factual situation in *Mission Foods*, a company also in

the business of producing and selling food items. As found by the Board at 252:

> The Employer alone sets and makes adjustments to the jobbers' routes, sometimes after requests by the jobbers and at other times over the objections of jobbers [compare with the instant case where routes and stops are set by the distributor without need of company approval]; determines the frequency of calls upon major (chain store) accounts, which constitute approximately 90 to 95 percent of the dollar volume in each territory [the responsibility of the distributor in the instant case], and gives detailed instructions regarding servicing and stocking of each account [the responsibility of the distributor, with at most company advice]; sets all prices [herein Respondent suggests retail prices which can be changed except for promotional and feature pricing for chains, in which case the distributor receives a special discount]; adds unordered merchandise to the jobber's order which the jobbers are required to sell [herein only for promotions]; and often has switched jobbers back and forth between company driver and jobber status according to what it felt was most advantageous to the Company at that particular time [not the case herein]. The Employer also disciplines the jobbers through written warnings and threats of loss of loading privileges [in the instant case, the Distributor's Agreement governs disputes and unilateral discipline is not part of the agreement]. Further, although the jobbers may purchase or lease their trucks, if they lease they must do so through the employer. The Employer retains the option of repurchasing any trucks it "sold" to the jobber in the event the jobber leaves [not the case herein]. Although the jobbers are responsible for their own vehicles and, with some restrictions exercised by the Employer, may hire and use helpers on their routes, they do not have a proprietary interest in those routes as they cannot sell them, and the Employer may change them unilaterally and without notice to, or further recourse by, the affected jobbers [emphatically not the case herein].

For the reasons stated, I believe that the cases relied upon by General Counsel on this point, *Roadway* and *Mission Foods*, are inapposite. I agree with Respondent on this point that independent contractor status of its distributors is established when the facts of this case are viewed in light of the Board's decisions in *Bellacicco & Sons*, 249 NLRB 877 (1980), and *Gold Medal Baking Co.*, 199 NLRB 895 (1972).

*D. Regardless of Whether the Decision to Convert is a Mandatory Subject of Bargaining, Did the Respondent Satisfy Its Burden of Bargaining in Good Faith with the Union over that Decision?*

1. Events leading to negotiations

Douglas Church, the union business representative responsible for servicing the Respondent's involved unit for much of the term of the 1985 to 1988 contract, testi-

fied that in June or July 1986, he met with Nolan and Respondent's personnel director, Paul Dearfield. Nolan informed him that the Company wanted to sell routes to the drivers, that the Company would draft individual contracts for each driver who would purchase his truck, and buy the product. Church replied that if the Company did this, the Union would strike. Church inquired why the Company wanted to go to this plan. Nolan said in effect that the drivers were content and not sufficiently motivated. They had no incentive to sell more product. Church testified that he believed that the Company was going to implement the distributorship plan in the very near future at the time of this conversation. He had had discussions with the drivers and had heard reports that the Company had gone to such a program in other areas. Church also indicated that the Union had a disagreement with the Company over insurance, which, would result in a strike if it were not solved.

Both Nolan and Dearfield tesified about this meeting with the only significant difference being a lack of detail. Both testified that the meeting ended abruptly when Church learned of its purpose and voiced his adamant objection. Nolan then stated that Respondent took no steps to implement the distributorship program after that meeting and before negotiations began. He also stated the supervisors were not instructed by the Company to meet with driver-salesmen about the program before negotiations started and supervisors were not told prior to negotiations that the Company had reached a decision with respect to the plan as no such decision had been reached. Nolan, as did Dearfield and Anderson, testified that such a decision was reached on March 22.

Steven Harris, currently a territory manager for Respondent, was employed as a driver-salesman from October 1985 until his promotion to a management position in March 1988. He testified that in March 1987, he attended a meeting at the Bluefield warehouse with the driver-salesmen assigned to that location and Union Steward L. T. Miller and Doug Church. Miller and Church told the drivers that the Company was planning to sell their routes at the expiration of the current collective-bargaining agreement and that the only way to prevent it was to stick together and join the Union. The assembled drivers were told that the Company had sold the routes in all of its other areas and would sell the Bluefield routes upon expiration of the agreement. Church indicated that the Company should not sell the Bluefield routes and that if need be, the Union would shut the bakery down to prevent their sale.

Michael Woodbridge, a former employee of Respondent, testified that he had a conversation with Respondent's Bluefield Branch Sales Manager William Rouse when he was hired in July 1987. Woodbridge stated that Rouse told him that he should be aware that the Company was going to distributorships when the current contract expired.

Employee Ben Bailey III testified that prior to June 1987, Rouse asked him if he was going to purchase a route. Bailey replied that he had heard nothing about this. Rouse told him that he would receive information

318                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

and that it could be one or two things, "It'll either be Flowers' [Respondent's] way or the highway."

William Smith, a 17-year employee of Respondent and a union steward, testified in this proceeding. At the time of hearing, he had been on sick leave for some time and had been employed as a driver-salesman at Respondent's Keene Mountain warehouse prior to going on leave. Smith testified that in the fall of 1987, around the end of October or the first of November, Bill Rouse informed him that as of contract time, the driver's routes would be sold and the salesmen would either have to buy their routes and become independent distributors or they would have to hunt for a job. Smith stated that he asked Rouse if he were sure about this and Rouse said he was very sure, and that if a driver did not buy a route, he would have to "hit the streets."

Rouse testified that he did not learn until April 1988 that the Company was going to implement the independent distributorship program in his territory, which is the territory involved in this proceeding. He testified that there was a lot going on prior to that and he passed on what he heard to higher management. He had been instructed not to comment on rumors because he did not know the answers. He admitted having discussions with route salesmen during the 1988 negotiations and told them that no decision had been made about the program. He testified that prior to October 1, 1987, no one had asked him about the distributorship conversion.

With regard to the Smith conversations, Rouse said he told Smith that a decision had not yet been made and that as of that time, he did not know what the Company was going to do. He also told Smith that as of that time, the Company was not working on anything. He denied the statements attributed to him by Smith.

Smith testified he received similar information from his district manager, Troy Byers, who said to him, "if you want your job, you'll buy your route." Around the first of February 1988, Smith stated that Charlie Thomas, Respondent's Bluefield district manager, came to the Keene Mountain facility to ride the drivers' routes and remap them. Thomas told Smith that Rouse had sent him to remap so they could split the routes up so they would be profitable when they sold them.

Smith also related a conversation he heard between Rouse and extra man Eddie Wells at the time of Wells' hiring in November or December 1987. One of the questions Rouse asked Wells was whether he would buy a route in March. With respect to this conversation, Rouse testified that Wells said he had heard rumors about the distributorship program and asked Rouse about it. Rouse told him that at that time the Company did not know what avenue it was going to take with the program. Wells then said he wanted to know because he did not want to leave his present job and go into a new one blind. Rouse told him that the program was something that had gone on in the northern end of the State of West Virginia, but for his group, he did not know.

Rouse also testified that he started working on route restructuring, which resulted in the routes sold to distributors, in the first part of October 1987. He testified that the restructuring was done because there was a lot of overlapping in the existing routes and they needed to be restructured, presumably for efficiency. He also worked up sales figures for the routes which were used to develop the pro forma performance analyses shown to prospective distributors. Rouse testified that the restructuring process was similar to ones done in the past and was done to improve service and profitability. He acknowledged that Troy Byers was involved in the route restructuring in a purely advisory capacity and gave Rouse no hint that the restructuring information was going to be used to set up the distributorship routes.

About 2 weeks prior to the beginning of negotiations, Rouse asked Smith whether he thought any of the Keene Mountain drivers would buy routes and Smith replied that none of the 10 drivers or the extra man were interested. Rouse then said that if they were not going to buy the routes, they should go ahead and quit so he could get replacements.

With respect to the various conversations set forth above wherein Rouse is involved, I credit the employees' versions of the conversations. I did not consider Rouse to be particularly credible and found his testimony with respect to the reasons for route restructuring and gathering of associated financial data to be patently unbelievable. I am not sure whether the testimony involved was intended, inter alia, to support the only 8(a)(1) violation alleged in the complaint; to wit, that on or about March 1988, Respondent threatened the driver-salesmen in the unit with discharge upon expiration of the contract unless they agreed to become "non union independent contractors."

In the event that the involved testimony is intended to support this complaint allegation, I find that no violation occurred even though I do find that the drivers were threatened with termination in the event they did not purchase a distributorship. There has been no antiunion animus shown on the part of Respondent and there has been no nexus shown between the threats of termination and any union or other protected activity. There is certainly no testimony or other evidence that any driver-salesman was threatened with discharge unless he agreed to become a "non union" independent contractor. Similarly, the Respondent's decision to implement the distributorship program and its ultimate implementation, which resulted in the termination of unit employees as driver-salesmen, has not been shown to have been motivated in any way by antiunion animus or because of the employees' union or other protected activity. Rather, I find that Respondent took the action it did for the legitimate business reasons that it has given in this record.

2. Negotiating sessions and events surrounding them

January 25 Session

Ken Hall, business representative and chief negotiator for the Union, testified that the first meeting over contract negotiations for the current collective-bargaining agreement was held on January 25. This was a meeting between Hall and John Anderson, Respondent's independent labor attorney and chief negotiator. At this meeting, dates were set for negotiations and Anderson asked Hall what the most important issues were from the

union's position. Hall replied that insurance would be the prime issue. Anderson replied that he believed that the proposed shift from driver employees to independent route salesmen would be the most important. Anderson stated that though he was not certain at that time, he believed that the Company intended to implement the proposed change. All of the above recitation is based upon Hall's version of the meeting.

Anderson testified in general similarly. He also stated that Hall indicated at this meeting that the distributorship program would be a major problem from the Union's standpoint, that they were not interested in the system. Anderson denied that he told Hall that Respondent intended to implement the plan, stating that he did not know as of the 25th whether the plan was even going to be part of the Respondent's proposals. He had a meeting scheduled the following day to determine with company management what the Company's proposals would be. Anderson also testified that Doug Church stopped by the meeting for a few minutes and that he hoped the Company was not thinking about trying the distributorship program. To the extent a credibility determination is necessary, I credit Anderson's testimony that he did not indicate at this meeting that Respondent was going to implement the distributorship program.

Prior to the 25th, Hall testified that he had heard rumors that the Company was interested in going to the independent distributorship program, but had not received clear notification from the Company of its intentions.

### February 25 Session

The first actual negotiating session was held on February 25. The Union bargaining committee consisted of Hall, Grover Marion, president of Local 175, and several employee bargaining committee members, including Bill Smith and L. T. Miller. Respondent's committee consisted of Anderson, Dick Nolan, president of Respondent, Paul Dearfield, Company personnel manager, and Steve Avera, an inhouse counsel for Respondent.

The meeting began with the parties exchanging proposals. The Union proposed some 38 changes from the old contract while the Company proposed 8, including the change in driver status.[7] Both sides explained their proposals to the other and the Union indicated that although it opposed all the company proposals, its major concerns were with the Company's insurance proposal, part-time employee proposal and the proposal to change the driver-salesmen to independent distributors. The Union indicated that it wanted the status of the driver-salesmen to remain the same and had no interest in the distributorship program.

Anderson testified that he replied that the Company felt the program was in its best long-term interests and that the Company would hold small group meetings with the employees to explain the program. He mentioned

[7] The record contains a great deal of testimony describing each negotiating session. Much of this testimony relates to matters in negotiation which are not at issue in this case. Although this evidence, as with all evidence presented, has been considered on the matter of credibility, it is not recited here unless it bears directly on an issue in question.

that because the proposal was a complex one it was not fair for the Company to expect the Union, at some point, to explain the proposal and that the Company would explain it to the employees. Hall does not remember any notice of such meetings being given and none of the parties notes of the February 25 session reflect such notice. Under the circumstances, I do not find that notice of the employee meetings was given. There was no substantive discussion at this meeting.

### March 11 Session

According to Hall, the next meeting, held March 11, began with the Union offering two additional proposals. One was a proposal to increase the holiday pay for the driver-salesmen and the other was to add a new classification in the sanitation department. Hall also told Anderson that it was his policy to present in writing for ratification any agreement reached during negotiations. For that reason, he felt that negotiations must be concluded in time for the Company's final offer to be put in writing by March 24 so the Union could hold a ratification vote on March 25.

The Company then responded to the union proposals, discussing its reasons for disagreement. Hall testified that there was no discussion of the independent distributor proposal and related proposals as the Company took the position that it had decided to implement the independent distributorship plan and saw no need to discuss the proposals relating to driver-salesmen. Hall testified that at the meeting's end, Anderson said that he recognized that the independent distributorship proposal was a major issue to the Union, but that management had made a decision to implement the plan. In response to the Union's question as to why this decision had been made, Anderson replied that management felt it was in the best interest of the Company. The Union registered its objection and Anderson informed the Union that Respondent did not have to negotiate on this issue; that the only reason that the issue was on the table was as a courtesy to let the Union know that the Company was going to implement it because of the historical good relationship between the parties. The Union presented no alternative proposals to the independent distributorship program at this meeting nor did it take a position with respect to the Company's assertion that it was a nonmandatory subject of bargaining.

Anderson gave a slightly different version of how the meeting began and the order of presentation. On the matter of the distributorship program, Anderson testified that Bill Smith said that employees in Keene Mountain had already been contacted by one of Respondent's competitors in an attempt to get the driver-salesmen to work for them if Respondent went to a distributorship system, and break the Keene Mountain market. Anderson also testified that because of the Union's adamant opposition to the distribution proposal, to create some type of bargaining, he tried to convey that the proposal was a nonmandatory subject of bargaining. He indicated that Respondent had received three different decisions regarding the proposal. But, that even though it was a nonmandatory subject of bargaining, because of the longstanding

320                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

good relationship between the parties, Respondent had wanted to bring it to the table so that the parties could have a full opportunity to review the proposal and let the Union have whatever input it thought appropriate. Anderson testified that at this point, the Company had not made a final decision as to whether it was going to be implemented. He denied telling the Union on March 11, that the Company had already made a decision to go to the independent distributorship program. In his testimony, Dearfield also said that no one from the Company indicated on this date that a final decision had been reached with respect to the program.

Anderson appears to me to be a careful and truthful person and I credit his testimony that he did not specifically tell the Union at this session that the Company had decided to implement the plan. On the other hand, the entire tenor of his comments could easily lead a rational person to believe that the Company had made such a decision. Hall could well have believed that he heard in this session that the decision to implement the plan had been made, although I believe that he actually just drew this inference from Anderson's statements.

Also at this meeting, the Company presented its insurance proposal, which the Union rejected, insisting on the Union's own health and welfare plan.

### Unilateral Meeting of Company Officials with Driver-Salesmen

Hall testified that he held a membership meeting for the purpose of requesting strike sanction from the International Union in the event a strike was deemed necessary. At that meeting, Hall was informed that Respondent had called the driver-salesmen to meetings where it presented them with documents relating to the independent distributorship program. Hall learned of these meetings on or about March 15. Hall indicated at one point that management may have given notice of its intention to meet with the driver-salesmen, but could not recall. His notes of bargaining sessions do not reveal such notice being given.[8]

Church testified that in the negotiations leading to the 1985 contract, the Company had made various proposals regarding insurance and had met with the employees to explain these proposals without objection. Anderson testified that these meetings were held during negotiations without prior notice to the Union.

Employee William Smith testified that the Company had scheduled a meeting for driver-salesmen in Vanzant, Virginia for a Wednesday in March to discuss the distributorship program, but that no drivers showed up. Later that month, Nolan and Dearfield met with the Keene Mountain drivers following a Nolan request of Smith that he get the men to talk with him. Nolan said he wanted to explain the distributor program to the men. At the meeting, Smith stated that Nolan explained to the men that the Company was going to sell the routes and

gave them various documents explaining the program. (G.C. Exhs. 2–8). Smith testified that at this meeting Nolan did not attempt to require anyone to make commitment.

Driver-salesman Ben Bailey III testified he attended one of these meetings where Nolan said that the routes would be sold, but did not ask anyone present to purchase a route.

Former driver-salesman Robert Nipper testified that he attended such a meeting, which was also attended by Joe Lester. Nipper testified that in response to his inquiry of Nolan of what would happen if he was not interested in becoming a distributor, Nolan told him to check with Dearfield about his unemployment benefits. He testified that Dearfield told him that he would be on unemployment status. Dearfield denied this conversation occurred. I credit Dearfield's denial. This testimony is contrary to other testimony relating to these meetings given by employees attending them and nothing was asked of Lester about it, though he appeared as a witness. It was also allegedly made at a time when Respondent was uncertain what the status would be of driver-salesmen who did not purchase a route, as indicated by statements made in negotiations.

Nolan and Dearfield were present at the employee meetings and testified about them. They stated that at the beginning of each meeting, Nolan explained to the assembled employees that management was there to explain the distributorship program. This was a proposal that the Company had made to the Union, that it was in negotiations and that a final decision had not been made on the program. No one would be asked to make a commitment or sign anything.

After this opening statement, Nolan explained the distributorship agreement in detail. He passed out various documents relating to the program as he discussed them. Nolan would then go over the financial pro forma prepared for each driver-salesman. These documents would show the employee what he had made for a particular period as an employee and show a breakdown of projected income and expenses for a like period as a distributor. When this document had been explained, Nick Fadero, Respondent's controller, would explain how the territory purchase, including the truck purchase, could be financed. Financing with the Company was available for the territory purchase price and was the overwhelming choice of new distributors; however, a distributor was free to pay the purchase price in cash or with other financing. Financing of the truck purchase was available through the Wachovia Bank. After this presentation, Dearfield would explain an available truck insurance package, a business insurance package, and a health insurance package. Then, a CPA who works with a number of distributors would explain how to go into business as a sole proprietorship, partnership or corporation, giving the various advantages and disadvantages of each form. He also would go into how one could set up bookkeeping. At this point, the meetings would end.

---

[8] Although the amended charge alleged direct dealing with employees, this was not alleged in the complaint, nor was it litigated by the General Counsel. Accordingly, this issue is not before the Board. *Koons Ford of Annapolis*, 282 NLRB 506 (1986); *Electrical Workers IBEW Local 1186*, 264 NLRB 712 (1982).

### March 22 Session

Hall testified that at the next negotiating session, held March 22, the majority of the union proposals were still on the table and the parties went through them. The Company refused to respond to the union proposals regarding driver-salesmen stating that it was not interested in driver-salesmen proposals as it had a proposal for independent distributorships. Hall stated that there was no give-and-take on this issue, although there was movement on other issues. The Union's position on the driver-salesmen issue was to retain that status and it offered no other alternative to the Company's distributorship program at this time.

Anderson testified that Hall made the first reference to the distributorship program on this date, stating that the Union was opposed to the independent distributorship system and that it was not there to negotiate members' jobs away. He also testified that Nolan gave a very detailed explanation of the program to the Union at the meeting, including how the territories or routes were determined and priced. He stated the Union had few questions. The Union did object that the Company did not have anything to sell as it did not own store shelf space. Nolan explained that the Company was selling the exclusive distribution rights to products and labels that it did own, analogizing it to a McDonald's type of franchise. Anderson testified that Miller raised an objection that the territories were not large enough, that there was not enough room to grow. Nolan responded to this and ultimately, Miller's objection was addressed in the next negotiating session.

The parties' positions on insurance remained fixed.

### March 23 Session

Anderson testified that after the March 22 session, he met with company officials and told them that they had to make a decision with respect to the distributorship program and its implementation. Given the Union's opposition to the plan, if the Company was not going to implement it, he wanted to know so that he could use the withdrawal of the proposal to the Company's strategic advantage. He said the Company decided then to go ahead with the program, that they were prepared to stay with it.

At the next session, held March 23, Hall testified that Anderson opened the meeting by informing the Union that the independent distributorship program proposal would be in the Company's final offer. During the meeting, the Union and the Company stated that this proposal would be a strike issue for the Union as well. There was quite a bit of discussion at that meeting relating to the proposal, and Nolan was asked if he had met with the driver-salesmen regarding the independent distributorship program. Nolan acknowledged that he, Dearfield, and other members of management had presented the program to the employees.

The Union also inquired what would be the status of the driver-salesmen if they did not buy a route. According to Hall, Anderson said the Company was not sure at that point, but they would be in layoff status, voluntary quit status or terminated. Hall testified that Nolan acknowledged that he had made statements to the driver-salesmen to the effect that there were outsiders waiting to buy the routes. Anderson testified that the Company had a list of persons who had made inquiries about purchasing a route that had been converted to a distributorship elsewhere in the ompany's operation. Hall said Nolan told L. T. Miller, a bargaining committee member and a present driver-salesman that, "You have a decision to make on Saturday (the old contract expiration date)." Marion testified that at this meeting, Nolan acknowledged that he had discussed the distributorship program with outside people, that the routes would be sold and that the drivers would have to make a decision by the end of this contract whether they were going to buy a route.

Hall testified that the Union from the beginning had sought bumping rights into the unit for the driver-salesmen. In the expiring contract, the sales and production departments were separate and sales employees could not bid or bump into the production department.

After discussion on independent distributorship program, Hall testified that it was clear that the Company was not going to negotiate on the issue and he informed the Company that the Union felt the Company was not bargaining in good faith and the Union was contemplating filing charges with the NLRB. To this, Hall said Anderson replied, "I've fought this battle before, and I'm ready to fight it again." Hall stated that Anderson's justification for this statement was that he had discussed the distributorship program with the Union. Marion testified that Anderson said that he did not have to talk to the Union about this issue, that he had been through this before, and it was a nonmandatory bargaining issue. Anderson stated that Respondent and Board decisions that indicated that the distributorship conversion was a nonmandatory subject of bargaining; that despite those decisions, Respondent had brought the issue to the table, that it had not precluded discussion on any issue but, that the Union had not been interested in discussing it.

Anderson testified that the distributorship program was kept as a proposal and included in the Company's final offer for two reasons. First, he stated the Union was treating it as a proposal and had identified it as a strike issue. He testified it needed to be resolved through negotiations. Second, Anderson was concerned that the subcontracting provision of the old contract could be interpreted in arbitration as prohibiting the Company's actions. Additionally, a proposal in the current negotiations called for all products produced in the bakery to be delivered by bargaining unit employees. Anderson felt this provision could be interpreted as covering the driver-salesmen.

On cross-examination, Hall stated that there had been a discussion of what the Company would do with regard to the routes in the event of a work stoppage at the expiration of the contract. The Company indicated that it would run them with management personnel. Respondent did not say it would implement the distributorship program.

At this meeting, the insurance issue was also identified by the Union as a strike issue.

322 DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

### March 24 Session

The next session was held on March 24 and according to Hall opened with Anderson informing the Union that he did not agree with it filing unfair labor practice charges, but that the Union had that right and to go ahead if that is the way the Union felt. Anderson provided the Union with a copy of the Regional Director's decision that the subject of distributorships was a nonmandatory subject of bargaining. The decision dealt with the same program as was being proposed in the contract negotiations which Respondent had implemented in its Charleston, West Virginia operation over the objection of its union employees. Anderson testified that at about this point he indicated that the program was a nonmandatory subject of bargaining, that the Company had put the proposal on the table and that it had been prepared to discuss any and all aspects of the proposal. He further indicated that it did not need the Union's agreement as the matter was a business decision.

There was then discussion of the status of drivers who did not purchase a route, with Anderson indicating that they would be in layoff status. The Company indicated that it was willing to give these drivers priority hiring rights, but they would have no seniority when hired, except for vacation and holidays.

Hall testified that the Union then asked for a copy of the independent distributorship program and was told that the Company did not have one at the meeting, but that driver-members of the bargaining committee had copies and the Union could get one from them. Marion testified that this request was made at the previous meeting on March 23. I believe the parties' notes of the sessions conclusively establish that March 24 was the actual date of this request. This request was not renewed throughout the remainder of negotiations. I do not view the Respondent's response as any indication of bad faith as the fact was, it did not have a copy of the program and some of the union committee members did have one.

In response to an inquiry, the Company said it would not pay health, welfare, and pension benefits for the independent distributors as they would not be employees. Marion testified that Anderson said that the distributors would not belong to the Union as they would not be employees. Anderson's version of this was that the distributors would not be members of the bargaining unit as they were not employees; whether they stayed members of the Union was their decision to make. He testified that Hall said the Teamsters would not allow them to remain members if they were not covered by the collective-bargaining agreement.

A number of specific inquiries about the details of the distributorship program were made during this session. Though the responses to these questions may well be relevant on some issues, they are not in the context of this bargaining session, except to note that the Company did attempt to answer the Union's questions about the plan. Detail about the Company's responses will be found in that portion of this decision dealing with the operation of the plan.

After a caucus, the meeting ended with the Company giving the Union its final offer (J. Exhs. 6(a), (b), and (c)). After a further caucus, the Union informed the Company that it would recommend the offer to the employees if the Company would accept the union insurance proposal and drop the independent distributorship proposal. The Company responded, no. To this point in negotiations, neither party had moved at all on their original positions with respect to driver-salesmen vs. independent distributors. Nor had any significant movement occurred with respect to the insurance issue.

Anderson testified that as of March 24, the Company was and had been willing to discuss any and all aspects of the distributorship proposal. By "discuss," Anderson said he meant to open the topic of conversation up for any type of negotiations, questions, or positions that the parties wanted to make.

### Ratification Vote of March 25

On March 25, the Union filed the instant unfair labor practice charge contending the Company had violated the Act by directly dealing with unit employees and bargaining to impasse over a nonmandatory subject of bargaining. Also on this date, the employees voted 121 to 29 to reject the Company's final offer. A strike began on March 27, which lasted until May 14. During the period of the strike several more negotiating meetings were held.

### April 11 Session

At the request of a Federal mediator, Phil Bradley, the parties met again on April 11. Bradley asked the parties to bring him up to date on the status of bargaining, with Anderson telling him the two big issues were insurance and the independent distributorship program. According to Hall, Anderson told the mediator that the program was a nonmandatory subject of bargaining.

The Union gave the mediator its remaining proposals and he asked the parties to separate. Bradley met separately with the parties for about 2 hours. According to Hall, he told the Union that the Company was not going to move on the issues, that the only reason the independent distributorship proposal was still on the table was because the Union had questions about it. Anderson testified similarly, pointing out that the mediator had told the company representatives that the Union was adamant on the insurance and distributorship issues. Anderson indicated that the Company discussed the matter for a while and then put its final offer back on the table for an additional 5-day period. The meeting then ended.

On April 15, the Union filed an amended unfair labor practice charge contending that the Respondent had refused to bargain in good faith over its decision to implement the distributorship plan and the effects of such decision, and further that the Respondent had implemented a system of independent distributorships and terminated the route salesmen on March 27.

### April 18 Session

On April 18, the parties again met, both in a fairly private session between the primary negotiators and later with the full negotiating committees. The record is not totally clear when certain events occurred on this date, though on the whole, there is agreement that they did

occur. According to Hall, he began the meeting by informing the Company that its final offer had again been turned down. Hall testified that there were a number of questions about the independent distributorship program. The Company again said it would not pay pension or health and welfare benefits for the distributors. The Company also stated, according to Hall, that it must maintain certain controls over the distributors, indicating that there would be supervisors on the routes with the distributors to maintain freshness and shelf stock. The Company indicated that its reason for going to the independent distributors was to give the people more incentive to increase sales. The Union inquired how sales could increase as the Company presently controlled about 95 percent of the market. The Company responded it did not know what percentage of the market it controlled.

At this meeting, the Union asked if the Company would supply the driver-salesmen with a truck and assign them a territory. The Union also indicated that it was willing to move on the matter of more incentives for the driver-salesmen to increase sales. It proposed decreasing their base pay and increasing commissions. The Company indicated that that was not what it had in mind. The Company again said that it did not have to bargain over the independent distributorship program and put its final offer of March 24 back on the table.

Anderson testified about this meeting and to the extent his testimony differs from that of Hall and Marion, or adds to it in some relevant way, it will be noted. Anderson indicated that at this meeting the Union cited him to a Board decision which to the Union established that the distributorship program was a mandatory subject of bargaining. Anderson said he had not read the case and pointed out he had a decision from the involved Board Region directly on point.

Anderson also took the position that if the distributorship program had been a mandatory subject of bargaining, that the Union had had the opportunity to bargain about it. The Union took the position that the program was a fait accompli at the time the Company presented it. Anderson denied this.

Anderson testified that at this meeting the subject of implementation had come up. He advised the Union that the Company had chosen not to implement the system up to that point, but that it did have a legal right to do so and that it could not hold off doing so indefinitely. He also indicated that before the Company did start to implement that he would contact Hall and advise him of that decision. As of April 18, the routes were being run by management personnel and no irreversible action had taken place. The meeting ended.

### April 19 Session

On April 19, the parties met again, with according to Hall, the Union indicating its seriousness at ending the strike. It proposed that the driver-salesmen become owner-operators whereby they would purchase trucks, lease them to the Company, and all of their income would come from commissions. The Union believed that this would address the Company's incentive concern as well as a concern of the Company that employees did

not take good care of the company trucks. Hall testified that Anderson said the Company would look at this proposal, but hoped it was not the Union's last proposal on the issue because he could not recommend it to his client.

The Union also reurged its proposals on bumping rights and the Company indicated it would reconsider its position on these issues. Hall testified that the Company also proposed to change the term of the new contract, which had been a proposed 3-year one, to a 4-year contract.

Anderson testified about this meeting and his testimony was similar to Hall's. He did note that at this meeting that he volunteered to delay implementation of the distributorship program for 6 weeks to let the effects of the strike settle. The meeting ended.

### April 20 Session

According to Hall, on April 20, the parties met with the Company reducing its proposed term of contract to 42 months and the Union urging its owner-operator plan. Hall testified that the Company was concerned about this proposal because a salesman would not have an incentive to build up his territory by getting new stops and increasing sales because he would be afraid that once he did, the Company would take some of the stops off his route and put them another salesman's route. The Union indicated it would be willing to negotiate terms whereby the Company could assign a salesman a specific territory just as it would under the distributorship plan. Hall stated that Anderson said that the Company did not want to pay health, welfare, and pension because these things were already calculated into the distributorship plan. Hall said that Anderson indicated that the Company was going to the independent distributorship plan and had sold over a thousand distributorship routes throughout the country. At another point in the record, Anderson agreed that this figure may be 50 percent of the routes of Respondent nationwide.

Hall said he then told the Company that the Union had been willing to move significantly on the driver-salesmen matter, but that the Company had made no movement. At the close of the day, the Company presented an offer involving a 3-year contract with the same wage increase, the distribution program, and the bumping rights with the exclusions proposed by the Union. The insurance was still as proposed by the Company. The meeting ended.

### April 21 Session

This meeting began with the Union making a counter-proposal to Judge's Exhibit 7, the Company's strike settlement offer. The Union agreed with the bumping rights proposal, term of contract and wages. It still disagreed with the insurance proposal. With respect to the distributorship proposal, the Union stood by its owner-operator proposal and the Company rejected it, with Anderson stressing its lack of equity incentive. The Company agreed to give certain employees, including driver-salesmen who did not buy a route, limited bumping rights into production. At this meeting union committee

member L. T. Miller inquired about one of the provisions of the distributorship program relating to the consequences of the death of a distributor. Miller may have asked to have the provision amended, but the Company attempted to assure him that his fears about the provision were groundless. The meeting ended with the Company presenting the Union with a strike settlement offer having a deadline of April 26. This date was subsequently extended to the April 27.

## April 27 Vote

On April 27, the employees voted to proceed with the unfair labor practice case against the Respondent and not to vote on the strike settlement proposal.

## May 5, 11, and 12 Sessions

The parties again met on May 5. No positions changed at this meeting and the Federal mediator suggested that the Union have the employees vote on what they could accept. On May 11, the employees again voted, but this time voted to accept the Company's strike settlement offer and return to work, with the proviso that the NLRB charges not be dropped. On the May 11 the employees presented themselves for work, but the Company refused and said the Union must speak with Anderson. Hall and Anderson met on May 12. Hall said Anderson indicated that the Company was not going to implement the distributorship program for 6 weeks for the routes that had not been sold. Anderson testified that this agreement had been made on April 19 or 20, as noted earlier. Hall testified that Anderson had called him on April 28 and informed him that the Company was going to start selling routes. Hall wrote Anderson on May 28 stating the Union's objection and warning the Company that it inform prospective purchasers of routes of the pending NLRB litigation.

## May 13 Settlement

On May 13, the parties agreed to the terms of the settlement and the employees returned to work the next day.

## May 27 Letter

On May 27, Hall sent a letter to Dearfield complaining that the Company was implementing the distributorship program without waiting 6 weeks as agreed and stating that this would be a violation of the strike settlement agreement.

## 3. Did Respondent bargain in good faith over the decision to convert and the effects of that decision?

General Counsel did not allege nor litigate the Company's overall bad faith in negotiations. I find no evidence of bad-faith bargaining on the part of Respondent in the negotiations in question. To the contrary, there is abundant evidence of the Company's good faith, including numerous concessions to reach agreement, appearance at 15 formal and informal negotiating sessions, the parties' good-bargaining relationship, a 95-cent-per-hour wage proposal over 3 years, and the parties' ultimate agreement. Indeed, the parties engaged in hard bargaining

over the admittedly important insurance issue and managed to reach agreement, with Respondent's position prevailing. I do not believe that the distributorship issue was in a materially different posture.

From the recitation of events leading to the negotiations, two things appear clear. First, the Respondent was very seriously considering implementing the conversion and probably intended to do so. Second, the Union had clear notice of the Respondent's desire to convert the driver-salesmen to independent distributors, and had expressed its adamant opposition to such conversion to the Company. From the very outset of negotiations, the parties' positions on this issue were relatively fixed, Respondent proposing conversion and the Union insisting on maintaining the employee status of the driver-salesmen. To the date of the filing of the unfair labor practice charge giving rise to this proceeding, the Respondent had not moved from its position nor had the Union moved from its position. No alternatives to the conversion plan were offered by either party until well into the strike, and after the filing of all unfair labor practice charges.

In spite of the Respondent's belief that the matter of conversion to independent distributorships was a nonmandatory subject of bargaining, it brought the issue to the table as a proposal and repeatedly expressed its willingness to discuss any and all aspects of the proposal. This willingness was not really tested by the union negotiators. From February 25 through March 22, the Union did not offer alternatives or even ask questions regarding the distributorship plan. This was in spite of the fact that Nolan had described the program in detail on March 22.

After March 22, the Union did ask questions although it proposed no alternatives until April 19, almost a month into the strike, which was brought about by the parties' disagreement on at least the insurance issue as well as the distributorship issue. The record is uncontradicted that the Company answered all of the Union's questions. As I have heretofore found, the Company did not announce its intention to have the distributorship program in its final offer until the March 23 meeting, almost a month after the negotiations began. When the Union did offer an alternative on April 19 and 20 (the owner-operator proposal with 100-percent commission), the Company considered the proposal during caucuses and gave a reasonable explanation for rejecting the proposal: it failed to provide the equity sales incentive and it did not result in recouping the capital it felt was inherent in its territories and brand names.

It is uncontradicted that the Respondent placed the distributorship issue on the table as a proposal on February 25. There is no real contention that as of that date, the Company had reached a final decision on its distributorship proposal. Although I have found that this decision was announced at the March 23 session, even the Union does not contend that it was announced before March 11. On brief, neither General Counsel nor the Union argue that the distributorship program was a fait accompli when the negotiations began and I find that it was not. Although the Respondent was arguably in a position to implement the plan at about that time (it had

.entative territories, Pro formas, available financing and Distributors' Agreements in hand), it had not signed up a single distributor. In fact no implementation took place until on or after April 28.

I cannot find that the Company's failure to change its position on the distributorship issue during negotiations is proof of bad-faith bargaining or a refusal to bargain over the issue. In all the circumstances, adamant insistence on this proposal does not constitute bad-faith bargaining or a refusal to bargain. In *Atlanta Hilton & Tower,* 271 NLRB 1600, 1603 (1984), the Board stated:

> It is necessary to scrutinize an employer's overall conduct to determine whether it has bargained in good faith. "From the context of an employer's total conduct, it must be decided whether the employer is lawfully engaging in hard bargaining to achieve a contract that it considers desirable or is unlawfully endeavoring to frustrate the possibility of arriving at any agreement." [*J. D. Lunsford Plumbing,* 254 NLRB 1360, 1370 (1981) quoting from *West Coast Casket Co.,* 192 NLRB 624, 636 (1971) enfd. in relevant part 469 F.2d 871 (9th Cir. 1972).] A party is entitled to stand firm on a position if he reasonably believes that it is fair and proper or that he has sufficient bargaining strength to force the other party to agree. *NLRB v. Advanced Business Forms Corp.,* 474 F.2d 467 (2d Cir. 1973).
>
> [A]n adamant insistence on a bargaining position is not of itself a refusal to bargain in good faith, *Neon Sian Corp. v. NLRB,* 602 F.2d 1203 (5th Cir. 1979).

I believe it is clear that the parties achieved impasse in their negotiations prior to the Company's implementation of the distributorship proposal on April 28. By that date the parties had met in 12 formal and informal sessions and spent approximately 25 hours on the distributorship issue. At their last session on April 21, the Union insisted on its owner-operator proposal and the Respondent insisted on the distributorship proposal, reiterating its rational reasons for rejecting the owner-operator plan. There is no evidence of bad-faith bargaining by Respondent during the course of negotiations. The employees had rejected the distributorship proposal twice and refused even to vote on it a third time on April 27. Clearly, the parties were at impasse and the Company lawfully implemented the distributorship proposal. *Teamsters Local 688 (Air-Ways Cab),* 277 NLRB 1518, 1526–1527 (1986); *Taft Broadcasting Co.,* 163 NLRB 475 (1967).

It is equally clear that the Company met its duty to bargain in good faith over the effects of the distributorship program. As noted above, the Union was advised of the distributorship proposal on February 25. The Union's reaction to this proposal was to insist on driver-salesmen employee status. On March 23, the Union through its bargaining committee member L. T. Miller said it was unfair for an employee with a number of years of service simply to be out of work. Anderson replied he was willing to listen to any proposal the Union had on that issue. On the same day, the Union asked what would happen

to those drivers who chose not to buy a distributorship. Anderson replied that no decision had been made, but they would probably be on layoff status. The Union presented no proposals at that point.

The Company's offer the next day included priority hiring rights for route sales employees who did not select distributorships. This offer was included in the Company's final offer made later that day. After rejection of the final offer by the Union, the parties continued to negotiate over the effects of the distributorship proposal. As a result, the Company made certain additional proposals regarding the effects. For example, the Union suggested a delay in implementation of the distributorship proposal to give the business an opportunity to build back up to its prestrike and preunion boycott levels. The Company agreed with this and included a proposal for a 6-week delay in implementation in its April 21 final offer. The Union also requested bumping rights for those employees who chose not to purchase a distributorship. The Company agreed to bumping rights as proposed by the Union. The parties ultimately achieved agreement on the effects issue.

### D. *Ultimate Conclusions with Respect to the Issues*

Based on the findings set forth above and for the reasons stated, I find and conclude that Respondent's decision to convert its driver-salesmen to independent distributors was not a mandatory subject of bargaining, that the independent distributors did not remain statutory employees after the conversion and Respondent did not unlawfully withdraw recognition from the Union as their representative; that Respondent did not refuse to bargain in good faith over the decision to convert and the effects of that decision and in fact, did bargain in good faith over such decision and its effects until impasse and lawful implementation of the distributorship program, and that Respondent did not threaten its driver-salesmen with discharge and ultimately discharge them because of their Union or other protected activity. In sum, I find that Respondent did not violate Section 8(a)(1), (3), and (5) as alleged in the complaint.

### CONCLUSIONS OF LAW

1. Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. The Union is a labor organization within the meaning of Section 2(5) of the Act.

3. Respondent has not engaged in any of the unfair labor practices alleged in the complaint.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[9]

---

[9] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

326

## WEST VIRGINIA BAKING CO.

### ORDER

The complaint is dismissed in its entirety.

### Appendix A

The projected labor cost impact of the conversion at the time of implementation can be calculated by totalling the cost to the Company of all payments to the distributors and subtracting from that the distributors' operating expenses formerly incurred by the Company. Thus, those costs which have simply been transferred from the Company to the distributor should be reduced from the distributors' total receipts to determine the net effect of the conversion on the Company's labor costs.

The distributor's principal and interest payments for the truck and the territory, however, should not be deducted. Unlike operating costs incurred by the distributor, the Company receives no concomitant reduction in its expenditures as a result of the distributors' investment in the territory and truck. Although the principal and interest for the territory and principal for the truck is paid back to the Company, the Company in return had sold its capital assets to the distributors. The result of the transaction is that these capital assets pass from the Company to the distributors at the Company's expense. Should the Company ever decide to return to the distribution business, it would be necessary to repurchase the territories and purchase additional trucks. Thus, the net effect of the increased discount rate which enables the distributors to purchase the territory and truck from the Company is to increase the Company's labor costs.

The calculation of the net effect of the conversion on the Company's labor costs is as follows:

Total yearly cost to the Company of the distributorship—$1,438,356

Total Weekly Gross Income (C. 12-14) X 52 weeks=$1,422,356

$500 per year accounting costs (T.456)
X 32 distributors=$16,000

Total yearly savings to the Company from the distributorship conversion (labor costs and other costs transferred to distributors)=$1,248,136.85

Route gross earnings (C. 12-14) X 52 weeks=

Vacation Pay (C. 10)                    $811,408.00
                                         49,097.59

| | |
|---|---|
| Holiday Pay (C. 10) | |
| A&S and Sick Leave (C. 10) | 12,840.00 |
| Health Insurance | 2,220.00 |
| $137,640.00 ($310.00 (T. 383)[1] X 37 employees X 12 months) | |
| − $21,509.28 (total weekly employee contributions X 52 weeks) (C. 11; T. 347) | $116,130.72 |
| Pension $95.33 (T. 343) X 37 employees X 12 months | 42,326.52 |
| Jury Duty (T. 343) | |
| Life Insurance (C. 10) | 0.00 |
| Workers Compensation | 0.00 |
| West Virginia Warehouse $1.55 rate X (weekly route gross earnings/100) (C. 14; T. 449) X 52 Weeks | $72.75 |
| | $5,863.65 |
| Virginia Warehouses $.43 rate X 83.29 (Total Virginia Warehouses weekly route gross earnings/100) (C. 12-13; T. 449) X 52 weeks=$1,862.37 | |
| Total | |
| Uniforms | $7,726.02 |
| $248.00 X 13 periods (T. 449) | |
| Casualty Insurance | 3,224.00 |
| $30.00 X 52 weeks X 34 Distributor (GC. 12-14) | |
| Truck Costs: Fuel | 53,040.00 |
| Fuel Adjustment[2] (T. 447-48); C. 12-14 | |

---

[1] This is the cost of Teamsters' Option 3 coverage which is the most expensive available. Although not all of the route sales employees purchased the most expensive coverage the precise breakdown is not available. For the purpose of calculating the labor cost impact of the distributorship program, however, the cost savings to the Company of the health insurance will be assumed to be the maximum.

[2] The fuel adjustment is an additional amount paid by the Company to those drivers whose vehicles are driven over 400 miles per week to compensate them for additional repairs required due to the additional mileage. The fuel and fuel adjustment numbers were based on an actual study of Company costs for its fleet of vehicles which included labor, material, and all other costs and is, therefore, an accurate reflection of the Company's savings as a result of the transfer of these costs to the distributors. The fuel adjustment figure is deducted from the fuel figure because the adjustment is an additional payment by the Company to the distributor. Thus, the Company's actual fuel cost transferred to the distributor is the net figure.

Keene Mountain Warehouse
$466-$63=$403 X 52 weeks=$20,956

Radford and Marion Warehouses
$521-$163=358 X 52 weeks=$18,616

Bluefield Warehouse

---

<sup>2</sup> The Tires and Repairs costs were based on an actual study of Company costs for its fleet of vehicles which included labor, material, and all other costs and is, therefore, an accurate reflection of the Company's savings as a result of the transfer of these costs to the distributors.

<sup>4</sup> The miscellaneous expenses cover those expenses transferred by the Company to the distributors such as licenses and business franchise fees.

<sup>5</sup> The warehouse expense is paid by the distributors to the Company to defray the Company's cost of heat, light, etc. in providing a warehouse to the distributors.

<sup>6</sup> At the hearing, the Company presented evidence that it reduced the number of routes in Bluefield from 17 to 14. As there were 37 routes previously, and only 32 distributorships, the fate of two routes is not clear in the record. The reduction in Bluefield, however, was considered necessary by Respondent regardless of the conversion to distributors. Therefore, any savings attributable to this reduction was not a savings resulting from the Company's decision to convert to distributors. However, even if

---

$690-$180=$582 X 52 weeks=$30,264

| | |
|---|---|
| Total | $69,836.00 |
| Total Tires and Repairs Costs<sup>3</sup> | |
| (C. 12-14) X 52 weeks= | $47,476.00 |
| Miscellaneous<sup>4</sup> | 3,328.00 |
| (C. 12-14) X 52 weeks | |
| Warehouse<sup>5</sup> | |
| (C. 12-14) X 52 weeks | 29,484.00 |
| *Net Increase in the Company's labor Costs—* | |
| *$190,219.15<sup>6</sup>* | |

the wages and benefits from those additional five drivers is factored into the above calculation, the Company's labor costs still increase as a result of the conversion. The benefit costs calculated above include the five additional drivers. The route gross earnings for the five additional drivers can be accurately estimated by dividing the total route gross earnings on Company Exhibits 12 through 14 by 32 distributors and multiplying that figure by five route sales employees. The resulting route gross earnings arguably saved by the Company is $126,782.50. Thus, the net labor cost increase to the Company, even including the reduction in the number of routes, is $63,436.65.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES MORROW and MICHAEL OVERTON, Individually and on behalf of similarly situated employees, | ) ) ) | |
| | ) | CIVIL ACTION NO: 3:07-CV-617-MHT |
| Plaintiffs, | ) ) | |
| | ) | |
| v. | ) ) | |
| | ) | |
| FLOWERS FOODS, INC., FLOWERS BAKING CO., OF OPELIKA, LLC, | ) ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF MICHAEL LORD

I, Michael Lord, having been duly sworn, hereby depose and state as follows:

1.      I am currently the Vice President of Sales for Flowers Baking Co. of Opelika, LLC ("Flowers/Opelika" or "Company") and have held this position since 2005. Before assuming this position, I held the positions of Branch Operations Manager, Sales Manager, and Director of Sales for Flowers/Opelika. I became Branch Operations Manager in 1996, Sales Manager in 1997, and Director of Sales in 2000. In these positions, I have become familiar with various aspects of Flowers/Opelika's distribution system, including policies and practices applicable to independent distributors of Flowers/Opelika.

2.      Flowers/Opelika's distribution system is comprised of eight branches, within which there are generally multiple sales warehouses which distributors operate out of. There are currently 14 warehouses, located in Montgomery, Troy, Selma, Greenville, Clanton, Alexander City, Tallassee, Opelika, Phenix City, and Roanoke, Alabama and LaGrange, Manchester, Georgetown, and Thomaston, Georgia. Each branch has a different Sales Manager and

Operations Manager who are responsible for general oversight of the distributor territories within their respective branch.  A breakdown of our current branches and the Sales Managers and Operations Managers assigned to each branch is as follows:

| Branch | Warehouse Locations | Sales Manager | Operations Manager |
|--------|---------------------|---------------|--------------------|
| 62 | Opelika | Rod DuBose | Scott Murphey |
| 64 | Montgomery/Troy | John Renfroe | Ricky Bell |
| 65 | LaGrange/Valley/Roanoke | David Earl | Terry Prather |
| 66 | Selma/Greenville/Clanton | Billy Reed | Fred Jeffcoat |
| 67 | Montgomery | Steve Stephens | Tammy Luster |
| 68 | Phenix City/ Georgetown | Max Faught | Joe Williams |
| 69 | Phenix City/Manchester/Thomaston | Linc Malphrus | Witt Pittman |
| 70 | Alexander City/Tallassee | Jeff Powell | Rex Floyd |

3.     Plaintiff Dwayne Cleveland currently works out of the Montgomery warehouse under Branch 64.  Plaintiff Morrow previously worked out of the Montgomery warehouse, also under this Branch.  Plaintiff Mark Murphy currently works out of the LaGrange warehouse under Branch 65.  Plaintiff Michael Smith formerly worked out of the LaGrange warehouse.  Plaintiff Overton formerly worked out of the Roanoke warehouse under Branch 65.  Plaintiff James Marty Smith also worked out of the Roanoke warehouse.  Doug Branch and Lew Baxter currently work out of the Montgomery warehouse under Branch 64.  Greg Patisaul formerly worked out of the LaGrange warehouse.  Ricky Small and Melvin Snow formerly worked out of the Greenville warehouse.

4.     Day-to-day issues with independent distributors are generally handled at the warehouse level by the local Sales Managers and Operations Managers.  From time to time, the

Company's Directors of Sales become involved with some of these issues. Such issues involve product ordering issues, removal of stale products from retail accounts, distributor performance and/or customer service issues, and the like. I, or the Company's President, Steve Bordeaux, generally only become involved in such issues when they involve serious customer relations issues and/or potential termination of a distributor's agreement with the Company. Flowers/Opelika currently has two Director of Sales, Grady Messer and Ricky Ward. Mr. Messer is responsible for Branches 64, 66, 67, 70 and Mr. Ward is responsible for Branches 62, 65, 68, and 69.

5. Flowers/Opelika management does not consult with management personnel of other subsidiaries of Flowers Foods, Inc. before or when addressing distributor or employee issues. Such issues and decisions are solely addressed by Flowers/Opelika management. Neither does Flowers/Opelika management become involved with distributor or employee issues at other subsidiaries of Flowers Foods. Occasionally, when addressing serious distributor issues, Steve Bordeaux or I may contact Flowers Foods' in-house legal counsel or Chuck Rich, Vice President of Distributor Operations for Flowers Foods Bakeries Group, to seek advice on handling such issues. Neither Flowers Foods' in-house counsel or Mr. Rich make any decisions regarding Flowers/Opelika distributors. Such decisions are made by Mr. Bordeaux, myself, or other management personnel of Flowers/Opelika.

6. Certain retail accounts have implemented pay-by-scan technology. Retail accounts that have implemented such technology only pay for products that are actually scanned through the sales register, unlike traditional accounts which pay for all products delivered to the accounts. Pay-by-scan accounts involve different accounting from traditional accounts and distributors who have such accounts must conduct physical inventories on a week by week basis.

Plaintiff Dwayne Cleveland currently has a pay-by-scan account, Wal-Mart. Plaintiff Mark Murphy at one point had a pay-by-scan account, Winn-Dixie, but it has subsequently closed. Plaintiff Morrow also had a Winn-Dixie account, which had implemented pay-by-scan. Plaintiffs Michael Smith, James Marty Smith, and Plaintiff Overton never had any pay-by-scan accounts.

7.     Retail accounts distributors service vary from distributor to distributor, including national accounts. For example, Plaintiffs Cleveland, Murphy, Michael Smith, James Marty Smith, Overton and Morrow serviced or served the following national accounts:

- Dwyane Cleveland – Target, Huddle House, Bruno's, Dollar General, Wal-Mart, and Costco

- Mark Murphy – Winn-Dixie, Burger King, CVS Drugs, and Dollar General

- Michael Smith – Dollar General, Family Dollar, and Hardee's

- James Marty Smith – Dollar General, Family Dollar, and Burger King

- Michael Overton – Dollar General, Family Dollar, and Burger King

- Charles Morrow – Winn-Dixie, Arby's, Chick-Fil-A, Publix, Sonic, and Zaxby's

8.     Distributors can utilize helpers to assist them in running their respective territories; some distributors have helpers and others do not.

9.     Distributors may obtain delivery vehicles from a source of their own choosing. Some use both a delivery truck and a trailer combo to run their respective territories. Vehicle financing decisions are up to the distributors.

10.    Distributors can take various steps to increase product sales in most of their accounts, including providing superior service to customers, asking customers for extra space or special displays, and utilizing point of sales materials. Such efforts are generally distributor

specific and depend upon what particular efforts a distributor decides to take. Some accounts require substantially more service than others. For example, Wal-Mart and traditional supermarkets like Winn-Dixie require substantially more service (and time spent at the account) than small "Mom and Pop" accounts or foodservice accounts (such as Burger King and Arby's).

11.    Distributors may sell branded and non-branded products at a price lower than the suggested wholesale price in national, non-pay-by-scan accounts, if the account is suppressed or if the distributor has obtained Flowers/Opelika's approval for a price allowance. Flowers/Opelika's approval is necessary because Flowers/Opelika bears most of the financial responsibility for price allowances in accounts that have not been suppressed. When accounts are suppressed, distributors bear full financial responsibility for price allowances. Distributors of Flowers/Opelika cannot charge national accounts above the suggested wholesale price for branded and non-branded products if Flowers/Opelika is collecting the accounts receivable. Distributors of Flowers/Opelika may not change the established prices for private label products. For non-chain accounts, distributors may charge a price higher or lower than the suggested wholesale price as long as such accounts are suppressed.

12.    Distributors' product orders depend upon the particular customer needs of the distributor. Such product order decisions are made by the respective distributor based on such sales. Distributors, at their discretion, may also make changes to their product orders ("adds and cuts").

13.    The handheld computer distributors utilize automatically generates suggested product orders for accounts based on historical sales to the account, specifically five weeks of historical sales, if available. Distributors are free to change these preliminary, suggested order numbers based on what they believe product needs for the particular account are, and do so

5

often. Distributors can also purchase products from other distributors to meet their customer needs.

14.     Distributors may sell their territories, in whole or in part. Partial transactions, where distributors sell or buy a portion of a territory, are fairly common.

15.     If an account opens in a distributor's territory, the distributor is the beneficiary of such additional business and does not need to pay any additional monies to the Company for such accounts. For example, a Costco account recently opened in Dwayne Cleveland's territory. It is anticipated that this account will generate sales of approximately $2,000.00 per week. Conversely, if an account closes in a distributor's territory, the distributor loses the profits derived from sales in such an account.

I hereby declare under penalty of perjury that the foregoing is true and correct according to my personal knowledge, and if called as a witness, I could and would testify truthfully thereto.

Executed on ___October 17th___ 2007.

_____
MICHAEL LORD

Sworn to and subscribed before me this ___17___ day of October, 2007.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:

MY COMMISSION EXPIRES AUG. 29, 2011

6

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CHARLES MORROW and MICHAEL )
OVERTON, Individually and on behalf )
of similarly situated employees, )
                     )       CIVIL ACTION NO: 3:07-CV-617-MHT
       **Plaintiffs,** )
                      )
v. )
                      )
FLOWERS FOODS, INC., FLOWERS )
BAKING CO., OF OPELIKA, LLC, )
                      )
      **Defendants.** )

## AFFIDAVIT OF STEVE BORDEAUX

I, Steve Bordeaux, having been duly sworn, hereby depose and state as follows:

1. I am currently the President of Flowers Baking Co. of Opelika, LLC ("Flowers/Opelika" or "Company"). I have held this position since January 2005. Prior to becoming President, I held the position of Vice President, which I assumed in 1991. As President, I have overall responsibility for both the manufacturing and distribution operations of Flowers/Opelika. As President, I also make final decisions with respect to employee terminations and termination of Distributor Agreements. I am familiar with the baking business and baking industry generally.

2. Flowers/Opelika, headquartered in Opelika, Alabama, bakes and/or distributes various baked goods throughout west Georgia and central and south Alabama.

3. I was involved in Flowers/Opelika's decision to convert to independent distributors in 1994. Before converting to independent distributors, our distribution system consisted of employee route salespersons. These route salespersons were paid on a base plus

commission basis. They were not paid overtime. We considered the route salespersons exempt from overtime as outside salespersons under the federal Fair Labor Standards Act. Charles Morrow and Doug Branch were employee route salespersons prior to the conversion to independent distributors.

4.    Flowers/Opelika distributors order and purchase bakery products from the Company. Products are sold to distributors at a specified discount percentage off of the suggested wholesale price. This discount percentage generally ranges from 18% to 23%. The distributors, in turn, sell the bakery products to retail accounts. A distributor's income is the difference between the price he/she purchases products from the Company for and the price he/she sells the products to retail accounts for, less the distributor's business expenses.

5.    We converted to independent distributors in Opelika because the program had been successful in building sales at other subsidiaries of Flowers Industries. With distributors having an ownership interest in the territory, and the ability to build their equity interest with increased sales, we felt that with the distributor model there was significantly more incentive to promote and build sales then there was as employee route salespersons.

6.    While officials of Flowers Industries helped us implement the distributorship program in Opelika, officials at Flowers Industries, and now Flowers Food, are not involved in decisions with respect to individual distributors. Day-to-day issues with our independent distributors are generally handled at the warehouse level by the local Sales Managers and Operations Managers. From time to time, our Director of Sales became involved with some of these issues. Such issues involve product ordering issues, removal of stale products in retail accounts, distributorship performance and/or customer service issues, and the like. I, and the Company's Vice President, Michael Lord, generally only become involved with such issues

when they involve serious customer relations issues and/or potential termination of a Distributor's Agreement with the Company.

7.    Flowers/Opelika management does not consult with the management personnel of other subsidiaries of Flowers Foods, Inc. before or when addressing distributor or employee issues.  Such issues and decisions are solely addressed by Flowers/Opelika management. Neither does Flowers/Opelika management become involved with distributor or employee issues at other subsidiaries of Flowers Foods.  Occasionally, when addressing serious distributor issues, I, or Michael Lord, may contact Flowers Foods' in-house legal counsel or Chuck Rich, Vice President of Distributor Operations for Flowers Foods Bakeries Group, to seek advice on handling such issues.  Neither Flowers Food's in-house counsel or Mr. Rich make any decisions regarding our distributors at Flowers/Opelika.  Such decisions are made by me, Mr. Lord, or other management personnel of Flowers/Opelika.

I hereby declare under penalty of perjury that the foregoing is true and correct according to my personal knowledge, and if called as a witness, I could and would testify truthfully thereto.

Executed on ___10/17/07_____, 2007.

_____
Steve Bordeaux

Sworn to and subscribed before me
this the _17_ day of ___October____, 2007.

_____
Notary Public

My commission expires:___MY COMMISSION EXPIRES AUG. 29, 2011___

3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CHARLES MORROW and MICHAEL )
OVERTON, Individually and on behalf )
of similarly situated employees, )
                                 )
          **Plaintiffs,** )
                                 )
·v. )
                                 )
FLOWERS FOODS, INC., FLOWERS )
BAKING CO., OF OPELIKA, LLC, )
                                 )
          **Defendants.** )

CIVIL ACTION NO: 3:07-CV-617-MHT

## AFFIDAVIT OF DON ADKINS

I, Don Adkins, having been duly sworn, hereby depose and state as follows:

1.     I am currently the Distributor Coordinator for Flowers Baking Co. of Opelika, LLC ("Flowers/Opelika" or "Company"). I have held this position since 1994. In this position, I am responsible for, among other things, maintaining distributor files for distributors of the Company. I am the custodian of such records. For purposes of this affidavit, I have reviewed the original distributor files of the distributors named below.

2.     I have reviewed the distributor file of Charles Morrow. The file includes a Distributor Agreement executed by Mr. Morrow with Flowers/Opelika on June 14, 1994. The Agreement states that Mr. Morrow purchased his distributorship for $38,634. Effective December 31, 2005, Mr. Morrow sold his distributorship back to the Company. This transaction is reflected in a Purchase Agreement and General Release. Mr. Morrow sold his distributorship back to the Company for $69,210.

3.    I have reviewed the distributor file of Michael Overton. Mr. Overton executed a Distributor Agreement with Flowers/Opelika on April 10, 2006. Mr. Overton purchased his distributorship for $45,100. Effective September 30, 2006, Mr. Overton sold his distributorship back to the Company. This transaction is reflected in a Purchase Agreement and General Release. The Company purchased his distributorship for the original purchase price.

4.    I have reviewed the distributor file of Michael Smith. Mr. Smith executed a Distributor Agreement with Flowers/Opelika on November 10, 2003. He purchased his distributorship for $48,840. Effective December 2, 2006, Mr. Smith sold his distributorship back to the Company by executing a Purchase Agreement and General Release. The Company purchased his distributorship for $46, 560. Mr. Smith previously purchased a different territory by Distributor Agreement dated February 3, 2003. He sold this territory back to the Company effective August 2, 2003.

5.    I have reviewed the distributor file of James Marty Smith. Mr. Smith purchased his distributorship by executing a Distributor Agreement with Flowers/Opelika on October 9, 2006. The purchase price of the distributorship was $47,420. Mr. Smith resold his distributorship back to the Company effective January 6, 2007. This transaction is reflected in a Purchase Agreement and General Release. The repurchase price was the same as the original purchase price, $47,420.

6.    I have reviewed the distributor file of Dwayne Cleveland. Mr. Cleveland purchased his distributorship by executing a Distributor Agreement with Flowers/Opelika on June 14, 2004. The purchase price of the distributorship was $37,800. Mr. Cleveland remains a current distributor. The current value of his territory is $45,190. This value is based on the formula ten times weekly branded product sales, utilizing a thirteen week average net sales.

2

7.    I have reviewed the distributor file of Mark Murphy.  Mr. Murphy purchased his distributorship by executing a Distributor Agreement with Flowers/Opelika on September 16, 2002.  The purchase price of the distributorship was $41,600.  Mr. Murphy remains a current distributor.  The current value of his territory is $49,080.  This value is based on the formula ten times weekly branded product sales, utilizing a thirteen week average net sales.

8.    I have reviewed the distributor file of Doug Branch.  He became a distributor on June 14, 1994 and remains a current distributor.

9.    I have reviewed the distributor file of Lew Baxter.  He became a distributor on November 24, 2003 and remains a current distributor.

10.    I have reviewed the distributor file of Ricky Small.  Mr. Small started his distributorship on March 6, 2000 and sold his distributorship back to the Company on September 24, 2005.

11.    I have reviewed the distributor file of Melvin Snow.  Mr. Snow started his distributorship on March 22, 2004.  He resold his distributorship back to the Company on September 10, 2005.

12.    I have reviewed the distributor file of Greg Patisaul.  Mr. Patisaul started his distributorship on March 14, 2005.  He resold his distributorship back to the Company on April 16, 2005.

13.    Based on a review of the distributor files, none of the aforementioned distributors executed a Distributor Agreement with any entity other than Flowers/Opelika.

I hereby declare under penalty of perjury that the foregoing is true and correct according to my personal knowledge, and if called as a witness, I could and would testify truthfully thereto.

Executed on _____10-17-07_____, 2007.

_____
Don Adkins

Sworn to and subscribed before me
this the 17 day of October, 2007.

_____
Notary Public

My commission expires: _____MY COMMISSION EXPIRES AUG. 29, 2011_____

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES MORROW and MICHAEL OVERTON, individually and on behalf of similarly situated employees, | )<br>)<br>)<br>) | |
| vs. | )<br>) | CIVIL ACTION NO.: 3:07-CV-617-MHT |
| FLOWERS FOODS, INC., FLOWERS BAKING CO. OF OPELIKA, LLC, | )<br>)<br>) | |

### DECLARATION OF ROBERT THOMPSON UNDER 28 U.S.C. § 1746

I, Robert Thompson, declare under penalty of perjury as follows:

1. My name is Robert Thompson. I am of age, competent to testify, and have personal knowledge of the matters stated herein. I became an independent distributor for Flowers Baking Company of Opelika in June, 1994. I always worked out of the LaGrange warehouse. Before that I worked for Flowers as a route salesman. I sold my territory in December, 2004.

2. When I became a distributor I received a Distributor Agreement to sign. I could review that agreement before signing it. I did not have an attorney or an accountant read the agreement. I understood the agreement.

3. My agreement provided me the exclusive right to sell Flowers' products in a certain area. I was not able to sell Flowers' products outside of that area. No one could sell Flowers' products in my area. I intended to be an independent contractor.

4. I had almost complete control of my business. I did have to be sure that I followed some minimal rules, per the agreement, to protect my and Flowers' businesses.

5. In my area, I sold bread, restaurant items, and cakes. Brands that I sold included Sunbeam, Natures Own, Flowers, Roman Meal, Bebo, Bluebird, Cobblestone Mill, and Red *act Steak* International. I did not sell any non-Flowers' goods. I always charged my customers the suggested wholesale price.

6.    To order products I decided what products that I thought my customers would need. After I placed the orders, I could also make adds or cuts to those orders by calling Flowers. The need to make adds or cuts was based solely on market conditions. I would need to do this one to three times per week.

7.    Some of the products, including buns and restaurant products, that I sold came from Flowers' bakeries outside of Georgia.

8.    I set my own work hours. To do that, I had to be at some locations, such as restaurants, at specific times. No one from Flowers ever required that I be at the warehouse at certain times or work certain hours.

9.    I usually spent a couple of hours at the warehouse. I usually worked 7 to 8 hours on my route making deliveries. These times were consistent while I was a distributor. The order in which I served the route was mostly based upon the times in which I could be in a particular customer's store.

10.   I have never hired a helper. I could have hired one if I was willing to pay him.

11.   I used a step van that I owned to service my route. I purchased the step van from a dealership.

12.   When servicing a typical customer, I would take out any stale product, bring in new product, determine what needed to be ordered and then get a ticket.

13.   I always promoted Flowers' products when servicing customers. I talked to the customers. I tried to get more shelf or display space. I tried to set up special displays. I also used point of sale materials such as stickers.

14.   I wore a uniform with a Flowers name or name brand on it. Flowers did not require me to wear a uniform but it did help promote the products.

15.   I did not consider myself the main sales contact between Flowers and the customers. The main sales contact was a Flowers manager because he dealt with customer problems. I am the person that actually sells the products to these customers.

16.   After buying my territory, I was able to add new accounts such as Wal-Mart. I also lost some accounts during this time. This includes a Big Star that was sold to A&P and then closed. There were also lots of little stores that opened or closed in my territory. Flowers has neither paid me nor required me to pay anything because of these changes.

17.   I believe that Flowers treated me in some ways as an independent businessman.

Further the affiant saith not.

I hereby declare under the penalty of perjury that the foregoing is true and correct according to my personal knowledge, and if called as a witness, I could and would testify truthfully thereto.

Executed on _____10 October_____, 2007.

_____
Robert Thompson

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

|  |  |  |
|---|---|---|
| CHARLES MORROW and MICHAEL OVERTON, individually and on behalf of similarly situated employees, | ) ) ) ) ) | |
| vs. | ) ) | CIVIL ACTION NO.: 3:07-CV-617-MHT |
| FLOWERS FOODS, INC., FLOWERS BAKING CO. OF OPELIKA, LLC, | ) ) ) ) | |

**DECLARATION OF RONALD COREY McDONALD UNDER 28 U.S.C. § 1746**

I, Ronald Corey McDonald, declare under penalty of perjury as follows:

1.    My name is Ronald Corey McDonald. I am of age, competent to testify, and have personal knowledge of the matters stated herein. I became an independent distributor for Flowers Baking Company of Opelika in 2007. I have always worked out of LaGrange. Prior to that I worked for CSX Railroad as a conductor.

2.    I signed a Distributor Agreement when I became a distributor. I had an opportunity to review that agreement before signing it. An attorney or an accountant could have reviewed the agreement for me. There was no part of the agreement which I did not understand.

3.    My agreement gives me an exclusive right to sell Flowers' products. I do not sell Flowers' products outside of my territory. No one sells Flowers' products in my territory. It was my intent, when I signed the Distributor Agreement, to be an independent contractor.

4.    Within my territory I sell Sunbeam, Cobblestone Mills, Nature's Own, Bluebird, and private label brands bread, cakes, and restaurant products. I do not sell any non-Flowers products. I always charge the suggested wholesale price.

5.    To place orders for products I generally work hand-in-hand with Flowers since I am still learning the business. Once orders are placed, I can make adds or cuts to those orders through a telephone system with Flowers. I make changes two to three times per week. The

changes are due to sales or lack thereof in the market. I also make cuts to remove items added to my order or to add stuff missing from my order.

6.    I am not sure if some of the products I sell come from Flowers' bakeries outside of Georgia.

7.    My customer's needs determine the hours I will work as a distributor. Flowers does not require me to be at the warehouse at certain times or work certain hours.

8.    During an average work day I spend 3 hours at the warehouse. During an average work day I spend 11 to 12 hours on my route. These times have decreased since I have been a distributor. The order in which I serve the route is determined mostly based upon the times in which I can be in a particular customer's store and location of the store.

9.    I have not hired a helper to assist me in my route because a helper is not needed.

10.   I currently use my Isuzu van to service my route. I obtained that van through a lease/purchase agreement through Flowers. I am not sure what I would do to replace it if I needed to do so.

11.   When servicing a typical customer, I determine their needs based on the product left in the store. I would take out any stale product and then bring in any fresh product that is needed. I then complete an inventory of the product.

12.   I attempt to sell Flowers' products by talking to customers and managers and trying to get more shelf or display space when there are specials being run by Flowers. I also try to get special displays set up at the customer locations when specials are being run. I also use point of sale materials such as stickers to market products.

13.   I wear a uniform with a Flowers name or name brand on it. Flowers likes for me to wear the uniform but my understanding is that Flowers does not require me to wear a uniform.

14.   I consider myself to be the main sales contact between Flowers and the customers because I am there with the customers every day. Flowers actually sells the products to these customers.

15.   After acquiring my territory I have been able to add a Freds store. Flowers has not paid me any extra amount due to that change.

16.   I believe that Flowers treats me as an independent businessman.

17.   I never sold any part of any territory to any other distributor or purchased part of another distributor's territory. I believe my distributorship is worth the same now as when purchased by me.

Further the affiant saith not.

I hereby declare under the penalty of perjury that the foregoing is true and correct according to my personal knowledge, and if called as a witness, I could and would testify truthfully thereto.

Executed on _10/12_____, 2007.

_Ronald Corey McDonald_
Ronald Corey McDonald

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES MORROW and MICHAEL | ) | |
| OVERTON, individually and on behalf | ) | |
| of similarly situated employees, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO.:  3:07-CV-617-MHT |
| | ) | |
| FLOWERS FOODS, INC., FLOWERS | ) | |
| BAKING CO. OF OPELIKA, LLC, | ) | |

### DECLARATION OF TERRY PRATHER UNDER 28 U.S.C. § 1746

I, Terry Prather, declare under penalty of perjury as follows:

1.    My name is Terry Prather.  I am of age, competent to testify, and have personal knowledge of the matters stated herein.  I became an independent distributor for Flowers Baking Company of Opelika in 1993 or 1994 in LaGrange.  Before that I was a route salesman. When I became a distributor, I signed a Distributor Agreement.  I could review that agreement before signing it.  An attorney could have reviewed it for me.  There was no part of the agreement which I did not understand.

2.    The agreement gave me the right to sell Flowers' products in a certain territory.  I was not allowed to sell Flowers' products outside of that territory.  No one could sell Flowers' products in my territory.  I intended to be an independent contractor.

3.    I sold bread, buns, rolls, cakes, and restaurant items.  I did not sell any non-Flowers' products.  I only charged customers something other than the suggested wholesale price if there was a Flowers' special.

4.    I ordered products generally based on Flower's suggested computer order.  Some of my customers would make specific orders.  Once orders were placed, I could make adds or cuts to those orders by phone.

5.    Some of the breads and cakes I sold came from Flowers bakeries outside of Georgia.

6.    I determined, based up my customers' schedules, the hours that I would work.  No one from Flowers ever told me to be at the warehouse at specific times or work certain hours.  My experience was that restaurants were to be serviced before lunch and grocery stores were to be serviced during the morning.

7.  On an average work day, I would spend about 4 hours at the warehouse. On an average work day, I would also spend about 8 hours on my route. The order in which I served the route was set based on customer schedules.

8.  There were times that I hired a kid to assist me in my route. I did this to help the kids.

9.  I used a step van that I owned in servicing my route. I bought that step van in a lease/purchase agreement through Flowers.

10. When servicing a typical customer, I would check their returns, count the carryovers, put them into the computer and then unload the truck.

11. I tried to sell Flowers' products when servicing customers by trying to get more display space when there were specials being run by Flowers. I also tried to get special displays set up at the customer locations by talking to the store manager. I also used point of sale materials such as stickers to market products.

12. I wore a uniform with a Flowers name on it. Flowers liked for me to wear such a uniform.

13. I thought of myself as the main sales contact between Flowers and the customers because I needed to service them well enough to maintain their business. I actually sold the products to these customers.

14. After acquiring my territory I added new accounts to that territory. I also lost some accounts during this time. Flowers has neither compensated me nor required me to pay any extra amounts due to these changes.

15. I believe that Flowers treated me as an independent businessman.

16. I never sold any part of my territory to any other distributor or purchased part of another distributor's territory. I eventually sold it back to Flowers. I believe that my distributorship had about the same value when I sold it as when I first purchased it.

Further the affiant saith not.

I hereby declare under the penalty of perjury that the foregoing is true and correct according to my personal knowledge, and if called as a witness, I could and would testify truthfully thereto.

Executed on ___/ 0-12_____, 2007.

Terry Prather

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| CHARLES MORROW and MICHAEL | ) | |
| OVERTON, individually and on behalf | ) | |
| of similarly situated employees, | ) | |
|  | ) | |
| vs. | ) | CIVIL ACTION NO.: 3:07-CV-617-MHT |
|  | ) | |
| FLOWERS FOODS, INC., FLOWERS | ) | |
| BAKING CO. OF OPELIKA, LLC, | ) | |

## DECLARATION OF DAVE FORSTER UNDER 28 U.S.C. § 1746

I, Dave Forster, declare under penalty of perjury as follows:

1.    My name is Dave Forster.  I am of age, competent to testify, and have personal knowledge of the matters stated herein.  I became an independent distributor for Flowers Baking Company of Opelika in 2004 working from LaGrange.  Prior to that I managed a West Point Stevens store.

2.    At the time I became a distributor I was given a Distributor Agreement to sign.  I had an opportunity to review that agreement before signing it.  I also had an opportunity to have an attorney or an accountant review the agreement although I did not have the agreement reviewed by such a person.  There was no part of the agreement which I did not understand.

3.    My agreement with Flowers provides me the exclusive right to sell Flowers' products in a certain geographic territory.  I am not allowed to sell Flowers' products outside of that territory nor is anyone else allowed to sell Flowers' products within my territory.  It was my intent, when I signed the Distributor Agreement, to be an independent contractor.

4.    I love this job because I am my own boss.  I can do what I want to do so long as customers do not complain.

5.    Within my territory I sell bread, snack cakes, and restaurant products.  This includes Sunbeam, Natures Own, Bluebird and Cobblestone Mills brands.  I do not sell any non-Flowers products.  I have on occasion charged customers less than the suggested wholesale price if the product was on sale.

6.    To place orders for products I generally consult with the customer to decide what products that they need.  I decide by myself what to order.  Once orders are placed, I can make adds

or cuts to those orders through a computer system with Flowers. I do this on almost a daily basis. These adjustments are based on what I see in my customers' stores or special requests from customers.

7.  I do not know if some of the products I sell come from Flowers bakeries outside of Georgia.

8.  My work hours are the same as what I was showed when I first became a distributor. No one from Flowers Baking Company of Opelika has ever required that I be at the warehouse at certain times or work certain hours. I do have some customers who require that I service them at specific hours. For example, grocery stores have a 12:00 p.m. cutoff.

9.  During an average work day I spend 3 hours at the warehouse. During an average work day I spend 8 to 9 hours on my route. Monday and Thursday are the longest days. Friday is the shortest. These times have been consistent since I have been a distributor. The order in which I serve the route is determined mostly based upon the times in which I can be in a particular customer's store and location of the store.

10. I have hired a helper to assist me in my route. I did that to assist that person who was my relative. This includes hiring my grandson and some other relatives.

11. I currently use a box truck that I own in servicing my route. I obtained that truck through a lease/purchase agreement through Flowers. If I were to purchase a new truck at this time I am not sure how I would purchase the vehicle.

12. When servicing a typical customer, I would first speak to the customer. I would then determine their needs based on the product left in the store. I would take out any stale product and then bring in any fresh product that is needed.

13. I attempt to promote Flowers' products when servicing customers. I do this by trying to get more shelf or display space when there are specials being run by Flowers. However, shelf space is generally set. I also try to get special displays set up at the customer locations when specials are being run. I also use point of sale materials such as stickers to market products.

14. I always wear a uniform with a Flowers name or name brand on it. It is my understanding that Flowers expects me to wear a uniform.

15. I consider myself to be the main sales contact between Flowers and the customers because I buy the product from Flowers and sell it to the customer. I am the person that actually sells the products to these customers. My income has gone up mainly because of increased sales within existing stores. I actively try to work my route to increase sales.

16. After acquiring my territory I have been able to add new accounts to that territory. These include Milanos, Biocafe restaurant and Sonic. I have also lost some accounts during this

time. This includes Quality Meats, Slab House and Freds,  Flowers has neither compensated me nor required me to pay any extra amounts due to these changes.

17.     I believe that Flowers treats me as an independent businessman.

18.     I never sold any part of any territory to any other distributor or purchased part of another distributor's territory.  I have swapped my territory to get a route closer to my home.  I believe that my distributorship is more valuable now than when I first purchased it.

Further the affiant saith not.

I hereby declare under the penalty of perjury that the foregoing is true and correct according to my personal knowledge, and if called as a witness, I could and would testify truthfully thereto.

Executed on ___/0 - / /_____, 2007.

_____
Dave Forster

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES MORROW and MICHAEL OVERTON, individually and on behalf of similarly situated employees, | ) ) ) ) | |
| vs. | ) ) | CIVIL ACTION NO.:  3:07-CV-617-MHT |
| FLOWERS FOODS, INC., FLOWERS BAKING CO. OF OPELIKA, LLC, | ) ) ) | |

**DECLARATION OF RUFUS FOSTER, JR. UNDER 28 U.S.C. § 1746**

I, Rufus Foster, Jr., declare under penalty of perjury as follows:

1.    My name is Rufus Foster, Jr. I am of age, competent to testify, and have personal knowledge of the matters stated herein.  I became an independent distributor for Flowers Baking Company of Opelika in 2003.  I have always worked out of the LaGrange warehouse.  Prior to that I worked for Dolly Madison as a distributor.

2.    At the time I became a distributor I was given a Distributor Agreement to sign.  I had an opportunity to read that agreement before signing it.  I could have but did not have an attorney or an accountant review the agreement.  I understood the agreement.

3.    The agreement gives me an exclusive right to sell Flowers' products in a certain area.  I cannot sell Flowers' products outside of that territory nor can anyone else sell Flowers' products in my territory.  When I signed the Distributor Agreement I wanted to be an independent contractor.

4.    Within my territory I sell Sunbeam, Natures Own and Cobblestone brand products.  I do not sell any non-Flowers items.  I do not charge customers more or less than the suggested wholesale price.

5.    To place orders for products, I generally decide what products and the amount of products that I believe my customers will need.  Some of my customers do their own orders.  After orders are placed, I can make adds or cuts to those orders by phone.  I do this one or two times per week but it does change from week to week.

6.      Some of my products come from Flowers' bakeries outside of Georgia.

7.      I decide my work hours. Some of my customers require that I make deliveries at certain times. For example, I cannot work Arbys during lunch.

8.      During an average day I spend 3½ to 4 hours at the warehouse and 7 hours on my route. This does not change much day to day. These times have been consistent since I have been a distributor. I service my customers based upon the times when they want me in the store.

9.      I have used a helper in my route.

10.     I own a step van for working my route. I bought that step van through a lease/purchase with Flowers. If I ever need a new truck I will probably purchase it somewhere else.

11.     When servicing a typical customer, I first speak to the customer. I then look at their needs then I take out stale product and check in fresh product.

12.     I attempt to promote Flowers while in stores. I ask for more shelf space, special displays or stickers when specials are being run.

13.     I generally wear a uniform with a Flowers name on it. Flowers likes for me to wear a uniform.

14.     I am the main sales contact between Flowers and the customers because I am there with the customers every day. I actually sell the products to my customers.

15.     After purchasing my territory, I have added new accounts to my territory. I have been able to get cakes added to Campbells. I have also added Country's Barbeque. Flowers was also able to add a prison in my area. I have also lost some accounts. Flowers has not paid me nor required me to pay it due to these changes.

16.     Flowers treats me as an independent businessman. Flowers knows that I am a hard worker.

17.     I have not sold or considered selling any part of any territory or purchased part of another distributor's territory. My territory is more valuable now than when I first purchased it.

Further the affiant saith not.

I hereby declare under the penalty of perjury that the foregoing is true and correct according

to my personal knowledge, and if called as a witness, I could and would testify truthfully thereto.

Executed on _12 OCT. 2007_, 2007.

Rufus Foster, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CHARLES MORROW and MICHAEL    )
OVERTON, individually and on behalf    )
of similarly situated employees,    )
    )
vs.    )    CIVIL ACTION NO.:  3:07-CV-617-MHT
    )
FLOWERS FOODS, INC., FLOWERS    )
BAKING CO. OF OPELIKA, LLC,    )

### DECLARATION OF JOHN ALAN RENFROE UNDER 27 U.S.C. § 1746

I, John Alan Renfroe, declare under penalty of perjury as follows:

1.    My name is John Alan Renfroe.  I am of age, competent to testify and have personal knowledge of the matters stated herein.  I became an independent distributor for Flowers Baking Company of Opelika in July, 1994 in ~~Montgomery.~~ Prior to that I worked for Flowers as a route salesman.  I owned a distributorship for eighteen months.

2.    When I became a distributor, I signed a Distributor Agreement.  I had an opportunity to review that agreement before signing it.  Prior to signed that agreement, I attended multiple meetings to explain that agreement.  There was no part of the agreement which I did not understand.

3.    My agreement with Flowers gave me the right to sell Flowers' products in a certain territory.  I was not allowed to sell Flowers' products outside of that territory nor was anyone else allowed to sell Flowers' products within my territory.  It was my intent, when I signed the Distributor Agreement, to work for myself.  There was no day-to-day supervision of me by Flowers.

4.    Within my territory I sold Sunbeam, Natures Own, Winn-Dixie, private label, and Bebo brands.  I did not sell any non-Flowers products.  Nor did I ever charge customers more or less than the suggested wholesale price.

5.    To place orders for products, I generally decided what products and the amount of products that I believed my customers would need based on my work in the store and their prior four weeks sales.  Once orders were placed, I could make adds or cuts to those orders through a relay bag or a telephone system with Flowers.

6.    I think that some of the products I sold came from Flowers' bakeries outside of Alabama. I am not sure which products those were.

7.    I determined, based upon customer needs, my work schedule. No one from Flowers told me to work certain hours. No one from Flowers would even know when I came and went. I did have some customers who required that I service them at specific hours. For example, convenience stores were serviced prior to 2:00 p.m. and schools were serviced prior to 2:30 p.m.

8.    During an average work day I spent 2½ hours at the warehouse. During an average work day I spent 10 hours on my route. These times were consistent while I was a distributor. I followed an already established pattern in servicing my customers.

9.    I did not hire a helper to assist me in my route but could have if I was willing to pay the extra expense. I did not for that reason.

10.   I used a Chevy van that I owned in servicing my route. I got that van from Flowers.

11.   When servicing a typical customer, I would go into the store, pull any stale product, check the stales out, pull the order, check in the order, put the order on a rack, and then load the store's back room.

12.   I attempted to promote Flowers' products by trying to get more shelf or display space when there were features or specials being run by Flowers. I also tried to get special displays set up at the customer locations when specials were being run or there were good items. I also used point of sale materials such as signs and stickers to market products.

13.   I wore a uniform with a Flowers name or name brand on it because I already had some uniforms. Flowers did not make me wear a uniform.

14.   I considered myself to be the main sales contact between Flowers and the customers because I was there with the customers every day. I was the person that actually sold the products to these customers.

15.   After acquiring my territory, I was able to add new accounts to that territory. I also lost some accounts during this time. If a store opened or closed in my territory, it affected me. Flowers never paid me or made me pay it extra amounts due to these changes.

16.   I believe that Flowers treated me as an independent businessman. I did not have a lot of dealings with management. I knew that I was an independent contractor and looked at it differently than when I was a Flowers employee.

17.    I sold my territory to Flowers when I became a manager.  I believe that my distributorship was more valuable when I sold it than when I first purchased it.

Further the affiant saith not.

I hereby declare under the penalty of perjury that the foregoing is true and correct according to my personal knowledge, and if called as a witness, I could and would testify truthfully thereto.

Executed on ____10/12/07____, 2007.

John Alan Renfroe

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CHARLES MORROW and MICHAEL          )
OVERTON, individually and on behalf )
of similarly situated employees,    )
                                    )
vs.                                 )       CIVIL ACTION NO.:  3:07-CV-617-MHT
                                    )
FLOWERS FOODS, INC., FLOWERS        )
BAKING CO. OF OPELIKA, LLC,         )

**DECLARATION OF ROBERT McCRORY UNDER 28 U.S.C. § 1746**

I, Robert McCrory, declare under penalty of perjury as follows:

1.    My name is Robert McCrory.  I am of age, competent to testify, and have personal knowledge of the matters stated herein.  I am an independent distributor in Montgomery for Flowers Baking Company of Opelika.  Prior to that I worked for Flowers as a route salesman. At the time I became a distributor I was given a Distributor Agreement to sign.  I had an opportunity to review that agreement before signing it.  I also had an opportunity to have an attorney or an accountant review the agreement although I did not have the agreement reviewed by such a person.  There was no part of the agreement which I did not understand.

2.    My agreement with Flowers provides me the exclusive right to sell Flowers' products in a certain geographic territory.  I am not allowed to sell Flowers' products outside of that territory nor is anyone else allowed to sell Flowers' products within my territory.  It was my intent, when I signed the Distributor Agreement, to be an independent contractor.

3.    Within my territory I sell bread, cakes, Sunbeam, Natures Own, and Cobblestone Mill brand products.  I do not sell any non-Flowers products.  I have never charged customers more or less than the suggested wholesale price.

4.    To place orders for products I generally decide what products and the amount of products that I believe my customers will need.  Although some of my customers make specific orders, most rely on me to supply them with their expected needs.  Once orders are placed, I can make adds or cuts to those orders through a telephone system with Flowers.  It is rare that I have to make changes to my orders.  This only happens about half-a-dozen times per year.  An example of such an add is when a new item was added at Sam's that required a change.  This also happens if Flowers runs a special in an ad that requires extra product to meet the demand.

Page 1 of 3

5.    I am aware that some of the products I sell come from Flowers' bakeries outside of Alabama. Some of those products are Blue Bird cakes, cinnamon rolls, and Natures Own.

6.    I determine, based upon customer needs, the hours which I will work as a distributor. On some days I have a longer route than others. No one from Flowers Baking Company of Opelika has ever required that I be at the warehouse at certain times or work certain hours. I do have some customers who require that I service them at specific hours. For example, restaurants are not to be serviced during the lunch hours, and chain stores have back door fixed hours.

7.    During an average work day I spend 2 hours at the warehouse. During an average work day I spend 10 hours on my route. My total work day, including any breaks, ranges from 8 to 14 hours. These times have been consistent since I have been a distributor. The order in which I serve the route is determined mostly based upon the times in which I can be in a particular customer's store and location of the store.

8.    There have been times that I have hired a helper to assist me in my route.

9.    I currently use a Isuzu box truck that I own in servicing my route. I obtained that box truck through a purchase agreement with the Nalley dealership in Georgia. If I were to purchase a new truck at this time I would probably attempt to purchase it on my own outside of Flowers.

10.   When servicing a typical customer, I determine their needs based on the product left in the store. I would take out any stale product and then bring in any fresh product that is needed.

11.   I attempt to promote Flowers' products when servicing customers. I do this by trying to get more shelf or display space when there are specials being run by Flowers. I also try to get special displays set up at the customer locations when specials are being run. I also use point of sale materials such as stickers to market products.

12.   I generally wear a uniform with a Flowers name or name brand on it. It is my understanding that Flowers does not require me to wear a uniform.

13.   I consider myself to be the main sales contact between Flowers and my customers because I am there with my customers every day. I am the person that actually sells the products to my customers.

14.   After acquiring my territory I have been able to add new accounts such as Sam's to my territory. I have also lost some accounts such as Food World during this time. I also had Delchamps change to a Brunos. Flowers has neither compensated me nor required me to pay any extra amounts due to these changes. I believe that I am currently making twice what I

originally made. This is due to new stores being added, increases in the sales within stores, and price increases.

15.    I believe that Flowers treats me as an independent businessman. Flowers knows that I am a hard worker and promptly do my job.

16.    I have swapped part of my territory with another distributor. I believe that my distributorship is more valuable now than when I first purchased it.

Further the affiant saith not.

I hereby declare under the penalty of perjury that the foregoing is true and correct according to my personal knowledge, and if called as a witness, ~~I could and would testify truthfully thereto.~~

Executed on _____ *1-12* _____, 2007.

_____
Robert McCrory

*I may testify if called. RM*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES MORROW and MICHAEL OVERTON, individually and on behalf of similarly situated employees, | ) ) ) ) | |
| vs. | ) ) | CIVIL ACTION NO.: 3:07-CV-617-MHT |
| FLOWERS FOODS, INC., FLOWERS BAKING CO. OF OPELIKA, LLC, | ) ) ) | |

## DECLARATION OF AARON CHAPMAN UNDER 28 U.S.C. § 1746

I, Aaron Chapman, declare under penalty of perjury as follows:

1.  My name is Aaron Chapman. I am of age, competent to testify, and have personal knowledge of the matters stated herein. I became an independent distributor for Flowers Baking Company of Opelika in 1998. Prior to that I worked for Flowers driving routes when distributors were on vacation. My first territory was in Selma. I sold that territory back to Flowers and purchased a territory in Montgomery so that my family could move.

2.  At the time I became a distributor I was given a Distributor Agreement to sign. I had an opportunity to review that agreement before signing it. I also had an opportunity to have an attorney or an accountant review the agreement although I did not have the agreement reviewed by such a person. There was no part of the agreement which I did not understand.

3.  My agreement with Flowers provides me the exclusive right to sell Flowers' products in a certain geographic territory. I am not allowed to sell Flowers' products outside of that territory nor is anyone else allowed to sell Flowers' products within my territory. It was my intent, when I signed the Distributor Agreement, to be an independent contractor.

4.  Within my territory I sell bread and cake products including Sunbeam, Natures Own, Roman Meal and Bluebird brands. I do not sell any non-Flowers products. I have charged customers more or less than the suggested wholesale price to match a price or on something where a sales price was not shown on my computer.

5.  To place orders for products I generally decide the type and amount of the products that I believe my customers will need. Although some of my customers make specific standard orders, most rely on me to supply them with their expected needs. The schools sometimes

also make special orders. Once orders are placed, I can make adds or cuts to those orders through a telephone system with Flowers.

6.  I am aware that some of the products I sell come from Flowers' bakeries outside of Alabama.

7.  I determine, based upon customer needs, the hours which I will work as a distributor. No one from Flowers Baking Company of Opelika has ever required that I be at the warehouse at certain times or work certain hours. I do have some customers who require that I service them at specific hours. For example, restaurants are not to be serviced during the lunch hours.

8.  During an average work day I spend 1½ hours at the warehouse. During an average work day I spend 8 hours on my route. Monday is the longest day. Saturday is the shortest day. All of the days are relatively close to the same time. These times have been consistent since I have been a distributor. The order in which I serve the route is determined mostly based upon the times in which I can be in a particular customer's store and location of the store. I generally do not conduct personal errands during the day but could by starting my day earlier.

9.  There have been times that I have hired a helper to assist me in my route. Usually, the helper is a Flowers employee hired so that I can take vacation time.

10. I currently use a step van that I own in servicing my route. I obtained that step van through a lease/purchase agreement through Flowers. If I were to purchase a new truck at this time I would probably attempt to purchase it on my own outside of Flowers.

11. When servicing a typical customer, I determine their needs based on the product left in the store. I would take out any stale product and then bring in any fresh product that is needed.

12. I attempt to promote Flowers' products when servicing customers. I do this by trying to get more shelf or display space when there are specials being run by Flowers. I also try to get special displays set up at the customer locations when specials are being run. I also use point of sale materials such as stickers to market products.

13. I generally wear a uniform with a Flowers name or name brand on it. Flowers does not require me to wear a uniform, however.

14. I consider myself to be the main sales contact between Flowers and my customers because I am there with my customers every day. I am the person that actually sells the products to my customers.

15. Since acquiring my territory I have been able to add new accounts to my territory. These include Wing Master and two Citgos. I have also lost some accounts during this time. A

Food World closed for a year then reopened as a Piggly Wiggly. Flowers has neither compensated me nor required me to pay any extra amounts due to these changes. My total income has gone up because the Montgomery route is better than the Selma route and because of my new stores.

16.    I believe that Flowers treats me as an independent businessman. Flowers knows that I am a hard worker and promptly do my job.

17.    I never sold any part of any territory to any other distributor or purchased part of another distributor's territory. I did swap a territory to move to Montgomery. I believe that my distributorship is more valuable now than when I first purchased it.

Further the affiant saith not.

I hereby declare under the penalty of perjury that the foregoing is true and correct according to my personal knowledge, and if called as a witness, I could and would testify truthfully thereto.

Executed on _/0 - /1_____, 2007.

Aaron Chapman

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES MORROW and MICHAEL OVERTON, individually and on behalf of similarly situated employees, | ) ) ) ) | |
| vs. | ) ) | CIVIL ACTION NO.:  3:07-CV-617-MHT |
| FLOWERS FOODS, INC., FLOWERS BAKING CO. OF OPELIKA, LLC, | ) ) ) | |

**DECLARATION OF BRADLEY SHAYNE ALLEN UNDER 28 U.S.C. § 1746**

I, Bradley Shayne Allen, declare under penalty of perjury as follows:

1. My name is Bradley Shayne Allen.  I am of age, competent to testify, and have personal knowledge of the matters stated herein.  I am an independent distributor for Flowers Baking Company of Opelika.  I have always worked out of the Montgomery warehouse.  Prior to that I worked for Coca Cola as a route salesman.

2. At the time I became a distributor I was given a Distributor Agreement to sign.  I had an opportunity to review that agreement before signing it.  I also had an opportunity to have an attorney or an accountant review the agreement although I did not have the agreement reviewed by such a person.  There was no part of the agreement which I did not understand.

3. My agreement with Flowers provides me the exclusive right to sell Flowers' products in a certain geographic territory.  I am not allowed to sell Flowers' products outside of that territory nor is anyone else allowed to sell Flowers' products within my territory.  It was my intent, when I signed the Distributor Agreement, to be an independent contractor.

4. Within my territory I sell Sunbeam, Bluebird, Natures Own, and private label brands including bread and cake products.  I do not sell any non-Flowers' products.  I have charged customers more or less than the suggested wholesale price.

5. To place orders for products I generally decide what products and the amount of products that I believe my customers will need.  Although some of my customers make specific orders, most rely on me to supply them with their expected needs.  Once orders are placed, I can make adds or cuts to those orders through a telephone system with Flowers.  I have to make changes, on average, every other day.  This happens due to me ordering too much, not enough or cutting some things that have been added.

6.      I am aware that some of the products I sell come from Flowers' bakeries outside of Alabama. Cobblestone products are baked outside of Alabama.

7.      I determine, based upon customer needs, the hours which I will work as a distributor. No one from Flowers Baking Company of Opelika has ever required that I be at the warehouse at certain times or work certain hours. I do have some customers who require that I service them at specific hours. For example, restaurants are not to be serviced during the lunch hours and chain stores have posted service hours.

8.      During an average work day I spend 1½ hours at the warehouse. During an average work day I spend 7 hours on my route. The time varies day to day from 4 to 10 hours. These times have been consistent since I have been a distributor. The order in which I serve the route is determined mostly based upon the times in which I can be in a particular customer's store and location of the store.

9.      There have been times that I have hired a helper to assist me in my route. I did this when I cut a tendon in my finger, had a brace on my hand and needed help to service my route.

10.     I currently use a Chevy box van that I own in servicing my route. I obtained that box van through a lease/purchase agreement through Flowers. If I were to purchase a new truck at this time I would probably attempt to purchase it on my own outside of Flowers.

11.     When servicing a typical customer, I determine their needs based on the product left in the store. I would take out any stale product and then bring in any fresh product that is needed.

12.     I attempt to promote Flowers' products when servicing customers. I do this by trying to get more shelf or display space when there are specials being run by Flowers. I also try to get special displays set up at the customer locations when specials are being run. I also use point of sale materials such as stickers to market products.

13.     I do not wear a uniform with a Flowers name or name brand on it. It is my understanding that Flowers does not require me to wear a uniform.

14.     I consider myself to be the main sales contact between Flowers and my customers because I am there with my customers every day. I am the person that actually sells the products to my customers.

15.     After acquiring my territory I have been able to add a Calhoun Foods, three Family Dollars and two Dollar Generals. I have also lost a Winn-Dixie. Flowers has neither compensated me nor required me to pay any extra amounts due to these changes.

16.    I believe that Flowers treats me as an independent businessman.  Flowers knows that I am a hard worker and promptly do my job.

17.    I have sold one part in my territory to Aaron Chapman but have not purchased part of another distributor's territory.  I sold that stop because it was too much for me and not worth working for me.  I believe that my distributorship is more valuable now than when I first purchased it.

Further the affiant saith not.

I hereby declare under the penalty of perjury that the foregoing is true and correct according to my personal knowledge, and if called as a witness, I could and would testify truthfully thereto.

Executed on ___October 10___, 2007.

_Bradley Shayne Allen_ (signature)
Bradley Shayne Allen

*I will not testify if called SDA* (handwritten)

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES MORROW and MICHAEL OVERTON, individually and on behalf of similarly situated employees, | ) ) ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO.: 3:07-CV-617-MHT |
| | ) | |
| FLOWERS FOODS, INC., FLOWERS BAKING CO. OF OPELIKA, LLC, | ) ) ) | |

<u>**DECLARATION OF MICHAEL LEE ATKINS UNDER 28 U.S.C. § 1746**</u>

I, Michael Lee Atkins, declare under penalty of perjury as follows:

1.   My name is Michael Lee Atkins.  I am of age, competent to testify, and have personal knowledge of the matters stated herein.  I became an independent distributor for Flowers Baking Company of Opelika in 1998.  I later sold my distributorship when I became dissatisfied but then purchased another around January, 2001.  I have always worked out of the Roanoke warehouse.  Prior to that I worked for Wal-Mart as a distribution center driver.

2.   At the time I became a distributor I was given a Distributor Agreement to sign.  I had an opportunity to review that agreement before signing it.  Nobody ever mentioned to me that I could have an attorney review the agreement.  I never asked if I could have an attorney or someone else review the agreement.

3.   My agreement with Flowers provides me the exclusive right to sell Flowers' products in my county.  I do not sell Flowers' products outside of that territory nor is anyone else allowed to sell Flowers' products within my territory.  It was my intent, when I signed the Distributor Agreement, to be an independent contractor.

4.   Within my territory I sell Sunbeam, Natures Own, Roman Meal, Bluebird cakes, and private label brand products.  I do not sell any non-Flowers products.  Nor have I ever charged customers more or less than the suggested wholesale price.

5.   To place orders for products I decide what products and the amount of products that I believe my customers will need.  The decision is totally mine to make.  Once orders are placed, I can make adds or cuts to those orders through a telephone system with Flowers.  I generally do this one or two times per week.  The adjustments are based strictly on what I observe on my route or specific changes from my customers.

6.    Some of the products I sell come from Flowers' bakeries outside of Alabama such as Thomasville or Villa Rica, Georgia. I am not sure which products those are.

7.    I determine, based upon customer needs, the hours which I will work as a distributor. No one from Flowers Baking Company of Opelika has ever required that I be at the warehouse at certain times or work certain hours. I do have some customers who require that I service them at specific hours.

8.    During an average work day I spend 3 hours at the warehouse. During an average work day I spend 5½ to 6 hours on my route. This varies very little by day. These times have not been consistent since I have been a distributor because my route has changed. The order in which I serve the route is determined mostly based upon the location of the store.

9.    My wife often works as a helper to assist me in my route. She does this because I have a large route. She is also very good in selling products to the customers.

10.   I currently use a Dodge Ram truck that I obtained from a dealership. If I were to purchase a new truck at this time I would probably purchase it on my own outside of Flowers.

11.   When servicing a typical customer, I determine their needs based on the product left in the store. I would take out any stale product and then bring in any fresh product that is needed.

12.   I attempt to promote Flowers' products when servicing customers. I do this by providing good service and by talking to the customers. I try to get more shelf or display space when there are specials being run by Flowers. I also try to get special displays set up at the customer locations when specials are being run. I also use point of sale materials such as stickers to market products.

13.   I generally wear a uniform with a Flowers name or name brand on it. Flowers does make me wear a uniform.

14.   I consider myself to be the main sales contact between Flowers and the customers because I am there with the customers every day and they have my phone number. I am the person that actually sells the products to these customers.

15.   After acquiring my territory I have been able to add plenty of new accounts such as Wal-Mart, Jacks, and other restaurants to that territory. I have not lost any accounts, other than restaurants that merely change names, during this time. Flowers has neither compensated me nor required me to pay any extra amounts due to these changes.

16.     Flowers treats me as an independent businessman. Flowers exercises little supervision over my normal activities. Flowers tries sometimes to get me to do specific things but they cannot tell me what to do.

17.     I have sold part of my territory to Flowers because the territory had grown too much. Flowers took what I sold plus part of a territory purchased from another distributor to form a new territory. Eventually, because of problems in servicing that new territory, Flowers sold back to me the territory that it had repurchased.

Further the affiant saith not.

I hereby declare under the penalty of perjury that the foregoing is true and correct according to my personal knowledge, and if called as a witness, I could and would testify truthfully thereto.

Executed on ___10/11_____, 2007.


_____
Michael Lee Atkins

# FREEDOM COURT REPORTING

1   IN THE UNITED STATES DISTRICT COURT

2  FOR THE MIDDLE DISTRICT OF ALABAMA

3     NORTHERN DIVISION

4

5 CASE NUMBER:  2:05-cv-937-F

6

7 HENRY G. PORTERFIELD,

8    Plaintiff,

9    VS.

10 FLOWERS BAKING COMPANY OF OPELIKA, LLC,

11    Defendant.

12    S T I P U L A T I O N

13    IT IS STIPULATED AND AGREED by

14 and between the parties through their

15 respective counsel, that the video

16 deposition of HENRY G. PORTERFIELD may be

17 taken before RENA' MESSICK LANIER, Court

18 Reporter and Notary Public for the State

19 of Alabama at Large, at the Tiger Town Inn

20 at 205 North 21st Street, Opelika, Alabama

21 36801, on the 9th day of May, 2007.

22    IT IS FURTHER STIPULATED AND

23 AGREED that the signature to and the

FREEDOM COURT REPORTING

Page 115

1    that what Flowers representatives told you

2    was incorrect?

3        A.    I don't know.

4        Q.    Did you service your Burger

5    Kings five days a week?

6        A.    Sometime.

7        Q.    And sometimes you didn't?

8        A.    Yes.

9        Q.    At some point, there were

10   complaints about your service to Burger

11   King, were there not?

12       A.    Yes.

13       Q.    How would you go about

14   servicing your territory when you were a

15   distributor for Flowers?

16            What time did you come into

17   the warehouse generally?

18       A.    4:30, quarter to five, five.

19   Somewhere around there.

20       Q.    Okay.  It wasn't any set

21   time to come in, was there?

22       A.    No.

23       Q.    And how did you determine

FREEDOM COURT REPORTING

Page 116

1    the order of visiting your accounts during

2    the course of a day?

3         A.    You determined by what time

4    they open up and about what time the --

5    outline the route you had to take to save

6    you gas on your truck.  That's it.

7         Q.    Did you make that decision?

8         A.    Yes, I did.

9         Q.    Flowers didn't tell you the

10   order in which you had to service the

11   accounts?

12        A.    They told me I had to

13   service -- I knew I had to service

14   Winn-Dixie before twelve and certain

15   things like that.

16        Q.    Because that was

17   Winn-Dixie's policy?

18        A.    Yes.

19        Q.    Take me through a typical

20   day of coming into the warehouse.  You've

21   ordered your product.  There's product in

22   the warehouse.  Just tell me what you did.

23        A.    When you first get in, you

FREEDOM COURT REPORTING

Page 117

1    run a load sheet, check your load.

2        Q.        When you say load, are you

3    referring to products?

4        A.        Product.    Check your

5    product.    Then you separate it by stops.

6    Then you load your truck.

7                  You load your truck with the

8    last stop you work to the front and work

9    yourself back.

10                 Then you go and start working

11   the route.    The first stop should be on

12   the tail end of the truck to bring it off

13   first.    And then just finish the day the

14   same way.

15       Q.        Could you make additions or

16   subtractions to product orders?

17       A.        Yes.

18       Q.        Was that commonly referred

19   to as adds and cuts?

20       A.        Yes.

21       Q.        How does that work?

22       A.        If you get in and you have

23   an overage, you can put in the overage.

FREEDOM COURT REPORTING

Page 118

1    If you have something that was damaged,

2    you can use damaged.  Something that

3    wasn't there, you can cut.

4        Q.    Is that your decision?

5        A.    Your daily decision.

6        Q.    Your daily decision?

7        A.    Yes.

8        Q.    What's a final load report?

9        A.    Final load report is --

10   final load report is what you had on the

11   truck.

12       Q.    That's the inventory

13   starting the day?

14       A.    Yes.

15       Q.    Tell me, how did you work,

16   you know, transactions with your

17   authorized charge accounts?  How did that

18   work?

19             What type of sales

20   transaction would you conduct with an

21   authorized charge account?

22       A.    What are you talking about?

23       Q.    Okay.  Did you have any

FREEDOM COURT REPORTING

Page 356

1    Mr. Porterfield, do you recognize

2    Defendant's Exhibit No. 59?

3          A.      My 1999 1040.

4          Q.      Turning to page two of this

5    document, is that your signature?  Is one

6    of those signatures yours?

7          A.      Uh-huh.

8          Q.      And to the right of your

9    signature is the date August 25, '06?

10         A.      Uh-huh.

11         Q.      Do you see that?

12         A.      Uh-huh.

13         Q.      Is that the date you

14   completed your 1999 tax return?

15         A.      Yes.

16         Q.      Had you completed a tax

17   return for the year 1999 before August 25,

18   2006?

19         A.      No.

20         Q.      Is it fair to say that you

21   knew you had an obligation to file an

22   annual tax return?  Did you know that?

23      -  A.      Yes, I do.

FREEDOM COURT REPORTING

Page 357

1      Q.     Is it fair to say that you

2   knowingly did not file a tax return for

3   the year 1999?

4      A.     Yes.

5      Q.     Why didn't you file a tax

6   return?

7      A.     I just didn't file it.

8      Q.     Is the information on this

9   tax return accurate?

10     A.     Should be.

11     Q.     Any reason to believe it's

12  not?

13     A.     Ain't no reason to believe

14  it's not.

15            THE VIDEO SPECIALIST:  I need

16  to change the tape, please.

17            MR. HISTA:  Okay.

18            THE VIDEO SPECIALIST:  We're

19  going off the Record.  This is end of Tape

20  6.

21       (Off-the-Record discussion.)

22            THE VIDEO SPECIALIST:  We're

23  back on the Record.  This is the beginning

FREEDOM COURT REPORTING

Page 360

1    61 was marked for identification purposes

2    by Mr. Hista.)

3            Q.      (BY MR. HISTA)

4    Mr. Porterfield, do you recognize

5    Defendant's Exhibit No. 61?

6            A.      Yes.

7            Q.      Tell me what it is, please.

8            A.      2000 taxes.

9            Q.      And turning to page two of

10   Defendant's Exhibit 61, does your

11   signature appear at the bottom of that

12   page?

13           A.      Yes.

14           Q.      Is it a first signature on

15   page two?

16           A.      Yes.

17           Q.      To the right of your

18   signature is a date.  Do you see that?

19           A.      Yes.

20           Q.      Would you agree with me that

21   the date is August 25, 2006?

22           A.      Yes.  Same day I did the

23   other one.

Page 361

1      Q.      Is this the first time that

2  you filed a tax return for the year 2000?

3      A.      Yes.

4      Q.      Turning your attention to

5  page three of this document --

6      A.      Yes.

7      Q.      -- would you agree with me

8  that this document reflects your income

9  and expenses from your Flowers

10 distributorship?

11     A.      Yes.

12     Q.      Do you believe that the

13 information that is on page three of this

14 tax return is accurate?

15     A.      I have to talk to my

16 accountant about that.  It looks like it.

17     Q.      Any reason to believe that

18 it's not accurate as we sit here today?

19     A.      I'm looking at this -- yes.

20 It's accurate.

21     (Whereupon, Defendant's Exhibit No.

22 62 was marked for identification purposes

23 by Mr. Hista.)

FREEDOM COURT REPORTING

Page 362

1        Q.      (BY MR. HISTA)  We've marked

2    the next one as Defendant's Exhibit No.

3    62.

4               Do you recognize this

5    document?

6        A.      Yes.

7        Q.      Turning to page two, is that

8    your signature -- first signature on that

9    page?

10       A.      Yes.

11       Q.      Do you agree with me that

12   this is the your 2001 Federal tax return?

13       A.      Yes.

14       Q.      And would you agree with me

15   that you didn't file this return until

16   August 25, 2006?

17       A.      Yes.

18          (Whereupon, Defendant's Exhibit No.

19   63 was marked for identification purposes

20   by Mr. Hista.)

21       Q.      (BY MR. HISTA)

22   Mr. Porterfield, you have in front of you

23   what has been marked as Defendant's

FREEDOM COURT REPORTING

Page 363

1    Exhibit No. 63.

2                    Do you recognize this

3    document?

4            A.      2002 taxes.

5            Q.      Is it your 2002 Federal tax

6    return?

7            A.      Yes.

8            Q.      For you and your wife?

9            A.      Yes.

10           Q.      And on page two of that

11   document, is that -- the first signature

12   on that page yours?

13           A.      Yes.

14           Q.      And you didn't file your

15   2002 tax return until August 25, 2006,

16   correct?

17           A.      Yes.

18           Q.      Turning to page three of

19   this document, do you believe that page

20   three of this document accurately reflects

21   your income and expenses related to your

22   Flowers distributorship for the year 2002?

23           A.      Yes.

# FREEDOM COURT REPORTING    364

1              (Whereupon, Defendant's Exhibit

2    Nos. 64 & 65 were marked for

3    identification purposes by Mr. Hista.)

4              Q.       (BY MR. HISTA)

5    Mr. Porterfield, do you recognize what has

6    been marked as Defendant's Exhibit 64?

7              A.       2003 taxes.

8              Q.       And is this your 2003

9    Federal tax return for yourself and your

10   wife?

11             A.       Yes.

12             Q.       And on page two of that

13   document, is the first signature on that

14   page yours?

15             A.       Yes.

16             Q.       And this tax return is also

17   dated 8/25/2006.  Would you agree with

18   that?

19             A.       Yes.

20             Q.       Turning to page three of

21   this document, would you agree with me

22   that page three reflects the income and

23   expenses from your Flowers distributorship

Page 365

1    for the year 2003?

2           A.      Yes.

3           Q.      Do you believe that it

4    accurately reflects your income and

5    expenses for the distributorship for that

6    year?

7           A.      Yes.

8           Q.      Okay.  We've just reviewed

9    your tax returns for the years 1999 to

10   2003 which you did not file until August

11   25, 2006, correct?

12          A.      Yes.

13          Q.      Is there any particular

14   reason why you didn't file any of those

15   tax returns until 2006?

16          A.      No reason.

17          Q.      You did understand that you

18   were supposed to file tax returns?

19          A.      I know.

20          Q.      What made you decide to

21   finally file tax returns for those years

22   in 2006?

23          A.      I decided to get them all

FILED IN CHAMBERS
U.S.D.C. Atlanta

AUG 2 3 2007

JAMES N. HATTEN, Clerk
By: [signature]
        Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JO ANN JOHNSON and JUDITH PAISLEY,
on their behalf and those
similarly situated,

                Plaintiffs

v.                                          CIVIL ACTION NO.
                                            1:06-CV-2430-ODE

WELLPOINT, INC., et al,

                Defendant

                            ORDER

        This putative collective action brought under the Fair Labor
Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 et seq., is before
the  Court  on  Plaintiffs'  Motion  for  Conditional  Class
Certification and Judicial Notice and Motion to Require Disclosure
of Names, Addresses, Etc. of Putative Class Members [#6]. For the
following reasons, Plaintiffs' motion is DENIED.


I.  Factual Background

        Wellpoint, Inc. ("Wellpoint") is a healthcare conglomerate,
the subsidiaries of which include numerous health insurance
companies.[1]  Through its subsidiaries Defendant provides health

------

        [1]Plaintiffs named Wellpoint, Inc., The Wellpoint Companies,
Inc., UniCare Life & Health Insurance Company, and Wellpoint
Health Networks, Inc. as defendants to this action.  Wellpoint
Health Networks, Inc. merged with Anthem, Inc. in 2004, and as a
result Wellpoint Health Networks, Inc. no longer exists as a legal
entity.  The Court will refer to the defendants collectively as
the singular "Wellpoint, Inc." because Wellpoint, Inc. is the
parent company all other defendants.

care benefits to approximately 34.2 million people. Defendant has approximately 42,000 employees.

Plaintiffs are former employees of subsidiaries of Defendant. Plaintiffs worked in Georgia. Prior to 2005, Plaintiff Jo Ann Johnson was employed as a Nurse Case Manager for Blue Cross/Blue Shield of Georgia. Prior to 2005, Plaintiff Judith Paisley was employed by UniCare Life & Health Insurance Company as a Medical Management Nurse.

Plaintiffs allege that despite their professional training as nurses, in their positions as Nurse Case Manager and Medical Management Nurse they were not employed in an executive, administrative, or professional capacity but instead were non-exempt employees under the FLSA. Because they were non-exempt employees under the FLSA, Plaintiffs contend that they were entitled to overtime compensation for all hours worked over forty hours per week. Plaintiffs brought this lawsuit on October 11, 2006, alleging that Defendant unlawfully withheld overtime compensation from them and from others similarly situated.

Plaintiffs seek conditional certification and judicial notice for a nationwide collective action on behalf of all nurses employed by Wellpoint who perform the job duties of Nurse Case Managers and/or Medical Management Nurses. Plaintiffs estimate the conditional class could include a few hundred people out of 42,000 employees of Defendant.

Three former employees of Defendant, Bernadine Upshaw, Miraca Jones, and Gail Teren, have filed Notices of Consent to opt-in as

2

plaintiffs to this action pursuant to 29 U.S.C. § 216. [2] Upshaw and Jones are former Nurse Case Managers, similar to Johnson. Teren is a former Medical Management Nurse, similar to Paisley. Upshaw, Jones and Teren, like Plaintiffs, were formerly employed by Defendant in either its Vinings or Buckhead offices in Atlanta. Plaintiff Johnson, Upshaw, and Jones had the same supervisor, Lisa Schottroff, while employed by Defendant. Plaintiff Paisley and Teren had the same supervisor as well, Karen Stevenson.

II. Brief Overview of the FLSA

Congress enacted the FLSA to remedy "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 201(a). Section 207 provides that:

> No employer shall employ any of his employees who in any workweek is engaged in commerce . . . for a workweek longer than forty hours . . . unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

Id. § 207(a)(2)(C).

However, the FLSA exempts "any employee employed in a bona fide executive, administrative, or professional capacity" from §

---

[2]"[A] putative plaintiff must affirmatively opt into a § 216(b) action by filing his written consent with the court in order to be considered a class member and be bound by the outcome of the action." Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1216 (11th Cir. 2001). These opt-in plaintiffs are not yet parties to this case. They will become class members if the Court certifies this case after finding that all plaintiffs are "similarly situated." See Rucker v. CompUSA, Inc., Case No. 1:05-CV-144-ODE (N.D. Ga. 2005).

3

207's overtime benefits provisions. Id. § 213(a)(1). The regulations accompanying the FLSA provide a set of criteria for determining when an employee falls within one of the exemptions.

An employee is employed in an administrative capacity if the employee is:

> (1) Compensated on a salary or fee basis at a rate of not less than $ 455 per week . . .;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200.

An employee is employed in a professional capacity if the employee is:

> (1) Compensated on a salary or fee basis at a rate of not less than $ 455 per week . . .; and
>
> (2) Whose primary duty is the performance of work:
>
>> (I) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction . . .

29 C.F.R. § 541.300.

The FLSA authorizes collective actions for relief: "An action...may be maintained against any employer...by any one or more employees for and in [sic] behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). To achieve collective action status in the instant action, Plaintiffs must prove that they and the putative class members are "similarly situated."

4

III.  Plaintiff's Motion for Conditional Class Certification

Plaintiffs ask the Court to conditionally certify a nationwide class of current and former nurse employees of Defendant who hold or held each of the four positions in the Nurse Case Manager and Medical Management Nurse categories.  For the following reasons, the Court finds that Plaintiffs have not made the requisite showing for conditional class certification under the FLSA.

A.  Standard for Conditional Class Certification

The United States Court of Appeals for the Eleventh Circuit has endorsed a two-tiered approach to certification of a collective action under the FLSA.  See Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208 (11th Cir. 2001).  The two-tiered approach defines two phases of certification: the earlier, "notice" phase, after which a class is conditionally certified; and a later phase prompted by the filing of a motion for decertification, at which point the case is either certified as a collective action or the conditional class is decertified.  Id. at 1218.  The instant motion asks the Court for conditional class certification, which is the first tier of the Hipp approach.

At the notice phase, "the district court should satisfy itself that there are other employees...who desire to "opt-in" and who are "similarly situated" with respect to their job requirements and with regard to their pay provisions."  Dybach v. State of Fla. Dept. of Corrections, 942 F.2d 1562, 1567-68 (11th Cir. 1991).  Plaintiffs bear the burden of establishing that they are similarly situated with the group of employees they wish to

5

represent. <u>Grayson v. K Mart Corp.</u>, 79 F.3d 1086, 1096 (11th Cir. 1996). Plaintiffs may make this showing by "making substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary." <u>Id.</u> at 1097 (internal quotation and citation omitted).

However, where plaintiffs seek to send court-approved notice to potential plaintiffs at the first-tier conditional certification stage, courts should treat those requests with a higher level of scrutiny:

> We can think of no good reason for apparent judicial sponsorship of the notice, at a stage in the litigation when there had been no determination that the plaintiff's allegations have any merit, and we can think of a good reason against it, which is that the judicial imprimatur is likely to be misunderstood as a representation that the suit probably has merit...

<u>Haynes v. Singer Co., Inc.</u>, 696 F.2d 884, 886 n.2 (11th Cir. 1983)(quoting <u>Woods v. New York Life Ins. Co.</u>, 686 F.2d 578, 581 (7th Cir. 1982)).

### B.  <u>Whether There Are Other Employees Who Desire to Opt In</u>

Plaintiffs contend that this action should be conditionally certified because they believe there are other Nurse Case Managers and Medical Management Nurses who worked for Defendant between October 11, 2003 and the present who will want to opt in to this action. Plaintiffs emphasize that three such employees, who held the same positions as Plaintiffs did while they were employed by Defendant, have already filed Notices of Consent to join in this action.

6

Defendant argues that the three former employees who have filed consent-to-join forms are not sufficient to show that others desire to opt in to this action. Defendant submits that the three former employees who have filed consent-to-join forms worked in the same offices as the two named Plaintiffs. Defendant contends that this is not sufficient to show that other employees inside or outside of Georgia want to opt-in to this action.

The Court agrees with Defendant. The fact that three former coworkers of Plaintiffs desire to opt-in does not demonstrate that there are other Nurse Case Managers and Medical Management Nurses who work in Defendant's many other offices, inside Georgia and elsewhere, who desire to opt-in. Additionally, the three women who have filed consent-to-join forms held the same positions as Plaintiffs– that is, the lowest of the four Nurse Case Manager and Medical Management Nurse positions. Plaintiffs have not shown that there are nurses who hold the higher Nurse Case Manager and Medical Management Nurse positions who wish to join this action.

### C. Whether Plaintiffs Are Similarly Situated to Putative Opt-in Plaintiffs

Plaintiffs contend that this action should be conditionally certified because they are similarly situated to the other Nurse Case Managers and Medical Management Nurses who worked for Defendant between October 11, 2003, and the present. Plaintiffs submit nearly identical declarations averring that all those who held Nurse Case Manager or Medical Management Nurse positions with Defendant are similarly situated to Plaintiffs. Plaintiffs also submit various documents, declarations and depositions that were

7

collected for the purpose of another FLSA collective action against Defendant that was before this Court prior to its settlement, <u>Morrow v. UniCare Life & Health Insurance Company and Wellpoint Health Networks, Inc.</u>, Case No. 1:04-CV-1774-ODE.

Plaintiffs contend that Defendant's employees who are Nurse Case Managers are salaried employees who work in call centers and essentially act as liaisons between the client (i.e., a group health insurance plan sponsor), the provider (i.e., the doctor or other provider of health care services), and the member (i.e., the patient covered under the health care plan). There are four separate Nurse Case Manager positions: Nurse Case Manager, Senior Nurse Case Manager, Specialty Nurse Case Manager, and Lead Nurse Case Manager. Piercy Decl. at 3. According to Plaintiffs, Nurse Case Managers regardless of their position perform certain essential job functions: (1) collecting medical data from the member's file; (2) inputting the medical data into a computer program; (3) providing "over-the-counter" information to members about their particular medical diagnosis; (4) referring to manuals on procedures and software; and (5) coordinating with medical and equipment providers.

Plaintiffs assert that Medical Management Nurses, like Nurse Case Managers, work in call centers, liaise between clients and members, and perform most of their daily duties on the telephone. However, Medical Management Nurses provide more basic medical advice to members who call into the call center. There are four Medical Management Nurse positions: Medical Management Nurse I, Medical Management Nurse II, Senior Medical Management Nurse, and Lead Medical Management Nurse. Piercy Decl. at 6. Plaintiffs

describe the duties of Medical Management Nurses as a "subset" of those of Nurse Case Managers. Johnson Decl. at 2; Paisley Decl. at 2. According to Plaintiffs, the essential job functions of Medical Management Nurses, regardless of their position, are: (1) collecting medical data from the member's file; (2) inputting the collected data into a computer program; (3) putting the matter through a "Level 1" acuity screening (a simple, multiple choice screening); and (4) informing the member of the computer's decision.

Plaintiffs assert that the job descriptions and tasks to be performed by Nurse Case Managers and Medical Management Nurses are the same no matter which subsidiary of Defendant's employs the Nurse Case Managers and Medical Management Nurses or in which geographic location the nurses are employed. Consequently, Nurse Case Managers and Medical Management Nurses are able to transfer or be reassigned among the various subsidiaries without needing to be retrained. Defendant uses a single intranet site to advertise online for open positions for nurses in its offices across various subsidiaries located in fifteen states. See Pl.'s Ex. C. Nurse Case Managers and Medical Management Nurses regardless of their physical location use the same computer program to handle their cases.

Plaintiffs contend that Defendant has developed and utilizes national standards for the Nurse Case Manager and Medical Management Nurse positions across all of its subsidiaries. The supervisors for Defendant's Nurse Case Managers and Medical Management Nurses are located in California, Illinois, and Massachusetts, although Nurse Case Managers and Medical Management

9

Nurses actually work in Georgia and in at least fifteen states. Members from many states call into call centers staffed by these nurses, so that a Nurse Case Manager in Georgia may field calls from members in many other states. Plaintiffs also submit that Defendant maintains a centralized human resources office for all of its operations, a centralized payroll, uniform and standard work rules throughout the country. Defendant's core values include a "One Company, One Team" mindset for employees.

Plaintiffs maintain that Nurse Case Managers and Medical Management Nurses are paid on the same terms. According to Plaintiffs, these nurses are all paid a salary on the basis of a forty hour work week. Plaintiffs contend that despite their salary being based on a forty hour work week, Nurse Case Managers and Medical Management Nurses must work more than forty hours per week in order to meet performance objectives set for them by Defendant. See Wampler Dep. at 8-11; Piercy Dep. at 196-97; Miello Decl. at 7. Defendant's management is aware that Nurse Case Managers work overtime in order to keep up with their case loads. Id.

Defendant argues that Plaintiffs and the three putative opt-in plaintiffs are not "similarly situated" within the meaning of the FLSA. Defendant contends that the putative opt-in plaintiffs have different employment settings and factual situations than Plaintiffs did while employed by Defendant. Defendant submits that the three putative opt-in plaintiffs (1) held different jobs with different titles, duties, qualifications and supervision than Plaintiffs; (2) held different positions at different levels within the Nurse Case Manager and Medical Management Nurse

10

categories; (3) had different employers due to Wellpoint's merger with Anthem; (4) had different supervisors, worked in different geographic locations, and had different clients; and (5) worked for Defendant at different time periods than Plaintiffs did. Defendant cites specific facts to support these contentions.

The Court finds that Plaintiffs have not shown that they are "similarly situated" to the class that they seek to represent. First, Plaintiffs each hold the lowest of the four positions within the Nurse Case Manager and Medical Management Nurse categories of employment with Defendant. While Plaintiffs assert that their essential job functions and interests are the same as those nurses who hold the other three positions within the categories of Nurse Case Manager and Medical Management Nurse, Plaintiffs have submitted no more than bare-bones declarations to support these assertions. The Court finds Plaintiffs' assertions unconvincing.

Second, Plaintiffs have not shown that their employment with Defendant's subsidiaries in Georgia was similar to other nurses' employment with Defendant's subsidiaries elsewhere. Plaintiffs attempt to make this showing by submitting that the job description and tasks to be performed by Nurse Case Managers and Medical Management Nurses are the same no matter which subsidiary of Defendant's employs the nurses or in which geographic location. However, the Court finds this evidence to be merely conclusory. Plaintiffs have shown little more than that nurses in one location employed by one subsidiary may apply for a position in another location with another subsidiary via Defendant's intranet.

11

Third, Plaintiffs have attempted to re-use the documents, declarations and depositions filed in support of <u>Morrow v. UniCare Life & Health Insurance Company and Wellpoint Health Networks, Inc.</u>, Case No. 1:04-CV-1774-ODE, a previous case before this Court, to argue that since Plaintiffs were co-workers of the <u>Morrow</u> plaintiffs, the Court should automatically grant conditional class certification in this case. However, the Court disagrees. The <u>Morrow</u> plaintiff sought to represent a small class of three individuals, all of whom worked for Defendant's subsidiaries in Georgia. The Court certified that class for reasons specific to the facts of that case, not the least of which was the fact that the <u>Morrow</u> plaintiff did not seek nationwide, court-approved notice and did not thereby invoke the stricter standard applicable to such cases as explained by the Eleventh Circuit in <u>Haynes</u>.

The Court finds that Plaintiffs have failed to meet their burden of showing that they are "similarly situated" to putative opt-in class members. Because the Court finds that Plaintiffs likewise have failed to show that there are others who desire to "opt-in" to this action, the Court DENIES Plaintiffs' Motion for Conditional Class Certification and Judicial Notice and Motion to Require Disclosure of Names, Addresses, Etc. of Putative Class Members [#6].

VI. <u>Conclusion</u>

For the foregoing reasons, Plaintiffs' Motion for Conditional Class Certification and Judicial Notice and Motion to Require Disclosure of Names, Addresses, Etc. of Putative Class Members

[#6] is DENIED.  Because the Court finds that a collective action is inappropriate here, the Court denies Plaintiffs' request for court-approved notice to potential FLSA plaintiffs and also denies Plaintiffs' motion to require Defendant to disclose the names, addresses and other information of putative class members.

The Court does not dismiss this action, but rather allows Plaintiffs to proceed with their FLSA claims in their individual capacities.  The Court instructs Bernadine Upshaw, Miraca Jones, and Gail Teren to file motions under Federal Rule of Civil Procedure 19 so that they may be joined as plaintiffs in this action if they so desire.

SO ORDERED, this 22 day of August, 2007.

ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE

13

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 05-21738-CIV-SEITZ/MCALILEY

KEITH D. QUARLES, *et al.*,

      Plaintiffs,

v.

FLOWERS FOODS, INC., *et al.*,

      Defendants.

_____/

**ORDER (1) GRANTING JOINT MOTION FOR APPROVAL OF DISMISSAL WITH**
**PREJUDICE OF PLAINTIFFS' FLSA CLAIMS PURSUANT TO STIPULATED CONSENT**
**JUDGMENT; (2) PROVIDING NOTICE OF COURT PRACTICE UPON SETTLEMENT; AND**
**(3) CLOSING CASE**

THIS CAUSE is before the Court based upon the parties' Joint Motion for Court Approval of

Dismissal of Plaintiffs' FLSA Claims Pursuant to Stipulated Consent Judgment [DE-65]. The parties

stated in paragraph 2 of the Joint Motion that "facts adduced during discovery revealed that Plaintiffs

have no cognizable claims under the Fair Labor Standards Act (the "FLSA" or "Act") . . . Plaintiffs now

agree that they do not have any actionable claims under the FLSA against Defendants." Thus, the

settlement involves Plaintiffs' waiver of any claims under the FLSA and a specific provision stating that,

even assuming that Plaintiffs were Defendants' employees under the Act, their counsel has advised them

that they do not have viable claims because of the outside sales and Motor Carrier exemptions. The

parties have advised the Court that each party shall bear his/its own attorneys' fees and costs.

Accordingly, upon due consideration, it is hereby

      ORDERED that:

      (1) The parties' Joint Motion for Court Approval of Dismissal of Plaintiffs' FLSA Claims

Pursuant to Stipulated Consent Judgment [DE-65] is GRANTED, the Court having found the dismissal

with prejudice of Plaintiffs' FLSA claims to be a fair and reasonable resolution;

      (2) By **January 5, 2007**, the parties shall file with this Court their Joint Stipulation of Dismissal

With Prejudice of All Claims in This Action, pursuant to Federal Rule of Civil Procedure 41(a).  If the

parties fail to file their Joint Stipulation, the Court shall dismiss this case with prejudice;

(3)  All pending motions not otherwise ruled upon in this Order are DENIED AS MOOT; and

(4)  This case is CLOSED for statistical purposes.

DONE AND ORDERED in Miami, Florida, this 5th day of December, 2006.

_____
PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:     All Counsel of Record