**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | |
|---|---|
| **CHARLES MORROW, MICHAEL OVERTON, JAMES MARTY SMITH, DWAYNE CLEVELAND, MICHAEL SMITH, MARK MURPHY, DOUG BRANCH, LEW BAXTER, RICKY SMALL, MELVIN SNOW, GREG PATISAUL and GARY CHAMBLISS, Individually and on behalf of similarly situated employees,** | ) ) ) ) ) ) ) ) ) ) |
| **Plaintiffs,** | ) CIVIL ACTION NO.: ) 3:07-CV-617-MHT |
| **v.** | ) ) |
| **FLOWERS FOODS, INC., FLOWERS BAKING CO., OF OPELIKA, LLC, and FLOWERS BAKING CO. OF THOMASVILLE, LLC,** | ) ) ) ) ) |
| **Defendants.** | ) ) |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

Plaintiffs respectfully submit this Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification. For the reasons set forth herein as well as in Plaintiffs' opening memorandum, conditional certification should be granted. Plaintiffs are requesting certification of a class consisting of "all current and former route distributors, or other persons performing a service and/or delivery function on a non-hourly basis, who worked overtime while employed at Flowers Foods' subsidiaries, and were not compensated for such overtime work at an amount equaling one and one-half times the employee's regular rate of pay," but shall not include "persons who, as part of their duties, cross state lines to make deliveries." (*See*, Second Amended Compl. ¶124, D.E. No. 54). As argued below, Plaintiffs have shown they are similarly situated to the proposed class members and the "putative plaintiffs" under Section 216(b) and

have satisfied the requirements for the proposed notice (i.e. the initial stage in Section 216(b) class certification motion). (Ex. 1 to Mot. For Conditional Certification, D.E. No. 32). Moreover, Plaintiffs request that the Court order the Defendants to provide the names and last known addresses of all putative class members and supervise the mailing of notice to current and former route distributors.

Defendants' Opposition to Class Certification (hereinafter "Opposition") focuses primarily on two arguments: (1) that Plaintiffs and the putative class members are not similarly situated and (2) that the Plaintiffs' claims lack merit and, as a result, should be denied the requested certification and issuance of opt-in notice to potential class members. (*See*, Opp., pp. 29-41, D.E. No. 42).

In arguing that Plaintiffs' claims lack merit, Defendants improperly ask the Court to engage in a merits inquiry for conditional certification without the benefit of discovery.[1] *Cuzco v. Orion Builders, Inc.*, 477 F. Supp.2d 628, 633 (S.D.N.Y. 2007); s*ee also Lynch v. United Services Auto Ass'n*, 491 F.Supp.2d 357, 368 (S.D.N.Y. 2007) (where the court held "at this procedural stage, the court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations")**.** Such an inquiry runs counter to the well established liberal standard for maintaining a collective action under Section 216(b) of the Fair Labor Standards Act. *See generally, Anderson v. Cagle's, Inc.*, 488 F.3d 945, 952 (11th Cir. 2007)**.** Indeed, the "merits inquiry" Defendants propose would be inappropriate under the more

---

[1] Indeed, while resisting Plaintiffs' discovery requests, Defendants, in their Opposition to Motion for Conditional Certification, cite to materials that deal largely with the irrelevant issues or that get into the merits of this litigation such as whether Defendants Flowers Foods, Inc., and Flowers Baking Co. of Opelika, LLC can be considered joint employers. It should be noted that Plaintiffs have attempted to obtain discovery on this very issue via a 30(b)(6) deposition of Defendant Flowers Foods Inc. and met with Defendants on October 2, 2007, and again on October 16, 2007, to resolve their objections but have been repeatedly denied discovery on this issue by the Defendants. On October 31, 2007, Flowers Foods moved for a protective order seeking to limit discovery to Flowers Food's involvement in matters with Flowers Baking Co. of Opelika. This motion is pending. In any event Plaintiffs assert that Defendants' materials do not refute the evidence presented in their opening memorandum that Plaintiffs are similarly situated.

demanding Federal Rule of Civil Procedure 23 standards governing class certification of non-FLSA cases.  *See generally, Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177(1974).

The original Plaintiffs and the additional plaintiffs[2] are similarly situated to the members of the putative class for the reasons set forth below.  Plaintiffs are subjected to the same policies and practices created and implemented by Flowers Foods and its subsidiaries and share common experiences with the putative class members regarding their treatment and position as route distributors.  In addition to the common factual issues, Defendants' Opposition identifies legal issues common to all current and potential plaintiffs such as whether all putative class members would be exempt under either the outside salesman exemption or the motor carrier act exemption,. (*See*, Opp. p. 3-4. D.E. No. 42).  Thus, conditional certification is warranted here.

### Factual Background

On July 2, 2007, Plaintiffs Morrow and Overton filed a complaint alleging overtime violations under the FLSA against Defendants Flowers Foods, Inc., and Flowers Baking Co. of Opelika, LLC.  Plaintiffs alleged that both Flowers Foods, Inc., and its wholly owned subsidiary, Flowers Baking Co. of Opelika, LLC, engaged in policies and practices that denied Plaintiffs time and a half for any hours worked over 40 hours in a work week.  (Compl. ¶¶ 14-30, 45, D.E. No. 1).  Between July 2007 and September 2007, when Plaintiffs filed their Motion for Conditional Class Certification, Plaintiffs' counsel was contacted by four route distributors of Flowers Baking Co. of Opelika, LLC, who work or worked at a total of three warehouses, located in Montgomery, Alabama, Roanoke, Alabama, and LaGrange, Georgia to join the complaint.  (*See*, First Mot. To Amend Complaint, D.E. No. 30).

---

[2] Plaintiffs have shown the original plaintiffs are similarly situated to all the putative plaintiffs with the addition of Mr. Gary Chambliss, a route distributor from another subsidiary, which became a party to this action on November 6, 2007.  *See* D.E. No. 52.  Plaintiff Chambliss' experiences are identical to those of the original plaintiffs as evidenced by the affidavits filed concurrently with this motion, which demonstrates that all putative class members are similarly situated.

Between September and October 2007, Plaintiffs' counsel were contacted by seven additional route distributors who sought to participate in this litigation who work or worked for warehouses located in Greenville, Alabama, LaGrange, Georgia, and Montgomery, Alabama as well as current route distributors who contracted with Flowers Baking Co of Thomasville, LLC. (*See*, Second Mot. To Amend Compl., D.E. No. 44). Mr. Gary Chambliss worked out of Cottondale, Florida for Flowers Baking Co. of Thomasville, LLC, another wholly owned subsidiary of Flowers Foods, Inc., and alleges violations of the FLSA arising out of the same policies and procedures implemented by Flowers Foods, Inc., and carried out by its subsidiaries. (*See,* Second Amended Compl., D.E. No. 54). Plaintiffs subsequently moved to further amend the complaint to include Flowers Baking of Thomasville, LLC, as a Defendant in this action. (*See*, Second Mot. To Amend Compl., D.E. No. 44). On November 6, 2007, the Court granted Plaintiffs' Motion to Amend. (*See*, D.E No. 52). Plaintiff Chambliss alleges the exact same facts and FLSA violations against Flowers Foods and Flowers Baking Co of Thomasville, LLC as the other Plaintiffs allege, further proving the common practices and policies throughout Flowers Foods' subsidiaries perpetuate violations of the FLSA. (*See*, Second Amended Compl. ¶117-123, D.E. No. 54). Thus, to date, Plaintiffs have identified route distributors in Alabama, Georgia, and Florida who have been subjected to these common practices.[3] (*See*, Second Amended Compl., *generally*, D.E. No. 54).

## Argument

I.    **At the notice stage, Class Certification is a low threshold to surpass and Plaintiffs have more than met this threshold.**

At the conditional certification stage, Plaintiffs have to meet a low threshold to show Plaintiffs are similarly situated. Because the court has minimal evidence, this determination is

---

[3] The additional route distributors are Gary Chambliss, Dwayne Cleveland, Ricky Small, Melvin Snow, James Marty Smith, Michael Smith, Greg Patisaul, Mark Murphy, Douglas Branch, and Lew Baxter.

made using fairly lenient standards, and typically results in "conditional certification" of a representative class. *See Hipp v. Liberty Nat'l Life Ins.*, 252 F.3d 1208, 1218 (11th Cir. 2001). The court must merely be satisfied that there are other employees who wish to opt-in, and that their positions are similarly situated to that of the original plaintiffs. *Anderson v. Cagle's, Inc.,* 488 F.3d 945, 953-53 (11th Cir. 2007).   Defendants argue that the evidence submitted by Plaintiffs fails to establish that plaintiffs are similarly situated.  (*See*, Opp. p. 29, D.E. No. 42). Based on the evidence submitted and the unsolicited consents to join since the filing of this action, Plaintiffs have surpassed the low threshold necessary to show that Plaintiffs are similarly situated and others desire to join the action.  This is especially true in light of the fact that Defendants thus far have refused to provide any discovery in spite of Plaintiffs' repeated attempts to reach an agreement.

Two Plaintiffs joined this suit originally, both claiming violations of the FLSA wage and hour laws.  (Compl. ¶¶3-4, D.E. No. 1).  Both Plaintiffs reported to work at the Montgomery, Alabama and Roanoke, Alabama warehouses.   Plaintiffs alleged that policies enacted by defendants have resulted in violations of the FLSA as they were applied and continue to be applied in the same manner to all potential plaintiffs as they were to both Plaintiffs.  (Compl. ¶¶37, 44, D.E. No. 1).  Since the filing of this action, Plaintiffs have received notification from 10 additional route distributors[4], which involve two more warehouse locations affiliated with Flowers Baking Co of Opelika, LLC and another warehouse location that involves another of

---

[4] Defendants, in their Opposition, argue that Plaintiffs and the additional plaintiffs who have expressed interest in the suit compromise less than 1% of the entire class proposed.  However, Defendants cite to no case to support their position that a certain percentage of individuals most opt in before conditional certification must be granted as there is no case that imposes such a requirement.  Additionally, such argument, if at all relevant would be more appropriate at the close of discovery when Defendants are allowed to seek decertification of the class.  Moreover, the fact that 11 people since the filing of the lawsuit have asked to be part of this litigation shows that putative class members are interested.  Additionally, Defendants argument is undermined by Plaintiffs, who in their affidavits, attest to their belief that more people would be interested in joining had they notice.  All that is required at this stage is a showing that others seek to join the class.  No case supports Defendants' position.

Defendant Flowers Foods' wholly owned subsidiaries. (*See*, Second Amended Compl. ¶¶ 3-14, D.E. No. 54). These additional plaintiffs allege the same practices, such as requiring handheld computers and negotiating with national accounts that are within individual territories, and FLSA violations occurring in these additional warehouses and by this additional Defendant, Flowers Baking Co. of Thomasville, LLC, acting in conjunction with its parent, Defendant Flowers Foods, Inc. (*See*, Second Amended Compl., D.E. No. 54).[5] Additionally, Plaintiffs and putative class members all hold the same position and perform the same tasks of delivering bread and sign a form contract, created by Flowers Foods, subjecting them to the same terms and conditions. This more than meets the lenient standard for conditional certification, and thus Plaintiffs' Motion for Conditional Certification should be granted unequivocally.[6]

The appropriate course of action at this stage and in light of Plaintiffs' evidence presented is to grant conditional certification and allow court-supervised notice to be sent and the class to proceed as a representative action throughout discovery. *See Hipp v. Liberty Nat'l Life Ins.*, 252 F.3d 1208 and 1219 (11th Cir. 2001) (*quoting Mooney v. Aramco Servs Co.* , 54 F.3d 1207, 1213-14 (5th Cir. 1995)). In fact, Defendants in their Opposition at page 21, highlight this fact by listing some recent FLSA actions that have decertified a class once the Court has had the benefit of a full and complete record through discovery and Plaintiffs have had a chance to

---

[5] Plaintiffs, in their Brief in Support of Motion for Conditional Certification, D.E. No. 33, cite to *Harper v. Lovett's Buffet, Inc.*, to demonstrate the lenient standard of conditional certification. 185 F.R.D. 358 (M.D. Ala. 1999). It should be noted that the Court in *Harper* certified a smaller class than what was asked for because Plaintiffs had no evidence of a corporate policy or that violations occurred at other locations than those in Alabama. (See Opposition p. 18) Here, Plaintiffs, by way of additional Plaintiff Gary Chambliss and his affidavit (attached as Exhibit 3), have shown that other geographical locations than Flowers Baking Co of Opelika, have treated the putative class members similarly. Additionally, Plaintiffs argue that it is Flowers Foods' corporate policy that the subsidiaries are implementing, and thus seek to establish a corporate policy exists, which would be enough to qualify to certification as to the entire class and not just Flowers Baking Company of Opelika as Defendants have asked for in the Opposition to Class Certification brief at p. 44-45.

[6] To the extent Defendants claim that Plaintiffs' testaments in support of conditional certification are not supported by facts, their argument again goes to the merits of the claim without the benefit of discovery. What is relevant is that eleven additional route distributors have joined the litigation and all allege that they were subjected to the defendants policies which resulted in Defendants' failure to pay them overtime in violation of the FLSA.

- 6 -

present their best evidence. *See Defs. Brief* at 21; *see also Hipp*, 252 F.3d at 1218 (at [the motion for decertification], the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, it proceeds to trial. If they are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice.) The proper procedure is to allow conditional certification at this stage and to revisit the issue once discovery has been taken and is completed. *See also Camp v. Progressive Corp.*, 2002 U.S. Dist. Lexis 21903 (E.D. La. 2002) (where the Eastern District of Louisiana certified a class of somewhere between 3,000 and 10,000 putative class members).

## II.    Plaintiffs are similarly situated and capable of representing the putative class.

It is well established that when applying the fairly lenient standard of the notice state, the plaintiffs are not required to show that they hold identical positions but rather must show only that their positions are similar to those positions held by putative class members. *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996). This is especially true here as plaintiffs seek to certify a class of individuals who all held the same position as a route distributor. "Rule 216(b)'s similarly situated requirement is less stringent than that for joinder under Rule 20(a) or for separate trials under Rule 42(b)." *Id.* (citing *Flavel v. Svedala Industries, Inc.*, 875 F.Supp. 550, 553 (E.D. Wis. 1994) for proposition that "the similarly situated requirement, in turn, 'is considerably less stringent' than the requirement of [Rule 23(b)(3)] that common questions predominate, or presumably, the Rule 20(a) requirement that claims arise out of the same action or occurrence."). This lenient standard "typically results in conditional certification of a representative class." *Hipp*, 252 F.3d 1208, 1217 (11th Cir. 2001).

**A. Plaintiffs have established that they are similarly situated to the putative class members.**

As discussed below, the "similarly situated" standard is easily satisfied in this case because among other things, the Class consists of individuals who all performed the same work and held the same job title, were required to sign the same standard form contracts created by Flowers Foods, were subjected to the same terms and conditions of such contracts created by Flowers Foods, were required to lease handheld computers, and had payments for delivered goods made payable to Flowers and not the individual route distributors. Additionally, Defendants concession that they would apply the motor carrier and outside salesman exemptions to all plaintiffs and putative class members were they found to be employees further evidence a common uniform practice and policy applying to all route distributors, thus establishing that plaintiffs are similarly situated..[7] Though the Eleventh Circuit does not require a uniform policy or practice applicable to all putative class members, the presence of such a policy, decision or practice means the "similarly situated" requirement is normally satisfied. *See Hill v. Muscogee County School Dist.*, 2005 WL 3526669 at *2 (M.D. Ga. 2005) (holding the class certification was appropriate because plaintiffs had alleged and provided some evidence of a uniform policy or practice). Indeed, the Defendants argue that all putative class members are exempt and that the use of an independent distributorship program was a well thought-out decision by Flowers Foods which was then executed by each of its subsidiaries. (Opp., pp. 3-5, D.E. No. 42). Such a contention only serves to show that plaintiffs and all putative class members are similarly situated. *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996). The legality of applying these exemptions to all plaintiffs and putative class members means that the common occurrence or transaction requirement of Rule 20 is also satisfied. Resolving this issue for all

---

[7] Plaintiffs disagree that such exemptions would apply to the class as defined which specifically excludes those individuals who deliver product across two states.

plaintiffs and putative class members would avoid unnecessary and duplicative litigation. *See Alexander v. Fulton County*, 207, F.3d 1303, 1322-23 (11th Cir. 2000).

In addition to the common practice or policy of classifying all plaintiffs and putative class members as exempt under the motor carrier act and the outside salesman exemption, the similarly situated requirement is further satisfied by shared facts. In deciding whether sufficient factual commonality exists, the Court should look at factors such as (1) whether the potential class members held the same job title, (2) whether the potential class members worked in the same geographical location, (3) whether the same time period is involved in the alleged violations, and (4) the similarity of the actions which Plaintiffs rely on to establish their claims. *See Pomerada v. Homebridge Mortgage Bankers Corp.*, 2007 WL 624331 (S.D. Fla. Feb. 23, 2007).

First, Defendants concede that all the plaintiffs and class members have one of two job classifications, namely, employee route salesperson and an independent distributor position. (*See,* Opp p. 37, D.E. No. 42)**.** According to the Defendant, there are approximately 4,744 past and current independent distributors and route sales employees. (Opp., p. 41, D.E. No. 42) Courts routinely certify FLSA collective actions where the plaintiffs hold similar job positions or perform similar job functions. *See, Gieseke v. First Horizon Home Loan Corp.*, 408 F.Supp.2d 1164 (D.Kan. 2006) (where the District of Kansas certified a FLSA claim on behalf of loan originators in both the NSS and Retail Divisions who performed slightly different functions); *see also Harper v. Lovett's Buffet, Inc.*, 185 F.R.D. 358, 360 -61 (M.D. Ala. 1999) (where the Court certified a class action based on a variety of jobs in a restaurant that all claims FLSA overtime and minimum wage violations for restaurant policies regarding clocking in and out). Here, employee route salesmen and independent distributors perform the same role and functions,

making them similarly situated under the FLSA conditional certification standard.  Both employee route salesmen and independent distributors deliver bread to stores on a specific route assigned to them by Defendants.[8]  It is undisputed that the Defendants would apply the motor carrier and outside sales exemption to all putative class members were they all deemed employees.  (*See,* Opp., pp. 3-4, D.E. No. 42).  Plaintiffs have alleged in their complaint and their affidavits that Defendants' actions apply equally to the putative class members.  (*See,* Second Amended Compl. ¶¶ 29-42, Overton Aff. ¶¶6-7 and 10, Morrow Aff. ¶¶6-7 and 10, Chambliss Aff. ¶6-7 and 10)**.**  Defendants created an independent distributor model that denies route salesmen overtime to which they are rightfully entitled, and this applies equally to all route distributors, employee route salesmen or independent distributors.  Other common facts include that both positions run a route with handheld computers and Defendants select the customers for each route.  (*See*, Second Amended Compl. ¶¶ 29, 34, D.E. No. 54).

Defendants erroneously state that Plaintiffs and the putative class members cannot be similarly situated because they are located in different locations and warehouses[9], and because the Plaintiffs and class members have different dates of hire.  It should be noted that Defendants cite to no case law to support this proposition.  It is contrary to the purpose of the FLSA to allow different locations or different start dates to hinder employees from recovering overtime violations.  *See Camp v. Progressive Corp.*, 2002 U.S. Dist. Lexis 21903 (E.D. La. 2002) (where

---

[8] If, as Defendant contends in their Opposition at page 37, the main difference between employee route salesmen and independent distributors is that employees would not be subject to the defense an employee versus independent contractor, then the Court could include a subclass in Plaintiffs' class definition to encompass employee route salesmen.  Conditional certification is warranted in any event.  If, after discovery is taken on the issue and such employees are found not to be proper parties, then Plaintiffs can revise their class definition to exclude employee route salesmen.  However, discovery will be needed to make this determination.

[9] To further support Plaintiffs' contention that it is not material that Plaintiffs worked in different warehouse, Plaintiffs have also attached an order of a case in the Northern District of Alabama where Court conditionally certified a class in spite of Defendant's arguments that each plant had a different way of calculating "line time" because the Court found that both plants were required to don protective gear before reporting to work.  *See,* Exhibit 4, *Aguilar v. Pilgrim's Pride Corp.*, CV-06-J-1673-NE (N.D. Al. January 31, 2007).

the Court certified an action involving all fifty (50) states); *see also Realite v. Ark Restaurants Corp.*, 7 F.Supp. 2d 303 (S.D.N.Y. 1998) (where the Court conditionally certified a FLSA action involving fifteen different restaurants located in New York and New Jersey, because the plaintiffs had submitted affidavits alleging that whether the restaurants were centrally controlled was a contested area of fact); *see also Belcher v. Shoney's Inc.*, 927 F.Supp. 249 (M.D. Tenn. 1996) (where the Court conditionally certified a FLSA action for employees who have worked at Defendants restaurants such as Captain D's, Pargo's, and Barbwire, which involved locations in Tennessee, Alabama, Florida, Georgia, Indiana, Kentucky, Louisiana, Mississippi, North Carolina, and South Carolina.).

Defendants' attempt to focus on certain activities that could be considered "individualized experiences" (*See,* Opp pp. 7-16, D.E. No. 42) fails as the overarching issue— whether Defendants' actions pertaining to its route distributors violates the FLSA—clearly supports that certification should be granted.   Defendants cite to irrelevant issues such as whether distributors paid different amounts for their route, whether they service(d) different national accounts on their routes, or whether they use(d) helpers on their routes.  These are not material differences and do not speak to the pattern or practice that Defendants had of not paying their route distributors for time worked in excess of forty hours in a given workweek.  All the route distributors signed the same form agreement that outlines the same principles that Flowers applies to all its route distributors.  The fact that one route distributor pays a different amount for a route than another is not relevant to whether Defendants violated the provisions of the FLSA. Plaintiffs and putative class members still worked an assigned territory (which is generally financed by another subsidiary of Defendant Flowers Foods) with assigned stores and were forced to work hours in excess of forty per week without overtime.

**B.  Plaintiffs' experiences, coupled with the evidence proffered by the Defendants, show they are adequate to represent the entire class.**

Defendants spend a good portion of their brief trying to show how Plaintiffs are not similarly situated to the putative class members and thus are not adequate to represent the entire class.  Defendants contend that the Court should deny certification because allegedly Plaintiffs' individual experiences are not identical and thus are not adequate to represent the entire class. (Opp. pp. 29-41, D.E. No. 42).  With their arguments, Defendants are attempting to impose a burden on Plaintiffs that is not required by the FLSA for conditional certification.  Indeed, if their experiences are so individualized, it is difficult to imagine how Defendants could legitimately assert that the motor carrier act or outside salesman exemptions would apply were they found to be employees.  It is well settled that the "similarly situated" requirement does not mandate a showing that plaintiffs and putative class members are identically situated.  *See Grayson v. K Mart*, 79 F.3d 1086, 1096 (11th Cir. 1996) ("to maintain an FLSA collective action, the named plaintiffs "need only show that their positions are similar, not identical, to the positions held by the putative class members.").  Indeed, it is clear that the requirement of pursuing a section 216(b) class action are independent of, and unrelated to, the requirements for class action under Rule 23 of the Federal Rules of Civil Procedure.  *Id.*, n. 12.

Clearly, Plaintiffs meet all the requirements of being "similarly situated" as they have shown that the policies and practices of the Defendant treat route distributors uniformly in denying them an overtime premium for hours worked over 40 in any given workweek.  (*See,* Second Amended Compl. ¶134, Overton Aff. ¶15, Morrow Aff. ¶15, Chambliss ¶15)**.**  The fact that some class members use helpers, or are able to slightly deviate from Flowers' set price, or that distributors determine the order of the stops on the route does not change the idea that they are similarly situated.  Flowers still determines for which accounts route distributors can change

- 12 -

the price,[10] (*See*, Flowers Foods' Answers to Plaintiffs' Interrogatories, attached as Exhibit 6 which states "Independent contractors may sell branded and non-branded products a price lower than the suggested wholesale in national, non pay-by-scan accounts *if the account is suppressed OR distributor has obtained F/O's approval for a price allowance and reduced price."*), which accounts distributors service, and routinely adds to distributors' orders. (*See*, Second Amended Compl. ¶¶ 41-42, D.E. No. 54). In fact, the uniformity of the affidavits presented by Defendants shows that route distributors are treated the same. (*See*, McDonald Aff. ¶4, D.E. No. 42-8, Thompson Aff. ¶5, D.E. No. 42-7, Prather Aff. ¶3, D.E. No. 42-9, Forster Aff ¶5, D.E. No. 42-10, Foster Aff. ¶4, D.E. No. 42-11, Chapman Aff. ¶4, D.E. No. 42-14). Although Defendants have tried to produce evidence saying they are each individualized positions, the position is the same in all of the wholly-owned subsidiaries that deliver bread. They all contract with purportedly "independent contractors" that sign distributorship agreements that are identical in terms except for the identification of each actual territory. (*See*, Morrow Aff ¶¶4-5, Overton Aff. ¶¶4-5, Chambliss Aff. ¶¶4-5).

Defendants also argue that Plaintiffs and putative class members cannot be similarly situated because they are not employed by the same employer and operate in different locations. (*See*, Opp. pp.34-36, D.E. No. 42). To support, Defendants offer evidence that Defendant Flowers Foods has no contract with Plaintiffs and that Defendant Flowers Baking Co of Opelika, LLC operates independently and with minimal interaction from Defendant Flowers Foods.[11]

---

[10] Plaintiffs have attached to this brief, as Exhibit 5, an Order revisiting the grant of conditional certification in the Northern District of Alabama in an FLSA collective action, where the Court used the Defendant's evidence proffered to determine that the employees were "similarly situated." Plaintiffs believe that Defendants' numerous exhibits with detailed descriptions of individual route distributors does exactly that: prove in their similarities and everyday job descriptions that Plaintiffs and putative class members are "similarly situated" for purposes of conditional certification. *Aguilar v. Pilgrim's Pride Corp.*, CV-06-J-1673-NE (N.D. Al. February 15, 2007).

[11] To the extent Defendants raise an issue as to whether Defendant Flowers Foods was properly included in this lawsuit, such issue is irrelevant and was previously addressed by the Court in its denial of Defendant Flowers Food's Motion for Judgment on the Pleadings.. *See*, Order dated September 5, 2007, D.E. No. 25.

Plaintiffs believe that Defendants can properly be considered joint employers, as Flowers Foods created the independent distributor model used by Flowers Baking Co of Opelika, LLC, Flowers Baking Co of Thomasville, LLC, and all of Flowers Foods' other wholly-owned subsidiaries.  In support of this, Plaintiffs have a consent to join from a putative class member who is from Flowers Baking Co of Thomasville, LLC.  His experiences are essentially identical to other Plaintiffs.  (*See*, Chambliss Aff, Exhibit 3; Second Amended Compl. ¶¶117-123, D.E. No. 54)**.** Additionally, Plaintiffs believe that Defendants have more than established "minimal interaction" as alluded to in their Opposition Brief.  In fact, Flowers Baking Co of Opelika, LLC, consulted with Defendant Flowers Foods' Vice President of Distributor Relations in their decision to terminate Mr. Porterfield's contract,[12] which shows that Flowers Foods, Inc. still exercises control over its wholly-owned subsidiaries, like Flowers Baking Co of Opelika, LLC. (*See,* Lord Depo. pp. 27-39, attached as Exhibit 7).  To further support this contention, some of Defendants corporate members change jobs from subsidiary to subsidiary depending on personal need.  (*See*, Bordeaux Depo, pp. 8-11, attached as Exhibit 8).

III.    **The Defendant's Opposition applies an incorrect legal standard to the question of whether the Court should, at the notice stage, conditionally certify the proposed class.**

One of Defendants' main arguments (as evidenced by the discussion of factual matters not germane to the certification and notice issue) is that the Plaintiffs claims lack merit.  (*See,* Opp. pp. 2-5, D.E. No. 42).  Despite the fact that such an argument is belied by Eleventh Circuit law on the standards for conditional certification, Plaintiffs dispute this contention and expect to

---

[12] Mr. Henry Porterfield is not a Plaintiff in this case, nor did he work with Flowers within the relevant time period. While Plaintiffs do not think the facts of Mr. Porterfield's case (that is currently pending) are relevant to this action., Defendants have attached selected testimony from that case in their Opposition Brief here thereby requiring Plaintiffs to respond by providing the Court with a more detailed factual record of that action.

prove at trial that the Defendant willfully and wrongfully[13] denied Plaintiffs and the putative class members an overtime premium for hours worked over forty (40) in a given work week. In any event, Defendants' merit-based argument should not preclude granting conditional certification. Indeed, the Court should not accept the Defendants' premature invitation to consider the merits of this dispute (when none has been taken) as a basis for denying certification and supervised notice. This is certainly the case during the notice stage when courts frequently must make a decision without benefit of factual record developed through discovery.[14] *See Hipp*, 252 F.3d at 1218; *see also Rodgers v. Averitt Express, Inc.*, 7:06-CV-1980-UWC (N.D. Al. August 27, 2007), attached as Exhibit 9.

Even in the context of the more stringent requirements of Rule 23, it is well settled that the courts should not deny class certification based on a merits determination of the underlying claims. *See generally Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177(1974). This principle should apply with equal, if not greater, force in the Section 216(b) context because the only question confronting the Court is the lenient standard of proof concerning whether the parties are "similarly situated" to the putative class members. *Hipp v. Liberty Nat'l Ins. Co.*, 252 F.3d 1208 (11th Cir. 2001). The "similarly situated" requirement does not require the plaintiff to establish that common issues predominate over individual ones.

---

[13] In their brief, Defendants argue that the Statute of Limitations for this action should be two years, because Defendants did not "willfully" violated the FLSA. Plaintiffs allege that the Defendants actions were willful. A Court may find an employer's refusal to pay overtime premiums "willful" if the employer knew or should have know it was violating the FLSA. *See generally, McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988). Plaintiffs believe that Defendants, in creating its independent distributor model, knew or should have known it was in essence creating an employee instead of an independent contractor because of the degree of control retained by Defendants, and thus the position remained subject to the provisions of the FLSA. Regardless, this is a matter that should not be addressed at this stage of the litigation, without the benefit of discovery for the reasons laid out in this section of this brief.

[14] Defendants' Opposition relies on a number of affidavits from corporate personnel and some opinions from other cases, which speak directly to the merits of the issue. This evidence is better suited to a Motion for Summary Judgment and not to address the Motion for Conditional Certification. The only relevant evidence in a Motion for Conditional Certification should speak to whether the Plaintiffs are "similarly situated" and not the merits of the action. Indeed, many of the declarations actually demonstrate that plaintiffs are similarly situated to the Class.

- 15 -

Imposing a predominance requirement would ignore the Eleventh Circuit's repeated statements that "similarly situated" requirement is less stringent than Rule 20's permissive joinder standard, a standard which undisputedly does not require a showing of predominance. Rather, Plaintiffs need only allege (1) that there is a uniform practice or policy (as in the Defendants treating the class members as independent contractors or applying the outside sales and motor carrier exemptions) or (2) that they share common identifiable features that further judicial economy (e.g. similar job titles, pay provisions, and similar conduct by the Defendant towards the proposed class members). *See generally Sperling v. Hoffman-LaRoche*, *Inc.*, 118 F.R.D. 392 (D.N.J. 1988). In fact, imposing a predominance requirement would ignore the Eleventh Circuit's repeated statements that the "similarly situated" requirement is less stringent than Rule 20's permissive joinder standard. *Grayson*, 79 F.3d at 1096. In the case at bar, Plaintiffs have satisfied the minimal showing required at the notice stage.

Even though the merits based inquiry is inappropriate at the certification stage of the litigation, Plaintiffs believe the facts will show that Defendants exhibit enough control for route distributors to be considered employees and that they are not subject to the outside sales or motor carrier act exemption.

For the route distributor position to be that of an employee, it is not necessary to have individualized factual determinations, as all the route distributors sign the same form agreement which establishes the employer- employee relationship. As noted by the Defendants, to prove an employee or independent contractor relationship, courts look to five different factors in totality: (1) the degree of control; (2) opportunities for profit or loss; (3) capital investment; (4) permanency of the relationship; and (5) skill required to perform the duties at hand. *See Schultz v. Capital International Security, Inc.,* 466 F.3d 298, 304-05 (4th Cir. 2006). Plaintiffs alleged

- 16 -

that Defendants exercise a large degree of control over the Plaintiffs, as evidenced by the contract the route distributors must sign in order to become a distributor. Additionally, Flowers retains the right to enter each distributor's territory and negotiates with their national contracts. Flowers Foods also finances the majority of the distributor's territories and trucks, providing distributors with capital they would not otherwise have in order to "buy" their territory. (*See*, McDonald Aff ¶10, D.E. No. 42-8, Prather Aff. ¶9, D.E. No. 42-9, Forster Aff. ¶11, D.E. No. 42-10, Foster Aff. ¶10, D.E. No. 42-11, Renfroe Aff. ¶10, D.E. No. 42-12, McCrory Aff. ¶9, D.E. No. 42-13, Chapman Aff. ¶10, D.E. No. 42-14, and Allen Aff. ¶10, D.E. No. 42-15). Defendants determine the prices of the products and often adds to route distributor's orders, which both show that Flowers really controls the opportunity for profit or loss, not the individual distributors[15]. Additionally, the relationship has relative permanence as it will continue until the distributor is unable to cure a 10 day notice (See Bordeaux Depo. pp. 84-90, attached as Exhibit 8) and the territory remains the same unless the distributor agrees to sell a portion of it. All of these factors combined together show that, though Flowers labels their route distributors as independent contractors, they are treated like employees and thus should be compensated as such.

Defendants argue that even if Plaintiffs are found to be employees, they are subject to the outside sales exemption or the motor carrier act exemption. With all FLSA exemptions, the employer has the burden of proving that the exemptions apply to a particular employee; and overtime exemptions are construed narrowly against an employer. *Corning Glass Works v. Brennen*, 417 U.S. 188 196-7 (1974). The Defendants' Opposition to Conditional Certification is not the appropriate vehicle for such a discussion for the reasons listed above.

---

[15] Defendants argue they do not control the price of the bread and that distributors may change their prices (*See,* Opp., pp. 29-30. D.E. No. 42*)* but Defendants, in their answers to interrogatories have shown that distributors are only able to change the price in suppressed accounts that are not national, pay-by-scan accounts **or with prior approval from Defendants**. (See Exhibit 6).

Distributors who are engaged in the intrastate transportation of goods are generally entitled to overtime compensation. 29 U.S.C. §213(b)(1). A driver who works only on intrastate shipments or vehicles during a workweek is not entitled to overtime compensation if the carrier is involved in interstate commerce and the drive could reasonably expected to make an interstate run or otherwise perform in the carrier's interstate activities. 49 U.S.C. §31502. The putative class here is limited to drivers who do not cross interstate lines and have a permanent route that is solely intrastate. (*See*, Second Amended Compl ¶124, D.E. No. 54). Thus, the Plaintiffs believe, with more discovery, it will be shown that the motor carrier act exemption will not apply.

For the outside sales exemption to apply, Defendants would have to show that route distributors are employed for the purpose of making sales rather than for the service and delivery duties which he performs. Plaintiffs believe that the outside sales exemption will not apply because Defendants through the use of hand-held computers and the solicitation of national contracts, as well as the original distribution of territories to Plaintiffs and putative class members, are the actual salespeople involved. Plaintiffs are performing a mere delivery service. With more discovery, it will be shown that the outside sales exemption will not apply.

## CONCLUSION

For the above stated reasons, the Plaintiffs respectfully request that the Court grant their motion for conditional certification of a class consisting of "all current and former route distributors, or other persons performing a service and/or delivery function on a non-hourly basis, who worked overtime while employed at Flowers Foods' subsidiaries, from July 2, 2004 to the present, and were not compensated for such overtime work at an amount equaling one and one-half times the employee's regular rate of pay," but not including "persons who, as part of

their duties, cross state lines to make deliveries," and order court supervised notice as set forth in

Plaintiffs Opening Memorandum in Support of Conditional Certification. (*See,* D.E. No. 33).

Dated:  November 8, 2007

Respectfully Submitted,

  /s/ Amy A. Weaver

Amy A. Weaver
ASB-6878-Y82A

**OF COUNSEL:**

THE LAW OFFICES OF GREG L. DAVIS
6987 Halcyon Park Drive
Montgomery, Alabama 36117
334-832-9080
gldavis@knology.net

WHATLEY DRAKE & KALLAS, LLC
2001 Park Place North, Suite 1000
Birmingham, Alabama 35203
205-328-9576
Joe R. Whatley, Jr. (ASB-1222-Y69J)
jwhatley@wdklaw.com
Amy A. Weaver (ASB-6878-Y82A)
aweaver@wdklaw.com

WHATLEY DRAKE & KALLAS, LLC
1540 Broadway, 37th Floor
New York, New York, 10036
212-447-7007
Joseph P. Guglielmo
jguglielmo@wdklaw.com

WOOD LAW FIRM, LLC
2900 1st Avenue South, Suite A
Birmingham, Alabama 35233
205-612-0243
E. Kirk Wood (ASB-2937-W55E)
ekirkwood1@cs.com

## CERTIFICATE OF SERVICE

I hereby certify that on this the 8th day of November, I electronically filed the foregoing Reply to Defendants' Response in Opposition to Plaintiffs' Motion for Conditional Certification of a Class using the CM/ECF system which will send notification of such filing to:

Sandra B. Reiss
Christopher W. Deering
Ogletree, Deakins, Nash, Smoak, & Stewart, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203-2118
205-328-1900
Sandra.Reiss@odnss.com
Chris.Deering@odnss.com

Kevin P. Hishta
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
600 Peachtree Street, NE
Suite 2100
Atlanta, Georgia 30308
404-881-1300
Kevin.Hishta@ogletreedeakins.com

                                          /s/ Amy A. Weaver
                                        Amy A Weaver, ASB-6878-Y82A

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CHARLES MORROW,                          )
and MICHAEL OVERTON,                     )
individually and on behalf of other      )
similarly situated employees,            )
                                         )
        Plaintiffs,                      )
                                         )          Civil Action No.:
v.                                       )          3:07-CV617-MHT
                                         )
FLOWERS FOODS, INC., and                 )
FLOWERS BAKING COMPANY OF                )
OPELIKA, LLC.                            )
                                         )
        Defendants.                      )

<u>AFFIDAVIT OF MICHAEL OVERTON</u>

STATE OF ALABAMA)

MONTGOMERY COUNTY)

I, MICHAEL OVERTON, having duly sworn, hereby depose and state as follows
follows:

1.      I am over the age of twenty one (21), and currently reside at 69 South Lake Drive,

Roanoke, Alabama 36274. I am of sound mind and am fully competent to execute this

Affidavit. I have personal knowledge of all the facts contained herein, and if called to

testify, I am competent to testify to the same. I submit this affidavit in support of the

Plaintiff's Motion to Conditionally Certify Class and Facilitate Class Notice in the above

styled case.

2.      I was formerly hired by the Defendant, Flowers Baking Company of Opelika

LLC, and under the policies of the Defendant, Flowers Foods, Inc. ("Flowers") as an

independent contractor for their Roanoke, Alabama warehouse. During the period of

March 2006 to September 2006, I was a route distributor who exclusively delivered Flowers products to stores within a territory local to Roanoke, Wadley, and Lafayette, Alabama. My route was within the state of Alabama and did not require me to cross state lines.

3.      I am a Plaintiff in the above-styled case against my former employer, Flowers Foods, Inc. and Flowers Baking Company of Opelika, LLC.

4.      I signed a form contract with Flowers Foods to become a route distributor.

5.      It is my understanding that other route distributors who delivered bread for Flowers had to sign the same contract.

6.      I know that other route distributors had to perform the same tasks and job functions that I was required to perform, including picking up and delivering bread and other bakery products, removing stales and delivering stales to the warehouse or thrift stores.

7.      While I was a route distributor, Flowers Foods required me to lease certain items and follow certain guidelines. Specifically, I was required to lease a handheld computer from Flowers. It was my understanding that other route distributors were also required to lease a handheld computer from Flowers and that we were required to use the handheld computer to track for and register each delivery, the order of the deliveries, the amount of product to be provided to each customer, and the amount of out-of-code product or stale bread being returned to the warehouse.

8.      In a typical day, I arrived at the warehouse at 4:00 a.m. I had to pick up bread by no later than 5:00 a.m. so that I could make all of the deliveries. Upon arrival, I loaded the truck and delivered to Flowers' customers such as Burger King and Piggly Wiggly in

2

Roanoke, Alabama. I would then return to the warehouse, unload empty product trays, and reload the truck with additional product for the other deliveries. I returned to the warehouse at the end of the day, and unloaded the truck, filled out paperwork regarding issues such as the amount of each delivery and out of code bread, and returned the handheld computer to its docking station. I worked on average in excess of 12 hours per day and usually finished my day between 4:00 and 6:00 p.m. I also worked on average in excess of forty 40 hours per week and did not receive overtime for those hours worked in excess of forty (40).

9.      I know that Flowers Foods Inc. was involved in creating the polices that governed my employment as a route distributor because I received documents from Flowers Foods, I spoke with employees from Flowers Foods, and management from Flowers Baking Co of Opelika informed me that Flowers Foods was involved in the operations.

10.     As a route distributor I was required like all the other route distributors to ensure that each of the deliveries I made were correct by, among other things, loading my truck, driving my route, and returning to the warehouses or thrift stores any stales and to unload my truck and dock the handheld computers Flowers provided me. Though these are part of my normal job duties, I am not compensated for all the hours I work during a typical day.

11.     Initially, Flowers hired me as an extra man through a Temp Agency from September 2005 to March 2006. As an extra man of Flowers, I drove the same route, had the same job duties and responsibilities, was issued a handheld computer, arrived and left work at the same time as I did as a route distributor, and had the same territory as in my independent contractor position.

3

12.     When my position was changed to that of an independent contractor, Flowers continued to retain control over my job duties and responsibilities and exercised control and authority over me and other route distributors. Specifically, Flowers determined which stores I could make deliveries to, it supplied me the financing to obtain a delivery truck, it determined the prices that I could charge and Flowers was also able to directly contract with national accounts that were within my territory and contract with them to supply them bread without informing me or seeking my agreement. Flowers also determined where I took my out of code of stale bread.

13.     I generally spent twelve to fourteen hours a day to finish my route and take the stales back to the Roanoke, Alabama warehouse.

14.     I worked five days a week, which can add up to twenty or more hours a week in unpaid wages.

15.     I know that Flowers did not pay route distributors in other areas for hours that they worked in excess of forty (40).

16.     I am part of this lawsuit because I felt like I was being cheated by my employer, Flowers, out of money I earned for hours I worked. I know that the hours I worked benefited Flowers, and therefore, I should get compensated for the time I spent performing functions essential to my job duties. I know of several other route distributors who were subjected to the same conduct by Flowers and agree with my preceding statements, and who want to get paid for the time they work. Some of them who I recently spoke with include Mark Murphy and Marty Smith and they have expressed an interest in joining this suit and have signed consents to join.

4

17.    I believe several of the route distributors, both past and present, would join this suit but do not fully understand That Flowers' practices violated their rights guaranteed by the government or that they may be afraid to join the suit because they fear retaliation by Flowers.  In fact, I am aware that Flowers has sent lawyers into its facilities and warehouses in Alabama and asked route distributors a number of questions regarding whether they believed that they were employees or did they understand the terms of their contract when they entered into it.  I understand that some of the statements from the lawyers for Flowers were confusing and that they did not disclose or identify what the nature of my complaint was about or that they could join this suit if they so chose. I believe that these route distributors are in the same or similar position as me, and I believe most are or would be interested in joining this suit if the Court authorized notice.

18.    I understand that other current and former route distributors have expressed and interest in joining this suit and have signed consents so stating.  It is my belief that if the Court informs route distributors like myself who worked in Alabama, Florida and Georgia as the other locations controlled by Flowers, that it has authorized and approved this suit for the benefit of Flowers' route distributors or other performing a service and/or delivery function, and that if they believe they can join without fear of reprisal, most route distributors will become more aware of their rights to join this suit and will sign consent forms to join.

19.    I am aware of two (2) employees who have already filed consents to join because I spoke to them about the case and told them to contact the attorneys.

I declare under penalty of perjury that under the laws of the State of Alabama the

foregoing is true and correct.

Dated this the ___7___ day of November, 2007.


                                                    _____
                                                        Michael Overton

Subscribed and Sworn to be me this _7th_ day of November, 2007.

                                    _____

                                    Notary Public for the State of Alabama
                                    My Appointment Expires
                                        NOTARY PUBLIC STATE OF ALABAMA AT LARGE
                                        MY COMMISSION EXPIRES:  Mar 4, 2011
                                        BONDED THRU NOTARY PUBLIC UNDERWRITERS

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| **CHARLES MORROW,** | ) | |
| **and MICHAEL OVERTON,** | ) | |
| **individually and on behalf of other** | ) | |
| **similarly situated employees,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action No.:** |
| **v.** | ) | **3:07-CV617-MHT** |
| | ) | |
| **FLOWERS FOODS, INC., and** | ) | |
| **FLOWERS BAKING COMPANY OF** | ) | |
| **OPELIKA, LLC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**AFFIDAVIT OF CHARLES MORROW**</u>

STATE OF ALABAMA)

MONTGOMERY COUNTY)

I, CHARLES MORROW having duly sworn, hereby depose and state as follows:

1.      I am over the age of twenty one (21), and currently reside at 113

Turnberry Court, Prattville, Alabama 36066. I am of sound mind and am fully competent

to execute this Affidavit. I have personal knowledge of all the facts contained herein, and

if called to testify, I am competent to testify to the same. I submit this affidavit in support

of the Plaintiff's Motion to Conditionally Certify Class and Facilitate Class Notice in the

above styled case.

2.      I was formerly hired by the Defendant, Flowers Baking Company of

Opelika, LLC, and under the policies of the Defendant, Flowers Foods, Inc. ("Flowers")

as an independent contractor for their Montgomery, Alabama warehouse. During the

period of 1994 to the end of 2005, I was a route distributor who exclusively delivered

1

Flowers products to stores within a territory local to Montgomery, Alabama. My route was within the state of Alabama and did not require me to cross state lines.

3.      I am a Plaintiff in the above-styled case against my former employer, Flowers Foods, Inc. and Flowers Baking Company of Opelika, LLC.

4.      I signed a form contract with Flowers Foods to become a route distributor.

5.      It is my understanding that other route distributors who delivered bread for Flowers had to sign the same form contract.

6.      I know that other route distributors had to perform the same tasks and job functions that I was required to perform, including picking up and delivering bread and other bakery products, removing stales and delivering stales to the warehouse or thrift stores.

7.      While I was a route distributor, Flowers Foods required me to lease certain items and follow certain guidelines. Specifically, I was required to lease a handheld computer from Flowers. It was my understanding that other route distributors were also required to lease a handheld computer from Flowers and that we were required to use the handheld computer to track for and register each delivery, the order of the deliveries, the amount of product to be provided to each customer, and the amount of out-of-code product or stale bread being returned to the warehouse.

8.      In a typical day, I arrived at the warehouse between 3:30 and 4:00 a.m. Upon arrival, I checked and loaded the Flowers product onto the truck, which took about an hour. I delivered to Flowers' customers such as Winn Dixie, Bruno's, and Publix in Montgomery, Alabama.   I would then return to the warehouse, unloaded stales from the truck, filled out paperwork regarding issues such as the amount of each delivery and out

2

of code bread, and returned the hand-held computer to its docking station. I worked on average 11 hours per day and usually finished my day around 3:00 p.m. I also worked on average in excess of forty (40) hours per week and did not receive overtime for those hours worked in excess of forty (40).

9.    I know that Flowers Foods, Inc., was involved in creating the policies that governed my employment as a route distributor. It was my understanding that Flowers Foods created company policies and sent them to Flowers Baking Co. of Opelika, who would, in turn, relay those policies to the individual route distributors.

10.    As a route distributor, I was required like all the other route distributors to ensure that each of the deliveries I made were correct by, among other things, loading my truck, driving my route, and returning to the warehouses or thrift store any stales and to unload my truck and dock my handheld computer Flowers provided me. Though these are part of my normal job duties, I am not compensated for all the hours I work during a typical day.

11.    Initially, Flowers hired me as an employee in October 1979, where I worked until 1994 when they made my position an independent contractor. As an employee of Flowers, I drove the same route, had the same job duties and responsibilities, and had the same territory as in my independent contractor position.

12.    When my position changed to that of an independent contractor, Flowers continued to retain control over my job duties and responsibilities and exercised control and authority over me and other route distributors. Specifically, Flowers determined which stores I could make deliveries to, it provided me the financing to obtain a delivery truck, determined the prices I could charge. Flowers was also able to directly contract

with national accounts that were within my territory and contract with them to supply

them bread without informing me or seeking my agreement. Flowers also determined

where I took my out of code stale bread.

13.     I generally spent ten to eleven hours a day to finish my route and take

back the stales to the thrift store in the Montgomery, Alabama warehouse.

14.     I worked five days a week, which can add up to ten or more hours a week

in unpaid wages.

15.     I know that Flowers did not pay route distributors in other areas for hours

that they worked in excess of forty (40).

16.     I am part of this lawsuit because I felt like I was being cheated by my

employer, Flowers, out of money I earned for hours I worked. I know that the hours I

worked benefited Flowers Foods, and, therefore, I should get compensated for the time I

spend performing functions essential to my job duties. I know of other route distributors

who were subject to the same conduct by Flowers and agree with my preceding

statement, and who want to get paid for the time they work.

17.     I believe several of the route distributors, both past and present, would join

this suit but do not fully understand that Flowers' practices violated their rights

guaranteed by the government or that they may be afraid to join the suit because they fear

retaliation by Flowers. In fact, I am aware that Flowers has sent lawyers into its facilities

and warehouses in Alabama and asked route distributors a number of questions regarding

whether they believed that they were employees or did they understand the terms of their

contract when they entered into it. I believe that these route distributors are in the same

4

or similar position as me, and I believe most are or would be interested in joining this suit if the Court authorized notice.

18.      I understand that other current and former route distributors have expressed an interested in joining the suit and have signed consents so stating.  It is my belief that if the Court informs route distributors like myself who worked in Alabama, Florida and Georgia as well as other warehouses controlled by Flowers, that it has authorized and approved this suit for the benefit of Flowers' route distributors or others performing a service and/or delivery function, and that they can join without fear of reprisal, most route distributors will become more aware of their rights to join this suit and will sign consent forms to join.

19.      I am aware of two (2) employees, Douglas Branch and Lew Baxter, who have already filed consents to join because I spoke to them about the case and told them to contact the attorneys.

I declare under penalty of perjury that under the laws of the State of Alabama the foregoing is true and correct.

Dated this the ____ day of November, 2007.

_Charles Morrow_
Charles Morrow

Subscribed and Sworn to be me this the ____ day of November, 2007.

Notary Public for the State of Alabama
My Appointment Expires _____

5

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES MORROW, | ) | |
| and MICHAEL OVERTON, | ) | |
| individually and on behalf of other | ) | |
| similarly situated employees, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.: |
| v. | ) | 3:07-CV617-MHT |
| | ) | |
| FLOWERS FOODS, INC., and | ) | |
| FLOWERS BAKING COMPANY OF | ) | |
| OPELIKA, LLC. | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF GARY CHAMBLISS

STATE OF FLORIDA)

JACKSON COUNTY)

I, GARY CHAMBLISS, having duly sworn, hereby depose and state as follows:

1.      I am over the age of twenty-one, and currently reside at 1653 Hudson Road,

Alford, FL 32420. I am of sound mind and am fully competent to execute this Affidavit.

I have personal knowledge of all the facts contained herein, and if called to testify, I am

competent to testify to the same. I submit this affidavit in support of the Plaintiffs'

Motion to Conditionally Certify Class and Facilitate Class Notice in the above-styled

case.

2.      I was formerly hired by the Defendant Flowers Baking Co of Thomasville, LLC.

And under the policies of the Defendant, Flowers Foods, Inc. ("Flowers") as an

independent contractor for their Cottondale, Florida warehouse. During the period of

1994 to 2006, I was a route distributor who exclusively delivered Flowers products to

1

stores within a territory local to Chipley, Greenhead, and Alford, Florida. My route was within the state of Florida and did not require me to cross state lines.

3.     I am a Plaintiff in the above-styled case against my former employer, Flowers Foods, Inc. and Flowers Baking Co of Thomasville, LLC.

4.     I signed a form contract with Flowers to become a route distributor.

5.     It is my understanding that other route distributors who delivered bread for Flowers had to sign the same contract.

6.     I know that other route distributors had to perform the same tasks and job functions that I was required to perform, including picking up and delivering bread and other bakery products, removing stales and delivering stales to the warehouse or thrift stores.

7.     While I was a route distributor, Flowers required me to lease certain items and follow certain guidelines. Specifically, I was required to lease a handheld computer from Flowers. It was my understanding that other route distributors were also required to lease a handheld computer from Flowers and that we were required to use the handheld computer to track for and register each delivery, the order of the deliveries, the amount of product to be provided to each customer and the amount of out-of-code product or stale bread being returned to the warehouse.

8.     In a typical day, I arrived at the warehouse at 2:30 a.m. Upon arrival, I loaded the truck and delivered to Flowers' national customers such as Wal-Mart and Winn Dixie, as well as local convenience stores and self-owned stores. I would then return to the warehouse, unload the truck, fill out paperwork regarding issues such as the amount of each delivery and out of code bread, and returned the handheld computer to its docking

2

station. Upon leaving the warehouse, I would go back to the big stores, like Wal-Mart

and Winn Dixie and restock the shelves. I worked on average in excess of 12 hours per

day and usually finished by day between 5:00 and 5:30 p.m. I also worked on average in

excess of forty (40) hours per week and did not receive overtime for those hours worked

in excess of forty (40).

9.    I know that Flowers Foods was involved in creating the policies that governed my

employment as a route distributor.

10.    As a route distributor I was required like all other route distributors to ensure that

each of the deliveries I made were correct by, among other things, loading my truck,

driving my route, and returning to the warehouses or thrift stores any stales and to unload

my truck and dock the handheld computers Flowers provided me. Though these are part

of my normal job duties, I am not compensated for all the hours I work during a typical

day.

11.    Initially, Flowers hired me as an employee in June of 1991 until 1994. As an

employee, I drove the same route, had the same job duties and responsibilities, was

issued a handheld computer, arrived and left work at the same time I did as a route

distributor, and had the same territory as in my independent contractor position.

12.    When my position was changed to that of an independent contractor, Flowers

continued to retain control over my job duties and responsibilities and exercised control

and authority over me and other route distributors. Specifically, Flowers determined

which stores I could make deliveries to, it supplied me the financing to obtain a delivery

truck, it determined the prices I could charge and Flowers was also able to directly

contract with national accounts that were within my territory and contract with them to

3

supply them bread without informing me or seeking my agreement. Flowers also determined where I took my out of code stale bread.

13.    I generally spent thirteen to fifteen hours a day to finish my route and take the stales back to the Cottondale, Florida warehouse.

14.    I worked five days a week, and sometimes a few hours on the other days, which can add up to twenty or more hours a week in unpaid wages.

15.    I know that Flowers did not pay route distributors in other areas for hours that they worked in excess of forty (40).

16.    I am part of this lawsuit because I feel like I was being cheated by my employer, Flowers, out of money I earned for hours I worked. I know that the hours I worked benefited Flowers, and therefore, I should get compensated for the time I spent performing functions essential to my job duties. I know of several other route distributors who were subjected to the same conduct by Flowers and agree with my preceding statements, and who want to get paid for the time they work.

17.    I believe several of the route distributors, both past and present, would join this suit but do not fully understand that Flowers' practices violated their rights guaranteed by the government or that they may be afraid to join the suit because they fear retaliation by Flowers.

18.    I understand that other current and former route distributors have expressed an interest in joining this suit and have signed consents so stating. It is my belief that if the Court informs route distributors like myself who worked in Alabama, Florida and Georgia and the other locations controlled by Flowers, that it has authorized and approved this suit for the benefit of Flowers' route distributors or others performing a

4

service and/or delivery function, and that if they believe they can join without fear or reprisal, most route distributors will become more aware of their rights to join this suit and will sign consent forms to join.

I declare under penalty of perjury that under the laws of the State of Florida the foregoing is true and correct.

Dated this 7 day of November, 2007.

*Gary Chambliss*
Gary Chambliss

Subscribed and Sworn to me this 7th day of November 2007.

*Peyton Dalton*

Notary Public
My Appointment Expires_____.

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Mar 4, 2011
BONDED THRU NOTARY PUBLIC UNDERWRITERS

5

FILED
2007 Jan-31  PM 01:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

SALVADOR AGUILAR, et al.,

    Plaintiffs,

vs.                     CASE NO. CV-06-J-1673-NE

PILGRIM'S PRIDE CORPORATION,

    Defendant.

## ORDER

This case came on to be heard on the plaintiffs' motion to conditionally certify class and facilitate notice (doc. 15), plaintiffs' memorandum in support of motion (doc. 16), defendant's opposition to plaintiffs' motion (doc. 20), and plaintiffs' reply (doc. 23). The court held a hearing on January 30, 2007, at which both parties were present by and through their respective counsel of record and the court heard arguments. Having considered the foregoing, the court finds as follows:

The plaintiffs brought this action under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219, on behalf of themselves and other similarly situated individuals. More specifically, the plaintiffs allege that their employer, defendant Pilgrim's Pride Corporation, violated the FLSA by failing to pay employees for donning and doffing protective gear and "line time" employees are not paid in accordance with the amount of time they actually perform work.

The defendant asserts several reasons why this case is not appropriate for class action treatment, including that different lines have different ways of calculating "line time" and that the Athens and Enterprise plants have different customs regarding what protective gear employees may put on at home.

The Eleventh Circuit Court of Appeals has established a two tiered approach for a district court's consideration of whether to allow a FLSA claim to proceed as a collective action:

> The first determination is made at the so-called "notice stage." At the notice stage, the district court makes a decision – usually based only on the pleadings and any affidavits which have been submitted – whether notice of the action should be given to potential class members.
>
> Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in "conditional certification" of a representative class. If the district court "conditionally certifies" the class, putative class members are given notice and the opportunity to "opt-in." The action proceeds as a representative action throughout discovery.
>
> The second determination is typically precipitated by a motion for "decertification" by the defendant usually filed after discovery is largely complete and the matter is ready for trial. At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are

dismissed without prejudice. The class representatives-
i.e. the original plaintiffs-proceed to trial on their
individual claims.

[*Hipp v. Liberty National Life Insurance Company*, 252 F.3d 1208,
1218 (11th Cir.2001)] (quoting *Mooney v. Aramco Servs. Co.*, 54 F.3d
1207, 1213-14 (5th Cir.1995) (internal footnote omitted)). Since *Hipp,*
the district courts in our circuit have utilized the two-tiered approach
described above. *See, e.g., Reed v. Mobile County Sch. Sys.*, 246
F.Supp.2d 1227, 1230 (S.D.Ala.2003); *Barron v. Henry County Sch.
Sys.*, 242 F.Supp.2d 1096, 1102 (M.D.Ala.2003); *Stone v. First Union
Corp.*, 216 F.R.D. 540, 544-46 (S.D.Fla.2003).

*Cameron-Grant v. Maxim Healthcare Services, Inc.*, 347 F.3d 1240, 1243 (11th

Cir.2003).

During the notice stage, the court may facilitate the notice process to

prospective class members. However, before intervening in the process, the

district court must be satisfied that there are other employees of the employer who

(1) desire to opt-in and (2) who are similarly situated with respect to their job

requirements and their pay provisions. *Cameron-Grant,* 347 F.3d at 1244; *Dybach

v. Florida Dept. of Corr.*, 942 F.2d 1562, 1567-68 (11th Cir.1991).

In *IBP, Inc. v. Alvarez*, 546 U.S. 21, 126 S.Ct. 514, 163 L.Ed.2d 288

(U.S.2005), the United States Supreme Court directly addressed several of the

issues presented by the plaintiffs here. The Court wrote that:

under *Steiner [v. Mitchell*, 350 U.S. 247, 248, 76 S.Ct. 330, 100 L.Ed.
267 (1956)], activities, such as the donning and doffing of specialized
protective gear, that are "performed either before or after the regular

3

*National Life Insurance Co.*, 252 F.3d 1208, 1217 (11th Cir.2001)(quoting *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1095 (11th Cir.1996). Here, through consents to join this case filed to date, the plaintiffs have established that at least 93 employees exist who allege they do not get paid for time spent donning and doffing protective gear or for other time they are engaged in "work."[2]

Having considered the foregoing, and being of the opinion the motion to conditionally certify the class and facilitate notice is due to be granted;

It is therefore **ORDERED** by the court that the plaintiffs' motion to facilitate 29 U.S.C. § 216(b) notice be and hereby is **GRANTED**.

It is further **ORDERED** by the court that the following Notice of Right to Opt-In to Collective Action be sent to all present and former employees of defendant who were paid on a "line time" basis, from August 23, 2003, to the present. It is further Ordered that said Notice be sent in English as well as accurately translated and sent in Spanish.

**DONE** and **ORDERED** this the 31st day of January, 2007.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

---

[2]The defendant alleges that the amount of time spent donning and doffing gear is de minimus and often accomplished by employees as they are walking to their work stations. However, this goes to the merits of the plaintiffs' claim and is not relevant to the issue of whether other similarly situated individuals are subject to the same "unified policy, plan or scheme of discrimination." *Hipp*, 252 F.3d at 1217.

*National Life Insurance Co.*, 252 F.3d 1208, 1217 (11th Cir.2001)(quoting *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1095 (11th Cir.1996).  Here, through consents to join this case filed to date, the plaintiffs have established that at least 93 employees exist who allege they do not get paid for time spent donning and doffing protective gear or for other time they are engaged in "work."[2]

Having considered the foregoing, and being of the opinion the motion to conditionally certify the class and facilitate notice is due to be granted;

It is therefore **ORDERED** by the court that the plaintiffs' motion to facilitate 29 U.S.C. § 216(b) notice be and hereby is **GRANTED**.

It is further **ORDERED** by the court that the following Notice of Right to Opt-In to Collective Action be sent to all present and former employees of defendant who were paid on a "line time" basis, from August 23, 2003, to the present.  It is further Ordered that said Notice be sent in English as well as accurately translated and sent in Spanish.

**DONE** and **ORDERED** this the 31st day of January, 2007.

_____
INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

_____

[2]The defendant alleges that the amount of time spent donning and doffing gear is de minimus and often accomplished by employees as they are walking to their work stations. However, this goes to the merits of the plaintiffs' claim and is not relevant to the issue of whether other similarly situated individuals are subject to the same "unified policy, plan or scheme of discrimination." *Hipp*, 252 F.3d at 1217.

5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

SALVADOR AGUILAR, et al.,

     Plaintiffs,

vs.                        CASE NO. CV-06-J-1673-NE

PILGRIM'S PRIDE CORPORATION,

     Defendant.

## NOTICE OF PENDING FAIR LABOR STANDARDS ACT LAWSUIT

**To**: Present and Former Employees of Pilgrim's Pride Corporation who were paid on a "line time" basis from August 23, 2003, to the present.

**Re**: Overtime claims against Pilgrim's Pride Corporation.

## I. INTRODUCTION

The purpose of this Notice is to inform you of the existence of a collective action lawsuit alleging unpaid overtime, to advise you of how your rights may be affected by this suit, and to instruct you on the procedure for participated in this suit, should you decide that you wish to do so.

## II. DESCRIPTION OF THE LAWSUIT

On August 23, 2006, a lawsuit was filed in the United States District Court for the Northern District of Alabama against Pilgrim's Pride Corporation ("Pilgrim's Pride") by Salvador Aguilar, on behalf of himself and other production line employees of Pilgrim's Pride employed at the facilities in Athens, Alabama OR Enterprise, Alabama.

This lawsuit alleges that Pilgrim's Pride violated the Fair Labor Standards Act ("FLSA") by forcing employees to continue working on the production line even though their employer has stopped compensating them for their time, and not paying employees for time spent donning (putting on) and doffing (taking off) personal protection equipment that their employer requires them to wear. The plaintiffs also seek liquidated damages in an amount equal to the unpaid and underpaid overtime wages. In addition, the plaintiffs have requested an injunction to prohibit Pilgrim's Pride from engaging in future violations of the FLSA.

Pilgrim's Pride contends that all employees were properly paid for all hours actually worked. Pilgrim's Pride expressly denies that it engaged in unlawful conduct with respect to the named plaintiffs and the class members and asserts that the class members were properly paid in accordance with the FLSA.

The court has not ruled on the merits of the plaintiffs' claims or on the denials and other defenses raised by Pilgrim's Pride.

## III. COMPOSITION OF THE CLASS

Plaintiff seeks to recover damages against Pilgrim's Pride on behalf of himself and also on behalf of the other line time paid employees of Pilgrim's Pride, past and present. The Court has ruled that the lawsuit shall be conditionally maintained as a collective action brought by the named Plaintiff, individually and on behalf of the class members. The Court's ruling rests on its preliminary determination that there may be other employees of Pilgrim's Pride who are similarly situated and who desire to join or opt-in to the lawsuit. Specifically, the Court has conditionally certified a class consisting of the following:

> All employees of Pilgrim's Pride's Athens, Alabama or Enterprise, Alabama poultry processing plants during anytime from August 23, 2003, to the present, who were paid on a line time basis and not paid fully for the time actually spent working.

You can participate if you worked on a line for Pilgrim's Pride at either the Athens facility or Enterprise facility at any point in time from August 23, 2003, to the present, and were not paid for all time spent working. Just as is true in any lawsuit, participation does not mean that the named Plaintiff or anyone opting into the collective action, is by participation alone, entitled to recover against Pilgrim's Pride.

## IV. YOUR RIGHT TO PARTICIPATE IN THIS LAWSUIT

If you fit the definition of the class described above, you may join this suit or "opt in" by returning in the enclosed envelope or by mailing by First Class mail, postage prepaid, a completed and signed "Consent to Become Party Plaintiff" form postmarked on or before **June 11, 2007**, to Plaintiff's counsel at the following address:

> WHATLEY, DRAKE & KALLAS, LLC
> 2323 Second Avenue North
> P.O. Box 10647
> Birmingham, AL 35202-0647
> (205) 328-9576

Further information about this Notice, the deadline for filing a "Consent to Become Party Plaintiff," or questions concerning this lawsuit, may be obtained by writing Plaintiff's counsel at the number and address stated above, or by calling attorney Kevin McKie of Whatley Drake & Kallas, L.L.C., at 1-800-695-6750.

The law firm of Whatley Drake & Kallas, L.L.C. has agreed to represent the Plaintiffs in this case, and by signing the consent to representation and the contract agreement you agree to their representation and the terms therein. As stated in the contract, Whatley Drake & Kallas, L.L.C.

2

is not charging you an hourly fee for their services. Their fee is set up on a contingency basis, and any money owed them will only be collected after the completion of a successful lawsuit.

Failure to timely return or properly complete and sign the Consent to Become Party Plaintiff form by the above date will result in your not being able to participate in this lawsuit.

The law prohibits retaliation against anyone participating in a lawsuit of this nature.

Even if you file a "Consent to Become a Party Plaintiff" form, your continued right to participate in this suit may depend upon a later decision by the District Court that you and the Plaintiffs are actually "similarly situated" in accordance with federal law.

## V. EFFECT OF JOINING THIS SUIT

If you choose to join this suit, you will be bound by the judgment, whether it is favorable or unfavorable. While this suit is proceeding, you may be required to provide information, appear for deposition, and/or testify in court.

## VI. NO OPINION EXPRESSED AS TO THE MERITS OF THE CASE

This notice has been authorized by Judge Inge Johnson of the United States District Court for the Northern District of Alabama solely for the purpose of notifying individuals of the lawsuit. The court has taken no position in this case regarding the merits of the plaintiff's claims or defenses of Pilgrim's Pride. This notice should not be taken as an indication that you should or should not join this lawsuit.

## VII. FURTHER INFORMATION

The pleadings and other documents of record in this lawsuit may be examined and copied at any time during regular business hours at the office of the Clerk of the United Stated District Court for the Northern District of Alabama located at the Hugo Black United States Courthouse, 1729 5th Avenue North, Birmingham, Alabama.

Pilgrim's Pride is represented by:

GARDERE WYNNE SEWELL LLP
1601 Elm Street, 3000 Thanksgiving Tower
Dallas, TX 75201

and

LIGHTFOOT FRANKLIN & WHITE, LLC
The Clark Building
400 North 20th Street
Birmingham, Alabama 35203-3200

3

Case 5:06-cv-01673-IPJ   Document 40   Filed 02/15/2007   Page 1 of 5

## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

SALVADOR AGUILAR, et al.,

     Plaintiffs,

vs.                           CASE NO. CV-06-J-1673-NE

PILGRIM'S PRIDE CORPORATION,

     Defendant.

## ORDER

Defendant having filed a motion to reconsider Order granting plaintiffs' motion to conditionally certify class and facilitate notice and brief in support (doc. 38), the plaintiffs having filed a response (doc. 39) and the court having considered said motion and response, finds as follows:

The defendant asserts that the plaintiffs failed to meet their burden of demonstrating a "reasonable basis" for their claim because the plaintiffs did not support their allegations with evidence.  Defendant's motion at 3.

Although not submitted by the plaintiffs, the court had before it numerous declarations, which were not refuted by any evidence.  The defendant submitted nine declarations of superintendents in support of its opposition to plaintiffs' motion to conditionally certify the class.  *See* defendant's amended opposition (doc. 32), exhibits A-I.  Of these, the declarations of Paul Francis (Exhibit A), Jerry Wayne Wilford, II (Exhibit B), James Dunn (Exhibit C), and James Kelly (Exhibit D),

demonstrate that the line employees are similarly situated.[1]  Each of these show that

the employees must don protective clothing of some type.  Exhibit A, ¶¶ 4-5; Exhibit

B, ¶¶ 4-5; Exhibit C ¶¶ 4-5; Exhibit D, ¶¶ 4-5.   Each of these declarations

demonstrates that if the employees in each of the referenced departments work with

a knife or scissors, they must wear a cut-proof glove.  *Id*.  Each of these declarations

also contains the statement that "[m]any partners ... are compensated on a 'line time'

basis ....  If for any reason partners in my department work beyond their line time,

their time is manually adjusted ...." Exhibit A, ¶¶ 8-9; Exhibit B, ¶¶ 8-9; Exhibit C,

¶¶ 8-9; Exhibit D, ¶¶ 8-9.   Additionally, the defendant acknowledged that "many

[employees] are paid pursuant to a departmental mastercard time system.... commonly

referred to as 'line time.'" Defendant's first amended opposition, at 7.

The court considered each of these declarations.  Although submitted by the

defendant, the court concluded that each declaration provided factual support for the

plaintiffs' allegations.  Indeed, these declarations satisfied the court that "there are

other employees of the department-employer who ... are 'similarly situated' with

respect to their job requirements and with regard to their pay provisions." *Cameron-

Grant v. Maxim Healthcare Services, Inc.*, 347 F.3d 1240, 1244 (11th Cir.2003); citing

---

[1]The defendant does not dispute that the plaintiffs established that there are other
employees of the defendant who desire to opt-in to this litigation.

2

*Dybach v. State of Florida Department of Corrections,* 942 F.2d 1562, 1567-1568 (11th Cir.1991).

This determination, made at the "notice stage," only need be based on the pleadings and affidavits which have been submitted. *Hipp v. Liberty Nat. Life Ins. Co.,* 252 F.3d 1208, 1218 (11th Cir.2001).

> Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class. If the district court 'conditionally certifies' the class, putative class members are given notice and the opportunity to 'opt-in.' The action proceeds as a representative action throughout discovery."
>
> The second determination is typically precipitated by a motion for 'decertification' by the defendant usually filed after discovery is largely complete and the matter is ready for trial. At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives-i.e. the original plaintiffs-proceed to trial on their individual claims.

*Hipp,* 252 F.3d at 1218 (quoting *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1213-14 (5th Cir.1995)).  The rationale for the "fairly lenient standard" is that at the early stages of litigation, plaintiffs have not had time to conduct discovery and marshal their best evidence. *See id.*

3

After reviewing the pleadings and evidence before it, the court determined that there are other employees of the defendant who desire to opt-in and are similarly situated. As evident from the notice the court drafted, the court found all employees paid on a line time basis are similarly situated to a degree as to meet the minimal standard for conditional certification under the FLSA.

Having considered the foregoing, the court is of the opinion that the defendant's motion to reconsider is due to be denied. At this "notice stage," the pleadings and affidavits submitted to the court certainly provided the court with evidence that members of the putative class are similarly situated. See *Hipp, supra.*

The court has also considered the defendant's argument that the class definition contained in the class notice should be revised. Defendant's motion to reconsider, at 6. The defendant having represented that the plaintiffs are not opposed to the revised definition, the court is of the opinion that the motion to reconsider is due to be granted in regard to the definition of the class.

In accordance with the foregoing, it is **ORDERED** by the court that the defendant's motion to reconsider is **GRANTED IN PART** and **DENIED IN PART.**

The motion is **GRANTED** as to the revised definition of the proposed class. The notice shall set forth the definition of potential class members as:

4

All employees of Pilgrim's Pride's Athens, Alabama or Enterprise, Alabama poultry processing plants during any time from August 23, 2003, to the present, who were paid on a line time basis.

It is further **ORDERED** by the court that the defendant's motion to reconsider

is **DENIED** as to the remainder of defendant's motion.

**DONE** and **ORDERED** this the 15th day of February, 2007.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

5

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES MORROW and MICHAEL OVERTON, Individually and on behalf of other similarly situated employees, | ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 3:07-CV-617-MHT |
| v. | ) ) | |
| FLOWERS FOODS, INC., and FLOWERS BAKING CO. OF OPELIKA, LLC, | ) ) ) ) | |
| Defendants. | ) | |

## DEFENDANT FLOWERS FOODS, INC.'S ANSWERS TO PLAINTIFFS' INTERROGATORIES

COMES NOW Defendant, Flowers Foods, Inc. ("Flowers Foods"), by and through its undersigned attorneys, hereby responds to Plaintiffs' Interrogatories as follows:

## GENERAL OBJECTIONS

1.     Flowers Foods generally objects to Plaintiffs' Interrogatories to the extent that they call for information and/or documents protected by the attorney-client privilege and/or work product doctrine, or which are otherwise immune from discovery. Inadvertent identification of any such information and/or such documents shall not constitute a waiver of any privilege with respect to any such information and/or documents, or the subject matter thereof, and shall not waive the right of Flowers Foods to object to the use of any such information and/or documents and/or the information contained therein.

2.     Flowers Foods generally objects to Plaintiffs' Interrogatories to the extent that they seek to impose burdens, duties, and obligations upon Flowers Foods in excess of or

15.    Please state whether Distributors are allowed to set prices for product delivered to national accounts and if Flowers Foods, Inc. is involved in any way in the setting of such prices.

**ANSWER:**  Flowers Foods objects to this Interrogatory to the extent that it is not relevant to the claims or defenses of any party under Fed.R.Civ.P 26(b)(1) and 34(a)(1). Because this action has not been conditionally certified, it is only an individual, multi-plaintiff action under the Fair Labor Standards Act (FLSA). Therefore, any information pertaining to or regarding subsidiaries of Flowers Foods other than Flowers/Opelika, the only subsidiary with which Plaintiffs Overton and Morrow and the additional Plaintiffs had or have independent distributor agreements, and any information regarding distributors other than Plaintiffs Morrow and Overton and the additional Plaintiffs is not relevant and is not within the proper scope of discovery.  The only relevant information is that regarding or pertaining to Flowers/Opelika which is reasonably calculated to lead to the discovery of admissible evidence as to Morrow and Overton's and the additional Plaintiffs' individual claims.  Flowers Foods further objects to this Interrogatory as it seeks information which is still otherwise overly broad, irrelevant, cumulative, and unnecessary for purposes of litigating the claims in this lawsuit.  Subject to, and without waiving, the aforementioned objections, Flowers Foods states that independent contractor distributors of Flowers/Opelika may sell branded and non-branded products at a price lower than the suggested wholesale in national, non-pay-by-scan accounts if the account is suppressed or distributor has obtained Flowers/Opelika's approval for a price allowance, and, therefore, reduced price.  Flowers/Opelika's approval is necessary because Flowers/Opelika bears most of the financial responsibility for price allowances in accounts that have not been suppressed. When accounts are suppressed, distributors bear full financial responsibility for price allowances. Distributors of Flowers/Opelika cannot charge national accounts above the suggested wholesale

15

price for branded and non-branded products if Flowers/Opelika is collecting the accounts receivable. Distributors of Flowers/Opelika may not change the established prices for private label products. Certain representatives of Flowers Foods Bakeries Group, LLC seek approval for branded and non-branded prices in certain national accounts on behalf of Flowers/Opelika and reach agreement with certain national accounts on private label and non-branded pricing on behalf of Flowers/Opelika.

16.    Please state whether Distributors are allowed to set prices for product delivered to any account.

**ANSWER:**  Flowers Foods objects to this Interrogatory to the extent that it is not relevant to the claims or defenses of any party under Fed.R.Civ.P 26(b)(1) and 34(a)(1). Because this action has not been conditionally certified, it is only an individual, multi-plaintiff action under the Fair Labor Standards Act (FLSA). Therefore, any information pertaining to or regarding subsidiaries of Flowers Foods other than Flowers/Opelika, the only subsidiary with which Plaintiffs Overton and Morrow and the additional Plaintiffs had or have independent distributor agreements, and any information regarding distributors other than Plaintiffs Morrow and Overton and the additional Plaintiffs is not relevant and is not within the proper scope of discovery. The only relevant information is that regarding or pertaining to Flowers/Opelika which is reasonably calculated to lead to the discovery of admissible evidence as to Morrow and Overton's and the additional Plaintiffs' individual claims. Flowers Foods further objects to this Interrogatory as it seeks information which is still otherwise overly broad, irrelevant, cumulative, and unnecessary for purposes of litigating the claims in this lawsuit. Subject to, and without waiving, the aforementioned objections, Flowers Foods states that independent contractor distributors of Flowers/Opelika may sell branded and non-branded products at a price lower than

# COPY

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


HENRY PORTERFIELD,

     Plaintiff,

  vs.               CIVIL ACTION NO.
                      2:05-CV-937-MEF

FLOWERS BAKING COMPANY OF
OPELIKA, LLC,

     Defendant.

         * * * * * * * * * * * *


**DEPOSITION OF MICHAEL LORD**, taken

pursuant to stipulation and agreement before Tracye

Sadler, Certified Shorthand Reporter and

Commissioner for the State of Alabama at Large, at

the Tiger Town Inn, 205 21st Street, Opelika,

Alabama, on May 8, 2007, commencing at

approximately 9:10 a.m.


         * * * * * * * * * * * *

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

27

1                    MS. REISS:  Object to the form.

2    Q.   You can answer.

3    A.   Myself and Mr. Bordeaux.

4    Q.   And when did that take place?

5    A.   March -- on or around March 22nd when we

6         issued him his termination letter.

7    Q.   Tell me about what led up to that.

8    A.   What led up?

9    Q.   To your decision, I guess, to terminate

10        Henry Porterfield.

11   A.   Well, he had --

12                   MS. REISS:  I'm going to object to

13                        the form.  Facts not in

14                        evidence.  He's not an

15                        employee of Flowers.  Can't be

16                        terminated.

17   A.   We terminated his contract.  We terminated

18        his contract because he did not cure the

19        ten-day breach with Sodexho.

20   Q.   And that's the reason that y'all terminated

21        his contract?

22   A.   That's the reason we terminated his

23        contract.

28

1   Q.   Did you and Mr. Bordeaux meet to discuss

2       this?

3   A.   Yes, sir.

4   Q.   When did y'all meet?

5   A.   The first time we found out what happened,

6       which would have been March the 7th.

7   Q.   7th?

8   A.   Yes, sir.

9   Q.   Tell me about your conversations with Steve

10      Bordeaux.

11   A.   We just talked about that we had another

12      issue -- another issue with Henry and felt

13      like we needed to give him a ten-day breach

14      letter over this.

15   Q.   Okay.  And you issued a ten-day breach

16      letter?

17   A.   Yes, sir.

18   Q.   Did you and Mr. Bordeaux talk any more

19      about it after the ten-day breach letter

20      was issued?

21   A.   Yes, sir.  We talked about it on the 16th

22      of March when the councilman came by to see

23      Grady and the threats that were made.  We

29

1      talked about it then because we decided to

2      bar him from the premises any -- from

3      Flowers' property.  And then we talked about

4      it the day that we did his termination

5      letter also.

6  Q.   Tell me, on March 16th were you in

7       Montgomery or were you in Opelika?

8  A.   I was in Opelika.

9  Q.   How did you learn about the March 16th

10      event?

11 A.   Grady sent an e-mail to Steve and myself --

12      Steve Bordeaux and myself.

13 Q.   That was the e-mail that we discussed or

14      looked at yesterday.  I think it was marked

15      as an exhibit.  It's marked as Plaintiff's

16      Exhibit 2 to Grady Messer's deposition?

17 A.   That's it.

18 Q.   And --

19 A.   And he also called me and told me what

20      happened too.

21 Q.   This says it was sent by Grady Messer, I

22      guess, 3-16 at 2:43 p.m.  Is that --

23 A.   Yes, sir.

30

1    Q.   I assume you received it sometime after

2         2:43 p.m.?

3    A.   Yes, sir.

4    Q.   Do you remember when you received it?

5    A.   No, sir, I don't.

6    Q.   Once you received it, what did you do?

7    A.   I read it and talked with Steve about it.

8         And Steve had read it, also, because it was

9         sent to him as well.

10   Q.   And is that when you made the decision to

11        bar him from the property?

12   A.   Yes, sir.

13   Q.   From company property?

14   A.   Yes, sir.

15   Q.   And what did you do to bar him from company

16        property?

17   A.   We issued him a letter stating that he was

18        not allowed to come on company property.

19        And I can't -- we also talked to Henry.  I

20        don't remember if it was myself or Grady

21        that talked to Henry.  And he said that he

22        wanted it in writing, so we put it in

23        writing.

31

| | | |
|---|---|---|
| 1 | Q. | Then on March 23rd you spoke again with |
| 2 | | Mr. Bordeaux; is that right? |
| 3 | A. | That's correct. |
| 4 | Q. | And that's when you terminated the |
| 5 | | contract? |
| 6 | A. | That is correct. |
| 7 | Q. | Tell me about any conversations you and |
| 8 | | Mr. Bordeaux had concerning terminating his |
| 9 | | contract. |
| 10 | A. | His ten days were up and it was -- we had |
| 11 | | to -- he couldn't cure the breach, so we |
| 12 | | had to terminate his contract. |
| 13 | Q. | Anything you remember Mr. Bordeaux saying |
| 14 | | about it or is that basically the whole |
| 15 | | conversation? |
| 16 | A. | That it was time to terminate his contract. |
| 17 | Q. | And you were terminating it because he |
| 18 | | didn't cure the breach with Sodexho |
| 19 | | Marriott at Troy State? |
| 20 | A. | Exactly. |
| 21 | Q. | Did you have -- I'm sorry.  You did have a |
| 22 | | conversation with Henry, I guess, on the |
| 23 | | 23rd when you met with him and his brother; |

32

```
1          right?

2     A.   It was more of a conversation with his

3          brother than Henry, but we did.

4     Q.   Was that Robert?

5     A.   I don't remember his name.  I just remember

6          him introducing me as his brother.

7     Q.   Tell me what you remember about that

8          conversation.

9     A.   That's been two years ago.  I know it was

10         about a ten-minute meeting.  It wasn't very

11         long.

12    Q.   Were y'all eating lunch?

13    A.   No, sir.

14    Q.   Was it just in the parking lot at Tenda

15         Chick?

16    A.   No, sir.  We -- myself and Grady got there

17         first and we just -- we waited for Henry to

18         get there.  We didn't know who he would be

19         with.  I was sure he would have someone

20         with him.  And I gave him the letter.  I

21         went over it with him.  And his brother

22         made a few comments.  And I basically just

23         told him that I would discuss it with Henry
```

33

1    but I wasn't going to discuss it with him.

2    Q.    Do you remember what comments his brother

3          made?

4    A.    No, sir, I really don't remember any exact

5          comment that he made.

6    Q.    What about Mr. Bordeaux?  Did he say

7          anything during the meeting?

8    A.    Mr. Bordeaux wasn't there.

9    Q.    Who else was there besides yourself, Henry,

10          and his brother?

11    A.    Grady Messer.  It was four of us there.

12    Q.    Anything else you remember about that

13          meeting?

14    A.    Other than it being a quick meeting, that

15          is really ...

16    Q.    About it?

17    A.    I really can't -- I can't remember much

18          else about it other than it was a short

19          meeting and he brought his brother.  And I

20          remember his bother was asking questions,

21          and I don't remember the questions.  I just

22          remember telling him that I would discuss

23          it with Henry but I wasn't going to discuss

34

1       it with him.

2                   (Plaintiff's Exhibit 3 was marked

3                   for identification.)

4    Q.    Let me show you what I've marked as

5          Plaintiff's Exhibit Number 3 to your

6          deposition.  Do you know what that document

7          is?

8                   MS. REISS:  Let him look at it for

9                   a second.

10   A.    Yes, sir.

11   Q.    What is that document?

12   A.    This is the termination letter I gave him

13         that day and it's also the release and

14         purchase agreement that I gave Henry that

15         day.

16   Q.    Okay.  Tell me about the release and

17         purchase agreement that you gave Henry that

18         day.

19   A.    I gave him what we would buy -- purchase

20         his route back for, which was $23,126.92.

21         And all he had to do to get that back was

22         sign the purchase agreement and the general

23         release.

35

1    Q.    Did you explain the release to him?

2    A.    I can't recall if I did or not.  I gave it

3          to him for him to look at.  But I can't

4          recall if I explained it to him.

5    Q.    Do you remember anything that

6          Mr. Porterfield -- Henry Porterfield said?

7    A.    In exact words, no, sir, I don't.

8    Q.    Generally?

9    A.    In general words, no, sir, I don't.

10   Q.    Mr. Porterfield didn't sign the release?

11   A.    No, sir, he did not.

12   Q.    Did he generally say anything about the

13         release that you remember sitting here

14         today?

15   A.    No, sir, not that I -- not that I recall.

16         The only thing I remember Henry saying now

17         that I sat here and thought about it is

18         you've done what you've got to do.

19         That's ...

20   Q.    Anything else that you recall?

21   A.    That's -- that's -- that's the only thing I

22         remember him saying.

23   Q.    Other than Grady Messer and Mr. Bordeaux,

36

1          is there anyone else that you discussed

2          terminating Henry Porterfield's contract

3          with?

4     A.   Yes, sir.

5     Q.   Who?

6     A.   That would be Chuck Rich.

7     Q.   And who is Chuck Rich?

8     A.   Chuck Rich is vice president of distributor

9          relations for Flowers Foods.

10    Q.   Where is he located?

11    A.   In Thomasville.

12    Q.   And what is vice president of distributor

13         relations?

14                   MS. REISS:  Object to the form.

15    Q.   If you know.

16    A.   I don't know exactly what Chuck's job is.

17         I just know he's vice president of

18         distributor relations and --

19    Q.   Why did you call him to discuss it?

20    A.   Just felt like I needed to speak with

21         someone else about it too.

22    Q.   Where does Chuck Rich -- or who does he

23         report to at Flowers Foods?

37

1    A.    I don't know.

2    Q.    Do you know how he falls in the scheme

3          of --

4    A.    No, sir, I do not.

5    Q.    -- the makeup of the company?

6                    MS. REISS:  Wait until the

7                    question is asked.

8    A.    I do not know.

9    Q.    Anyone other than Chuck Rich that you spoke

10         to?

11   A.    That's all I spoke to.

12   Q.    Tell me what you recall about your

13         conversations with Chuck Rich.

14   A.    Just that we had another breach on Henry

15         and that was basically it.  I mean, we had

16         another breach on him and we had to decide

17         what we were -- how we were going to

18         proceed it -- or pursue it.

19   Q.    Did you call him on the phone or did you go

20         to Thomasville?

21   A.    No.  I talked to him on the phone.

22   Q.    Did you send him any e-mails regarding it?

23   A.    I may have.  I don't remember.

38

1   Q.   Do you still have any e-mails you might

2        have sent to Chuck Rich?

3   A.   If I sent him something I do.

4   Q.   Tell me what you recall Chuck Rich saying

5        over the phone.

6   A.   I don't really recall.

7   Q.   Or any other type of communication that --

8        did he send you any e-mails back?

9   A.   I'm sure he did, but I ...

10  Q.   Would you still have those e-mails if he

11       sent you e-mails back?

12  A.   Yes, sir.

13  Q.   Generally what do you remember Chuck Rich

14       saying?

15  A.   That he breached his contract and we needed

16       to pursue it.

17  Q.   Needed to pursue --

18  A.   Pursue terminating his contract.

19  Q.   Anything else?

20  A.   That's basically what we talked about.

21  Q.   How many phone conversations do you

22       remember having with Chuck Rich concerning

23       Henry Porterfield?

39

```
 1   A.    That was what I remember right there.

 2   Q.    Just one?

 3   A.    Well, the one -- the first one of what took

 4         place and then the -- the first ten-day

 5         breach letter and then the final

 6         termination.  And the reason I thought --

 7         well, let me tell you the reason I called

 8         him.  Because we had already had two issues

 9         with Henry in the first two months I was in

10         this position and I just wanted to speak

11         with someone else about it.

12   Q.    Okay.  Anything else you remember about any

13         conversations with Chuck Rich?

14   A.    No, sir.

15                   MR. DAVIS:  Can I take about a

16                   five-minute break?

17                   MS. REISS:  Sure.

18                   (A brief recess was taken.)

19   Q.    (Mr. Davis continuing:)  Mr. Lord, let me

20         ask you about the codes and dates that are

21         placed on the bread.  What's your

22         understanding of why codes and dates are

23         placed on the bread?
```

COPY $^1$

1

2

3

4              IN THE UNITED STATES DISTRICT COURT

5           FOR THE MIDDLE DISTRICT OF ALABAMA

6                      NORTHERN DIVISION

7

8    HENRY PORTERFIELD,

9          Plaintiff,

10     vs.                        CIVIL ACTION NO.
                                  2:05-CV-937-MEF
11
     FLOWERS BAKING COMPANY OF
12   OPELIKA, LLC,

13          Defendant.

14                 *  *  *  *  *  *  *  *  *  *  *  *

15

16

17            **DEPOSITION OF STEVE BORDEAUX**, taken

     pursuant to stipulation and agreement before Tracye
18
     Sadler, Certified Shorthand Reporter and
19
     Commissioner for the State of Alabama at Large, at
20
     the Tiger Town Inn, 205 21st Street, Opelika,
21
     Alabama, on May 8, 2007, commencing at
22
     approximately 11:10 a.m.
23
                   *  *  *  *  *  *  *  *  *  *  *  *

8

1   Corporation.

2   Q.   What did you do for Ampex?

3   A.   Just a utility worker learning the job that

4        they were having me to do, which would be a

5        press operator, which I didn't really like.

6   Q.   How long did you stay at Ampex?

7   A.   Probably three months.

8   Q.   Then where did you go next?

9   A.   Worked with the Safety-Kleen Corporation.

10  Q.   Where was Safety-Kleen located?

11  A.   It was here in Opelika.

12  Q.   And what did you do for Safety-Kleen?

13  A.   Presold parts cleaning machines for places

14       like Capitol Chevrolet, mechanic type

15       shops, and sold oil filters for them.

16  Q.   How long did you stay with Safety-Kleen?

17  A.   A little over a year and a half.

18  Q.   Where did you go next?

19  A.   I think Flowers hired me at that time.

20  Q.   So that was in about '73, '74?

21  A.   Yes, sir.  I started in April of '73 with

22       Flowers.

23  Q.   In what position were you hired on at

9

1   Flowers?

2   A.   Hired as a route salesman trainee.

3   Q.   And what geographic area or what -- of

4        Flowers did you begin working in?  Was it

5        the Opelika market or was it the Montgomery

6        market or --

7   A.   They hired me here in Opelika for a route

8        that was open in LaGrange, Georgia, and I

9        moved to LaGrange, Georgia, to take that --

10       to learn that job and be assigned a bread

11       route after training.

12  Q.   How long did you stay in LaGrange?

13  A.   Approximately two years, two and a half

14       years.

15  Q.   And what happened after two years?

16  A.   We had -- my wife at the time had some

17       sickness in her family.  Her mother was

18       dying of cancer, and although LaGrange was

19       not that far, she insisted that we move

20       back.  And we moved back so she could help

21       tend to her mother with her cancer.

22  Q.   So moved back to Opelika?

23  A.   Yes, sir.

10

1   Q.   Did you continue to work for Flowers in

2        Opelika?

3   A.   Yes, sir.

4   Q.   And what did you do here?

5   A.   I was kind of promoted to an extra man.  I

6        had been on a route for a while and learned

7        that and they thought enough of me to

8        promote me to extra person.

9   Q.   How long did you stay as extra person at

10       Opelika?

11  A.   I probably worked in Opelika as well as

12       Alex City, LaGrange, Columbus, Georgia,

13       until -- I believe it was December of 1978

14       they promoted me to district manager or

15       supervisor for Montgomery, Alabama.  And I

16       moved to Montgomery, Alabama.

17  Q.   And what was your job duties and

18       responsibilities as a supervisor in 1978?

19  A.   I was responsible for six, seven, or eight

20       bread routes over a geographical area of

21       Montgomery, Alabama, and I believe at the

22       time Wetumpka might have been in my

23       territory then.

11

1    Q.    How long were you a supervisor in

2          Montgomery?

3    A.    I believe it was in '85 or '86 they

4          promoted me to sales manager.

5    Q.    Of Montgomery?

6    A.    Yes, sir.

7    Q.    And how long were you sales manager in

8          Montgomery?

9    A.    Until May of '91.

10    Q.    And what happened in May of '91?

11    A.    I was promoted to VP of sales for Opelika

12          bakery -- Flowers Baking Company of

13          Opelika.

14    Q.    And how long did you stay VP of sales in

15          Opelika?

16    A.    Just till approximately two and a half

17          years ago.  I got promoted to plant

18          president.

19    Q.    2004 or --

20    A.    No, sir.  It was 2005, January of 2005.

21    Q.    To president of Flowers Baking Company of

22          Opelika?

23    A.    That is correct.

84

1      ate them.  And I am sure that you have done

2      that.  Your wife has done that.  I have

3      done that.  Probably everybody that we know

4      of has done that.

5    Q.    I understand that.

6    A.    There's nothing wrong with that product.

7    Q.    There's nothing wrong with freezing

8      product.  I agree with that.  The

9      difference is that there is something wrong

10     with freezing product that you represent to

11     be fresh.

12                  MR. HISTA:  Objection.

13                     Argumentative.

14   Q.    Do you think that it's fine to distribute

15     product that you represent to be fresh when

16     you have frozen it or suspended it as you

17     would say?

18   A.    Yes, sir, I do.

19   Q.    And that's Flowers' position; right?

20   A.    And it's my position.  I think it's okay.

21     You asked me did I think --

22                  MS. REISS:  I'm going to object to

23                     the extent that he is not a

85

1          30(b)(6) witness.  He is

2          testifying as Steve Bordeaux;

3          okay?

4               MR. DAVIS:  He's also

5          testifying --

6    Q.   Are you testifying today as the president

7         of Flowers Baking Company of Opelika?

8    A.   Yes, ma'am -- yes, sir.

9    Q.   Is there anybody at Flowers Baking Company

10        of Opelika that -- in any corporate

11        capacity that has more authority than you

12        do at Flowers Baking Company of Opelika?

13   A.   No, sir.

14              MR. DAVIS:  Why don't we take

15          about a five-minute break.

16          (A brief recess was taken.)

17   Q.   (Mr. Davis continuing:)  Under the

18        distributors's agreement there are two

19        kinds of breaches; correct?

20   A.   Yes, sir.

21   Q.   A noncurable breach and a curable breach;

22        correct?

23   A.   Yes, sir.

86

| | | |
|---|---|---|
| 1 | Q. | Mr. Porterfield wasn't terminated for a |
| 2 | | noncurable breach, was he? |
| 3 | | MS. REISS:  Object to the form. |
| 4 | | Go ahead and answer. |
| 5 | A. | No, sir.  It was a curable breach that |
| 6 | | he ... |
| 7 | Q. | And curable breach is listed under 16.3 and |
| 8 | | curable breach is the one that gives you |
| 9 | | ten days to correct the problem; correct? |
| 10 | A. | I'd have to review it to see, sir. |
| 11 | | 16.3 is curable.  16.2 is noncurable. |
| 12 | Q. | And 16.3 is the one that gives you the |
| 13 | | ten-day time period; correct? |
| 14 | A. | Yes, sir. |
| 15 | Q. | Actually 16.3 has two parts to it, doesn't |
| 16 | | it? |
| 17 | | Why don't you read -- |
| 18 | A. | Let me read it right quick. |
| 19 | | Okay. |
| 20 | Q. | The way I read it -- and you tell me if I'm |
| 21 | | wrong -- is that under 16.3, which covers |
| 22 | | curable breaches, you can determine that a |
| 23 | | distributor has a curable breach and give |

87

1     him ten days to cure it.  That's one way

2     under curable breach.  The second way under

3     16.3, in some situations the company can

4     determine that there is no cure at all and

5     terminate the person; is that right?

6  A.   I'm sorry.  Would you repeat that.

7  Q.   Sure.  Let me show you.  Let me --

8  A.   Okay.

9  Q.   If you don't mind, I'll come around there

10     and we'll look at it together.

11       Under curable breach, you've got the

12     ten-day part of curable breach where you

13     give them ten days.  Furthermore, the

14     parties agree that repeated violations

15     constitute a chronic failure of performance

16     and threatens substantial harm to the

17     company's business, and in such event

18     company shall be entitled to terminate this

19     agreement and distributor shall have no

20     further right to cure.  You read that?

21  A.   Yes, sir, I read that.

22  Q.   And in situations where the company

23     determines that there's a chronic failure

88

1      or it threatens substantial harm to the

2      company's business, you don't even have to

3      send a ten-day letter to the distributor.

4      You can just terminate and he have -- the

5      distributor shall have no further right to

6      cure.  Is that the way you read that?

7   A.  Yes, sir.

8   Q.  In Mr. Porterfield's situation under 16.2,

9      he didn't receive a noncurable breach

10      letter, did he?

11  A.  No, sir.

12  Q.  Under 16.3, Mr. Porterfield received a

13      curable breach letter which gave him ten

14      days to correct it.  He didn't receive a

15      letter that gave him no right to cure under

16      16.3, did he?

17  A.  Excuse me.  No, sir.  It also says right

18      here after failure of performance within

19      ten-day period the company may thereafter

20      terminate.  We didn't have to do anything

21      if we didn't want to.  We were subject to

22      do whatever we wanted to after that ten

23      days.

89

1    Q.    It was up to the company to do it?

2    A.    Yes, sir.

3    Q.    Whether or not a distributor is in breach

4          of the contract is determined solely by

5          Flowers, isn't it?

6    A.    More or less, yes, sir.

7    Q.    Flowers is the ultimate decision-maker in

8          deciding whether or not the distributor is

9          in breach; right?

10   A.    Yes, sir.  But to my knowledge, Mr. Davis,

11         we have never ran anybody off in regards to

12         terminating their contract that didn't

13         justifiably warrant doing so.

14   Q.    And that was based on Flowers' opinion that

15         it justifiably warranted doing so?

16   A.    Based on past history, past write-ups, past

17         ten-day letters, et cetera, et cetera, et

18         cetera.

19   Q.    But my point is Flowers decides that;

20         correct?

21   A.    Yes, sir.

22   Q.    Who drafts the contract that the

23         distributor signs?

90

1   A.   In the years past when I was VP I did some
2        of them.  At the present time Michael Lord
3        does some of them along with the director
4        of sales.
5   Q.   Does the distributor get to negotiate on
6        the contract regarding what terms should be
7        in here or what shouldn't be or is the
8        distributor given this copy to sign?
9   A.   He's given that copy to sign as far as the
10       contract.
11  Q.   Let me ask you a question about what I want
12       to mark as Plaintiff's Exhibit Number ...
13            (Brief interruption.)
14            (Plaintiff's Exhibits 3, 4, and 5
15             were marked for identification.)
16  Q.   Let me show you what I've marked as
17       Plaintiff's Exhibit Number 3 to begin
18       with.  Are you familiar with this document?
19  A.   Not this particular one.  I do know it's a
20       distributor's statement.
21  Q.   Who at Flowers is the -- do you have a
22       comptroller or an accountant or someone in
23       a position that actually determines all of

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| DA-HEEM RODGERS; TOMMY MAHAN; MELVIN MOORE; PERCY KELLY; JIMMY HARDY; LEAUNDRA SPENCER; RAYVON HENRY; TEFFNEY SPEARS WILLIAMS; DARREN DEWAYNE MORRISON; RODNEY HILL; GARY GOFF; JAMES CASH; JERRY SMOOT; SONJIA SPIGNER; WILLIE TRAVIS; DEWEY A. PRUITT; CHRIST BOLDEN; JOHN O. BANKS, III; TONY TURNER; and DAVID HARRIS, on behalf of themselves and similarly situated employees, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action Number **7:06-cv-1980-UWC** |
| Plaintiffs. | ) ) ) |
| vs. | ) ) ) |
| AVERITT EXPRESS, INC., | ) ) |
| Defendant. | ) ) ) |

**MEMORANDUM OPINION
ON COLLECTIVE ACTION CERTIFICATION**

This action was commenced under the the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206, *et seq.*, by twenty (20) current drivers, switchers and/or conveyor monitors employed by Averitt Express, Incorporated. ("Averitt"). Plaintiffs allege that Averitt is violating the FLSA by willfully failing to compensate them fully for hours worked in excess of forty hours in a given work week. Presently before the

1

Court is a motion by Plaintiffs, (Doc. 23), to conditionally certify an opt-in class and facilitate class notice. *See* 29 U.S.C. § 216(b).

For the reasons set forth below, the Court finds that Plaintiffs' motion is due to be granted.

## I.  Factual Background

Averitt provides dedicated transportation services for its clients.  This means that Averitt employs truck drivers who transport goods from its clients' facilities to various delivery points (outbound services) and from various pick-up points to its clients' facilities (inbound services).  These services are called "dedicated" services because Averitt drivers are assigned to only one client and Averitt maintains separate bases of operation at each client's facility.

As drivers, Plaintiffs provide dedicated services for various Averitt clients, the largest of which is Mercedes Benz U.S.I. ("Mercedes"), which operates two automobile manufacturing plants located adjacent to each other in Vance, Alabama.[1] These drivers transport items from various suppliers and pick-up points to Mercedes.

---

[1] Another client is the Ogihara Company, a Birmingham manufacturer that produces automotive parts.  Averitt employee-drivers transport parts from Ogihara to Mercedes and to the Honda automobile manufacturing facility located in Lincoln, Alabama.  Ogihara drivers are members of the putative class defined by Plaintiffs.

The Mercedes drivers are divided into two categories, mileage drivers and hourly drivers. Mileage drivers are also referred to as over-the-road ("OTR") drivers. They pick up items located a considerable distance from the Mercedes plants. Indeed, the OTR drivers "primarily" pick up from locations outside the State of Alabama. In contrast, the "hourly" or "local" drivers pick up items located closer to the Mercedes plants. Some of the closer sites are also located outside Alabama.

Some of the locations where the drivers pick up items are called "sequencing" facilities. These facilities serve as a holding point for parts picked up directly from the manufacturer. Specifically, a driver may pick up parts from a manufacturer and deliver them to a sequencing facility. When Mercedes needs the parts, a driver then picks up the parts from the sequencing facility and delivers them to Mercedes. One of these sequencing facilities, Ai3, is located a short distance from Mercedes. Ai3 is not owned by Mercedes.

The switcher position is also referred to as the "yard driver" or "yard truck" operator position. The yard drivers only transport items between the two Mercedes plants or solely between various points at Ai3. The switchers do not travel off their designated sites.

The conveyor monitor position involves observing the automatic offloading of freight from Averitt vehicles at Mercedes. Some of Averitt's trailers contain an

automatic freight offloading mechanism, including a conveyor belt. The conveyor monitors must observe the offloading process to ensure that technical problems are abated. Often, conveyor monitors bid for and hold positions as drivers.

All of the plaintiffs work from 45 to 55 hours per week and are not paid overtime.

Plaintiffs Rodgers and Harris deliver parts from the Ai3 warehouse to Mercedes; thus all of their runs are intrastate. Putative class members Cedric Ervin, Johnny Dukes, Vincent Epperson, Joe Franklin, Alfred Foster, James Lewis, Jr., and Charles W. Chambers also deliver parts from the Ai3 warehouse to Mercedes.

In contrast, Plaintiffs Mahan, Moore, Kelly, Hardy, Spencer, Henry, Williams, Morrison, Hill, Goff, Cash, Smoot, Spigner, Travis, Bolden, Pruitt, and Turner make intrastate daily runs between local suppliers and Mercedes. Putative class members Jonathan Welch, Philip Green, Maurice Gunter, Larry Fowler, Byron Keith Hyche, Tamara Kyles, Anthony McGlown, Larry Patterson, Angie Salazar, Joseph Trull, Robin Swallford, Kerry Washington, Raymond Wilson, Alford Woods, and Carl Jackson make similar runs.

Putative class members David Dallas, Jeff Ferguson, and Eugene Spurger are regularly assigned to jobs exclusively in the Mercedes plant.

Putative class members James Lewis and John Brown make deliveries from the

4

Ogihara facility in Birmingham to other companies in Alabama.

## II. The Putative Class

Plaintiffs seek to certify an opt-in class defined as follows:

All current and former hourly drivers/switchers assigned to an intrastate route and all hourly conveyor monitors and who have worked as a driver/switcher or conveyor monitor for the Defendant at its MBUSI or Ogihara dedicated service operations since September 29, 2003.[2]

(Doc. 23, Pls.' Reply Br. 1-2.)

## III. The Applicable Law

As a general rule, the FLSA provides that all employees who hold jobs in interstate commerce are entitled to overtime compensation at one and a half times their regular rate for all hours in excess of forty hours per week. 29 U.S.C. § 207. However, there are several important exemptions from this general rule.

For example, the overtime provisions do not apply to employees for whom the Secretary of Transportation ("SOT") has power to establish qualifications and maximum hours of service rules under the Motor Carrier Act, 49 U.S.C. § 13501 *et*

---

[2] Initially, the Plaintiffs' proposed class definition did not include any references to the Ogihara employees. After Averitt filed its brief in opposition to the certification motion, Plaintiffs amended their proposed class definition to included Averitt employees located at Ogihari. Because the complaint does not appear to include any references to the Honda plant, the Court will modify the class definition to clarify that the class includes **only** those employees located at Ogihara who make deliveries to Mercedes.

*seq.* This "motor carrier" exemption applies only if the employee: 1) is employed by a carrier subject to the power of the SOT to establish qualifications and maximum hours of service; 2) is engaged in activities that directly affect the operational safety of motor vehicles, such as a driver, and 3) is assigned to a vehicle that transports property on public highways in <u>interstate</u> or foreign commerce. 29 C.F.R. §§ 782.2(e), 782.2(b)(2).

Drivers who are engaged only in the <u>intrastate</u> transportation of goods are generally entitled to overtime compensation. However, pursuant to Department of Labor ("DOL") regulations, intrastate drivers may fall within the motor carrier exemption under certain conditions. 29 C.F.R. § 782.7(b)(1). Specifically, "[t]ransportation within a single State is in <u>interstate</u> commerce within the meaning of the Fair Labor Standards Act where it forms a part of the 'practical continuity of movement' across State lines from the point of origin to the point of destination." *Id.* (emphasis added). Thus, some drivers who work only <u>intrastate</u> routes are not entitled to overtime compensation.

A driver who works solely on <u>intrastate</u> shipments or vehicles during a workweek is not entitled to overtime compensation if the carrier is involved in <u>interstate</u> commerce and the driver could reasonably be expected to make an <u>interstate</u> run or otherwise perform in the carrier's interstate activities. The

6

requirement that the driver could reasonably be expected to make an interstate run

"means more than a remote possibility." *Garcia v. Pace Suburban Bus. Serv.*, 955

F. Supp. 75, 77 (N.D. Ill. 1996) (citing *Reich v. American Driver Serv., Inc.*, 33 F.3d

1153, 1156 (9th Cir. 1994)). The exemption from overtime compensation applies

only where the employee's actual job duties, regularly or from time to time, require

performance of activities that affect directly the safety of vehicles operating in

interstate commerce, regardless of how frequently or infrequently those activities

arise. 29 C.F.R. § 782.2(b)(3). Additionally, an employee is exempt for any week

in which those exempt duties are performed. *Id.*

As with all FLSA exemptions, the employer has the burden of proving that the

motor-carrier exemption applies to a particular employee; and overtime exemptions

are construed narrowly, against the employer. *Corning Glass Works v. Brennen*, 417

U.S. 188, 196 - 97 (1974); *Avery v. City of Talladega*, 24 F.3d 1337, 1340 (11th Cir.

1994). The application of an exemption is "**'limited to those establishments**

**plainly and unmistakably within their terms and spirit.'** " *Aguayo v. Oldenkamp*

*Trucking*, No. CV F 04-6279 ASI LJO, 2005 WL 2436477, * at 7 (E. D. Cal. Oct. 3,

2005) (emphasis added) (citing *Bilyou v. Duchess Beer Distrib., Inc.*, 300 F.3d 217,

222 (2d Cir. 2002)).

Section 16(b) of the FLSA authorizes actions for unpaid overtime

7

compensation against an employer "by any one or more employees for and **on behalf of himself or themselves and other employees similarly situated.**" 29 U.S.C. § 216(b) (emphasis added). Thus, opt-in collective actions are authorized under the statute [3] and the more stringent class action standards, embodied in Federal Rule of Civil Procedure 23, are inapplicable. *LaChapelle v. Owens-Illinois, Inc.,* 513 F.2d 286, 289 (5th Cir. 1975).

To maintain an FLSA collective action, the named plaintiffs "**need only show 'that their positions are similar, not identical,' to the positions held by the putative class members.**" *Grayson v. K-Mart,* 79 F.3d 1086, 1096 (11th Cir. 1996) (citing *Sperling v. Hoffman-LaRoche,* 118 F.R.D. 392, 497 (D. N.J. 1968))

In a collective action under the FLSA, the court utilizes a two-tier process. At the first stage, called the "notice stage," the court makes a determination, based on the pleadings and affidavits on file, of whether notice of the action should be given to potential class members. The standard is fairly lenient: the court must be satisfied that there are other employees who wish to opt-in, and that their positions are similarly situated to that of the original plaintiffs.[4] *Anderson v. Cagle's, Inc.,* 488

---

[3] "No employee shall be a party plaintiff to any action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b)

[4] To show "similarly situated" positions at the notice stage, the named plaintiffs need only establish that they and the putative opt-ins perform the same tasks under the same conditions.

F.3d 945, 952 - 53 (11th Cir. 2007) (citations omitted); *Dybach v. State of Fla. Dept. of Corrections,* 942 F.3d 1562, 1567 -68 (11th Cir.1991). If these two requirements are satisfied, the court <u>conditionally</u> certifies a class. Court-supervised notice of the pendency of the action is then given to the potential class members, and they are afforded an opportunity to "opt-in" the action.

The second stage of the process is activated by the Defendant's filing of a class decertification motion following the completion of discovery. At this stage, the court makes a determination of whether the named plaintiffs and the opt-ins are similarly situated, based on a fully developed record. If they are not found to be similarly situated, the action is decertified, the opt-in plaintiffs are dismissed without prejudice, and the named plaintiffs proceed to trial on their individual overtime claims. *Hipp v. Liberty Nat'l,* 252 F.3d 1208, 1218 (11th Cir. 2001); *Cameron-Grant v. Maxim Healthcare Servs.,* 347 F.3d 1240, 1243 n.2 (11th Cir. 2003).

## IV. Analysis

It is clear that the named Plaintiffs and the putative class members are similarly situated, and that other Averitt employees wish to opt-in to this action. Averitt does not seriously argue otherwise. Rather its position is that the motor carrier exemption applies; and that in any event, individual issues predominate and should preclude

---

*See Anderson.,* 488 F.3d at 952.

9

the certification of this action as a collective action.

At the notice stage of this case, a determination of the applicability of the motor carrier exemption would be premature. Discovery is incomplete. A motion for decertification or summary judgment, after the completion of discovery, is the appropriate time to address that issue. *See Cameron-Grant*, 347 F.3d at 1243 n.2. By way of example, it is far from clear, based on the affidavits in the record, that in each quarter since October 1, 2003, each of the Plaintiffs could reasonably be expected to make one of the carrier's interstate runs. Some of the affidavits would suggest otherwise. Indubitably, on the present record, the court cannot "plainly and unmistakably" determine if the exemption applies to any or all Plaintiffs in this litigation. *See Aguayo*, 2005 WL 2436477, at * 7-8. Rather, at this early stage of the class proceeding, the inquiry is solely whether Plaintiffs have established that they are similarly situated. *See id.* The answer to that inquiry is in the affirmative.

The fact that individualized determinations may be required is not a barrier to certification as a collective action. First, it is less than certain that individualized determinations will be required. Based on the evidence in the record, it may well be that determinations can be made with respect to discrete subgroups. Second, assuming the necessity for individualized determinations, these arguments and evidence are more appropriately presented in a second stage motion for

10

decertification.

### III. Conclusion

Because Plaintiffs have established that they are similarly situated consistent with the requirements of FLSA, Plaintiffs' motion for class certification will be granted by separate order.

U.W. Clemon
United States District Judge

11